## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RASTELLI PARTNERS, LLC, RASTELLI BROTHERS, INC. D/B/A RASTELLI FOODS GROUP, RAYMOND M. RASTELLI, JR. and RAYMOND RASTELLI, III,<br><br>Plaintiffs,<br><br>vs.<br><br>JAMES A. BAKER a/k/a AL BAKER, BRITTANI BAKER and SABRINA BAKER,<br><br>Defendants. | CIVIL NO.<br>**1:23-CV-2864-RBK-AMD**<br><br>**JURY TRIAL DEMANDED** |

## AMENDED VERIFIED COMPLAINT

The Plaintiffs, Rastelli Partners, LLC ("RP"), Rastelli Brothers, Inc. d/b/a Rastelli Foods Group ("RBI"), Raymond M. Rastelli, Jr. ("Ray, Jr.") and Ray Rastelli, III ("Ray, III") (collectively the "Plaintiffs"), by way of Verified Complaint against the Defendants, James A. Baker a/k/a Al Baker ("Al Baker"), Brittani Baker, Sabrina Baker (Al Baker, Sabrina Baker and Brittani Baker collectively referred to as the "Defendants") state and allege as follows:

## PARTIES

1.     The Plaintiff, RP, is a limited liability company formed in the State of New Jersey with its principal place of business at 300 Heron Drive, Swedesboro,

County of Gloucester, New Jersey 08085.  The members of RP are Ray, Jr., Anthony

Rastelli and a trust for the benefit of Ray, Jr. and Anthony Rastelli.  RP, Ray, Jr. and

Anthony Rastelli are citizens of the State of New Jersey.

2.      The Plaintiff, RBI, is a corporation formed in the State of New Jersey

with its principal place of business at 300 Heron Drive, Swedesboro, County of

Gloucester, New Jersey 08085.   RBI's shareholders are Ray, Jr. and Anthony

Rastelli.  Ray, Jr. and Anthony Rastelli are citizens of the State of New Jersey.

3.      The Plaintiff, Ray, Jr. is an individual domiciled, and a citizen of, the

the State of New Jersey and a member and officer of RP and RBI.

4.      The Plaintiff, Ray, III is an individual domiciled, and a citizen of, in the

State of New Jersey and an officer of RP and RBI.

5.      The Defendant, Al Baker, is an individual who, is domiciled in, and a

citizen of, the State of Florida and/or the State of Ohio, with a last known address at

675 S. Gulfview Boulevard, #1004, Clearwater, FL 33767.

6.      The Defendant, Sabrina Baker is an individual who, is domiciled in,

and a citizen of, the State of Florida and/or the State of Ohio, with a last known

address at 675 S. Gulfview Boulevard, #1004, Clearwater, FL 33767 and is Al

Baker's wife.

7.      The Defendant, Brittani Baker is an individual who is domiciled in, and

a citizen of, the State of Florida, State of Ohio or the State of California with a last

known address at 10460 Roosevelt Blvd N, 247, St. Petersburg, FL 33716 and/or

1865 Julia Avenue, Avon, OH 44011 and/or 3033 West Olympic Boulevard, Suite 205, Unit #1110, Los Angeles, CA 90006 and is Al Baker and Sabrina Baker's daughter.

8.     None of the Plaintiffs and Defendants are citizens of the same State.

## JURISDICTION AND VENUE

9.     This Court has original jurisdiction under 28 U.S.C. 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

10.     This Court has personal jurisdiction over the parties because the parties previously agreed to jurisdiction in this Court pursuant to the Settlement Documents as hereinafter defined.

11.     Venue is proper because the company at issue in this case, FOFBakers, LLC, has its principal place of business is in County of Gloucester, New Jersey, and its books and records are maintained at that location.

## THE RASTELLI BRAND

12.     RP, RBI and other related entities is a family-owned business located in Swedesboro, New Jersey which commonly does business as Rastelli Foods Group.

13.     RP and RBI manufacturers, processes and/or distributes beef, seafood and other protein products.

14.     RP and RBI provide food products and services to both private and public entities.

15.     RBI has been in business since approximately 1980.

16.     RP has been in business since approximately 2004.

17.     Ray, Jr. has been a professional in the food processing, distribution and management business for over forty (40) years and is intimately familiar with the food industry business.

18.     Beginning in about 1976, Ray, Jr. operated a small retail store called The Meat Stop.

19.     Since 1976, Ray, Jr. has been instrumental in building a vertically integrated, global food services company, operating under the Rastelli Foods Group umbrella.

20.     Rastelli Foods Group has been at the nucleus of food management since 1976.

21.     Brothers Ray, Jr. and Anthony Rastelli ("Tony") have built a thriving and multi-faceted family of companies with a focus on superior quality, food health and safety.

22.     The tiny, one-room butcher shop where Ray, Jr. got his start was once a beloved doughnut shop in the small town where Ray, Jr. and Tony grew up.  One late night, after playing a music gig, Ray, Jr. arrived to discover it was shuttered. Ray, Jr. noticed that the neighborhood could use a deli and soon re-envisioned the

space as a butcher shop that would supply the deli and locals with quality meat. Within months, the first "Meat Stop" opened its doors.

23.     Ray, Jr. and Tony quickly built a reputation for premium meats, hand-selected for their friends and neighbors.  Over the next fifteen (15) years, the Rastelli brothers expanded to eight (8) shops and rebranded to the family name, Rastelli's. In each shop, they set meticulous standards for superior butchery.  Customers could always count on perfect cuts, with none of the fat and gristle left behind by most grocery stores.

24.     Over the ensuing decades, Rastelli's expanded to become more than just a butcher shop.  Rastelli's designed, built and operated a 200,000-square-foot state-of-the-art manufacturing and processing facility.

25.     Rastelli's developed a premium network of sourcing partners and incorporated seafood into its product portfolio.

26.     Around the globe, Rastelli's has fed the United States military in Europe, Asia and the Middle East.

27.     Rastelli's became pioneers in food safety, international logistics, fulfillment and distribution.

28.     Today, Rastelli Foods Group helps food service, retail and e-commerce clients expand their food product offerings with an extensive menu of gourmet meats, seafood, heat and serve, as well as value-added items.

29.     With every step of growth, Rastelli Foods Group has taken great pains to ensure that it remains the same family business it was when the first Meat Stop opened more than forty-five (45) years ago.

30.     One or more entities under the Rastelli Foods Group umbrella is certified or approved by the United States Department of Agriculture (commonly referred to as the "USDA") and the United States Food and Drug Administration (commonly referred to as the "FDA") and secured FoodChek™ & Safe Quality Foods Institute (commonly referred to as "SQF") Level 3 certification related to sourcing, harvesting, processing and packaging.

31.     The SQF Institute provides audit and inspection standards to protect food from contamination.

32.     Rastelli Foods Group is a nationally recognized leader in food safety; including ozonated water systems and daily in-house pathogen batch tests to ensure overall wholesomeness.

33.     From the American Heartland to the Faroe Islands in the North Atlantic, Rastelli Foods Group travels the world to find what it believes are the best partners for each of its different sourcing needs.

34.     Today, Rastelli Food Group brings over forty-five (45) years of expertise in cutting and packaging to grocers, club stores and other retail outlets.

35.     Rastelli Foods Group prides itself on providing products with high standards that made Rastelli a leading name in quality meats and seafood for chefs around the world.

36.     Rastelli Foods Group is a world-class provider of premium proteins, setting the standard in quality, cleanliness and safety from each of its food processing plants.

37.     Rastelli Foods Group hand-trims, processes, packs and ships much of its products in state-of-the-art SQF Level 3 facilities that allow for increased safety and quality control.

38.     Rastelli Foods Group proudly serves restaurants, pubs, bistros, universities, hospitals and chain restaurants throughout the world.

39.     In 2008, Rastelli Foods Group launched its eCommerce division at the start of the frozen foods home delivery movement.

40.     Today, Rastelli Foods Group is a leader in online food retail with years of advanced experience in this evolutionary market with over 300 products available. Rastelli Foods Group's expertise aids its clients and corporate partners as they get started in one of the fastest-growing industries.

41.     Rastelli Food Group's International division services countries all over the world as an international consolidator of food and beverage products, national and private brands, and restaurant supplies.  Countless custom orders are managed and processed daily through it USDA Certified consolidation and fulfillment center.

Additionally, Rastelli Foods Group is proud to be one of the largest suppliers for government contracts overseas, as well as a premier consolidator for food service and retail outlets around the world.

42.    The Rastelli Foods Group umbrella also operates Rastelli Market Fresh, a retail grocery store with two (2) locations which also offers full-service catering and gourmet gift baskets.  Rastelli Market Fresh has become more than just a grocery store.  It is known as a revitalizing destination - a place for friends, family and foodies alike to gather; a fabric of their communities.

43.    Rastelli Foods Group takes pride in offering the best brands available anywhere.  Its superior selection shows a dedication to producing and sourcing a comprehensive portfolio of premium products from around the world.  Its brands directly reflect its overall commitment to providing efficient and cost-effective and high-quality food services to its clients and consumers. Rastelli Foods Group stands behind its products and brands with a 100% customer satisfaction guarantee.

44.    Rastelli Foods Group is in the top 10 of largest family-owned businesses in the Tristate area, employing over 800 people worldwide.

45.    Since approximately 2016, Ray, Jr. has made regular appearances on QVC to sell various products.

46.    QVC is known as one of the world's largest video commerce platforms. QVC reaches millions of homes in the United States through a variety of mediums such as broadcast channels, streaming, web, mobile and social platforms.  QVC

considers itself as the pioneers of video storytelling and offers vendors the platforms and tools to build relationships with an engaged community of digitally savvy shoppers. QVC has a long history of successfully launching and fostering the growth of some of today's most popular brands via numerous means such as the power of live video storytelling, discovery-driven shopping experiences and loyal customer community-building.

47.    In or about March 2023, Rastelli Foods Group earned the coveted QVC Vendor of the Year & Merchandising Excellence award during QVC's annual Star Awards program which celebrates the innovation, commitment and overall excellence of QVC's vendors and guests. Every year, QVC, considered a world leader in video commerce, which includes video-driven shopping across linear TV, ecommerce sites, digital streaming and social platforms, nominates current vendors and guests that go to great lengths to bring shopping to life and deliver the happiness of discovery through the power of relationships.

48.    Rastelli Foods Group is proud of the work that its family has done with QVC, and hopes to continue its successful relationship for many years to come as what QVC stands for aligns with its own company and family values: hard work, trusted relationships and high quality products.

49.    Over the years, Rastelli Foods Group has also received many other awards and recognitions.

50.    In 2015, Rastelli Foods Group was recognized for Plant of the Year by National Provisioner.

51.    In 2016, Rastelli Foods Group was recognized as Top 100 Companies by Meat + Poultry.

52.    In 2018, Rastelli Foods Group received the Family Business Award by The Inquirer.

53.    In 2018, Rastelli Foods Group was also recognized as Processor of the Year by the National Provisioner.

54.    In 2019, Rastelli Foods Group was recognized for Best Burger by QVC.

55.    In 2019, Rastelli Foods Group was recognized for Best Seafood by QVC (Egg Harbor Seafood).

56.    In 2019, Rastelli Foods Group was recognized for Most Recommended Brand by QVC.

57.    In 2020, Rastelli Foods Group was recognized again by Meat + Poultry as Top 100 Processors.

58.    In 2021, Rastelli Foods Group was recognized for Best Appetizer by QVC.

59.    Also, in 2021, Rastelli Foods Group was recognized for Best Fish by QVC (Egg Harbor Seafood).

60.    In 2021, Rastelli Foods Group was recognized for Best Grilling Food Item by QVC.

61.     Rastelli Foods Group also engages in a variety of charitable endeavors.

62.     Rastelli Foods Group provides food to Logan Township's food bank every month.

63.     Rastelli Market Fresh donates catered meals to cancer patients in Philadelphia hospitals through the Headstrong Foundation, and it donates food to local schools and community organizations.

64.     Personally, Ray, Jr. and Tony also donate to the Deptford, NJ youth sports facilities and programs.

65.     Rastelli Foods Group made a $500,000.00 donation to Deptford High School in New Jersey.

66.     Rastelli Foods Group has made monetary donations to East Greenwich Township School Districts and Friends School of Mullica Hill.

67.     Rastelli Foods Group has made donations to Woolwich & Swedesboro School Districts by providing 500 boxes of food to fill local families' freezers for the winter.

68.     Rastelli Foods Group also donates to Living for Giving through QVC which benefits Feed America.

69.     Most recently, Rastelli Foods Group made a donation of $1,000,000.00 to the Rowan College of South Jersey and that college's business center is named "Rastelli Business & Corporate Center".

70.    In the past, Rastelli Foods Group has donated food to the Broad Street Ministries in Philadelphia, as well as The Food Bank of South Jersey.

71.    Rastelli Foods Group makes hundreds of donations a year to support local communities and worthy causes.

72.    Over the decades, Rastelli Foods Group has invested significant time, effort and other resources to develop its relationships with vendors, customers and those in the supply chain such as its suppliers of food products and transportation providers.

73.    These relationships are based on trust and Rastelli's long-standing credibility in the marketplace which takes years to develop.

74.    Various financial and other data such as, but not limited to, product costs, other expenses, the identity of suppliers and mark-up (collectively, "Confidential Information") is generally not known to anyone outside of Rastelli Foods Group.

75.    There are a limited number of employees who have access to Rastelli Foods Group's Confidential Information.

76.    The employees who have access to Rastelli Foods Group's Confidential Information is limited to a small number of personnel within the organization.

77.    Selection of the limited number of personnel who have access to Rastelli Foods Group's Confidential Information is determined by Ray, Jr. and those who have an ownership interest in the organization.

78.     There are only approximately ten (10) people who have access to Rastelli Foods Group's Confidential Information.

79.     This is only a very small percentage of 1.25% of the 800 employees Rastelli Foods Group uses for its operations.

80.     In addition, measures are taken to safeguard the secrecy of Confidential Information.

81.     Such access to Rastelli Foods Group's Confidential Information is password protected and is only accessible by a small number of employees on a need-to-know basis.

82.     It would be inordinately difficult for anyone outside of Rastelli Foods Group to acquire such information as Rastelli Foods Group is a private organization with protective security and confidentiality measures in place.

83.     Rastelli Foods Group's Confidential Information would be of great value to competitors as access to this information by others would enable them to be privy to, among other things, the identity and requirements of Rastelli Foods Group's suppliers and other vendors and customers, its marketing and business strategy and know-how, its cost structures, its pricing formulas and techniques and its compilation of data.

84.     Any competitor could easily attempt to capitalize monetarily or otherwise from Rastelli Food Group's information and success.

85.    Rastelli Foods Group's Confidential Information could not be duplicated by others and would be very valuable in the hands of others who seek to compete, enter the market or otherwise profit from such information.

86.    Documents related to Rastelli Foods Group's Confidential Information are generally not known, or available, to anyone outside of the organization and its suppliers, vendors and customers with whom it does business.

87.    Rastelli Foods Group's Confidential Information and related documents are essential to its business model and development and it is crucial that same be protected from disclosure for it to fairly compete in the market.

88.    It is very important for Rastelli Foods Group to keep this sensitive business information confidential as there is serious risk associated with disclosure of this information to third parties, including the public and competitors.

89.    Rastelli Foods Group's suppliers, vendors, customers and any brokers are dealt with on a need-to-know basis and are not privy to any information outside of what is absolutely necessary to perform their specific service.

90.    Rastelli Foods Group's Confidential Information took considerable time, effort and expense for it to compile, develop and protect, and is generally not known by others outside of the business.

91.    Ray, Jr. leads the operations of the Rastelli Foods Group and is the driving force for its positive corporate culture and founding values, as it continues

to maintain its foot print, and expand, in food service, production, distribution, retail and e-commerce markets.

92.    Ray, III began working with Rastelli Foods Group at the young age of 15.  A true participant in the family company, Ray, III has held virtually every position and has risen through the ranks, gaining industry knowledge, invaluable experience and building solid client relationships.

93.    Rastelli Foods Group is a family owned and operated world-class provider of meat and seafood products that has developed an outstanding reputation in the industry and a tremendous amount of goodwill which was achieved over decades of hard work and investment of significant resources and based on reliability and high standards in taste, quality, cleanliness, and safety.

## THE RELATIONSHIP BETWEEN PLAINTIFFS AND DEFENDANTS

94.    The claims herein arise out of the operation of FOFBakers, LLC, a Delaware limited liability company formed on or about October 27, 2015 (the "Company").

95.    The Company was organized to develop, market, sell and distribute a specific food product line developed by FOF Bakers Holding Company, LLC ("FOF Bakers Holding") known as Bubba's Q De-Boned Baby Back Rib Steak and Bubba's Q World Famous, and to develop, market, sell and distribute product line extensions that complement Bubba's De-Boned Baby Back Rib Steak, Bubba's Q World Famous and the "Bubba's Q" brand (the "Business").

96.     The Company was formed, and is intended to operate, pursuant to its Limited Liability Company Operating Agreement dated November 11, 2015 (the "Original Operating Agreement").   See copy of Original Operating Agreement attached hereto as Exhibit "A".

97.     Since December 30, 2015, the Company has been registered as a foreign limited liability company in the State of New Jersey and has maintained an agent for service of process at 300 Heron Drive, Swedesboro, County of Gloucester, New Jersey 08085.

98.     The Company operates the Business from its principal place of business at 300 Heron Drive, Swedesboro, County of Gloucester, New Jersey 08085 and its books and records are maintained at that location.

99.     The Members of the Company are FOF Bakers Holding, RP, and DF Ventures, LLC ("DF Ventures"), a New York limited liability company (together, the "Members").

100.    Leading up to the formation of the Company and since its formation in 2015, the Defendants have had regular contact with the Plaintiffs in New Jersey in connection with the Business.

101.    RP and the Company have their principal place of business in New Jersey, Ray, Jr. resides in New Jersey, the Company's food products are developed, marketed, sold and/or distributed from New Jersey and the causes of action herein arose in New Jersey.

## THE PRIOR FEDERAL COURT ACTION

102.   In 2019, a dispute arose between the parties to the Original Operating Agreement.

103.   RP alleged that FOF Bakers Holding and Al Baker engaged in conduct intended to advance their own personal interests over those of the Company and other Members of the Company.

104.   Specifically, RP alleged that FOF Bakers Holding and Al Baker made unsubstantiated monetary demands and unlawfully sought to hold the Company and its other Members hostage by refusing to participate in Member and Manager meetings, refusing to participate in required mediation and arbitration, reneging on their prior approval of the pork supplier and withholding critical decision-making to enable the Company to continue operations by, among other things, timely taking advantage of an international franchise system opportunity and carrying out its plan for operations pursuant to a 2019 operating budget.

105.   At that time, the Defendants were represented by Edward J. Heben, Jr., Esquire ("Heben").

106.   Heben, on behalf of FOF Bakers Holding and Al Baker, threatened claims for "conversion, civil conspiracy, embezzlement, fraud, and civil RICO claims among others and claims for punitive damages". See Heben's January 20, 2019 email to Benjamin. A. Levin, RP's counsel, attached hereto as Exhibit "B".

107.    There was no basis for FOF Bakers Holding and Al Baker's threatened claims.

108.    The threatened claims were an attempt by FOF Bakers Holding and Al Baker to change the terms of the Original Operating Agreement and seek an immediate pay day.

109.    On or about January 29, 2019, RP and Ray, Jr. initiated litigation against FOF Bakers Holding and Al Baker in the matter captioned <u>Rastelli Partners, LLC and Raymond Rastelli, Jr. v. FOFBakers Holding Company, LLC and James A. Baker a/k/a Al Baker, Individually</u>, Superior Court of New Jersey, Chancery Division, Gloucester County, Docket No. C-5-19 and which, on February 8, 2019, was removed by said Defendants to the United States District Court for the District of New Jersey, Camden Vicinage, which bears Docket No. 1:19-cv-05124-NLH-JS (the "Federal Court Action").  See copy of Verified Complaint attached hereto as Exhibit "C".

110.    Realizing that they had no factual or legal basis to refuse to participate in Member and Manager meetings, refuse to participate in required mediation and arbitration, and to withhold critical decision-making to enable the Company to continue operations, FOF Bakers Holding and Al Baker finally consented to cooperate pursuant to a Court Order entered on February 15, 2019 (the "Consent Order").  See Consent Order attached hereto as Exhibit "D".

111.   Pursuant to the Consent Order, FOF Bakers Holding and Al Baker agreed to participate in all duly called meetings of the Members and Managers of the Company, submit to arbitration on the deadlock issues of (i) approval of pricing information for the Company to submit to a major international franchise chain, (ii) enter into an agreement with the major international franchise chain for the testing and sale of products and (iii) the continued use of the Company's sourcing of pork, and participate in expedited mediation with respect to developing and approving a 2019 operating budget.

112.   On February 22, 2019, the parties participated in binding arbitration on the deadlock issues before Retired Judge Francis J. Orlando, Jr. (the "Arbitrator").

113.   The Arbitrator ruled in favor of RP and Ray, Jr. on all issues submitted to him.   See the Arbitrator's Ruling Regarding Results of Arbitration Held on February 22, 2019, attached hereto as Exhibit "E" (pricing and other confidential information redacted).

114.   The parties in the Federal Court Action resolved that lawsuit.

115.   In addition to FOF Bakers Holding and Al Baker, Jabezbaker, Sabrina Baker and Brittani Baker were significantly involved in settlement negotiations, and all were represented by Heben and other lawyers.

116.   The settlement reached in the Federal Court Action was reflected in a Settlement Agreement and Mutual Release ("Settlement Agreement") attached hereto as Exhibit "F", an Amendment to Operating Agreement of FOFBakers, LLC

("Amendment") attached hereto as Exhibit "G", an Addendum to the Amendment to Operating Agreement of FOFBakers, LLC (Addendum") attached hereto as Exhibit "H", all dated September 5, 2019, and a handwritten Supplement attached hereto as Exhibit "I". The Settlement Agreement, Amendment, Addendum and Supplement shall collectively be referred to as the "Settlement Documents").

117.   FOF Bakers Holding, Al Baker, Jabezbaker, Brittani Baker and Sabrina Baker were signatories to the Settlement Agreement and Jabezbaker, Brittani Baker and Sabrina Baker acknowledged and agreed to Sections 3, 4, 5, 9, 10, 11, 12, 13, 14 and 15 therein.

118.   FOF Bakers Holding was a party to the Amendment.

119.   Pursuant to the Addendum, Al Baker, Jabezbaker and Britani Baker agreed to certain terms in the Amendment including, but not limited to, Sections 4, 6, 9, 11, 12, 13 and 14 therein.

120.   FOF Bakers Holding, Al Baker, Jabezbaker, Brittani Baker and Sabrina Baker were signatories to the Supplement.

121.      Section 11.1 of the Original Operating Agreement states as follows:

> **Confidentiality Generally**. ***Each of the Members shall, during the term of this Agreement and at all times thereafter, maintain in confidence all confidential and proprietary information and data of the Company and of the other Members and their Affiliates***, (each, a "disclosing party") ***disclosed to it*** (the "**Confidential Information**"). Each of the Members further agrees that it shall not use the Confidential Information during the term of this Agreement or at any time thereafter for any purpose other than the performance of its obligations or the exercise of its rights under this Agreement. The Company and

each Member shall take all reasonable measures necessary to prevent any unauthorized disclosure of the Confidential Information by any of their employees, agents or consultants.

(Emphasis added).

122.   Section 11.3 of the Original Operating Agreement, relating to Section

11.1 provides as follows:

— **Remedies; Survival of Covenants**. ***Each Member acknowledges and agrees that any breach of the provisions of Section 11.1 of this Agreement is likely to result in irreparable injury to the Company, the other Members and their respective members, shareholders, partners, officers, affiliates, employees, and agents, and that the remedy at law alone will be an inadequate remedy for such breach, and that in addition to any other remedy they may have***, the Company the other Members, or their respective members, shareholders, partners, officers, affiliates, employees and agents ***shall be entitled to specific performance of Section 11.1 of this Agreement by such Member and to seek both temporary and permanent injunctive relief (to the extent permitted by law)*** without bond and without liability should such relief be denied, modified, or vacated. Neither the right to obtain such relief nor the obtaining of such relief shall be exclusive or preclude the Company, the other Members or their respective members, shareholders, partners, officers, employees, and agents from any other remedy.  The provisions of this Section 11.3 shall survive the termination of this Agreement to the extent applicable after the termination hereof.

(Emphasis added).

123.   Section 4 of the Settlement Agreement provides in relevant part as follows:

**Mutual Release**.  In consideration of the promises in this Agreement, ***each Party and*** Rastelli Brothers, Inc., ***Jabezbaker, LLC, Brittani Baker and Sabrina Baker*** on behalf of themselves and all persons or entities claiming by, through or under them

(together, the "Releasors"), ***do hereby release, remise, acquit and forever discharge each other, and all related persons and entities*** including, but not limited to, each of its/his/her respective officers, directors, shareholders, members, employees, directors, trustees, contractors, managers, partners, servants, representatives, attorneys, accountants, agents, consultants, parent companies, subsidiaries, affiliates, successors, heirs and assigns (together, the "Releasees"), ***from any and all actions, causes of action, claims, suits, demands, covenants, debts, obligations, accounts, contracts, agreements, promises, controversies, liabilities, judgments, damages, losses, costs, charges, expenses, fees, attorneys' fees and executions, of every kind and nature whatsoever*** either at law or in equity, contingent or fixed, known or unknown, that the Releasors had, have or claim to have against the Releasees from the beginning of the world to this date including, but not limited to, all claims arising from, connected with, or relating to, the matters which are the subject of the Litigation; …

(Emphasis added).

124.    Section 5 of the Settlement Agreement reads as follows:

> **Restrictions**.    ***Each Party and*** Rastelli Brothers, Inc., ***Jabezbaker, LLC, Brittani Baker and Sabrina Baker forever agree not to solicit, disrupt, interfere with, disparage and/or defame any other Party and such other Party's employees, vendors and customers***, current and/or prospective, and those of any entity any such other Party operates, has control of or has any interest in.    ***Each Party and*** Rastelli Brothers, Inc., ***Jabezbaker, LLC, Brittani Baker and Sabrina Baker forever agree not to make any written or verbal remarks or statements (even in the form of an opinion) about any other Party to anyone including, but not limited to, any such other Party's employees, vendors and customers***, current and/or prospective, and those of any entity any such other Party operates, has control of or has any interest in, ***that are in any way negative, disparaging or false or which could adversely impact the reputation, goodwill, credibility or value of any such other Party or entity or could discourage current and/or prospective customers from buying products from them***.    Except as may be necessary to comply with the rights and obligations under this

Agreement, the Operating Agreement, the Amendment to Operating Agreement of FOFBakers, LLC and the Addendum to the Amendment to Operating Agreement of FOFBakers, LLC, each Party and Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker and Sabrina Baker forever agree not to contact any other Party's employees, current and/or prospective, and those of any entity any such other Party operates, has control of or has any interest in. ***Each Party and*** Rastelli Brothers, Inc., ***Jabezbaker, LLC, Brittani Baker and Sabrina Baker forever agree not to contact any other Party's vendors and customers, current and/or prospective***, and those of any entity any such other Party operates, has control of or has any interest in. ***Each Party and*** Rastelli Brothers, Inc, ***Jabezbaker, LLC, Brittani Baker and Sabrina Baker forever agree not to interfere with any other Party's business relationships, current and/or prospective***, and those of any entity any such other Party operates, has control of or has any interest in.

(Emphasis added).

125.    Section 14 of the Settlement Agreement includes the following:

> **Enforcement**.    The Parties and Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker and Sabrina Baker ***agree that the United States District Court for the District of New Jersey, Camden Vicinage, shall retain jurisdiction to enforce the terms of this Agreement***.

(Emphasis added).

126.    The settlement, via the Amendment, also includes how Jabezbaker was to be compensated.

127.    Pursuant to Section 4 of the Amendment, RBI agreed to pay Jabezbaker four percent (4%) of the Gross Receipts of Product sales on the first $5,000,000 of Gross Receipts of Products sold, and three percent (3%) of Gross Receipts on Product sales over $5,000,000, on a per annum basis (the "Royalty Payments"). The terms Gross Receipts and Products are defined in the Amendment.

128.   RBI made any Royalty Payments each month when due and submitted along with each payment a report form substantially in the form attached to the Amendment (the "Report Form").

129.   Pursuant to the Amendment, FOF Bakers Holding, AL Baker and Jabezbaker were not entitled to receive any money outside of the Royalty Payments, a fee for personal appearances by Al Baker and reimbursable expenses.  Specifically, Section 6 of the Amendment states in relevant part as follows:

> Because no operating revenues are coming into the Company, the RBI Grant, ***the Royalty Payments set forth in this Amendment are in lieu of, and replace in their entirety, any ongoing profits, royalties, license fees, compensation or any other payments or distributions of the Company to its Members, or to any Party to the Addendum*** signed of even date herewith and attached hereto. …

> (Emphasis added).

130.   Therefore, none of the Defendants are entitled to any profits, compensation or other payments or distributions of the Company period.

## THE DEFENDANTS' DISPARAGEMENT CAMPAIGN

131.   Recently, the Defendants in this case have orchestrated a deliberate disparagement campaign against the Plaintiffs which is in violation of their contractual and common law obligations.

132.   The Defendants falsely allege that RP has not complied with its contractual obligations while at the same time completely ignoring their legal obligations.

133. While RP and RBI have complied with their obligations, the Defendants clearly have not.

134. The Defendants have engaged in willful conduct blatantly designed to irreparably harm the Plaintiffs.

135. The Defendants disclosed confidential information to journalists and social media outlets including, but not limited to, the L.A. Times. Such disclosure includes alleged sales figures, spreadsheets and reports with financial information and internal communications about the Company. The article can be found at the following link: An ex-NFL player's nightmare journey through 'Shark Tank' - Los Angeles Times (latimes.com) (latimes.com).

136. The Defendants made and/or posted written remarks or statements that are negative, disparaging, or false on social media including, but not limited to Facebook, Twitter, Instagram and Tik Tok. Some examples of such negative, disparaging, or false remarks include the following:

> (i) "Where is the $$" and "where did the money go." These remarks are intended to give the impression that RP and RBI did not pay money that was allegedly due. That is false. The Defendants fail to mention that they, with the assistance of counsel during the Federal Court Action, negotiated an initial payment of $33,333.33 plus additional minimum payments from RBI of $8,333.33 per month for a period of twelve (12) months totaling at least $133,000.00 and representing Royalty Payments for that period. From September 2019 (when the settlement was reached in the Federal Court Action) to the present, Jabezbaker was paid over $233,000.00 in Royalty Payments accordance with the terms of the Settlement Documents. Likewise, and in addition to the Royalty Payments, the Defendants

fail to mention that Al Baker negotiated, again with the assistance of counsel, having RBI pay Al Baker for personal appearances plus reasonable expenses. RBI complied with its obligations in this regard. See Settlement Documents.

(ii) Alleging that the Defendants are not provided information about the Company or requests for information are ignored. The Defendants are provided with reports that support any money that may be due and other documents and information about the operation of the Company and its efforts to source and sell the product.

(iii) "Daymond John & Rastelli Foods ARE trying to steal my families [sic] business." That is false. The parties' relationship is governed by certain written agreements including those identified above. To the extent the Defendants are referring to the Company's right to have the patents transferred to it after certain Product sales are reached and the Royalty Payments have been made, that is something that they knowingly agreed to while they were represented by counsel. Their attempt to once again rewrite the Original Operating Agreement and Settlement Documents is bad faith. The Plaintiffs are not attempting to steal any business.

(iv) "Over $700,000 of underreported income" which was part of the Federal Court Action. There was no underreporting. In addition, any alleged claims the Defendants believe they had on this issue were released as part of the settlement that was reached in 2019.

(v) That Rastelli is attempting to push the Defendants out of this business. That is false.

(vi) Contacting and/or hashing RP and RBI's customers and vendors and interfering with their business relationships including, but not limited to, QVC, Hungry Root and Sunbasket. These customers and vendors have seen the negative posts, contacted Rastelli Foods Group, complained about the negative posts and warned Rastelli Foods Group that if such posts are not removed and/or other negative comments are made by the Defendants, they will curtail and/or cease their business with Rastelli Foods Group.

(vii) On a post on Bubba's Q Food Trucks page controlled by Brittani Baker and/or Al Baker, they commented and claimed that that

Rastelli Foods Group has multiple sets of books meaning that Rastelli Foods Group is "cooking the books". That is false.

137.   Here is a link with certain of the Defendants' posts and videos.

https://www.dropbox.com/scl/fo/6jhipcp6aetle5jzqb402/h?dl=0&rlkey=8ok27bgnu ncwsyd3bb8uxnb5h

138.   These posts, remarks and statements are in clear violation of the confidentiality and non-disparagement clauses set forth above.

139.   The Defendants' posts also include excerpts of written communications from the Plaintiffs that disclose Confidential Information and/or are taken out of context. In addition, these communications from RP, RBI, Ray, Jr. and/or Ray, III all predate the settlement of the Federal Court Action and any related potential claims the Defendants believe they may have based on such communications were resolved and released pursuant to the Settlement Agreement.

140.   When the Defendants became aware that certain posts were under review by the social media platform(s), the Defendants resorted to soliciting and recruiting third parties to re-post, re-tweet and share the negative, disparaging or false remarks and statements. For example, the Defendants' solicitation and recruitment in this regard includes such statements as "Can y'all please share this as much as you can EVERYWHERE!?" See post attached hereto as Exhibit "J".

141.   The responses from these third parties clearly show that they are accepting the negative, disparaging or false remarks and statements regardless of the truth.

142.   Brittani Baker created an Instagram post tagging Ray, Jr.'s personal Instagram page and hash tagging his name and announced the Defendants are doing a show on the NFL Alumni Network to discuss "John and Rastelli Food of corporate injustices" and using the well-recognized NFL trademark logo to promote same.

143.   Al Baker has done the same on his Facebook page and likewise is using the well-recognized NFL trademark logo and music in connection with the ongoing disparagement of the Plaintiffs.

144.   Furthermore, the lack of credibility of the posts, remarks and statements is obvious as the Defendants' disparagement campaign is directly contrary to the website used to promote the product and their admissions.

145.   The product website https://www.bubbasbonelessribs.com/ references "As seen on Shark Tank" and "As Seen on ABC's hit shows Shark Tank & Beyond the Tank!"

146.   In the contact section, the product website identifies a phone number (877-686-3276) and fax number (856-241-1916) for "Customer Support", both of which belong to RP and/or RBI.  See website excerpt attached hereto as Exhibit "K".

147.   The product website posts an article written on January 12, 2021 (after the settlement of the Federal Court Action and not too long ago) wherein Al Baker admits as follows:  "Daymond John is a great partner.  He reached out to me on the show, and he's been true to form ever since.  He's never too busy and always willing

to help." See website excerpt, answer to question #4, attached hereto as Exhibit "L".

148.   The Defendants boast on the product website how they are a "Proud Partner of the 5&2 Program by Rastelli Cares," and the product website explains that the Rastelli Cares Charitable Foundation is committed to reduce hunger in our communities by decreasing food waste and feeding our homeless and families in need.

149.   Just a few months ago, on February 15, 2023, an article was written which is posted on the product website, which praises the Defendants' success via, and happiness with, Shark Tank and concludes with the following: "The football star and entrepreneur stated that his lifelong success was 'proof that if you live your life with integrity, you work hard – good things happen to you.'" See website excerpt attached hereto as Exhibit "M".

150.   The Defendants' conduct is absolutely intended to publish negative, disparaging or false remarks and statements which could, and do, adversely impact the reputation, goodwill, credibility and value of the Plaintiffs and the Company and is designed to discourage current and/or prospective customers and vendors from doing business with the Plaintiffs and to sabotage the Company.

151.   The Plaintiffs have worked very hard for decades to build an honest reputation and are well-respected in the industry.

152.  No matter what the Defendants may believe, that gives them no right to engage in their unlawful conduct.

153.  Such conduct gives rise to various claims against the Defendants as set forth herein and is causing irreparable harm to the Plaintiffs.

154.  Counsel for RP, RBI, Ray, Jr. and Ray, III sent a cease and desist letter to the Defendants on May 23, 2023.  See cease and desist letter attached hereto as Exhibit "N".  Rather than cease their conduct, the Defendants failed to comply and doubled-down by continuing to post negative comments and included a piece of correspondence from Ray, III from **2016**, about three (3) years **prior to** the Federal Court Action and **prior to** the release of any and all potential claims they believed they had.  See, for example, post attached hereto as Exhibit "O".

155.  The Defendants with the money in hand received pursuant to the Settlement Documents seek to continue to trade on the goodwill and resources of the Plaintiffs while at the same time violate their contractual and common law obligations to the Plaintiffs.

156.  The Defendants' conduct constitutes willful misconduct and caused the Plaintiffs and the Company to suffer irreparable harm, damage to their reputation, loss of goodwill, damage to their credibility and monetary damages.

157.  This is not the first time the Defendants attempted to sabotage the Company and defame the Plaintiffs.

158.    Prior to the Settlement Agreement in 2019, the Defendants engaged in a similar pattern of misconduct by among other things, posted negative comments such as when Brittani Baker posted "[p]lease don't promote this right now".

159.    The post then referred or was directed to the Defendants' "Bubba's-Q" brand and has two rolling eyes at a post by Daymond John.

160.    Brittani Baker's post was clearly made to influence consumers not to buy the Company's product and further sabotage the Company and the Plaintiffs and their promotional efforts.

161.    Furthermore, on or about the weekend of May 25, 2019, Brittani Baker secretly accessed the Company's database and downloaded customer data/lists without approval or authority by the Plaintiffs or the Company and without notifying them.

162.    As a result, RP and Ray, Jr. filed a motion for leave to file an Amended Complaint in the Federal Court Action and placed the Defendants on notice of the alleged claims against them.

163.    While the motion was pending, the Federal Court Action was resolved and the motion became moot.

164.    This pattern of misconduct demonstrates a willfulness by the Defendants to harm the Plaintiffs for the purpose of seeking to rewrite the agreements between the parties.

165.   Pursuant to Section 6 of the Supplement, the prevailing party in any litigation in connection with the Original Operating Agreements or the Settlement Documents is entitled to reasonable attorney's fees and costs from the non-prevailing party.

## FIRST COUNT – BREACH OF FIDUCIARY DUTIES
### (Al Baker)

166.   The Plaintiffs incorporate all of the above allegations as if fully set forth at length.

167.   Member of the Company, FOF Bakers Holding, and Al Baker, who controls, at least in part, FOF Bakers Holding, owe a fiduciary duty to the Company and the Members.

168.   Such duty includes, but is not limited to, the duty of trust, duty of confidence, duty of loyalty, duty of care and the duty of good faith and fair dealing.

169.   Sadi Defendants' conduct constitutes a clear breach of the fiduciary duty owed to the Company and the other Members.

170.   Said conduct has prevented Ray, Jr. from effectively performing his functions as a Manager and from adequately operating the Company.

171.   Said conduct has reduced the value of the Company and RP's interest in the Company.

172.   Such conduct has, and continues to, irreparably harm the Plaintiffs and the Company.

173.   Such conduct also proximately caused damages to the Plaintiffs and the Company including, but not limited to, irreparable harm and damages to their reputation, profits, business, goodwill, credibility and value.

## SECOND COUNT – BREACH OF ORIGINAL OPERATING AGREEMENT
### (Al Baker)

174.   The Plaintiffs incorporate all of the above allegations as if fully set forth at length.

175.   FOF Bakers Holding is a Member of the Company.

176.   Baker and FOF Bakers Holding are bound by the Original Operating Agreement.

177.   As set forth in this Verified Complaint, Al Baker and FOFBakers Holding's conduct constitutes breach of the Original Operating Agreement.

178.   As a result of such breach, the Plaintiffs and the Company have suffered, and continue to suffer, irreparable harm and damages to their reputation, profits, business, goodwill, credibility and value.

## THIRD COUNT – BREACH OF SETTLEMENT DOCUMENTS
### (Al Baker, Brittani Baker and Sabrina Baker)

179.   The Plaintiffs incorporate all of the above allegations as if fully set forth at length.

180.   As set forth in this Verified Compliant, said Defendants are bound by the Settlement Documents.

181.   As set forth in this Verified Complaint, said Defendants' conduct constitutes breach of the Settlement Documents.

182.   As a result of such breach, the Plaintiffs and the Company have suffered, and continue to suffer, irreparable harm and damages to their reputation, profits, business, goodwill, credibility and value.

## FOURTH COUNT – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Al Baker, Brittani Baker and Sabrina Baker)

183.   The Plaintiffs incorporate all of the above allegations as if fully set forth at length.

184.   Implied in the Original Operating Agreement and the Settlement Documents is the covenant of good faith and fair dealing.

185.   Said Defendants' actions constitute a breach of the implied covenant of good faith and fair dealing.

186.   As a result of said breach, the Plaintiffs and the Company have suffered, and continue to suffer, irreparable harm and damages to their reputation, profits, business, goodwill, credibility and value.

## FIFTH COUNT – TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS
### (All Defendants)

187.   The Plaintiffs incorporate all of the above allegations as if fully set forth at length.

188.   The Plaintiffs and the Company use social media and numerous followers to market the Company's Business and promote the Rastelli's brand to existing and potential customers.

189.   By, among other things, subverting the Plaintiffs and the Company's marketing efforts, and engaging in the actions set forth in this Verified Compliant, the Defendants have intentionally interfered with the Plaintiffs' and Company's pursuit of prospective economic or contractual business relationships and ability to attract and pursue customers and there is a reasonable probability that the interference caused the loss of the prospective gain.

190.   By, among other things, subverting the Plaintiffs and the Company's marketing efforts, and engaging in the actions set forth in this Verified Compliant, the Defendants have intentionally interfered with potential customers who, by virtue of "following" persons/entities on various social media platforms, are inherently interested in the Plaintiffs' and Company's products and, therefore, are reasonably likely to enter into business with them.

191.   The Defendants' actions proximately caused third parties to not enter into or continue their prospective relations with the Plaintiffs and the Company.

192.   The Defendants' actions prevented the Plaintiffs and the Company from acquiring prospective relations with customers.

193.   As a result of the Defendants' intentional actions, the Plaintiffs and the Company have suffered, and continue to suffer, irreparable harm and damages to their reputation, profits, business, goodwill, credibility and value.

## SIXTH COUNT – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Al Baker, Brittani Baker and Sabrina Baker)

194.   The Plaintiffs incorporate all of the above allegations as if fully set forth at length.

195.   The Original Operating Agreement is a valid contract governing the Business.

196.   Al Baker, Brittani Baker and Sabrina Baker were, and are, aware of the Original Operating Agreement and its purpose since the Company's inception or prior to said Defendants' conduct as set forth in this Verified Compliant.

197.   Said Defendants intentionally interfered with, among other things, the Plaintiffs and the Company's marketing efforts.

198.   By doing so, said Defendants intentionally interfered with the Original Operating Agreement.

199.   Said Defendants have no justification for their actions.

200.   The Plaintiffs and the Company have been injured by said Defendants' actions through lost sales or profits they would have otherwise made.

201.   As a result of said Defendants' intentional actions, the Plaintiffs and the Company have suffered, and continue to suffer, irreparable harm and damages to their reputation, profits, business, goodwill, credibility and value.

## SEVENTH COUNT – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (All Defendants)

202.   The Plaintiffs incorporate all of the above allegations as if fully set forth at length.

203.   The Plaintiffs have contractual relationships with various vendors, customers and others.

204.   The Defendants were, and are, aware of these relationships prior to the Defendants' conduct as set forth in this Verified Compliant.

205.   The Defendants intentionally interfered with these relationships.

206.   By doing so, the Defendants caused existing vendors, customers and others of the Plaintiffs to no longer purchase the Plaintiffs' products or to curtail purchases or serious risk of such vendors, customers and others doing so.

207.   The Defendants have no justification for their actions.

208.   The Plaintiffs have been injured by the Defendants' actions through lost sales or profits they would have otherwise made.

209.   As a result of said Defendants' intentional actions, the Plaintiffs have suffered, and continue to suffer, irreparable harm and damages to their reputation, profits, business, goodwill, credibility and value.

## EIGHTH COUNT – INJURIOUS FALSEHOOD
### (All Defendants)

210.  The Plaintiffs incorporate all of the above allegations as if fully set forth at length.

211.  The Defendants have made or caused to be made numerous reckless remarks and statements, through various social media posts and/or otherwise, regarding the Plaintiffs and the Company.

212.  The Defendants intended these remarks and statements (particularly those directed at the Plaintiffs) to be publicized to other persons.

213.  The Defendants intended for these statements to result in harm to the Plaintiffs and Company's business interests in general.

214.  The Defendants intended for these statements to result in harm to the Plaintiffs' business relationships.

215.  The Defendants knew or should have known that the remarks and statements made were false.

216.  In making these remarks and statements, the Defendants acted in reckless disregard for the truth.

217.  The Defendants' remarks and statements were intended to be harmful to the pecuniary interests of the Plaintiffs and the Company.

218.  The Defendants made these statements with a reckless, conscious disregard for their effect on the Plaintiffs and the Company.

219.  The Defendants had no justification for their actions.

220.   As a result of the Defendants' intentional actions, the Plaintiffs and the Company have suffered, and continue to suffer, irreparable harm and damages to their reputation, profits, business, goodwill, credibility and value.

### NINETH COUNT – DEFAMATION
### (All Defendants)

221.   The Plaintiffs incorporate all of the above allegations as if fully set forth at length.

222.   The Defendants' communications were, and are, defamatory.

223.   The Defendants' communications were published to other persons.

224.   The Defendants' communications referred directly to the Plaintiffs and the Company.

225.   The recipients of the communications, understood the communications to be of a defamatory character.

226.   The Plaintiffs and the Company have been injured.

227.   As a result of the Defendants' actions, the Plaintiffs and the Company have suffered, and continue to suffer, irreparable harm and damages to their reputation, profits, business, goodwill, credibility and value.

WHEREFORE, the Plaintiffs request that a Temporary Restraining Order and injunction issue, preliminarily and until final hearing, and permanently thereafter, and judgment be entered which provide for the following:

  a. Prohibiting the Defendants from, directly or indirectly, publishing any negative, disparaging or false remarks and statements in any medium (including, but not limited to, Facebook, Twitter, Instagram, Tik Tok and the like) about the Plaintiffs and any of their affiliates.

b. Prohibiting the Defendants from all future (and planned social media posts) related to the Plaintiffs and their affiliates.  Take down all social media entries, including posts, videos, and comments, related to Rastelli and any of their affiliates.

c. Prohibiting the Defendants from, directly or indirectly, participating in any interviews with media outlets related to the Plaintiffs and any of their affiliates.

d. Prohibiting the Defendants from, directly or indirectly, reposting and retweeting related to the L.A. Times story, and the Plaintiffs and any of their affiliates.

e. Compelling the Defendants to delete any and all reposts and retweets they generated from the L.A. Times story.

f. Compelling the Defendants, their family, their representatives and any other agents acting on their behalf to retain and preserve all evidence related to the foregoing matters including, but not limited to, all documents and communications (e.g. notes, memoranda, text messages, telephone records, facsimiles, posts, videos and email correspondence) kept in any form (hard copy, electronic, etc.).

g. Judgment for all damages including, but not limited to, incidental, compensatory, consequential and punitive damages.

h. Judgment for costs of suit.

i. Judgment for attorney's fees.

j. Judgment for interest.

k. Such other relief as the Court deems just, equitable and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand trial by jury as to all claims triable to a jury.

**HYLAND LEVIN SHAPIRO LLP**

Date:  May 30, 2023

David R. Dahan, Esq.
NJ Attorney ID #027391997
6000 Sagemore Drive, Suite 6301
Marlton, NJ  08053-3900
P: 856.355.2991 | F: 856.355.2901
*Attorneys for Plaintiffs, Rastelli*
*Partners, LLC, Rastelli Brothers, Inc.*
*d/b/a Rastelli Foods Group, Raymond*
*M. Rastelli, Jr. and Ray Rastelli, III*

## VERIFICATION

1.      I, Raymond M. Rastelli, Jr., as President of Rastelli Partners, LLC and Rastelli

Brothers, Inc. and individually, Plaintiffs herein, do hereby verify that the foregoing allegations

of fact are true and correct to the best of my information, knowledge and belief based upon my

review of available documents.

2.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of

the United States of America that the foregoing is true and correct.

Dated:  5-30-23

Raymond M. Rastelli, Jr., President of
Rastelli Partners, LLC and Rastelli Brothers,
Inc., and Individually

## VERIFICATION

1.    I, Ray Rastelli, III, a Plaintiff herein, do hereby verify that the foregoing allegations of fact are true and correct to the best of my information, knowledge and belief based upon my review of available documents.

2.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:   5-30-23

Ray Rastelli, III

# EXHIBIT A

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

## OF

## FOFBAKERS, LLC

### (a Delaware limited liability company)

This **LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF FOFBAKERS, LLC** (the "**Company**") is entered into as of the <u>11th</u> day of <u>November</u>, 2015 by **FOFBakers Holding Company, LLC**, an Ohio limited liability company ("**Baker**"), **Rastelli Partners, LLC**, a Delaware limited liability company ("**RP**"), and **DF Ventures, LLC**, a New York limited liability company ("**Daymond**"), as the members of the Company (sometimes individually referred to as a "**Member**" and collectively as the "**Members**").

### RECITALS:

**WHEREAS**, the Company was formed under the Delaware Limited Liability Company Act, as amended from time to time (the "**Act**") pursuant to the filing of its Certificate of Formation ("**Certificate**") with the Secretary of State of the State of Delaware on October 27, 2015; and

**WHEREAS**, the Company was organized to develop, market, sell, and distribute a specific food product line developed by Baker, known as Bubba's Q De-Boned Baby Back Rib Steak and Bubba's Q World Famous, and to develop, market, sell, and distribute product line extensions that compliment Bubba's De-Boned Baby Back Rib Steak, Bubba's Q World Famous and the "Bubba's Q" brand (the "**Business**"); and

**WHEREAS**, the Members now wish to memorialize and to establish the terms and conditions relating to their relationship and to the governance of the Company.

**NOW, THEREFORE**, the undersigned Members, in consideration of the mutual covenants and conditions herein contained and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, agree as follows:

## ARTICLE 1
## FORMATION, PURPOSE AND DEFINITIONS

1.1.   <u>Definitions.</u>  As used in this Agreement, capitalized terms (other than those specifically defined in this Agreement) shall have the following meanings:

"**Affiliate**" of any Person means (i) any other Person which, directly or indirectly, is in Control of, is Controlled by or is under common Control with, such Person; (ii) any other Person who is a director or officer of (A) such Person, (B) any subsidiary of such Person, or (C)

any Person described in clause (i) above; or (iii) any corporation, limited liability company or partnership which has as a director any Person described in subsection (ii) above.

"**Agreement**" shall mean this Limited Liability Company Operating Agreement, as amended.

"**Business Expenses**" shall mean all cash expenditures of the Company, including, without limitation, (i) taxes (whether federal, state or local) withheld or required to be withheld from sales or salaries including contributions for social security payments, (ii) payment on loans, indebtedness, and other liabilities, (iii) expenses for compensation to employees, accountants, attorneys, consultants, and others, (iv) marketing and advertising expenses, (v) travel, meal, and entertainment expenses, (vi) rents, royalties, and fees, including, but not limited to, those fees payable in accordance with Article 6, (vii) production costs, including, but not limited to, cost of goods sold, product development costs, and inventory management costs, (viii) costs associated with customer service and order processing, and (ix) any and all cash expenditures contemplated in the Operating Budget (as defined in Section 4.4 and approved by the Members in accordance with Section 4.3).

"**Capital**" shall mean the sum of all funds and other property contributed to the Company by the Members as provided herein.

"**Capital Account**" shall mean the book capital account established and maintained for each Member.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Company**" shall mean FOFBAKERS, LLC.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person whether through ownership of voting securities, beneficial interests, by contract or otherwise. The definition is to be construed to apply equally to variations of the word "Control," including "Controlled," "Controlling" or "Controlled by."

"**Disability**" means a mental or physical condition that renders any Manager unable to carry out his or her responsibilities as a Manager of the Company, as applicable, held by such Manager at the time the condition was incurred for a period of nine (9) consecutive months or 270 days in any consecutive 365-day period.

"**Disabled**" means a Manager that is unable to carry out his, her, or its responsibilities as a Manager of the Company, as applicable, as a result of his or her Disability.

"**Distributable Cash**" shall mean, for any Fiscal Year (as defined herein) or any portion thereof, the total annual cash gross receipts of the Company from all sources plus any reduction in cash reserves of the Company for such period minus (a) Business Expenses (as

defined herein), and (b) all reserves of the Company as determined by the Managers and/or Members, as applicable, for such period.

"**Equity Interest**" of a Member shall mean such Member's proportionate Interest in the Capital and Profits and Losses of the Company, expressed as a percentage as shown on Exhibit A.

"**Gross Asset Value**" means, with respect to any asset, its adjusted basis for federal income tax purposes, except as follows:

(a) The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of the asset, as determined by the contributing Member and the Company.

(b) The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Tax Matters Partner (as such term is defined in Section 7.4 below), as of the following times:

(i) The acquisition of an additional Equity Interest in the Company by any new or existing Member in exchange for more than a de minimis contribution of money or other property;

(ii) The distribution by the Company to a Member of more than a de minimis amount of money or other property as consideration for an Equity Interest in the Company;

(iii) The liquidation of the Company for federal income tax purposes within the meaning of Regulation § 1.704-1(b)(2)(ii)(g);

Except that the adjustments pursuant to Paragraphs (i) and (ii) immediately above shall be made only if the Member reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company.

(c) The Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution.

(d) The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of those assets pursuant to Code § 734(b) or Code § 743(b), but only to the extent that the adjustments are taken into account in determining Capital Accounts pursuant to Regulation § 1.704-1(b)(2)(iv)(m), except that Gross Asset Values shall not be adjusted pursuant to this Paragraph (d) to the extent the Tax Matters Partner determines that an adjustment pursuant to Paragraph (b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Paragraph (d).

(e)     If the Gross Asset Value of an asset has been determined pursuant to Paragraph (a), (b), or (d), that Gross Asset Value shall thereafter be adjusted by the depreciation (as defined by the Code) taken into account with respect to that asset for purposes of computing Profits and Losses (as such term is defined below).

"**Gross Receipts**" shall mean and include the aggregate amount received from all sales of products of every kind or nature sold from, at or in connection with the operation of the Business, whether for cash or credit, but excluding: (i) federal, state or municipal taxes or services taxes collected from customers and paid to the appropriate taxing authority, (ii) refunds, (iii) voided customer purchases, and (iv) sales taxes collected in connection with the operation of the Business.

"**Immediate Family Member**" means a Person's spouse, parent, child (including stepchild), grandchild (including step-grandchild) or sibling.

"**Interest in the Company**" shall mean the respective Voting Interest and Equity Interest in the Company owned by each Member, which ownership relationship between Members is expressed as such Member's Equity Interest and corresponding Voting Interest as set forth on Exhibit A attached hereto.

"**Majority**" means the Member or Members whose Voting Interests represent more than eighty five percent (85%) of the Voting Interests held by all of the Members in the Company.

"**Managers**" shall mean the natural person appointed by RP to serve as a Manager of the Company and the natural person appointed by Baker to serve as a Manager of the Company.

"**Members**" shall mean, unless the context indicates otherwise, the current Members as of the date of this Agreement as set forth on Exhibit A and all other Persons subsequently admitted as Members in accordance with the terms of this Agreement.

"**Person**" shall mean any individual, corporation, partnership, limited liability company, trust or other entity incorporated, organized or otherwise properly formed under the laws of the jurisdiction governing such entity.

"**Proceeding**" shall mean, with respect to any Member: (a) any judgment is obtained in any legal or equitable proceeding against the Member, which has become final and non-appealable, and the sale or attachment of any of the Member's Interests in the Company is contemplated or threatened under legal process as a result of such judgment, (b) any execution is issued on a judgment against the Member, (c) any of the Member's Interests in the Company become the subject of legal attachment, (d) there is instituted by or against the Member any other form of legal proceeding or process by which the sale or transfer of any of the Member's Interests in the Company is contemplated within the next sixty (60) days), (e) the Member makes an assignment for the benefit of creditors, (f) the Member admits its inability to pay its debts as they mature, or commences a voluntary case or proceeding under any Bankruptcy Law (defined

as Title 11 of the U.S. Code or any similar federal or state law for the relief of debtors), or consents to the entry of an order for relief against such Member in an involuntary case or proceeding under any Bankruptcy Law, or consents to the appointment of a receiver, trustee, liquidator or similar official for such Member or for all or substantially all of such Member's property, or (g) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law for relief against the Member in an involuntary case or proceeding and the order or decree remains unstayed and in effect for sixty (60) days.

"**Profits and Losses.**" For each taxable year or other period, an amount equal to the Company's taxable income or loss for that year or period, determined in accordance with Code § 703(a) (for these purposes, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code § 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to the foregoing shall be added to such taxable income or loss.

(b) Any expenditures of the Company described in Code Section 705(a)(2)(B) or that are treated as Code § 705(a)(2)(B) expenditures pursuant to Regulation § 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits and Losses pursuant to the foregoing shall be subtracted from such taxable income or loss.

(c) In the event the Gross Asset Value of any Company asset is adjusted pursuant to Paragraph (b), (c), or (d) of the definition of Gross Asset Value, the amount of the adjustment shall be taken into account as gain or loss from the disposition of the asset for purposes of computing Profits and Losses.

(d) Gain or loss resulting from any disposition of Company assets with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of the property differs from its Gross Asset Value.

(e) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account depreciation for the taxable year or other period.

Notwithstanding the above, any items that are specially allocated to certain Members shall not be taken into account in computing Profits and Losses.

"**Regulations**" shall mean the regulations promulgated from time to time by the U.S. Treasury Department under the Code.

"**Transfer**" shall mean any and all types of dispositions and transfers of an Interest in the Company including, but not limited to, any sale, conveyance, assignment, disposition, distribution, encumbrance, pledge, mortgage, hypothecation or gift.

"**Voting Interest**" shall mean a Member's interest in the right to vote upon Company matters pursuant to the terms of this Agreement, expressed as a percentage as shown on Exhibit A.

 1.2. **Establishment of Limited Liability Company**.  The Members hereby agree to establish and organize a limited liability company pursuant to the provisions of the Act, upon the terms set forth in this Agreement.  The Members are hereby admitted to membership in the Company and, until this Agreement is amended appropriately to contemplate the admission of additional members and their right to participate in the conduct of the Business, the Members shall be the only members of the Company.

 1.3. **Name**.  The name of the Company is "FOFBAKERS, LLC".  The Company may conduct its activities under that name and any other permissible name designated by the Members.  The Managers (as defined herein) shall be responsible for complying with any registration requirements if an alternate name is used.

 1.4. **Principal Place of Business of the Company**.  The principal place of business of the Company shall be located at 300 Heron Drive, Swedesboro, NJ 08085 or at such other or additional locations as the Members may determine.  The registered agent for the service of process and registered office for the service of process of the Company shall be the location set forth in the Company's Certificate of Formation.  The Managers may, from time to time, change such registered office, by appropriate filings as required by law.

 1.5. **Purpose**.  The purpose of the Company is (i) to develop, market, sell, and distribute a specific food product line developed by Baker, known as Bubba's Q De-Boned Baby Back Rib Steak, (ii) to develop, market, sell, and distribute product line extensions that compliment Bubba's De-Boned Baby Back Rib Steak and the "Bubba's Q" brand, and (iii) to engage in any lawful act or activity and to exercise any powers permitted to limited liability companies organized under the Act that are related or incidental to and necessary, convenient or advisable for the accomplishment of items (i) and (ii) above.

 1.6. **Duration**.  Unless the Company shall be earlier terminated in accordance with the provisions of this Agreement, it shall have perpetual existence.

 1.7. **Other Activities of Member**.  The Members may engage in or possess an interest in other business ventures of any nature, whether or not similar to or competitive with the activities of the Company.

## ARTICLE 2
## MEMBERS AND THEIR INTERESTS

2.1.   <u>Members.</u>  The Members each shall have an Interest in the Company, which shall be expressed as the Member's Equity Interest and corresponding Voting Interest as set forth on <u>Exhibit A</u> hereto.  A schedule of current Members shall be kept at the principal office of the Company.

2.2.   <u>Capital Contributions.</u>  Each Member separately has made or has agreed to make a contribution of Capital to the Company in intangibles, cash, and/or property in the amount set forth opposite such Member's name on the attached <u>Exhibit B</u> and which value is proportionate to such Member's Equity Interest in the Company ("**Capital Contribution**").  No Member shall be obligated to make any additional capital contributions to the Company.

2.3.   <u>Admission of Additional Members.</u>   Additional Members may be admitted to the Company only upon the written consent of all of the Members.  The Equity Interest(s) in the Company of the most recently admitted Member(s) shall be as specified at the time such new Member(s) shall be admitted, and, correspondingly, the Equity Interest in the Company of each of the then current Members shall be reduced pro rata in proportion to such Member's Equity Interest immediately prior to such admission.  The Voting Interest of the most recently admitted Member(s) shall be specified at the time such new Member(s) shall be admitted, and, correspondingly, the Voting Interests of all of the Members shall be updated accordingly.  The foregoing shall not apply to any substituted Member who is the transferee of an Equity Interest in the Company from another Member hereunder, including, without limitation, a substituted Member who acquires an Interest in the Company in accordance with Article 8.

2.4.   <u>Limitation of Liability; Other Activities of Members.</u>   Except as otherwise expressly and specifically provided for in this Agreement, no Member shall have authority, nor shall it undertake, to bind, to act for or to assume any obligation or responsibility on behalf of any of the other Members or the Company.  No Member shall be responsible or liable for any indebtedness or obligation of the other Members incurred or arising either before or after the execution of this Agreement.  It is expressly agreed by the Members that each Member is at all times hereunder acting and performing as an independent individual or entity other than in its capacity as a Member of the Company, and that no act of commission or omission of any Member shall be construed to make or render any other Member its principal, agent, partner or employee liable for such act, except to the extent specifically provided herein.  No Member may in any manner encumber, pledge, transfer, assign or otherwise convey any interest in the Company in contravention of any provision of this Agreement.  The Members and/or their Affiliates may engage in or possess an interest in other business ventures of any nature, whether or not similar to or competitive with the activities of the Company, for their respective accounts and not for the account of the Company or the other Members.  Neither the Company nor any Member shall have any right by virtue of this Agreement nor the relationship created hereby in or to such other ventures or activities, or to the income or proceeds derived therefrom; and the pursuit of such ventures, even if competitive with the Business, shall not be

deemed wrongful or improper. No Member shall have any liability or obligation for any debts, liabilities or obligations of the Company, nor of any agent or employee of the Company, beyond each such Member's respective Capital Contributions.

**2.5.** **Loans.** If a Member makes any loans to the Company, or advances money on its behalf, the amount of any such loan or advance shall not be deemed an increase in, or contribution to, the Capital Contribution of the Member and shall not affect such Member's Equity Interest in the Company or its Voting Interest. Interest shall accrue on any such loan at an annual rate agreed to by the Managers and the Member making such loan (but not in excess of the maximum rate allowable under applicable usury laws).

### ARTICLE 3
### CAPITAL ACCOUNTS, DISTRIBUTIONS, AND ALLOCATIONS

**3.1.** **Capital Accounts.**

(a)     Establishment and Maintenance. A single Capital Account shall be established and maintained for each Member in accordance with the allocation and Capital Account maintenance provisions of the Regulations under Section 704 of the Code, which are hereby incorporated by reference, including, without limitation, a "qualified income offset" within the meaning of Regulation § 1.704-1(b)(2)(ii)(d), the rules regarding allocation of "partner nonrecourse deductions" under Regulation § 1.704-2(i)(1), "minimum gain chargeback" under Regulation § 1.704-2(f) and "partner nonrecourse debt minimum gain chargeback" under Regulation § 1.704-2(i)(4), and the limitation on allocation of losses to any Member that would cause a deficit capital account in excess of such Member's capital contribution obligations and share of minimum gain and partner nonrecourse debt minimum gain under Regulation § 1.704-1(b)(2)(ii)(d) as modified by Regulation §§ 1.704-2(g)(1) and 1.704-2(i)(5).

(b)     Contributed Property. To the extent contributed property has a fair market value at the time of contribution that differs from the contributing Member's basis in the property, and to the extent the carrying value of property of the Company for Capital Account purposes otherwise differs from the Company's basis in such property, depreciation, gain, and loss for capital account purposes shall be computed by reference to such carrying value rather than such tax basis. In accordance with Section 704(c) of the Code, income, gain, loss, and deduction with respect to such property shall, solely for tax purposes, be shared among the Members so as to take account of the variation between the basis of the property to the Company and its fair market value at the time of contribution, or at the time that the carrying value of such property is adjusted under Regulation § 1.704-1(b)(2)(iv)(f), as the case may be. For these purposes, the Members hereby acknowledge and agree that the carrying value of each of their initial Capital Contributions to the Company in the form of intangibles, cash, and/or property, is set forth opposite each Member's name in the attached Exhibit B.

**3.2.** **Return of Capital.** Each Member is entitled to the return of its Capital Contribution only by way of distributions made pursuant to Article 10 hereof. No Member shall have the right to demand or receive any property other than cash in return for that Member's

Capital Contribution or to bring an action of partition against the Company or its property. The Managers shall have no personal liability for the repayment of the Capital contributed by the Members.

3.3. <u>Allocation of Profits and Losses</u>. After giving effect to any allocations required by <u>Section 3.1</u>, above, the Profits and Losses realized by the Company shall be allocated among the Members in accordance with their Equity Interests as set forth in the attached <u>Exhibit A</u>.

3.4. <u>Cash Distributions</u>. Except as otherwise provided in Section 3.5 and <u>Article 10</u> below (related to Dissolution and Liquidation), distributions of Distributable Cash and/or other assets or property of the Company, from whatever source, shall be made as to the Members in proportion to their Equity Interests as provided in the attached <u>Exhibit A</u>; provided, however, that such distributions shall not be made more frequently than monthly without the unanimous consent of the Members. In making determinations regarding distributions, the Managers may set aside funds and establish reserves for such items as the Managers shall determine, including, without limitation, working capital, capital expenditures, Business Expenses, acquisition of other assets by the Company, and the satisfaction of liabilities (including, without limitation, tax liabilities and contingent liabilities).

3.5. <u>Payment to Baker</u>. Notwithstanding anything contained herein to the contrary, the Members agree that $52,500 of the cash contributed or to be contributed by Daymond to the Company as part of Daymond's initial Capital Contribution shall be distributed to Baker as reimbursement for certain prior business expenses incurred by Baker in connection with the start-up of the Business, including, without limitation, marketing, travel and development expenses (the "Reimbursement"). The Reimbursement shall be distributed to Baker within seven (7) business days from the date of this Agreement.

3.6. <u>Restoration of Negative Capital Accounts</u>. If upon the dissolution and liquidation of the Company, or the liquidation of any Member's Equity Interest in the Company, the Member has a negative balance in its Capital Account, that Member shall not be required to make any contribution to the Company on account of such negative Capital Account balance.

### ARTICLE 4
### MANAGEMENT OF THE COMPANY

4.1. <u>General Provisions</u>.

(a) There shall be two (2) Managers of the Company. As long as RP shall be a Member, it shall be entitled to appoint a natural person to serve as a Manager of the Company. As long as Baker shall be a Member, it shall be entitled to appoint a natural person to serve as a Manager of the Company. RP hereby appoints Raymond M. Rastelli, Jr. as an initial Manager and Baker hereby appoints Al Baker as an initial Manager. Upon RP or Baker respectively ceasing to be a Member (a "Transferring Member"), such Transferring Member's right to appoint a natural person to serve as a Manager of the Company shall terminate, and the

Members other than the Transferring Member shall appoint a replacement Manager by the unanimous written consent of the remaining non-Transferring Members.

(b)     RP and Baker, respectively, shall each have the power, by written instrument, to appoint a successor Manager, to serve upon the death, Disability, bankruptcy, resignation or removal (as described in Section 4.1(c)) of the Manager appointed pursuant to Section 4.1(a) above (each, a "Triggering Event"); provided, however, that RP and Baker, respectively, shall each have the right to revoke a written appointment of a successor Manager, by written instrument, at any time prior to the occurrence of a Triggering Event.  If a successor Manager fails or ceases to act as Manager, by reason of a Triggering Event, then RP or Baker, as applicable, shall appoint a successor Manager within thirty (30) days of the Triggering Event; provided, however, that if RP or Baker, respectively, fails to appoint a successor Manager within the thirty (30) day period, then a successor Manager shall be appointed by the unanimous written consent of the Members.

(c)     A Manager may be immediately removed from his or her position as a Manager of the Company in the following circumstances:

(i)     The Manager's commission of any act of fraud, gross negligence, or willful misconduct against the Company;

(ii)     The Manager's commission of any felony, embezzlement or misappropriation of money or other property of the Company; or

(iii)     The order or decree of any court of competent jurisdiction.

(d)     The Managers shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement, to manage, control, administer, and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs.  The Managers shall have the authority to delegate any or all of his responsibilities hereunder, and the power to fulfill such duties in accordance with the terms and conditions under this Article 4, to such officers of the Company or other authorized persons, as well as the power and authority to engage one or more of its Affiliates to provide management, operational, and/or administrative services to or for the Company, for such period of time and under such conditions as the Managers may determine, in their absolute discretion.

(e)     Except with respect to Extraordinary Transactions (as defined in Section 4.3 below) or as otherwise expressly stated elsewhere in this Agreement or as required by the Act, the Managers, without the need for notice to or the consent from all or any of the Members, shall have the full and exclusive power on the Company's behalf, and in its name, to (i) manage, control, administer and operate the business and affairs of the Company and to do or cause to be done anything it deems necessary or appropriate to carry out the purposes of the Company and (ii) execute and deliver such vendor contracts, agreements and other documents as it deems necessary or appropriate to carry out the purposes of the Company.

(f)     Notwithstanding anything herein to the contrary, the Managers shall have no authority to create any note, mortgage, pledge, assignment or other obligation, or any guarantee or suretyship thereof, in favor of any Person, without the express written consent of each Member. For this purpose, the execution by a Member of a guarantee, surety or similar agreement relating to indebtedness of the Company shall conclusively be deemed to evidence such Member's express written consent.

(g)     If the Managers cannot agree on a particular action or resolution (the "Resolution") after a vote on the Resolution has been taken during two (2) separate meetings of the Managers or requests for unanimous written consent, which meetings or requests have been duly called and held pursuant to this Agreement (such disagreement is hereinafter referred to as a "Deadlock"), then the Managers shall select an individual who is not an officer, Member, or Manager of the Company (an "Independent Person") to serve as a Neutral Arbitrator (as defined below) to resolve the Deadlock, within five (5) business days after the second meeting of the Managers. If the Managers cannot agree on an Independent Person to serve as the Neutral Arbitrator, then each Manager shall select an Independent Person, the identity of which shall be disclosed in writing to all of the Managers and to each such Independent Person, and the two (2) Independent Persons selected shall then promptly appoint one (1) Independent Person to serve as Neutral Arbitrator, to resolve the Deadlock. The Neutral Arbitrator shall vote for or against the Resolution at the next duly called and convened meeting of the Managers.

(h)     The "Neutral Arbitrator" means, for purposes of this Agreement, a natural person who has no legal, equitable, or economic interest in the Company. The Neutral Arbitrator's sole obligation, duty, and authority shall be approving or disapproving a Resolution in order to resolve a Deadlock, having only the authority to vote with respect to the approval or disapproval of the specific Resolution causing the Deadlock. Upon the resolution of the specific Deadlock by the approval or disapproval of the Neutral Arbitrator, said Neutral Arbitrator shall cease to have any obligation, duty or authority whatsoever with respect to the Company.

4.2.    **Meetings of Managers.**

(a)     **In General.** Any Manager may call a meeting of the Managers by giving written notice to all Managers not less than two (2) nor more than thirty (30) days prior to the date of the meeting, to consider the affairs of the Company and to take any action permitted to be taken by the Act, this Agreement, or the Certificate; provided, however, that any meeting of the Managers may take place without notice in the event that the Managers consent to such meeting and waive notice. All decisions by the Managers at any meeting must be unanimous to have any force or effect. Managers may participate in a meeting of the Managers by means of conference telephone, email or other similar communications equipment by means of which all persons participating in the meeting can immediately communicate with all other persons participating, and participation by such means shall be deemed to constitute presence in person at a meeting of the Managers.

(b)     <u>Action by Managers without a Meeting</u>.   Action required or permitted to be taken at a meeting of the Managers may be taken without a meeting if the action is evidenced by a unanimous written consent of the Managers describing the action taken signed by all Managers or confirmed by email and filed by the Managers with the Company records.

(c)     <u>Waiver of Notice by a Manager</u>.   When any notice is required to be given to any Manager, a waiver thereof in writing signed by the Manager entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

### 4.3.   <u>Extraordinary Transactions</u>.

(a)     Notwithstanding anything to the contrary in this Agreement, the Extraordinary Transactions listed in <u>Section 4.3(b)</u> below shall require the unanimous written consent of all of the Members.  Upon receipt of the required approval of any Extraordinary Transaction, the Managers shall have all power and authority necessary or desirable to carry out the purposes of such Extraordinary Transaction, including without limitation the power and authority to execute, acknowledge and deliver all agreements, contracts, assignments, deeds, notes, mortgages, bills of sale, stock powers, instruments and other documents necessary or convenient for the carrying out of the purposes of such Extraordinary Transaction, all without requiring the signature of any other Member thereon, and to make all expenditures relating thereto.

(b)     As used herein, an "**Extraordinary Transaction**" is defined to mean each of the following actions or decisions, each of which is deemed "not in the ordinary course of the business":

(i)     Approve an Operating Budget (as defined in <u>Section 4.4</u>) for the Company for each Fiscal Year;

(ii)    Establish a reserve for Business Expenses of an amount in excess of ten percent (10%) of the total amount of Business Expenses contemplated in the Operating Budget;

(iii)   Accept an additional Capital Contribution from any Member(s) of the Company;

(iv)    Obligate the Company to incur any indebtedness or act as guarantor or surety under any loan, promissory note, mortgage, pledge, security agreement, financing statement or other financing arrangement; or

(v)     Authorize the Company to enter into an agreement, contract, arrangement or other transaction with any Affiliate of the Company or any Member's Immediate Family Member in which the material terms and conditions are on terms more favorable than those otherwise contained in an arm's length transaction between third parties.

(vi)    Amend the Certificate or this Agreement, including making any modifications to the Equity Interests or Voting Interests following the date of this Agreement;

(vii)   Approve the Company's purchase or redemption of an Interest in the Company (provided that, for such purposes, the unanimous consent of the disinterested Members shall be sufficient);

(viii)  Approve the sale, merger or consolidation of the Company with any other entities;

(ix)    Approve the sale of all or substantially all of the Company's assets to a third party; or

(x)     File a voluntary petition in bankruptcy; make an assignment for the benefit of creditors; seek, consent to, or acquiesce in the appointment of a trustee, receiver, or liquidator of the Company or all or any substantial part of the Company's assets; or file any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, rule or regulation.

**4.4.    Operating Budget.**  As soon as practicable, after the execution of this Agreement, and annually thereafter, the Members shall develop and approve an operating budget for the ensuing Fiscal Year (the "**Operating Budget**") in accordance with Section 4.3(b)(i), which shall provide for, among other things, the Company's Business Expenses, as well as casualty, general liability, director and officer and any other insurance coverage deemed appropriate or necessary by the Managers in amounts sufficient to reasonably protect the interests of the Members, the Managers, and/or the officers of the Company. The Managers shall utilize the Operating Budget in the operation of the Business and in purchases and expenditures (including, but not limited to, Business Expenses) for the operating requirements of the Business. In addition to its use of the Operating Budget, the Managers shall have full authority and discretion to utilize any and all reserves for Business Expenses in its operation of the Business, including, but not limited to, the reserve funded and approved by the Members in accordance with Section 4.3(b)(ii).

**4.5.    Action by Written Consent.**  Any action by the Members may be taken in the form of a written consent, unanimous or otherwise, rather than at a meeting of the Members; provided, that such consent contains the requisite approval of the Members as required under the Act or this Agreement for such matter.  The Managers shall maintain a permanent record of all actions taken by the Members.

**4.6.    Meetings of Members.**  No meetings of the Members need be held. However, there shall be, within fifteen (15) days of a written demand by any Member, a meeting of the Members to consider the affairs of the Company and to take any action permitted to be taken by the Act, this Agreement, or the Certificate.  Such a meeting may be held in person or by telecommunications equipment.  For purposes of this Section 4.6, notice of a written demand for a meeting by e-mail, facsimile, first class mail, overnight mail or delivery service, or hand-

delivery shall be sufficient. Unless this Agreement provides otherwise, at a meeting of the Members, the presence in person or by proxy of all of the Members shall constitute a quorum for the transaction of business. A Member may vote either in person or by written proxy signed by the Member or by the Member's duly authorized attorney-in-fact. The Members present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the withdrawal of enough Members to leave less than a quorum, if any action taken (other than adjournment) is approved by the requisite percentage of Voting Interests specified by this Agreement; provided, however, that if this Agreement does not specify a requisite percentage of Voting Interests for an action to be taken by the Members, then said action shall require the requisite percentage of Voting Interests specified by the Act. Except as otherwise provided in this Agreement, the vote of holders of a Majority of the Voting Interests held by all of the Members present at a meeting in person or by proxy shall be required to approve any matter to be decided upon by the Members.

4.7.   **Standard of Care of the Managers**.  The Managers shall not be liable to the Company or any Member for any matter or item, unless such matter or item is attributable to gross negligence, willful misconduct or fraud on the part of the Managers.

4.8.   **Indemnification**.   The Company shall indemnify, defend and hold harmless the Managers and each duly appointed officer, including Members who are officers of the Company, against any claim or liability incurred in connection with its actions on behalf of the Company to the fullest extent permitted by the Act or other applicable law. No Capital Account of any Member may be drawn upon to support such indemnification and no Member shall have any liability beyond the amount of his or its Capital Account. Neither the Company nor any Member shall have any claim against the Managers by reason of any act or omission, or by reason of any determination by any taxing authority that the treatment of any item on any Company tax return was improper, provided that the Managers acted in good faith in connection with such matters. The Company shall not indemnify the Managers, any officer or other person in connection with (i) a proceeding by or in the right of the Company in which the person was judged liable to the Company or (ii) in connection with any other proceeding charging improper personal benefit to such person, whether or not involving action on behalf of the Company, in which the person was adjudged liable on the basis that personal benefit was improperly received by him.

4.9.   **Reliance by Third Parties**.  Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of the Managers. Any corporation, trust, partnership, or other business entity called upon to Transfer any property to or from the name or account of the Company shall be entitled to rely on instructions or assignments signed by the Managers without inquiry as to the authority of the Person signing or purporting to sign such instructions or assignments and without inquiry as to the validity of the Transfer.

## ARTICLE 5
### LIABILITY AND RIGHTS OF MEMBERS

**5.1.** <u>No Personal Liability</u>.  The Members shall in no event be liable personally for any of the debts or losses of the Company beyond the amount of such Member's Capital Account.  No Member shall have any obligation to contribute any sums of money or other property to the Company (other than the agreed upon contributions provided for herein) on account of any deficit or negative balance in his or its Capital Account.

**5.2.** <u>No Participation in Management</u>.  Except as otherwise provided herein, or in any employment agreement between the Company and a Member, the Members (other than the Managers), shall not participate in the management or control of Company business, nor shall the Members transact any business for the Company, nor shall the Members have the power to act or bind the Company, said powers being vested exclusively in the Managers.

## ARTICLE 6
### MEMBER OBLIGATIONS AND MEMBER AFFILIATE RELATIONSHIPS

**6.1.** <u>Member Obligations.</u>

(a) Baker has agreed to provide or engage its Affiliate(s) to provide certain food product inventory developed under the "Bubba's Q" brand to the Company.  In addition, Al Baker, individually, has agreed to serve as a brand ambassador and on-air television personality for the Company, to provide or cause to be provided by Baker sales contacts to the Company, and to provide or cause to be provided by Baker certain marketing, promotion, product development, sales, and advertising services and support to the Company.

(b) RP shall provide or engage its Affiliate(s) to provide certain product packaging, labeling, distribution, quality assurance audit, United States Department of Agriculture approval, co-packer management and related services (the "Co-Packer Services").  RP shall also perform or engage its Affiliate(s) to perform certain services for the Company, which may include, but not be limited to, e-commerce product order fulfillment, order processing, customer service, point-of-service development, sales support services, and revenue collection services, but expressly excluding any marketing and/or promotional services, which shall be performed by and be the sole responsibility of the Company (the "RP Services").  The provision of the Co-Packer Services and the RP Services to the Company by RP and/or its Affiliate(s) shall be subject to the terms and conditions set forth in Section 6.4, below.

(c) Daymond John, individually, has agreed to serve as a brand ambassador and on-air television personality for the Company, to provide or cause to be provided by Daymond sales contacts to the Company, and to provide or cause to be provided by Daymond certain marketing, promotion, product development, sales, and advertising services and support to the Company.

(d)     The Company shall indemnify the Members in connection with each Member's provision of services on behalf of the Company as outlined in this Section 6.1, including Daymond John, individually, with respect to his personal services as set forth in Section 6.1(c) and Al Baker, individually, with respect to his personal services as set forth in Section 6.1(a), within the scope of such services as set forth in this Section 6.1, respectively; provided, however, that the Company shall not indemnify any Member (or Al Baker or Daymond John, individually, to the extent applicable) for monetary damages resulting from any act of fraud, gross negligence, or willful misconduct on the part of any Member (or Al Baker or Daymond John, individually, to the extent applicable).

6.2.     Relationship to JABEZBAKER, LLC.  Baker hereby represents and warrants that JABEZBAKER, LLC, an Affiliate of Baker, is the sole owner of certain existing patents, as set forth in Exhibit C hereto ("Patents"), attendant to and in connection with the Business, and that the Patents shall remain the sole and exclusive property of JABEZBAKER, LLC, subject to the terms and conditions set forth herein and in Section 6.3 below.  The Members agree and acknowledge that Baker shall cause JABEZBAKER, LLC to enter an exclusive license agreement between the Company and JABEZBAKER, LLC allowing for the Company's exclusive use of the Patents, upon terms that are mutually acceptable to the Company and JABEZBAKER, LLC (the "License Agreement"), which License Agreement shall include, but not be limited to, the right to use the Patents on an exclusive basis subject to the following royalty fees, which shall be paid monthly to JABEZBAKER, LLC, by the Company:

(a)     Royalty fee of $1.00 per pound for ecommerce sales of Bubba's Q De-Boned Baby Back Rib Steak;

(b)     Royalty fee of one percent (1%) of sales of Bubba's Q De-Boned Baby Back Rib Steak through retail and food service venues; and

(c)     Royalty fee of $0.50 per case for all cases of Bubba's Q De-Boned Baby Back Rib Steak sold through television infomercials, promotions, and offers, including, but not limited to, sales to QVC, Inc. and Home Shopping Network (a/k/a HSN).

6.3.     Assignment of Patents.  The Members acknowledge and agree that immediately upon the determination of the Company's accountant that the Company has generated an aggregate of thirty million dollars ($30,000,000) of Gross Receipts, Baker shall cause JABEZBAKER, LLC to irrevocably and unconditionally grant, convey, transfer, and assign to a newly formed Delaware limited liability company ("NewCo") all of its right, title, and interest in the Patents (the "Patent Assignment"), in consideration for the continuing right of JABEZBAKER, LLC to receive fees equivalent in value to the royalty fees set forth in Sections 6.2(a), 6.2(b), and 6.2(c), above, for such Patent Assignment.  Each Member of the Company or Permitted Transferee thereof, if applicable, shall receive an ownership interest in NewCo that is consistent with such Member's Equity Interest in the Company at the time of the Patent Assignment.

**6.4.    Relationship to RP Affiliate(s).**  The Members acknowledge and agree that RP shall cause Rastelli Brothers, Inc., an Affiliate of RP, to enter into an agreement with the Company upon terms that are mutually acceptable to the Company and Rastelli Brothers, Inc., to provide the Co-Packer Services (the "**Co-Packer Agreement**").    The Members further acknowledge and agree that RP shall also perform or engage its Affiliate(s) to perform the RP Services. In consideration for the RP Services and for the Co-Packer Agreement, in addition to any profits paid or distributions made to RP elsewhere under this Agreement as a Member, RP shall be entitled to an additional fee in an amount equal to (a) the actual cost of products provided to the Company plus (b) a proportional amount of facility overhead for the facility where the Co-Packer Agreement is being performed, which amount shall be proportional to the volume of products provided to the Company under the Co-Packer Agreement and (c) an amount equal to twelve percent (12%) of the expenses and costs associated with providing the RP Services plus a fee of $.38 per pound of all sales of products provided to the Company.

**6.5.    Assignment of Baker Intangibles.**  Baker represents and warrants that Bubba's-Q, Inc., an Affiliate of Baker, is the sole owner of that certain trade mark filing made in the State of Ohio for the name "Bubba's Q World Famous," QueenAnn, Inc., an Affiliate of Baker, is the sole owner of that certain service mark filing made in the State of Ohio for the name "De-Boned Baby Back Rib Steak," copies of which filings are attached hereto as **Exhibit D**, and Baker and/or its Affiliates are the sole owner of certain goodwill, brand names, service marks and intellectual property attendant to and in connection with the Business (collectively, the "**Baker Intangibles**", and together with the Patents to be known as the "**Existing Intangible Rights**"). Notwithstanding anything contained herein to the contrary, the Members acknowledge that the Baker Intangibles are not protected by any federal trademarks as of the date of this Agreement.    The Members hereby agree and acknowledge that contemporaneous with the execution of this Agreement, Baker shall cause QueenAnn, Inc., Bubba's-Q, Inc., and any and all other Affiliates of Baker, including, without limitation, any Baker Intangibles owned by Baker or Baker family members, to irrevocable and unconditionally grant, convey, transfer and assign to the Company or NewCo (as defined above), as the Managers may determine, all of their rights, title and interest in the Baker Intangibles (the "**Intangibles Assignment**"). In consideration for the Intangibles Assignment, the Company and/or NewCo (as applicable) shall file for and attempt to obtain federal trademarks with respect to the Baker Intangibles and the "Bubba's Q" related brand, as soon as reasonably practicable (the "Trademark Filings").    The Trademark Filings, if obtained, shall be made in the name of and be owned by the Company or NewCo (as applicable).  Any filings, registrations, trademarks, services and/or patents for or relating to the Existing Intangible Rights, made hereinafter shall be made in the name of and shall be owned by the Company or NewCo, as applicable.  Notwithstanding the foregoing, the ownership and assignment of the Patents shall be handled in accordance with Sections 6.2 and 6.3 of this Agreement. Notwithstanding anything contained herein to the contrary, the Members further intend and agree that in addition to the Existing Intangible Rights being contributed to the Company, the website, http://bubbasbonelessribs.com, and any other now existing or future created websites related to the Business, shall be contributed to and owned by the Company or NewCo (as applicable) as of the date of this Agreement.

**ARTICLE 7**
**TAX, ACCOUNTING, AND FISCAL MATTERS**

7.1.   Fiscal Year.   The fiscal year of the Company ("Fiscal Year") shall be the calendar year.

7.2.   Method of Accounting.   The Members shall select a method of accounting for the Company as deemed necessary or advisable and shall keep, or cause to be kept, full and accurate records of all transactions of the Company in accordance with sound accounting principles consistently applied.

7.3.   Financial Books and Records.   All accounting records shall, at all times, be maintained at such location specified by the Managers, and such records shall be open to inspection by any of the Members upon advance notice during reasonable business hours.

7.4.   Tax Matters Member.   The "Tax Matters Partner" of the Company pursuant to Section 6231(a)(7) of the Code shall be RP. Any Member who is designated Tax Matters Partner shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Code. Any Member who is designated Tax Matters Partner shall inform each other Member of all significant matters that may come to its attention in his capacity as Tax Matters Partner by giving notice thereof on or before the fifth (5th) Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications he may receive in that capacity. The Company shall reimburse the Tax Matters Partner for any costs incurred representing the interests of the Members in respect of Company tax matters.

7.5.   Tax Returns.   The Managers shall cause all tax returns for the Company to be prepared and timely filed with the appropriate taxing authorities and shall provide copies of all such returns to the Members as soon as available.

7.6.   Tax Elections.   The Managers may, in their reasonable discretion make, or petition the relevant taxing authority to revoke, any tax election which is available to the Company, including, without limitation, an election under Section 754 of the Code.

**ARTICLE 8**
**TRANSFERABILITY OF INTERESTS**

8.1.   Restriction of Transfer Generally; Exception.   No Member shall Transfer all or any part of its Interest in the Company except in compliance with this Article 8. Except as provided in Section 8.2 and Section 8.3 hereof, any Transfer of a Member's Interest in the Company shall require the unanimous written consent of the Members. Any Transfer not expressly permitted under the terms of this Agreement shall be void and of no effect.

8.2.   Permitted Transfers.   Any Member may give, assign, sell, or Transfer all or part of such Member's Interest in the Company to an entity that is under the Control of, or

common Control with the Member or to the trustee of a trust that qualifies as a "Grantor Trust" pursuant to Sections 671-679 of the Code having as its sole beneficiaries the Member and/or one or more of the Member's Immediate Family Members (each such entity or trustee being referred to herein as a "**Permitted Transferee**", and each such Transfer being referred to herein as a "**Permitted Transfer**"); provided, however, that a Member shall provide written notice to the Company and the other Members not less than ten (10) days prior to a Permitted Transfer.

8.3.  Right of First Offer / Right of First Refusal.

(a)  With respect to any bona fide arm's length offer received or solicited from a Person other than a Permitted Transferee (a "**Prospective Purchaser**") to acquire all or any portion of a Member's Interest in the Company (the "**Offer**"), upon receipt thereof, such Member (the "**Selling Member**") shall notify the Company and the Members in writing of the terms of such Offer within ten (10) days of the receipt thereof, including the identity of the Prospective Purchaser the amount of the Member's Interest in the Company that is the subject of the Offer (the "**Offered Interests**") and the term and conditions of the Offer, and shall provide such information and documentation relating to the Offer as the Company and the Members may require. An Offer that includes the Prospective Purchaser securing financing to complete the Transfer shall qualify as a bona fide arm's length written offer only if it is accompanied by a binding commitment from a bank, commercial lender or other financial institution to provide the required financing.

(b)  If the remaining Member(s) desire(s) to purchase all, but not less than all, of the Offered Interests, the Member(s) shall, within thirty (30) days of receiving the Offer, send the Selling Member a written notice of its election to purchase the Offered Interests from the Selling Member under the terms and conditions specified in the Offer (the "**Member Purchase Notice**"). If more than one (1) of the remaining Members elects to purchase the Offered Interests, by delivering a Member Purchase Notice, such Members shall each receive a portion of the Offered Interests equal to their proportionate Interest in the Company vis-a-vis each other. If no Member delivers a Member Purchase Notice within its specified thirty (30) day period, the Company shall then have thirty (30) days, beginning on the first day after the expiration of the Members' thirty (30) day period, to provide the Selling Member with a written notice of its intent to purchase the Offered Interests (the "**Company Purchase Notice**").

(c)  The Member Purchase Notice or Company Purchase Notice shall, when taken in conjunction with the Offer, be deemed to constitute a valid, legally binding and enforceable agreement for the Transfer of the Offered Interests as is set forth in the Member Purchase Notice or Company Purchase Notice on the terms of the Offer.

(d)  If the Company or the remaining Members elect to purchase the Offered Interests, the closing of such Transfer shall take place no later than sixty (60) days following the expiration of the period provided in Section 8.3(b) above.

(e)  If neither the Company nor the remaining Member(s) elect to purchase the Offered Interests, then for a period of thirty (30) days commencing upon the

expiration of the period provided in Section 8.3(b) above, the Selling Member may Transfer all of the Offered Interests to the Prospective Purchaser upon the terms specified in the Offer; provided, however, that any material change in the terms of the Offer prior to closing shall constitute a new Offer subject to the right of first offer and/or right of first refusal option of the Members and the Company described in this Section 8.3. Any Offered Interests not sold within the thirty (30) day period commencing upon the expiration of the period provided in Section 8.3(b) above pursuant to the terms specified in the Offer shall continue to be subject to the terms and conditions of this Agreement, including, without limitation, the requirements of this Section 8.3.

(f)      In the event of any completed Transfer to any Prospective Purchaser in accordance with this Section 8.3, the Company may request in writing that the Selling Member provide the Company with copies of the fully executed documents transferring the Offered Interests to the Prospective Purchaser within five (5) days of any such written request.

(g)      If any proposed Transfer under this Section 8.3 involves consideration other than cash, any Person having rights under this Section shall have the right to elect to pay, in lieu of such non-cash consideration, cash in an amount equal to the fair market value of such non-cash consideration.

8.4.   Effect on Transfer.

(a)      In addition to compliance with Section 8.1 above, no assignee or transferee (including, but not limited to, a Permitted Transferee) of all or part of an Interest in the Company shall have the right to become admitted as a Member, unless and until:

(i)      the assignee or transferee has executed an instrument reasonably satisfactory to the Members accepting and adopting the provisions of this Agreement;

(ii)      the assignee or transferee has paid all reasonable expenses incurred by the Company in connection with the admission of such assignee or transferee as a Member;

(iii)      if requested by the Managers, the assignee or transferee has delivered to the Company an opinion of counsel reasonably satisfactory to the Managers that such Transfer is exempt from the registration requirements of all applicable federal and state securities laws;

(iv)      the assignee or transferee has executed and delivered to the Managers such other documents and instruments as are necessary or appropriate, in the Managers' discretion, in connection with the assignee or transferee becoming a Member; and

(v)      such assignment or Transfer shall be reflected in a revised Exhibit A to this Agreement.

(b)     A Permitted Transferee or a Person who is an assignee of an Interest in the Company may be admitted to the Company as a Member and may receive an Interest in the Company without making a contribution or being obligated to make a contribution to the Company.

8.5.    Members' Representatives. If a Member who is an individual dies or a court of competent jurisdiction adjudges the individual to be incompetent to manage the person or property of the individual, the executor, administrator, guardian, conservator or other legal representative of the Member may exercise all of the rights of the Member for the purpose of settling the estate or administering the property of the Member, including the power under this Agreement of an assignee to become a Member. If a Member is a corporation, limited liability company, trust or other entity and is dissolved or terminated or is administered under the power of a trustee or receiver, the powers of that Member may be exercised by its legal representative or successor.

## ARTICLE 9
## REDEMPTION OF INTERESTS

9.1.    Optional Redemption Upon a Proceeding. During the term of this Agreement, upon the occurrence of any Proceeding against any Member (a "Redeemed Member"), the Company shall have the option, but not the obligation, to purchase all, but not less than all, of the Redeemed Member's Interest in the Company (the "Redeemed Interest") for a redemption price equal to the Fair Market Value (as defined below) for the Redeemed Interest. Any such option may be exercised by the Company pursuant to written notice to the Redeemed Member within thirty (30) days following the occurrence of a Proceeding against the Redeemed Member. Upon the Redeemed Member's receipt of a notice by the Company of its intention to exercise such purchase option, the Redeemed Member shall be obligated to sell and deliver to the Company the Redeemed Interest in the Company as of the Proceeding, for Fair Market Value subject to the terms and conditions set forth in Section 9.4. If all Proceedings with respect to the Redeemed Member terminate and the Redeemed Member retains record and beneficial ownership of some or all of his, her, or its Interest in the Company, the Company shall become obligated to purchase, and the Redeemed Member, or the personal representative of his estate if deceased, as applicable, shall become obligated to sell and deliver to the Company, all of the Redeemed Interests owned by the Redeemed Member upon the termination of the Proceedings against the Redeemed Member.

**9.2.** **Optional Redemption Upon Termination.** Upon the dissolution or termination of any member that is an entity (each, a "**Termination Event**," and such Member shall be referred to as a "**Terminated Member**"), the Company shall have the right, but not the obligation, to purchase all, but not less than all, of the Interests in the Company owned by the Terminated Member at the time of the Termination Event (the "**Terminated Interest**") at a redemption price equal to the Fair Market Value (as defined below) for the Terminated Interest. Notwithstanding anything to the contrary in this Agreement, the decision of the Company to exercise this option shall require the approval of all of the disinterested Members. If the Company desires to purchase the Terminated Interest, it shall deliver written notice to the Terminated Member or his or her personal representative, as applicable, within thirty (30) days following the Termination Event.

**9.3.** **Redemption Price.** The redemption price for any Interest in the Company redeemed under Section 9.1 or Section 9.2 above shall be the total "Fair Market Value" for the Redeemed Interest or Terminated Interest, as the case may be. Except as otherwise provided in this Agreement, "**Fair Market Value**" shall be determined by an appraisal of the Company performed by a firm mutually agreed to by the purchasing party or parties and the Redeemed Member or Terminated Member, or their successors and representatives, in writing. If such parties are unable to agree upon the identity of an appraiser, the purchasing party and the Redeemed Member (or Terminated Member, as the case may be) shall each choose a Qualified Appraiser. For purposes of this Section 9.3, the term "**Qualified Appraiser**" shall mean an independent, certified business appraiser, licensed in the State of Delaware and with at least five (5) years of experience. Each of the two (2) Qualified Appraisers so chosen shall deliver its determination of the Fair Market Value to the purchasing party or parties, the Redeemed Member (or Terminated Member), and the Company, within thirty (30) days of its selection. If the lower of the two (2) appraisals is not equal to at least ninety percent (90%) of the higher appraisal, then the higher appraisal shall determine the Fair Market Value of the Redeemed Interest. If the lower of the two (2) appraisals is at least ninety percent (90%) of the higher appraisal, then the Fair Market Value of the Redeemed Interest or Terminated Interest shall be determined by averaging the two appraisals obtained by the parties.

**9.4.** **Closing.** Any closing of the Company's purchase of a Redeemed Interest or Terminated Interest under this Article 9 (each a "**Closing**") shall occur within sixty (60) days following the date of exercise of the purchase option or within thirty (30) days of the determination of Fair Market Value of the Redeemed Interest or Terminated Interest pursuant to Section 9.3, whichever is later. The terms of payment for the redemption of Equity Interests in the Company pursuant to the options granted in this Article 9 shall be negotiated and mutually agreed upon by the parties. At Closing, the Company shall enter into such documents and agreements and the Redeemed Member or Terminated Member shall supply such documentation deemed by legal counsel to the Company necessary to evidence the redemption and as may be required by applicable law.

## ARTICLE 10
## DISSOLUTION AND LIQUIDATION

      10.1.  <u>Dissolution</u>. The Company shall be dissolved and commence winding up and liquidation upon the occurrence of any of the following:

      (a)    Upon the written consent of all of the Members to effect such dissolution; or

      (b)    Upon entry of a decree of judicial dissolution pursuant to the Act.

      10.2.  <u>Liquidation</u>.

      (a)    Upon the dissolution of the Company and at the election of the Managers, all Company assets shall be sold and reduced to cash and/or distributed in-kind to the Members within ninety (90) days following dissolution of the Company. All Company assets shall be distributed in payment of the liabilities of the Company and to the Members in the following order:

      (i)    First, to the payment of the debts and liabilities of the Company and the expenses of liquidation, including sales commission to any selling agent;

      (ii)    Second, to the funding of any reserves which the Managers deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company. At the expiration of such period as the Managers shall deem advisable, the balance thereof, if any, shall be distributed in the manner provided in this Section, and in the order named. Such reserves shall not be unreasonable and shall be in accordance with acceptable accounting and business standards.

      (iii)    Third, to the Members in accordance with their Capital Accounts, to the extent the sums are positive, and any amount in excess of their Capital Accounts shall be distributed in proportion to their Equity Interests.

      (b)    A reasonable time, as determined by the Managers, shall be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to creditors in order of legal priority so as to enable the Members to minimize any losses attendant upon liquidation.

## ARTICLE 11
## CONFIDENTIALITY

      11.1.  <u>Confidentiality Generally</u>. Each of the Members shall, during the term of this Agreement and at all times thereafter, maintain in confidence all confidential and proprietary information and data of the Company and of the other Members and their Affiliates, (each, a "disclosing party") disclosed to it (the "**Confidential Information**"). Each of the Members further agrees that it shall not use the Confidential Information during the term of this

Agreement or at any time thereafter for any purpose other than the performance of its obligations or the exercise of its rights under this Agreement. The Company and each Member shall take all reasonable measures necessary to prevent any unauthorized disclosure of the Confidential Information by any of their employees, agents or consultants.

      **11.2.**   <u>Permitted Disclosures</u>. Nothing herein shall prevent the Company, any Member, or any employee, agent or consultant of the Company or of any Member (the "receiving party") from using, disclosing, or authorizing the disclosure of any information such Person receives in the course of the business of the Company which:

          (a)    becomes publicly available other than through default hereunder by the receiving party;

          (b)    is lawfully acquired by the receiving party from a source not under any obligation to the disclosing party regarding disclosure of such information;

          (c)    is properly in the possession of the receiving party in written or other recorded form at the time of its disclosure hereunder;

          (d)    is non-confidentially disclosed to any third party by or with the permission of the disclosing party; or

          (e)    is independently developed without the use of any Confidential Information.

      **11.3.**   <u>Remedies; Survival of Covenants</u>. Each Member acknowledges and agrees that any breach of the provisions of <u>Section 11.1</u> of this Agreement is likely to result in irreparable injury to the Company, the other Members and their respective members, shareholders, partners, officers, affiliates, employees, and agents, and that the remedy at law alone will be an inadequate remedy for such breach, and that in addition to any other remedy they may have, the Company and the other Members, or their respective members, shareholders, partners, officers, affiliates, employees and agents shall be entitled to specific performance of <u>Section 11.1</u> of this Agreement by such Member and to seek both temporary and permanent injunctive relief (to the extent permitted by law) without bond and without liability should such relief be denied, modified, or vacated. Neither the right to obtain such relief nor the obtaining of such relief shall be exclusive or preclude the Company, the other Members or their respective members, shareholders, partners, officers, employees, and agents from any other remedy. The provisions of this <u>Section 11.3</u> shall survive the termination of this Agreement to the extent applicable after the termination hereof.

**ARTICLE 12**
**MEDIATION OF DISPUTES**

      In the event of any dispute between the Members or between the Company and one or more Members, the parties agree to use commercially reasonable efforts to resolve the

dispute through Mediation in a mutually acceptable manner. For this purpose, the parties in dispute shall accept a mutually acceptable mediator. If the parties in dispute cannot agree upon a mediator, then the matter shall be decided upon by a panel of three (3) mediators, with each party selecting a mediator and the mediators selecting a third, neutral mediator. The parties in interest shall share equally all initial costs of mediation. The mediators shall hold meetings on the question, matter, or dispute and shall provide opportunity to the parties to be present and to be fully heard thereat by counsel or otherwise. Discovery by the parties shall be permitted prior to such meetings. In the event that the mediation is unsuccessful, the parties shall have the right to pursue legal action under the laws of the State of Delaware.

## ARTICLE 13
## INDEPENDENT LEGAL REPRESENTATIONS

Each Member acknowledges that, prior to entering into this Agreement, such Member has been advised and has had an opportunity to obtain independent counsel to represent such Member in connection with the formation of the Company and entering into this Agreement, including the potential income tax consequences thereof. Each Member acknowledges and understands that Hyland Levin LLP ("Hyland Levin") has represented RP and the Company with regard to the preparation of this Agreement and the formation of the Company. Each Member further acknowledges and understands that Hyland Levin is not representing any Member(s) other than RP with regard to the preparation of this Agreement and the formation of the Company, notwithstanding any prior or current representation of any such Member in other matters.

## ARTICLE 14
## MISCELLANEOUS

14.1.   _Binding Effect_. Except as otherwise provided in this Agreement to the contrary, this Agreement shall be binding upon and inure to the benefit of the Members and their successors and assigns.

14.2.   _Integration_. This Agreement constitutes the sole agreement among the Members with respect to the subject matter hereof and shall supersede all oral agreements and prior writings with respect to the subject matter hereof.

14.3.   _Governing Law_. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware without reference to conflict of laws principles.

14.4.   _Severability_. The invalidity or unenforceability of any particular provision of this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

14.5.   _Gender and Number_. As used in this Agreement, the masculine gender shall include the feminine and the neuter, and vice versa and the singular shall include the plural.

    **14.6.**   <u>Headings.</u>   The headings herein have been included for convenience of reference only and shall not be considered in interpreting this Agreement.

    **14.7.**   <u>Dissociation.</u>   Each Member does hereby waive any right to dissociate or the right to take any other action which might otherwise be available to such Member for the purpose of severing its relationship with the Company, or such Member's Equity Interest in the Company from the Equity Interests in the Company of the other Members until the dissolution of the Company as provided in <u>Article 10</u> hereof.

    **14.8.**   <u>Notices.</u>   Unless otherwise specified, all notices required to be given pursuant to this Agreement shall be given personally or be sent by hand delivery, certified mail, return receipt requested or overnight express delivery service to the addresses specified on <u>Exhibit A</u> or, for a Member who shall become a Member after the execution hereof, on the joinder or other agreement executed by such Member (or any superseding addresses specified by proper notice) with all postage or other charges of conveyance prepaid and shall be effective upon the earlier of the actual receipt thereof or the second day (excluding weekends and Federal holidays) after the proper sending thereof.

    **14.9.**   <u>Execution of Documents.</u>   The Members agree that they shall execute any amendments or other documents relating to the Certificate as required by the Act and any other instrument necessary to carry out the terms of this Agreement and the actions contemplated hereby.

    **14.10.** <u>Counterparts.</u>   This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same Agreement.

    **14.11.** <u>Amendment.</u>   The Certificate and this Agreement may only be amended by the written approval of all of the Members.

*[Remainder of this page intentionally left blank. Signatures appear on the following page.]*

**IN WITNESS WHEREOF,** and intending to be legally bound, the Members have executed this Agreement as of the date first written above.

FOFBAKERS HOLDING COMPANY, LLC,
an Ohio limited liability company

By: *James A. Baker*
Name: James A. Baker
Title: CEO/President

RASTELLI PARTNERS, LLC,
a New Jersey limited liability company

By: _____
     Name:    Raymond M. Rastelli, Jr.
     Title:     President

DF VENTURES, LLC,
a New York limited liability company

By: _____
     Name:  Daymond John
     Title:

**IN WITNESS WHEREOF**, and intending to be legally bound, the Members have executed this Agreement as of the date first written above.

FOFBAKERS HOLDING COMPANY, LLC,
an Ohio limited liability company

By:_____
Name:
Title:

RASTELLI PARTNERS, LLC,
a New Jersey limited liability company

By: _____
Name:     Raymond M. Rastelli, Jr.
Title:      President

DF VENTURES, LLC,
a New York limited liability company

By: _____
Name:  Daymond John
Title:

**IN WITNESS WHEREOF**, and intending to be legally bound, the Members have executed this Agreement as of the date first written above.

FOFBAKERS HOLDING COMPANY, LLC,
an Ohio limited liability company

By:_____
Name:
Title:


RASTELLI PARTNERS, LLC,
a New Jersey limited liability company

By: _____
     Name:   Raymond M. Rastelli, Jr.
     Title:    President

DF VENTURES, LLC,
a New York limited liability company

By:_____
     Name:  Daymond John
     Title:

## EXHIBIT A

### Members

| Member Name & Address | Voting Interest | Equity Interest |
|---|---|---|
| FOFBakers Holding Company, LLC | 51% | 45% |
| Rastelli Partners, LLC | 32% | 35% |
| DF Ventures, LLC | 17% | 20% |
| **TOTAL:** | 100% | 100% |

{HL479703.19}                    A-1

**EXHIBIT B**

**Initial Capital Contributions**

Baker will contribute the Existing Intangible Rights and intellectual property, including the website (as defined in Article 6 of the Agreement), as well as certain goodwill and know-how to the Company.

RP will contribute certain goodwill and know-how to the Company.

Daymond will contribute $52,500 in cash to the Company to be distributed to Baker pursuant to Section 3.5 of the Agreement and the intellectual property in connection with the website, and has contributed $47,500 expended on research and development ($22,500), trade show ($15,000) and start-up expenses ($10,000) that have directly benefitted the Company.

Based on the mutually agreed upon relative value of the aforesaid contributions and the respective undertakings between the Members as set forth in this Agreement, the parties agree and acknowledge that the Members' initial Equity Interests in the Company shall be as follows:

| Member | Initial Capital Contribution |
|---|---|
| FOFBakers Holding Company, LLC | Intangibles valued at $225,000 |
| Rastelli Partners, LLC | Intangibles valued at $175,000 |
| DF Ventures, LLC | Intangibles and Cash valued at $100,000 |
| TOTAL: | $500,000 |

## EXHIBIT C

### Patents Attached

US007666075B1

(12) **United States Patent**
Baker et al.

(10) Patent No.: US 7,666,075 B1
(45) Date of Patent: Feb. 23, 2010

(54) **RIB MEAT PRODUCT AND PROCESS FOR PREPARING SAME**

(76) Inventors: James Albert London Baker, 2784 Trinity Ct., Avon, OH (US) 44011; Brittani Bo Baker, 27559 Remington Cir., WestIake, OH (US) 44145

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 532 days.

(21) Appl. No.: 11/595,268

(22) Filed: Nov. 9, 2006

(51) Int. Cl.
A22C 17/04 (2006.01)

(52) U.S. Cl. .................................................. 452/135

(58) Field of Classification Search ......... 452/135–140, 452/174, 198
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,137,605 | A | * | 2/1979 | van Rij et al. ................ 452/138 |
| 4,186,216 | A | * | 1/1980 | Roth ........................... 452/140 |
| 4,217,679 | A | * | 8/1980 | Gordan ....................... 452/140 |
| 5,104,251 | A | | 4/1992 | van den Nieuwelaar et al. |
| 5,197,918 | A | | 3/1993 | Klaassen |
| 5,273,483 | A | * | 12/1993 | Gagliardi, Jr. ............. 452/135 |
| 5,464,368 | A | | 11/1995 | White et al. |
| 5,525,103 | A | | 6/1996 | White et al. |
| 5,667,435 | A | | 9/1997 | Baughman et al. |
| 5,775,986 | A | | 7/1998 | Law et al. |
| 5,823,867 | A | * | 10/1998 | Roth et al. .................. 452/138 |
| 5,868,613 | A | | 2/1999 | Heidke et al. |
| 5,976,004 | A | * | 11/1999 | Herzenbruck ............... 452/136 |
| 6,527,636 | B2 | * | 3/2003 | Mickelson .................. 452/140 |
| 6,648,744 | B2 | | 11/2003 | Bell et al. |
| 6,716,097 | B2 | | 4/2004 | Freund et al. |
| 7,008,313 | B2 | * | 3/2006 | Gagliardi, Jr. ............. 452/135 |
| 7,022,007 | B2 | | 4/2006 | Neufang |
| 7,198,564 | B2 | * | 4/2007 | Hino et al. ................. 452/135 |
| 2006/0035005 | A1 | | 2/2006 | McMindŒ et al. |

FOREIGN PATENT DOCUMENTS

EP 1053684 11/2002

* cited by examiner

*Primary Examiner*—Thomas Price
(74) *Attorney, Agent, or Firm*—Curatolo Sidoti Co., LPA; Salvatore A. Sidoti; Joseph G. Curatolo

(57) **ABSTRACT**

A cooked and de-boned substantially intact slab of rib meat is provided. A process for preparing a de-boned rib meat product from a pork or beef rib cut is also provided. The process for preparing the rib meat product involves cooking a length of rib meat having rib bones embedded therein at a temperature and for a time sufficient to enable the removal of the rib bones from the length of rib meat, while maintaining a substantially intact length of rib meat.

10 Claims, 5 Drawing Sheets



U.S. Patent          Feb. 23, 2010          Sheet 1 of 5          US 7,666,075 B1



FIG 1

U.S. Patent          Feb. 23, 2010          Sheet 2 of 5          US 7,666,075 B1



FIG 2

**U.S. Patent**     Feb. 23, 2010     Sheet 3 of 5     US 7,666,075 B1

40

42

44



FIG 3

**U.S. Patent**       Feb. 23, 2010       Sheet 4 of 5       US 7,666,075 B1



FIG 4A

**U.S. Patent**          Feb. 23, 2010          Sheet 5 of 5          US 7,666,075 B1



FIG 4B

US 7,666,075 B1

**1**

## RIB MEAT PRODUCT AND PROCESS FOR PREPARING SAME

### TECHNICAL FIELD

Generally provided is a cooked and de-boned meat product and a process for preparing the meat product. More particularly, provided is a cooked and de-boned rib meat product and a process for preparing the rib meat product. The process of preparation results in a ready-to-eat substantially intact beef or pork rib meat steak, which does not include any rib bones.

### BACKGROUND

Pork and beef carcasses are typically butchered into several cuts or portions, which may be used to prepare spare ribs and back ribs. Spare ribs may be further divided into the traditional breast bone spare ribs or St. Louis style spare ribs. St. Louis style spare ribs generally comprise the upper part of a rib separated from the breast bone or brisket bone. St. Louis style spare ribs are generally very meaty and include minimal fat.

Back rib cuts are generally prepared by cutting the loin sections between the back ribs and the semispinalis muscle adjacent to the back ribs to form a loin cut and a back rib cut. The back rib meat cut, also known as a baby back rib cut, includes rib bones and related intercostal meat. Each back rib cut is intact and includes portions of at least eight ribs. See *Institutional Meat Purchaser Specification Item No. 422* (Jano, 1997). Back rib cuts are generally sold as a single intact rib section, which may be prepared and consumed with various sauces. The demand for the baby back rib cuts has increased dramatically in recent years due to the increase in the number of barbeque-themed restaurants. However, because back rib cuts typically contain only intercostal meat between the rib bones, conventional back rib cuts do not include a substantial amount of meat.

In recent years, corporations owning barbeque-themed restaurants have become increasingly interested in barbeque style food products that can retain the interest of repeat business. Consuming barbeque style ribs in a social situation, however, has always been a delicate undertaking. Traditionally, barbeque style ribs have carried the distinction of being an untidy food item, and as a result, are left off of many fine dining menus. Enjoying barbeque style ribs is often difficult, as eating them can be time consuming, embarrassing, and messy. As is often the custom, barbeque ribs are eaten without utensils, utilizing one's own hands to assist in separating the meat from the rib bones and introducing the meat into one's mouth.

As a result of this direct contact of the meat with the hands, the thick consistency of barbeque sauce has the potential to coat one's hands and is difficult to remove without the assistance of a moist towelette or inserting by one's own fingers into their mouth to assist in removing the excess barbeque sauce.

Embarrassment can also occur due to the shape of the rib bones themselves. A single barbeque style rib possesses the shape of an elongated cylinder, encased in meat and covered with barbeque sauce. When taken in one's mouth to eat, if not eaten with care, the rib can displace sauce onto the consumer's face, which can cause great embarrassment.

There are also health risks associated with the consumption of ribs. Because of the irregular shapes and hardness of the rib bones, the risk of injury to the inside of one's mouth is also a concern. Furthermore, the potential for choking on a portion of a rib bone causes people to avoid consuming ribs.

**2**

Additionally, a meat cut that includes both rib bones and associated meat makes it more difficult for a person to consume all available meat, because the person must work around and between the bones. Therefore, consuming barbeque style ribs has the tendency to be tedious and laborious, due to the requirement of tearing the meat from the bones and eating meat from around the rib bones themselves.

There have been attempts to produce boneless pork and beef back rib products. One such method of producing boneless rib meat includes first separating the rib meat from the bones, creating a paste-like meat intermediate product, and restructuring the paste-like intermediate product into a form that attempts to resemble the appearance of a natural slab of ribs. These types of processed or restructured rib products are commonly offered by fast food restaurant chains and in the frozen foods sections of retail grocery stores. Obviously, these boneless pork or beef products that lack the natural appearance and consistency of an unprocessed slab of rib meat.

Heretofore, there has been no process for providing a ready-to-eat de-boned rib product that does not involve processing the native rib meat into piece or parts, and reforming or restructuring meat pieces into a slab-shaped product. Accordingly, there is still a need in the art for a barbeque style rib meat product that can be readily consumed and that overcomes the disadvantages associated with consuming traditional barbeque ribs having bones embedded therein. Such a de-boned rib meat product would avoid the stigma traditionally attached to dining on barbeque style ribs and is therefore more likely to result in repeat business for barbeque-themed restaurants, retail grocery outlets, and the like.

### SUMMARY

Provided is a de-boned substantially intact length of rib meat.

Also provided is a cooked and de-boned substantially intact length of rib meat.

Additionally provided is a process for preparing a length of de-boned rib meat comprising cooking a length of rib meat having at least one rib bone at least partially embedded therein at a temperature and for a time sufficient to enable the removal of at least one of said rib bones from said length of rib meat, while maintaining a substantially intact length of rib meat; and removing at least one of said rib bones from said length of rib meat.

Further provided is a packaged ready-to-heat and serve rib meat product comprising a package, at least one de-boned substantially intact length of rib meat contained within said package, and optionally a flavoring agent associated with said package.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a side sectional view of a side of pork or beef with cut lines added to illustrate main portions including St. Louis style rib and back rib portions.

FIG. 2 is a perspective view of slab of rib meat including a plurality of rib bones embedded within the rib meat.

FIG. 3 is a perspective view of a cooked and de-boned continuous slab of rib meat.

FIG. 4A is a flowchart of one illustrative embodiment of a process for preparing the cooked and de-boned rib meat product.

FIG. 4B is a flowchart of another illustrative embodiment of a process for preparing the cooked and de-boned rib meat product.

US 7,666,075 B1

3

DETAILED DESCRIPTION

Disclosed is a process for the preparation of a de-boned beef or pork rib meat cut. Broadly, the rib meat cut is prepared by cooking a desired length of rib meat having at least one bone embedded within the rib meat and removing the at least one of the embedded rib bones from the rib meat. According to the process, the rib bones can be easily separated from the rib meat, while thereby maintaining a substantially intact length of rib meat. Thus, the process provides a cooked and de-boned substantially intact continuous length of rib meat. The rib meat product can be consumed using conventional utensils (fork and knife), without having to first separate the meat from the bones, or to navigate around the bones to remove all of the rib meat. By removing the bones from a barbeque style slab of rib meat, the tediousness, embarrassing, and messy nature of the act of consuming the ribs is avoided.

According to illustrative embodiments, the process for preparing the rib meat product involves cooking a length of rib meat having at least one rib bone embedded therein at a temperature and for a time sufficient to enable the removal of at least one the rib bones from the length of rib meat, while maintaining the continuous length of natural rib meat. At least one of the embedded rib bones is removed from the rib meat, thereby forming a substantially intact continuous length of rib meat.

As used throughout this specification, the term "cooking" shall refer to partially cooking, substantially cooking, or fully cooking a desired length of rib meat. A partially cooked length of rib meat retains certain qualities of raw pork or beef meat, but a higher internal temperature than that of raw meat is reached within the meat. A substantially cooked length of rib meat refers to meat that has been more than partially cooked and has reached an internal temperature where the rib meat begins to lose its reddish color. A fully cooked length of rib meat refers to a length of rib meat that has been cooked such that it can be readily consumed without a health risk. The term "cooked" refers to a length of rib meat that has been partially cooked, substantially cooked or fully cooked. It should be noted that partially cooking, substantially cooking, or fully cooking may provide sufficient cooking to produce rib meat retaining minimal attachment to the rib bones, thereby enabling the removal of the rib bones from the meat while maintaining a substantially intact continuous length of rib meat.

As used throughout this specification, the term "de-boned" shall refer to a desired length or section of rib meat, wherein at least one of the rib bones embedded in the rib meat has been removed. Thus, a de-boned length of rib meat refers to desired lengths of rib meat wherein one or more of the rib bones have been removed from the meat. According to certain illustrative embodiments, all of the rib bones in a desired length of rib meat have been removed to provide a boneless length of rib meat. It should be noted, however, that it may be desirable to leave one or more of the rib bones embedded within the length of rib meat at strategic positions. Therefore, the term "de-boned" may also refer to those lengths of rib meat in which at least one rib bone has been removed, but at least one rib bone remains embedded in the rib meat.

As used throughout this specification, the term "substantially intact" refers to a desired length or section of rib meat, wherein after removal of at least one of the rib bones embedded therein, the rib meat substantially retains its natural consistency, texture, and shape is held prior to the bones being removed. It should be noted that in removing the bones from the length or section of rib meat, the bones may retain some slight level of attachment to the meat wherein the bones

4

emerge from the length of rib meat with an amount of meat remaining attached on the bones. This situation is encompassed by the term "substantially intact."

The term "length of rib meat" refers to any desired section or portion of rib meat. It can be appreciated that a length of rib meat is not limited to a length of rib meat that spans a plurality of rib bones, but the length of rib meat may also comprise an individual (a single) rib section) rib section wherein the one rib bone location in this rib meat section has been removed. A single rib meat section simply comprises the rib meat adjacent both sides of the removed rib bone and connecting meat.

FIG. 1 is a diagrammatical side sectional view of the side of pork or beef 10 with cut lines 12 added to illustrate the major cuts or portions of side 10 after butchering. Typically, side 10 is butchered about cut lines 12 into main cuts or portions including shoulder 14, loin 16, ham 18, and belly 20. Back ribs 22, also known as "baby back" ribs, originate from the blade and center section of the loin 16. Back ribs 18 contain meat between the ribs called finger meat and include at least 8 ribs.

Spare ribs 24 comprise the intact rib section removed from the belly 20 of the pork side. Spare ribs 24 may be further butchered or cut into St. Louis-style spare ribs and brisket or breast bone spare ribs. Spare ribs 24 are separated into St. Louis-style ribs and breast bone spare ribs by cutting about cut line 13 along costal cartilage connecting the breast bone spare ribs and the St. Louis-style ribs. Breast bone spare ribs are generally taken from the belly of the hog or cow.

FIG. 2 illustrates the traditional slab of rib meat 30 with rib bones 32 lodged among the intercostal meat 34. Despite St Louis-style rib being illustrated in FIG 2, this process is not limited to the preparation of a de-boned and substantially intact length of rib meat from a St. Louis-style rib cut, but may also include any rib cut including, without limitation, the traditional spare rib cut and baby back rib cut.

FIG. 3 is a perspective view of an illustrative embodiment of a cooked and substantially intact length of rib meat prepared in accordance with the process. As shown in FIG. 3, side 42 of the rib meat product 40 comprises a completely de-boned and substantially intact length of rib meat that is ready for consumption. Reference numeral 44 refers to the channel or slits in the rib meat where the rib bones had resided prior to being removed. The rib meat 40 retains its natural consistency, texture, form and shape it held prior to the bones being removed. The cooked and de-boned length of rib meat resembles a high-end boneless steak or filet of rib meat. Accordingly, the rib meat is more palatable and can be consumed in an easier and tidier fashion, which is contrary to most previous barbeque dining experiences.

The process for preparing a length of de-boned rib meat includes cooking a length of rib meat having at least one rib bone embedded therein at both a temperature and for a time sufficient to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat. At least one of the rib bones is removed from the length of rib meat. According to certain embodiments, all of the bones from the length of rib meat are removed to produce a boneless slab of rib meat.

The rib meat is cooked under certain time-temperature regimens to enable the removal of the rib bones from the rib meat without damaging the continuous length of rib meat. According to certain illustrative embodiments, the rib meat is cooked pursuant to at least two time-temperature regimens. By way of illustration, but not in limitation, the process includes cooking the length of rib meat at a first temperature for a first period of time, followed by cooking the length of rib

US 7,666,075 B1

5

meat at a second temperature for a second period of time. Cooking the rib meat in accordance with these time-temperature regimens permits the easy removal of at least one of the rib bones from the length of rib meat.

According to certain embodiments, desired length of rib meat are cooked at a temperature of greater than 0 to about 400 degrees Fahrenheit for a sufficient amount of time to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat.

According to certain embodiments, desired lengths of rib meat are cooked at a temperature of greater than 0 to about 400 degrees Fahrenheit for a period of time ranging from about 1 hour to about 6 hours to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat.

According to certain embodiments, desired lengths of rib meat are cooked at a temperature of greater than 0 to about 400 Fahrenheit for a period of time ranging from about 1 hour to about 5 hours to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat.

According to certain embodiments, the time-temperature regimens for cooking the rib meat include cooking a length of rib meat for a first temperature from about 100 to about 300 degrees Fahrenheit for a period of time from about 1 to about 6 hours, followed by cooking the length of rib meat at a second temperature for a second period of time and removing at least one of the rib bones from the length of cooked rib meat.

According to other embodiments, the time-temperature regimens for cooking the rib meat includes cooking said length of rib meat at a first temperature for a first period of time, followed by cooking the length of rib meat at a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 about 120 minutes, and removing at least one of the rib bones from the length of rib meat.

According to further embodiments, the time-temperature regimens for cooking the rib meat includes cooking said length of rib meat at a first temperature from about 100 to about 300 degrees Fahrenheit for a time period from about 1 to about 6 hours, followed by cooking said length of rib meat for a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 to about 120 minutes and removing at least one of the rib bones from the length of rib meat.

According to further embodiments, the time-temperature regimens for cooking the rib meat comprises cooking the length of rib meat at a first temperature of about 400 degrees Fahrenheit for a time period from about 1 to about 4 hours, followed by cooking the length of rib meat for a time period from about 300 degrees Fahrenheit for a time period from about 30 to about 90 minutes and removing at least one of the rib bones from the length of rib meat.

To facilitate the retention of moisture within the length of rib meat during the use of more of the various cooking regimens, the length of rib meat may be located within a moisture loss preventive environment. The moisture loss preventive environment is any suitable environment that acts to minimize, reduce, lessen or prevent loss of moisture of from the length of rib meat. For example, without limitation, to facilitate the retention of moisture in the rib meat, at least a portion of the length of rib meat may be enclosed or wrapped in a suitable moisture loss preventive material. Such materials

6

include plastic wrap, metal foil, such as aluminum foils, cooking bags, and other suitable containers. The step of enclosing or wrapping the length of rib meat in a moisture loss preventive material may also comprise hermetically sealing the length of rib meat in a suitable hermetic enclosure. The length of rib meat may be enclosed or wrapped in such moisture loss preventive material at any stage prior or during the cooking process. To be hermetically sealed, the slab of rib meat will cook within its own environment that is different from the oven enclosure. Sealing the slab of rib meat protects the slab from a cooking environment and maintains the moisture level within the slab of rib meat. A plastic sheet or plastic bag or any other suitable packaging (such as vacuum packaging) may be used to wrap the slab of rib meat as long as it provides a hermetic enclosure. It should be noted that the step of locating the length of rib meat within a moisture loss preventive environment is not limited to enclosing, or wrapping the meat within a moisture loss preventive material. The length of rib meat may be positioned within the inner chamber or volume of suitable piece of equipment and further cooked, so long as the chamber or volume acts to minimize, reduce or even prevent moisture loss from the length of rib meat.

By way of illustration, the desired length of rib meat may be to enclosed within a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat, prior to the commencement of any cooking. Thus, according to certain embodiments, the process for preparing a de-boned length of rib meat includes enclosing the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat cooking at a temperature and for a time sufficient to enable the removal of at least one of said rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat cooking at a first temperature for a first period of time and cooking the length of rib meat at a second temperature for a second period of time enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat for a first temperature from about 100 to about 300 degrees Fahrenheit for a period of time from about 1 to about 6 hours, and cooking the length of rib meat at a second temperature for a second period of time enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat at a first temperature for a first period of time, and cooking said length of rib meat at a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 about 120 minutes to enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact

US 7,666,075 B1

7

continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat at a first temperature from about 100 to about 300 degrees Fahrenheit for a time period from about 1 to about 6 hours, and cooking the length of rib meat for a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 to about 120 minutes; and to enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

The various cooking regimens of the process may be carried out by cooking the length of rib meat in any suitable cooking apparatus. For example, and without limitation, cooking the length of rib meat may be carried out by cooking in a conventional oven, cooking in a convection oven, smoking, steaming, roasting, boiling, broiling, cooking in a slow cooker, halogen lamp cooking, or any combinations thereof. According to a suitable embodiment, the cooking stages are carried out by smoking the length of rib meat. In other embodiments, a combination of smoking the length of rib meat and cooking by halogen lamps may be used to facilitate removal of the rib bones, yet maintaining the tenderness and juiciness of the rib meat to enable the separation of the rib bones from the rib meat.

The process for the preparation of the de-boned rib product also includes imparting a flavor to the length of rib meat. The step of imparting flavor to the length of rib meat may comprise at least one of seasoning the meat, marinating the meat, injection marinating the meat, dry rubbing the meat, basting the meat, smoking the meat, or combinations thereof.

Once the length of rib meat has been cooked to enable removal of the rib bones, the bones are removed. The rib bones may be removed from the rib meat by any suitable process known in the culinary art, so long as the desired length of rib meat remains substantially intact. For example, and not in limitation, the removal of at least one rib bones may be accomplished by manually removing the rib bones, using a non-automated hand-tool to remove the bones, by mechanically removing the rib bones with suitable power equipment, or by combinations thereof. It should be also noted that the rib bones may be removed prior to cooking the length of rib meat, so long as the process of removing the rib bones from the meat maintains a substantially intact length of rib meat.

If the cooked and de-boned length of rib meat is prepared in the retail restaurant setting, the product may be presented to the diner for consumption. If the cooked and de-boned length of rib meat is prepared and destined for resale at a retail grocery store, or other sales outlet, then the product can be suitably packaged. By way of illustration, suitable packaging includes vacuum packaging the length of cooked and de-boned rib meat. It is contemplated that the cooked and de-boned rib meat may also by suitable for sale as a frozen, heat and serve product that would be commercially available at a grocery outlet. In this case, the cooked and de-boned rib meat is frozen and packaged in a suitable package for resale.

Also disclosed is a packaged ready-to-heat and serve de-boned rib meat product. The packaged rib product comprises a package and at least one de-boned substantially intact length of rib meat that is contained within the package. According to certain embodiments, a separate flavoring agent may be associated with the packaged rib product. It should be

8

noted that the separate flavoring agent may be contained with the cooked and de-boned rib meat inside of the package, or simply provided with the packaged rib meat product.

According to certain embodiments, also provided is a packaged ready-to-heat and serve rib meat product comprising a package, at least one cooked and de-boned substantially intact continuous length of rib meat contained within the package, and optionally a flavoring agent associated with the package. It should be noted that the separate flavoring agent may be contained with the cooked and de-boned rib meat inside of the package, or simply provided with the packaged rib meat product.

For the embodiments of the packaged rib meat product that includes a flavoring agent, the flavoring agent may include an agent in the form of dry rubs, sauces, bastes, marinades, injection flavorings, or combinations thereof.

FIG. 4A depicts a flow chart for an illustrative embodiment of the process for preparing a cooked and de-boned length of rib meat. This process results in the preparation of de-boned length of rib meat that retains the natural consistency, texture and shape of a slab of rib meat that has been removed from the rib meat.

At step 50, a slab of ribs is presented for processing. As described herein, the slab of ribs may comprise a slab of traditional spare ribs, a slab of St. Louis style ribs, baby back ribs, or any other rib cut. According to step 60, the process includes the optional step of imparting a flavoring to the rib meat with any combination of spices and seasonings. The exact form and blend of flavorings is unlimited and is up to the preparer of the slab of rib meat.

At step 70, the flavored or unflavored slab of rib meat is then located within a moisture loss preventive environment. Locating the slab of ribs in such an environment maintains a suitable moisture level within the slab of rib meat.

Following the optional flavoring 60 and locating 70 steps, if these steps are carried out, the length of rib meat is cooked 80 at a temperature and for a time sufficient to enable the removal of the rib bones from the length of rib meat, while maintaining a substantially intact length of rib meat. Following cooking step 80, the rib bones are separated from the slab of rib meat, leaving a substantially intact continuous length of rib meat.

After the bones have been removed from the rib meat in step 90, the boneless steak or filet of rib meat may be immediately consumed 100 or packaged for future sale 110. Alternatively, the boneless slab of rib meat can be further packaged as desired (e.g., frozen, seasoned, cooked, smoked etc.) to create a final servable food product. The further packaged boneless slab of rib meat can be sold as a pre-cooked ready to eat meal, and only requires that the slab of rib meat be warmed to a desirable temperature.

FIG. 4B depicts a flow chart for another illustrative embodiment of the process for preparing a cooked and de-boned length of rib meat. This process results in the preparation of de-boned length of rib meat that retains the natural consistency, texture and shape of a slab of rib meat had the bones not been removed from the rib meat.

At step 120, a slab of ribs is presented for processing. As described in connection with the flowchart of the illustrative embodiment shown in FIG. 4A, the slab of ribs may comprise a slab of traditional spare ribs, a slab of St. Louis style ribs, baby back ribs, or other rib cut. According to step 130, the process includes the optional step of imparting a flavoring to the rib meat with any combination of spices and seasonings. The exact blend of flavoring is unlimited and is up to the preparer of the slab of rib meat.

US 7,666,075 B1

9

Following the seasoning stage, at step 140, the length of rib meat is exposed to a first cooking regimen which comprises exposing the length of rib meat to a flavored smoke at a temperature of at least 100 degrees Fahrenheit for a period of time between two hours and six hours. To "smoke" a slab of rib meat comprises burning flavored wood (for example, but not limited to Apple, Cherry, Hickory, Peach or Mesquite woods) within a confined area so that the slab of rib meat absorbs the aroma of the smoke and therefore imparts additional flavor to the slab of rib meat.

Following the "smoking" step 140, the slab of rib meat is then removed from the smoker 150 and optionally seasoned with various barbeque sauce flavors. The meat can be either basted with a semi-viscous fluid or "dry-rubbed" with a powder seasoning mix. In one embodiment, basting the rib meat is performed by covering the slab of rib meat with a fluid of high viscosity on the theory that the slab of rib meat will absorb additional flavor from the basting. Basting the meat allows the highly viscous fluid to penetrate the outer layer of the meat and permeate the lower layers of meat, providing additional flavor throughout the meat, and not only within the outermost layers of meat.

In another embodiment, the meat can also be seasoned with a "dry-rub". Dry rubs differ from basting sauces in that the rubs are powdery mixes lacking any form of moisture. Dry rub mixes can be made up of a multitude of seasonings into infinite number of mixes and only limited by the creativity of the preparer. The theory behind seasoning the slab of meat is the same behind the basting process. The powder seasoning mix will mix with the meats own juices secreted during cooking, allowing the mix to be absorbed into the lower layers of meat. However, in the seasoning process, both the basting step and dry rub step is purely optional and can be skipped at the desire of the preparer.

At step 160, the slab of rib meat is then enclosed within a moisture loss preventive environment. According to the embodiment of the process depicted in the flowchart of FIG. 4B, the length of rib meat is enclosed in a cooking bag which is then sealed.

As shown at step 170, once the slab of rib meat is located within the moisture loss preventive environment, it is desirable that the slab of rib meat be cooked by convection oven cooking 170 for at least 60 minutes at a temperature of at least 200 degrees, depending on the individual oven and how many slabs are on each sheet tray. Thus, depending on the number of slabs on a tray, cooking time may be lengthened and/or the temperature be raised. Additionally, a single slab of rib meat may require less cooking time, and the temperature may need to be constant.

In another further embodiment, it is possible to wrap the slab of rib meat or seal in a hermetic enclosure prior to the smoking of the slab of rib meat or prior to the first period of time in the suitable cooking device. Therefore, it is optional that the slab of rib meat need not be wrapped or sealed in between the first and second cooking stages. Accordingly, if wrapped prior to the smoking stage, the slab of rib meat can be inserted directly into the second cooking stage for its desired length of time.

Following the second period of cooking at step 170, the slab of rib meat can be removed from the cooking enclosure. At this time, according to step 180, the slab of rib meat can be removed from the moisture loss preventive environment and the rib bones are separated from the length of rib meat to produce a substantially intact de-boned continuous length of rib meat.

Each rib bone within the slab of rib meat is exposed to very small forces in during the removal process, so that its fiber

10

structure of the slab of rib meat is retained as much as possible, and the risk of damage to the meat is very low. What is left is a boneless slab of rib meat that is substantially intact.

The exact reason for the meat separating from the bone during the wrapped/cooking stage is not precisely known. Without being bound to any particular theory, locating the slab of rib meat within a moisture loss preventive environment protects the slab of rib meat within a cooking environment that maintains a high level of moisture level within the meat itself. This high level of moisture serves two purposes: first, retaining the moisture maintains the slab of rib meat's juiciness and tenderness, which prevents it from becoming dry and difficult to consume; second, the high level of moisture also acts as a solution to break down the natural attachments between the muscle (meat) and the bone. It is this breaking down of the bonds between the meat and bone that allows the bone to be removed from the slab of rib meat with little to no resistance and therefore leaves the slab of rib meat substantially intact.

After the bones have been removed in step 180, the boneless length of rib meat can then be immediately consumed 190 or packed either dry or with a marinade 200 for future sale. Alternatively, the boneless slab of rib meat can be further packaged as desired (e.g., frozen, seasoned, cooked, smoked etc.) to create a final servable food product. The further packaged boneless slab of rib meat can be sold as a pre-cooked ready to eat meal, and only requires that the slab of rib meat be warmed to a desirable temperature.

The disclosed process prepares a pork or beef meat cut to become a more attractive and economically beneficial product to achieve an end product that is more in demand. The boneless slab of rib meat can be consumed with utensils, in the manner similar to how one would consume other boneless or bone-in pork or beef meat products like steaks or pork chops.

Thus, provided is a process for producing a boneless slab of rib meat that which results in a meaty and easy to consume boneless steak or filet of rib meat. This process involves a minimally invasive way to remove the rib bones from a slab of rib meat to provide a length of boneless rib meat. Accordingly, the process creates an edible boneless slab of rib meat, which can be consumed without having to maneuver around the rib bones themselves.

It will be understood that the embodiments described herein are merely illustrative and that a person skilled in the art may make many variations and modifications without departing from the spirit and scope of the invention. All such modifications and variations are intended to be included within the scope of the appended claims. It should be understood that the embodiments described herein are not only in the alternative, but can be combined.

We claim:

1. A cooked and de-boned substantially intact length of rib meat.

2. The rib meat of claim 1, comprising beef rib meat.

3. The rib meat of claim 1, comprising pork rib meat.

4. The rib meat of claim 3, comprising cooked and de-boned substantially intact continuous length rib meat from a traditional spare rib cut.

5. The rib meat of claim 3, comprising cooked and de-boned substantially intact continuous length rib meat from a St. Louis style spare rib cut.

6. The rib meat of claim 3, comprising cooked and de-boned substantially intact continuous length from a back rib cut.

7. The rib meat of claim 3, wherein said substantially intact length of rib meat is boneless

US 7,666,075 B1

11

8. A packaged rib meat product comprising:

a package;

at least one de-boned substantially intact length of rib meat contained within said package; and

a separate flavoring agent associated with said product.

9. The packaged rib meat product of claim 8, wherein said product is a ready-to-heat and serve product and comprises at

12

least one cooked and de-boned substantially intact length of rib meat contained within said package.

10. The packaged rib meat product of claim 8, wherein said flavoring agent is selected from the group consisting of dry rubs, sauces, bastes, marinades, injection flavorings, and combinations thereof.

* * * * *

## UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.        : 7,666,075 B1                                           Page 1 of 1
APPLICATION NO. : 11/595268
DATED              : February 23, 2010
INVENTOR(S)      : Baker et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page:

The first or sole Notice should read --

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b)
by 638 days.

Signed and Sealed this

Seventh Day of December, 2010

David J. Kappos
Director of the United States Patent and Trademark Office

US007959500B1

(12) **United States Patent**
Baker et al.

(10) Patent No.: **US 7,959,500 B1**
(45) Date of Patent: **Jun. 14, 2011**

(54) **PROCESS FOR PREPARING RIB MEAT PRODUCT**

(76) Inventors: **James A. Baker**, Avon, OH (US); **Brittani Baker**, Westlake, OH (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/691,450**

(22) Filed: **Jan. 21, 2010**

**Related U.S. Application Data**

(62) Division of application No. 11/595,268, filed on Nov. 9, 2006, now Pat. No. 7,666,075.

(51) Int. Cl.
*A22C 17/00* (2006.01)

(52) U.S. Cl. ............................................ 452/135

(58) Field of Classification Search ............... 452/2–6, 452/102–105, 125, 137, 198
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,137,605 A | 2/1979 | van Rij et al. |
| 4,186,216 A | 1/1980 | Roth |
| 4,217,679 A | 8/1980 | Gordon |
| 5,104,351 A | 4/1992 | van den Nieuwelaar et al. |
| 5,197,918 A | 3/1993 | Kloosen |
| 5,273,483 A | 12/1993 | Gagliardi, Jr. |
| 5,464,368 A | 11/1995 | White et al. |
| 5,525,103 A | 6/1996 | White et al. |
| 5,667,435 A | 9/1997 | Baughman et al. |
| 5,775,986 A | 7/1998 | Law et al. |
| 5,823,867 A | 10/1998 | Roth et al. |
| 5,868,613 A | 2/1999 | Heidke et al. |
| 5,976,004 A | 11/1999 | Hazenbroek |
| 6,527,636 B2 | 3/2003 | Mickelson |
| 6,648,744 B2 | 11/2003 | Bell et al. |
| 6,716,097 B2 | 4/2004 | Freund et al. |
| 7,008,313 B2 | 3/2006 | Gagliardi, Jr. |
| 7,022,007 B2 | 4/2006 | Nichting |
| 7,198,564 B2 | 4/2007 | Hino et al. |
| 2006/0035005 A1 | 2/2006 | McMindes et al. |

FOREIGN PATENT DOCUMENTS

EP    1053684    11/2002

*Primary Examiner* — Thomas Price
(74) *Attorney, Agent, or Firm* — Cantolo Sidoti Co., LPA; Salvatore A. Sidoti

(57) **ABSTRACT**

A cooked and de-boned substantially intact slab of rib meat is provided. A process for preparing a de-boned rib meat product from a pork or beef rib cut is also provided. The process for preparing the rib meat product involves cooking a length of rib meat having rib bones embedded therein at a temperature and for a time sufficient to enable the removal of the rib bones from the length of rib meat, while maintaining a substantially intact length of rib meat.

23 Claims, 5 Drawing Sheets



U.S. Patent          Jun. 14, 2011          Sheet 1 of 5          US 7,959,500 B1



FIG 1

**U.S. Patent**          Jun. 14, 2011          Sheet 2 of 5          US 7,959,500 B1



FIG 2

**U.S. Patent**          Jun. 14, 2011          Sheet 3 of 5          US 7,959,500 B1



FIG 3

**U.S. Patent**          Jun. 14, 2011          Sheet 4 of 5          US 7,959,500 B1



FIG 4A

**U.S. Patent**          Jun. 14, 2011          Sheet 5 of 5          US 7,959,500 B1



FIG 4B

US 7,959,500 B1

**1**

## PROCESS FOR PREPARING RIB MEAT PRODUCT

### CROSS REFERENCE TO RELATED APPLICATIONS

This application is a divisional application of copending application U.S. Ser. No. 11/595,268 filed on Nov. 9, 2006, which is incorporated by reference in its entirety.

### TECHNICAL FIELD

Generally provided is a cooked and de-boned meat product and a process for preparing the meat product. More particularly, provided is a cooked and de-boned rib meat product and a process for preparing the rib meat product. The process of preparation results in a ready-to-eat substantially intact beef or pork rib meat steak, which does not include any rib bones.

### BACKGROUND

Pork and beef carcasses are typically butchered into several cuts or portions, which may be used to prepare spare ribs and back ribs. Spare ribs may be further divided into the traditional breast bone spare ribs or St. Louis style spare ribs. St. Louis style spare ribs generally comprise the upper part of a rib separated from the breast bone or brisket bone. St. Louis style spare ribs are generally very meaty and include minimal fat.

Back rib cuts are generally prepared by cutting the loin sections between the back ribs and the semispinalis muscle adjacent to the back ribs to form a loin cut and a back rib cut. The back rib meat cut, also known as a baby back rib cut, includes rib bones and related intercostal meat. Each back rib cut is intact and includes portions of at least eight ribs. See *Institutional Meat Purchaser Specification Item No. 422* (June, 1997). Back rib cuts are generally sold as a single intact rib section, which may be prepared and consumed with various sauces. The demand for the baby back rib cuts has increased dramatically in recent years due to the increase in the number of barbeque-themed restaurants. However, because back rib cuts typically contain only intercostal meat between the rib bones, conventional back rib cuts do not include a substantial amount of meat.

In recent years, corporations owning barbeque-themed restaurants have become increasingly interested in barbeque style food products that can retain the interest of repeat business. Consuming barbeque style ribs in a social situation, however, has always been a delicate undertaking. Traditionally, barbeque style ribs have carried the distinction of being an untidy food item, and as a result, are left off of many fine dining menus. Enjoying barbeque style ribs is often difficult, as eating them can be time consuming, embarrassing, and messy. As is often the custom, barbeque ribs are eaten without utensils, utilizing one's own hands to assist in separating the meat from the rib bones and introducing the meat into one's mouth.

As a result of this direct contact of the meat with the hands, the thick consistency of barbeque sauce has the potential to coat one's hands and is difficult to remove without the assistance of a moist towelette or inserting by one's own fingers into their mouth to assist in removing the excess barbeque sauce.

Embarrassment can also occur due to the shape of the rib bones themselves. A single barbeque style rib possesses the shape of an elongated cylinder, encased in meat and covered with barbeque sauce. When taken to one's mouth to eat, if not

**2**

eaten with care, the rib can displace sauce onto the consumer's face, which can cause great embarrassment.

There are also health risks associated with the consumption of ribs. Because of the irregular shapes and hardness of the rib bones, the risk of injury to the inside of one's mouth is also a concern. Furthermore, the potential for choking on a portion of a rib bone causes people to avoid consuming ribs.

Additionally, a meat cut that includes both rib bones and associated meat makes it more difficult for a person to consume all available meat, because the person must work around and between the bones. Therefore, consuming barbeque style ribs has the tendency to be tedious and laborious, due to the requirement of tearing the meat from the bones and eating meat from around the rib bones themselves.

There have been attempts to produce boneless pork and beef back rib products. One such method of producing boneless rib meat includes first separating the rib meat from the bones, creating a paste-like meat intermediate product, and restructuring the paste-like intermediate product into a form that attempts to resemble the appearance of a natural slab of ribs. These types of processed or restructured rib products are commonly offered by fast food restaurant chains and in the frozen foods sections of retail grocery stores. Obviously, these boneless pork or beef products that lack the natural appearance and consistency of an unprocessed slab of rib meat.

Heretofore, there has been no process for providing a ready-to-eat de-boned rib product that does not involve processing the native rib meat into piece or parts, and reforming or restructuring meat pieces into a slab-shaped product. Accordingly, there is still a need in the art for a barbeque style rib meat product that can be readily consumed and that overcomes the disadvantages associated with consuming traditional barbeque ribs having bones embedded therein. Such a de-boned rib meat product would avoid the stigma traditionally attached to dining on barbeque style ribs and is therefore more likely to result in repeat business for barbeque-themed restaurants, retail grocery outlets, and the like.

### SUMMARY

Provided is a de-boned substantially intact length of rib meat.

Also provided is a cooked and de-boned substantially intact length of rib meat.

Additionally provided is a process for preparing a length of de-boned rib meat comprising cooking a length of rib meat having at least one rib bone at least partially embedded therein at a temperature and for a time sufficient to enable the removal of at least one of said rib bones from said length of rib meat, while maintaining a substantially intact length of rib meat; and removing at least one of said rib bones from said length of rib meat.

Further provided is a packaged ready-to-heat and serve rib meat product comprising a package, at least one de-boned substantially intact length of rib meat contained within said package, and optionally a flavoring agent associated with said package.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a side sectional view of a side of pork or beef with cut lines added to illustrate main portions including St. Louis style rib and back rib portions.

FIG. 2 is a perspective view of slab of rib meat including a plurality of rib bones embedded within the rib meat.

US 7,959,500 B1

3

FIG. 3 is a perspective view of a cooked and de-boned continuous slab of rib meat.

FIG. 4A is a flowchart of one illustrative embodiment of a process for preparing the cooked and de-boned rib meat product.

FIG. 4B is a flowchart of another illustrative embodiment of a process for preparing the cooked and de-boned rib meat product.

## DETAILED DESCRIPTION

Disclosed is a process for the preparation of a de-boned beef or pork rib meat cut. Broadly, the rib meat cut is prepared by cooking a desired length of rib meat having at least one bone embedded within the rib meat and removing the at least one of the embedded rib bones from the rib meat. According to the process, the rib bones can be easily separated from the rib meat, while the maintaining a substantially intact length of rib meat. Thus, the process provides a cooked and de-boned substantially intact continuous length of rib meat. The rib meat product can be consumed using conventional utensils (fork and knife), without having to first separate the meat from the bones, or to navigate around the bones to remove all of the rib meat. By removing the bones from a barbeque style slab of rib meat, the tediousness, embarrassing, and messy nature of the act of consuming the ribs is avoided.

According to illustrative embodiments, the process for preparing the rib meat product involves cooking a length of rib meat having at least one rib bone embedded therein at a temperature and for a time sufficient to enable the removal of at least one the rib bones from the length of rib meat, while maintaining the continuous length of natural rib meat. At least one of the embedded rib bones is removed from the rib meat, thereby forming a substantially intact continuous length of rib meat.

As used throughout this specification, the term "cooking" shall refer to partially cooking, substantially cooking, or fully cooking a desired length of rib meat. A partially cooked length of rib meat retains certain qualities of raw pork or beef meat, but a higher internal temperature than that of raw meat is reached within the meat. A substantially cooked length of rib meat refers to meat that has been more than partially cooked and has reached an internal temperature where the rib meat begins to lose its reddish color. A fully cooked length of rib meat refers to a length of rib meat that has been cooked such that it can be normally consumed without a health risk. The term "cooked" refers to a length of rib meat that has been partially cooked, substantially cooked or fully cooked. It should be noted that partially cooking, substantially cooking, or fully cooking may provide sufficient cooking to produce rib meat retaining minimal attachment to the rib bones, thereby enabling the removal of the rib bones from the meat while maintaining a substantially intact continuous length of rib meat.

As used throughout this specification, the term "de-boned" shall refer to a desired length or section of rib meat, wherein at least one of the rib bones embedded in the rib meat has been removed. The de-boned length of rib meat refers to desired lengths of rib meat wherein one or more of the rib bones have been removed from the meat. According to certain illustrative embodiments, all of the rib bones in a desired length of rib meat have been removed to provide a boneless length of rib meat. It should be noted, however, that it may be desirable to leave one or more of the rib bones embedded within the length of rib meat at strategic positions. Therefore, the term "de-boned" may also refer to those lengths of rib meat in which at

4

least one rib bone has been removed, but at least one rib bone remains embedded in the rib meat.

As used throughout this specification, the term "substantially intact" refers to a desired length or section of rib meat, wherein after removal of at least one of the rib bones embedded therein, the rib meat substantially retains its natural consistency, texture, and shape it held prior to the bones being removed. It should be noted that in removing the bones from the length or section of rib meat, the bones may retain some slight level of attachment to the meat wherein the bones emerge from the length of rib meat with an amount of meat remaining attached on the bones. This situation is encompassed by the term "substantially intact."

The term "length of rib meat" refers to any desired section or portion of rib meat. It can be appreciated that a length of rib meat is not limited to a length of rib meat that spans a plurality of rib bones, but the length of rib meat may also comprise an individual (a single rib section) rib section wherein the one rib bone location in this rib meat section has been removed. A single rib meat section simply comprises the rib meat adjacent both sides of the removed rib bone and connecting meat.

FIG. 1 is a diagrammatical side sectional view of the side of pork or beef 10 with cut lines 12 added to illustrate the major cuts or portions of side 10 after butchering. Typically, side 10 is butchered about cut lines 12 into main cuts or portions including shoulder 14, loin 16, ham 18, and belly 20. Back ribs 22, also known as "baby back" ribs, originate from the blade and center section of the loin 16. Back ribs 18 contain meat between the ribs called finger meat and include at least 8 ribs.

Spare ribs 24 comprise the intact rib section removed from the belly 20 of the pork side. Spare ribs 24 may be further butchered or cut into St. Louis-style spare ribs and brisket or breast bone spare ribs. Spare ribs 24 are separated into St. Louis-style ribs and breast bone spare ribs by cutting about cut line 33 along costal cartilage connecting the breast bone spare ribs and the St. Louis-style ribs. Breast bone spare ribs are generally taken from the belly of the hog or cow.

FIG. 2 illustrates the traditional slab of rib meat 30 with rib bones 32 lodged among the intercostal meat 34. Despite St Louis-style ribs being illustrated in FIG. 2, this process is not limited to the preparation of a de-boned and substantially intact length of rib meat from a St. Louis-style rib cut, but may also include any rib cut including, without limitation, the traditional spare rib cut and baby back rib cut.

FIG. 3 is a perspective view of an illustrative embodiment of a cooked and substantially intact length of rib meat prepared in accordance with the process. As shown in FIG. 3, side 42 of the rib meat product 40 comprises a completely de-boned and substantially intact length of rib meat that is ready for consumption. Reference numeral 44 refers to the channel or slits in the rib meat where the rib bones had resided prior to being removed. The rib meat 40 retains its natural consistency, texture, form and shape it held prior to the bones being removed. The cooked and de-boned length of rib meat resembles a high-end boneless steak or filet of rib meat. Accordingly, the rib meat is more palatable and can be consumed in an easier and tidier fashion, which is contrary to most previous barbeque dining experiences.

The process for preparing a length of de-boned rib meat includes cooking a length of rib meat having at least one rib bone embedded therein at both a temperature and for a time sufficient to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat. At least one of the rib bones is removed from the length of rib meat. According to certain embodi-

US 7,959,500 B1

5

ments, all of the bones from the length of rib meat are removed to produce a boneless slab of rib meat.

The rib meat is cooked under certain time-temperature regimens to enable the removal of the rib bones from the rib meat without damaging the continuous length of rib meat. According, to certain illustrative embodiments, the rib meat is cooked pursuant to at least two time-temperature regimens. By way of illustration, but not in limitation, the process includes cooking the length of rib meat at a first temperature for a first period of time, followed by cooking the length of rib meat at a second temperature for a second period of time. Cooking the rib meat in accordance with these time-temperature regimens permits the easy removal of at least one of the rib bones from the length of rib meat.

According to certain embodiments, desired lengths of rib meat are cooked at a temperature of greater than 0 to about 400 degrees Fahrenheit for a sufficient amount of time to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat.

According to certain embodiments, desired lengths of rib meat are cooked at a temperature of greater than 0 to about 400 degrees Fahrenheit for a period of time ranging from about 1 hour to about 6 hours to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat.

According to certain embodiments, desired lengths of rib meat are cooked at a temperature of greater than 0 to about 400 Fahrenheit for a period of time ranging from about 1 hour to about 5 hours to enable the removal of at least one of the rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat.

According to certain embodiments, the time-temperature regimens for cooking the rib meat include cooking a length of rib meat for a first temperature from about 100 to about 300 degrees Fahrenheit for a period of time from about 1 to about 6 hours, followed by cooking the length of rib meat at a second temperature for a second period of time and removing at least one of the rib bones from the length of cooked rib meat.

According to other embodiments, the time-temperature regimens for cooking the rib meat includes cooking said length of rib meat at a first temperature for a first period of time, followed by cooking the length of rib meat at a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 about 120 minutes, and removing at least one of the rib bones from the length of rib meat.

According to further embodiments, the time-temperature regimens for cooking the rib meat cooking said length of rib meat at a first temperature from about 100 to about 300 degrees Fahrenheit for a time period from about 1 to about 6 hours, followed by cooking said length of rib meat for a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 to about 120 minutes and removing at least one of the rib bones from the length of rib meat.

According to further embodiments, the time-temperature regimens for cooking the rib meat comprises cooking the length of rib meat at a first temperature of about 400 degrees Fahrenheit for a time period from about 1 to about 4 hours, followed by cooking the length of rib meat for a second temperature of about 300 degrees Fahrenheit for a time period from about 30 to about 90 minutes and removing at least one of the rib bones from the length of rib meat.

6

To facilitate the retention of moisture within the length of rib meat during the one or more of the various cooking regimens, the length of rib meat may be located within a moisture loss preventive environment. The moisture loss preventive environment is any suitable environment that acts to minimize, reduce, lessen or prevent loss of moisture of from the length of rib meat. For example, without limitation, to facilitate the retention of moisture in the rib meat, at least a portion of the length of rib meat may be enclosed or wrapped in a suitable moisture loss preventive material. Such materials include plastic wrap, metal foil, such as aluminum foils, cooking bags, and other suitable containers. The step of enclosing or wrapping the length of rib meat in a moisture loss preventive material may also comprise hermetically sealing the length of rib meat in a suitable hermetic enclosure. The length of rib meat may be enclosed or wrapped in such moisture loss preventive material at any stage prior or during the cooking process. To be hermetically sealed, the slab of rib meat will cook within its own environment that is different from the oven enclosure. Sealing the slab of rib meat protects the slab from a cooking environment and maintains the moisture level within the slab of rib meat. A plastic sheet or plastic bag, or any other suitable packaging (such as vacuum packaging) may be used to wrap the slab of rib meat as long as it provides a hermetic enclosure. It should be noted that the step of locating the length of rib meat within a moisture loss preventive environment is not limited to enclosing or wrapping the meat within a moisture loss preventive material. The length of rib meat may be positioned within the inner chamber or volume of suitable piece of equipment and further cooked, so long as the chamber or volume acts to minimize, reduce or even prevent moisture loss from the length of rib meat.

By way of illustration, the desired length of rib meat may be to enclosed within a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat, prior to the commencement of any cooking. Thus, according to certain embodiments, the process for preparing a de-boned length of rib meat includes enclosing the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat at a temperature and for a time sufficient to enable the removal of at least one of said rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat cooking at a first temperature for a first period of time and cooking the length of rib meat at a second temperature for a second period of time enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat for a first temperature from about 100 to about 300 degrees Fahrenheit for a period of time from about 1 to about 6 hours, and cooking the length of rib meat at a second temperature for a second period of time enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cook-

US 7,959,500 B1

7

ing stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat at a first temperature for a first period of time, and cooking said length of rib meat at a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 about 120 minutes to enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat at a first temperature from about 100 to about 300 degrees Fahrenheit for a time period from about 1 to about 6 hours, and cooking the length of rib meat for a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 to about 120 minutes; and to enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

The various cooking regimens of the process may be carried out by cooking the length of rib meat in any suitable cooking apparatus. For example, and without limitation, cooking the length of rib meat may be carried out by cooking in a conventional oven, cooking in a convection oven, smoking, steaming, roasting, boiling, broiling, cooking in a slow cooker, halogen lamp cooking, or any combinations thereof. According to a suitable embodiment, the cooking stages are carried out by smoking the length of rib meat. In other embodiments, a combination of smoking the length of rib meat and cooking by halogen lamps may be used to facilitate removal of the rib bones, yet maintaining the tenderness and juiciness of the rib meat to enable the separation of the rib bones from the rib meat.

The process for the preparation of the de-boned rib product also includes imparting a flavor to the length of rib meat. The step of imparting flavor to the length of rib meat may comprise at least one of seasoning the meat, marinating the meat, injection marinating the meat, dry rubbing the meat, basting the meat, smoking the meat, or combinations thereof.

Once the length of rib meat has been cooked to enable removal of the rib bones, the bones are removed. The rib bones may be removed from the rib meat by any suitable process known in the culinary art, so long as the desired length of rib meat remains substantially intact. For example, and not in limitation, the removal of at least one rib bones may be accomplished by manually removing the rib bones, using a non-automated hand-tool to remove the bones, by mechanically removing the rib bones with suitable power equipment, or by combinations thereof. It should be also noted that the rib bones may be removed prior to cooking the length of rib meat, so long as the process of removing the rib bones from the meat maintains a substantially intact length of rib meat.

If the cooked and de-boned length of rib meat is prepared in the retail restaurant setting, the product may be presented to the diner for consumption. If the cooked and de-boned length of rib meat is prepared and destined for resale at a retail grocery store, or other sales outlet, then the product can be suitably packaged. By way of illustration, suitable packaging includes vacuum packaging the length of cooked and de-

8

boned rib meat. It is contemplated that the cooked and de-boned rib meat may also by suitable for sale as a frozen, heat and serve product that would be commercially available at a grocery outlet. In this case, the cooked and de-boned rib meat is frozen and packaged in a suitable package for resale.

Also disclosed is a packaged ready-to-heat and serve de-boned rib meat product. The packaged rib product comprises a package and at least one de-boned substantially intact length of rib meat that is contained within the package. According to certain embodiments, a separate flavoring agent may be associated with the packaged rib product. It should be noted that the separate flavoring agent may be contained with the cooked and de-boned rib meat inside of the package, or simply provided with the packaged rib meat product.

According to certain embodiments, also provided is a packaged ready-to-heat and serve rib meat product comprising a package, at least one cooked and de-boned substantially intact continuous length of rib meat contained within the package, and optionally a flavoring agent associated with the package. It should be noted that the separate flavoring agent may be contained with the cooked and de-boned rib meat inside of the package, or simply provided with the packaged rib meat product.

For the embodiments of the packaged rib meat product that includes a flavoring agent, the flavoring agent may include an agent in the form of dry rubs, sauces, bastes, marinades, injection flavorings, or combinations thereof.

FIG. 4A depicts a flow chart for an illustrative embodiment of the process for preparing a cooked and de-boned length of rib meat. This process results in the preparation of de-boned length of rib meat that retains the natural consistency, texture and shape of a slab of rib meat had the bones not been removed from the rib meat.

At step 50, a slab of ribs is presented for processing. As described herein, the slab of ribs may comprise a slab of traditional spare ribs, a slab of St. Louis style ribs, baby back ribs, or any other rib cut. According to step 60, the process includes the optional step of imparting a flavoring to the rib meat with any combination of spices and seasonings. The exact form and blend of flavorings is unlimited and is up to the preparer of the slab of rib meat.

At step 70, the flavored or unflavored slab of rib meat is then located within a moisture loss preventive environment. Locating the slab of ribs in such an environment maintains a suitable moisture level within the slab of rib meat.

Following the optional flavoring 60 and locating 70 steps, if these steps are carried out, the length of rib meat is cooked 80 at a temperature and for a time sufficient to enable the removal of the rib bones from the length of rib meat, while maintaining a substantially intact length of rib meat. Following cooking step 80, the rib bones are separated from the slab of rib meat, leaving a substantially intact continuous length of rib meat.

After the bones have been removed from the rib meat in step 90, the boneless steak or filet of rib meat may be immediately consumed 100 or packaged for future sale 110. Alternatively, the boneless slab of rib meat can be further packaged as desired (e.g., frozen, seasoned, cooked, smoked etc.) to create a final servable food product. The further packaged boneless slab of rib meat can be sold as a pre-cooked ready to eat meal, and only requires that the slab of rib meat be warmed to a desirable temperature.

FIG. 4B depicts a flow chart for another illustrative embodiment of the process for preparing a cooked and de-boned length of rib meat. This process results in the preparation of de-boned length of rib meat that retains the natural

US 7,959,500 B1

9

consistency, texture and shape of a slab of rib meat had the bones not been removed from the rib meat.

At step 120, a slab of ribs is presented for processing. As described in connection with the flowchart of the illustrative embodiment shown in FIG. 4A, the slab of ribs may comprise a slab of traditional spare ribs, a slab of St. Louis style ribs, baby back ribs, or other rib cut. According to step 130, the process includes the optional step of imparting a flavoring to the rib meat with any combination of spices and seasonings. The exact blend of flavoring is unlimited and is up to the preparer of the slab of rib meat.

Following the seasoning stage, at step 140, the length of rib meat is exposed to a first cooking regimen which comprises exposing the length of rib meat to a flavored smoke at a temperature of at least 100 degrees Fahrenheit for a period of time between two hours and six hours. To "smoke" a slab of rib meat comprises burning flavored wood (for example, but not limited to Apple, Cherry, Hickory, Peach or Mesquite woods) within a confined area so that the slab of rib meat absorbs the aroma of the smoke and therefore imparts additional flavor to the slab of rib meat.

Following the "smoking" step 140, the slab of rib meat is then removed from the smoker 150 and optionally seasoned with various barbeque sauce flavors. The meat can be either basted with a semi-viscous fluid or "dry-rubbed" with a powder seasoning mix. In one embodiment, basting the rib meat is performed by covering the slab of rib meat with a fluid of high viscosity on the theory that the slab of rib meat will absorb additional flavor from the basting. Basting the meat allows the highly viscous fluid to penetrate the outer layer of the meat and permeate the lower layers of meat, providing additional flavor throughout the meat, and not only within the outermost layers of meat.

In another embodiment, the meat can also be seasoned with a "dry-rub". Dry rubs differ from basting sauces in that the rubs are powdery mixes lacking any form of moisture. Dry rub mixes can be made up of a multitude of seasonings into infinite number of mixes and only limited by the creativity of the preparer. The theory behind seasoning the slab of meat is the same behind the basting process. The powder seasoning mix will mix with the meats own juices secreted during cooking, allowing the mix to be absorbed into the lower layers of meat. However, in the seasoning process, both the basting step and dry rub step is purely optional and can be skipped at the desire of the preparer.

At step 160, the slab of rib meat is then enclosed within a moisture loss preventive environment. According to the embodiment of the process depicted in the flowchart of FIG. 4B, the length of rib meat is enclosed in a cooking bag, which is then sealed.

As shown at step 170, once the slab of rib meat is located within the moisture loss preventive environment, it is desirable that the slab of rib meat be cooked by convection oven cooking 170 for at least 60 minutes at a temperature of at least 200 degrees, depending on the individual oven and how many slabs are on each sheet tray. Thus, depending on the number of slabs on a tray, cooking time may be lengthened and/or the temperature be raised. Additionally, a single slab of rib meat may require less cooking time, and the temperature may need to be constant.

In another further embodiment, it is possible to wrap the slab of rib meat or seal in a hermetic enclosure prior to the smoking of the slab of rib meat or prior to the first period of time in the suitable cooking device. Therefore, it is optional that the slab of rib meat need not be wrapped or sealed in between the first and second cooking stages. Accordingly, if

10

wrapped prior to the smoking stage, the slab of rib meat can be inserted directly into the second cooking stage for its desired length of time.

Following the second period of cooking at step 170, the slab of rib meat can be removed from the cooking enclosure. At this time, according to step 180, the slab of rib meat can be removed from the moisture loss preventive environment and the rib bones are separated from the length of rib meat to produce a substantially intact de-boned continuous length of rib meat.

Each rib bone within the slab of rib meat is exposed to very small forces in during the removal process, so that its fiber structure of the slab of rib meat is retained as much as possible, and the risk of damage to the meat is very low. What is left is a boneless slab of rib meat that is substantially intact.

The exact reason for the meat separating from the bone during the wrapped/cooking stage is not precisely known. Without being bound to any particular theory, locating the slab of rib meat within a moisture loss preventive environment protects the slab of rib meat within a cooking environment that maintains a high level of moisture level within the meat itself. This high level of moisture serves two purposes: first, retaining the moisture maintains the slab of rib meat's juiciness and tenderness, which prevents it from becoming dry and difficult to consume; second, the high level of moisture also acts as a solution to break down the natural attachments between the muscle (meat) and the bone. It is this breaking down of the bonds between the meat and bone that allows the bone to be removed from the slab of rib meat with little to no resistance and therefore leaves the slab of rib meat substantially intact.

After the bones have been removed in step 180, the boneless length of rib meat can then be immediately consumed 190 or packed either dry or with a marinade 200 for future sale. Alternatively, the boneless slab of rib meat can be further packaged as desired (e.g., frozen, seasoned, cooked, smoked etc.) to create a final servable food product. The further packaged boneless slab of rib meat can be sold as a pre-cooked ready to eat meal, and only requires that the slab of rib meat be warmed to a desirable temperature.

The disclosed process prepares a pork or beef meat cut to become a more attractive and economically beneficial product to achieve an end product that is more in demand. The boneless slab of rib meat can be consumed with utensils, in the manner similar to how one would consume other boneless or bone-in pork or beef meat products like steaks or pork chops.

Thus, provided is a process for producing, a boneless slab of rib meat that which results in a meaty and easy to consume boneless steak or filet of rib meat. This process involves a minimally invasive way to remove the rib bones from a slab of rib meat to provide a length of boneless rib meat. Accordingly, the process creates an edible boneless slab of rib meat, which can be consumed without having to maneuver around the rib bones themselves.

It will be understood that the embodiments described herein are merely illustrative and that a person skilled in the art may make many variations and modifications without departing from the spirit and scope of the invention All such modifications and variations are intended to be included within the scope of the appended claims. It should be understood that the embodiments described herein are not only in the alternative, but can be combined.

US 7,959,500 B1

11

We claim:

1. A process for preparing a length of de-boned rib meat comprising:

cooking a length of rib meat having at least one rib bone at least partially embedded therein at a temperature and for a time sufficient to enable the removal of at least one of said rib bones from said length of rib meat, while maintaining a substantially intact length of rib meat; and

removing at least one of said rib bones from said length of rib meat.

2. The process of claim 1, comprising:

cooking said length of rib meat at a first temperature for a first period of time;

locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

cooking said length of rib meat at a second temperature for a second period of time; and

removing at least one of said rib bones from said length of rib meat.

3. The process of claim 2, comprising:

cooking said length of rib meat for a first temperature from about 100 to about 300 degrees Fahrenheit for a period of time from about 1 to about 6 hours;

locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

cooking said length of rib meat at a second temperature for a second period of time; and

removing at least one of said rib bones from said length of rib meat.

4. The process of claim 2, comprising:

cooking said length of rib meat at a first temperature for a first period of time;

locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

cooking said length of rib meat at a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 to about 120 minutes; and

removing at least one of said rib bones from said length of rib meat.

5. The process of claim 2, wherein:

cooking said length of rib meat at a first temperature from about 100 to about 300 degrees Fahrenheit for a time period from about 1 to about 6 hours;

locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

cooking said length of rib meat for a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 to about 120 minutes;

removing at least one of said rib bones from said length of rib meat.

6. The process of claim 2, wherein said locating said length of rib meat comprises hermetically sealing said length of rib meat.

7. The process of claim 6, wherein said locating comprises wrapping said length of rib meat with plastic wrap, metal foil, or enclosing within a cooking bag.

8. The process of claim 1, comprising:

locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

cooking said length of rib meat at a temperature and for a time sufficient to enable the removal of at least one of

12

said rib bones from said length of rib meat, while maintaining a substantially intact length of rib meat; and

removing at least one of said rib bones from said length of rib meat.

9. The process of claim 8, wherein said locating said length of rib meat comprises hermetically sealing said length of rib meat.

10. The process of claim 9, wherein said locating comprises wrapping said length of rib meat with plastic wrap, metal foil, or enclosing within a cooking bag.

11. The process of claim 1, comprising:

locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

cooking said length of rib meat at a first temperature for a first period of time;

cooking said length of rib meat at a second temperature for a second period of time; and

removing at least one of said rib bones from said length of rib meat.

12. The process of claim 11, comprising:

locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

cooking said length of rib meat at a first temperature from about 100 to about 300 degrees Fahrenheit for a period of time from about 1 to about 6 hours;

cooking said length of rib meat at a second temperature for a second period of time; and

removing at least one of said rib bones from said length of rib meat.

13. The process of claim 11, comprising:

locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

cooking said length of rib meat at a first temperature for a first period of time;

cooking said length of rib meat at a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 to about 120 minutes; and

removing at least one of said rib bones from said length of rib meat.

14. The process of claim 11, wherein:

locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

cooking said length of rib meat at a first temperature from about 100 to about 300 degrees Fahrenheit for a time period from about 1 to about 6 hours;

cooking said length of rib meat for a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 to about 120 minutes; and

removing at least one of said rib bones from said length of rib meat.

15. The process of claim 1, further comprising imparting a flavor to said length of rib meat.

16. The process of claim 15, wherein said imparting a flavor comprises said at least one of seasoning, marinating, injection marinating, dry rubbing, basting, or smoking.

17. The process of claim 1, wherein said cooking said length of rib meat comprises cooking in a conventional oven, cooking in a convection oven, smoking, steaming, roasting, boiling, broiling, cooking in a slow cooker, halogen lamp cooking, and combinations thereof.

18. The process of claim 17, comprising

smoking said length of rib meat at a first temperature for a first period of time; and

US 7,959,500 B1

13

cooking said length of rib meat at a second temperature for a second period of time.

19. The process of claim 17, comprising

cooking said length of rib meat at a first temperature for a first period of time; and

halogen lamp cooking said length of rib meat at a second temperature and for a second period of time.

20. The process of claim 17, comprising

smoking said length of rib meat at a first temperature and for a first period of time; and

14

halogen lamp cooking said length of rib meat at a second temperature and for second period of time.

21. The process of claim 1, comprising removing said at least one rib bone manually, with a hand-tool, mechanically, or combinations thereof.

22. The process of claim 1, comprising packaging said cooked and de-boned length of rib meat.

23. The process of claim 1, comprising freezing and packaging said length of cooked and de-boned rib meat.

* * * * *

## EXHIBIT D

**Ohio Service Mark Filings Attached**



| DATE:<br>09/17/2010 | DOCUMENT ID<br>201025900735 | DESCRIPTION<br>TRADE MARK/ORIGINAL FILING (TMO) | FILING<br>125.00 | EXPED<br>100.00 | PENALTY<br>.00 | CERT<br>.00 | COPY<br>.00 |

**Receipt**

This is not a bill. Please do not remit payment.

WILLIAM DAVID MOORE
815 SUPERIOR AVENUE, EAST
SUITE 1717 SUPERIOR BLDG.
CLEVELAND, OH 44114

# STATE OF OHIO
## CERTIFICATE
### Ohio Secretary of State, Jennifer Brunner

1963461

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

**BUBBA'S-Q WORLD FAMOUS**

and, that said business records show the filing and recording of:

Document(s)                                                    Document No(s):

**TRADE MARK/ORIGINAL FILING**                                 201025900735
   Class:  MEATS AND PROCESSED FOODS
   Registrant's State of Inc.:  OH                    BUBBA'S-Q, INC.
   Date of First Use:        11/12/1993               820 CENTER ROAD
   Date of First Use in Ohio: 11/12/1993              AVON, OH 44011
   Expiration Date:          09/16/2020

Witness my hand and the seal of
the Secretary of State at Columbus,
Ohio this 16th day of September,
A.D. 2010.

United States of America
State of Ohio
Office of the Secretary of State                Ohio Secretary of State



| DATE:<br>10/08/2010 | DOCUMENT ID<br>201028100185 | DESCRIPTION<br>SERVICE MARK/ORIGINAL FILING<br>(SMO) | FILING<br>125.00 | EXPED<br>100.00 | PENALTY<br>.00 | CERT<br>.00 | COPY<br>.00 |
|---|---|---|---|---|---|---|---|

### Receipt

This is not a bill. Please do not remit payment.

WILLIAM D MOORE
815 SUPERIOR AVENUE EAST
SUITE 1717
CLEVELAND, OH 44114

---

# STATE OF OHIO
## CERTIFICATE
### Ohio Secretary of State, Jennifer Brunner

1968129

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

"DE-BONED BABY BACK RIB STEAK"

and, that said business records show the filing and recording of:

Document(s)                                         Document No(s):
**SERVICE MARK/ORIGINAL FILING**                    201028100165
  Class:  PROVIDING FOOD AND DRINK
  Registrant's State of Inc.:   OH          QUEENANN, INC.
  Date of First Use:        09/08/2010        820 CENTER ROAD
  Date of First Use in Ohio: 09/08/2010       AVON, OH 44011
  Expiration Date:          10/07/2020



United States of America
State of Ohio
Office of the Secretary of State

Witness my hand and the seal of
the Secretary of State at Columbus,
Ohio this 7th day of October, A.D.
2010.

Ohio Secretary of State

# EXHIBIT B

**Susan Manion**

| | |
|---|---|
| **From:** | edheben@hebenlaw.com |
| **Sent:** | Sunday, January 20, 2019 9:37 PM |
| **To:** | Benjamin A. Levin |
| **Subject:** | RE: Baker Family |

Ben,

It was good talking to you on Friday even though you hung up on me just because I would and could not agree with you. I hope we can work better together.

First, I am happy that you at least recognized and stated the common ground that my client should receive more money which he is entitled to – and which is a good start. You said "it's all about money, isn't it?". And I agree that money is an important part, but not everything. I am all ears.

Second, I also am happy that you stated that you would produce any documents requested by my clients and myself and I am appreciative of that. Thank you in advance.

Please, in the interest of amicably resolving our issues short of litigation, provide me tomorrow via email with copies of the following documents that we discussed on the phone which you said are easily accessible on the Rastelli's computer system:

> 1) A copy of the agreement between "the Company (FOF Bakers LLC) and Rastelli Brothers, Inc., to provide the Co-Packer services  (the '**Co-Packer Agreement**')" mandated in Section 6.4 of the Operating Agreement which is the sole consideration besides the performance of the RP Services for the receipt of any RP/Rastelli distributions except their LLC membership 35%  profit distribution; and

> 2) A copy of "All" documents concerning the purchase, cooking, processing, freezing, storing, and selling of the ▮▮▮▮▮▮pork rib inventory referred to by Ray Rastelli III in his November email, including all bills of lading etc.

Also in our conversation you mistakenly stated that my client's daughter had been trained on the Rastelli's accounting/business computer system and had access to all documents "at her fingertips". That is  not true since the Rastelli's did not authorize or make arrangements for her training until just recently when they said they would arrange for training, but that has not been accomplished yet.

Your interpretation that the Operating Agreement mandates mediation for Manager disputes which you read back to me verbatim  is also incorrect as I pointed out to you. A Manager deadlock on a "resolution" may require "arbitration" - not "mediation", but since the current claims/disputes involve both member and manager disputes, and we have potential claims of conversion, civil conspiracy, embezzlement, fraud, and civil RICO claims among others and claims for punitive damages, I believe that these disputes and claims would be amenable to litigation if we cannot resolve these matters amicably.

Maybe we can work on the ▮▮▮▮▮ issue alone for the moment, but my client will not agree to any further payments to RP regarding ▮▮▮▮exclusive of the 35% membership distribution and their out of pocket cost of product excluding the expense of co-packer and RP mandated services to third parties, and then we can work backwards if that makes sense to you.

Also effective immediately pursuant to the Operating Agreement all business dealings and financial transaction must be undertaken by and through FOF Bakers LLC, not the Rastelli's company and we will appoint the accounting firm. My

client never authorized the current arrangement which has enabled the Rastellis to grossly mismanage the business and deprive FOF Bakers LLC of tax advantages. I will await your response.

 **LIFE MEMBER**
**MILLION DOLLAR ADVOCATES FORUM**
**MULTI-MILLION DOLLAR ADVOCATES FORUM**
The Top Trial Lawyers in America™ 

**Edward J. Heben, Jr.**
*Trial Lawyer and Counselor at Law*

**Heben Law LLC**
39253 Hawthorne Drive
Avon, Ohio 44011
Office: (216) 431 - LAWS (5297)
Cellular: (216) 965-3376
Facsimile: (216) 391-3278
Email: edheben@hebenlaw.com

**Confidentiality Note:** This email is covered by the federal Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521 and is legally privileged. This e-mail message is for the sole use of the intended recipient(s) only and may contain highly confidential or privileged information and is otherwise protected from disclosure. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, printing or any other use of, or any action in reliance on, the contents of this electronic message is unauthorized and prohibited. If you have received this communication in error, please notify us and destroy the original message. Thank you.

# EXHIBIT C

Jan. 30. 2019   9:22AM                                                    No. 0997   P. 1

HYLAND LEVIN LLP
By:    David R. Dahan, Esquire
       NJ Attorney ID #027391997
6000 Sagemore Drive, Suite 6301
Marlton, NJ 08053-3900
Phone: 856.355.2991
Fax:   856.355.2901

```
RECEIVED & FILED

JAN 2 9 2019

SUPERIOR COURT OF NJ
GLO. COUNTY CIVIL PART
```

| | |
|---|---|
| RASTELLI PARTNERS, LLC and RAYMOND M. RASTELLI, JR., <br><br> Plaintiffs, <br><br> vs. <br><br> FOFBAKERS HOLDING COMPANY, LLC and JAMES A. BAKER a/k/a AL BAKER, Individually, <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY <br> GLOUCESTER COUNTY <br> CHANCERY DIVISION <br><br> DOCKET NO.:   C -S - 19 <br><br> **VERIFIED COMPLAINT** |

The Plaintiffs, Rastelli Partners, LLC ("Rastelli Partners") and Raymond M. Rastelli, Jr. ("Rastelli, Jr." or "Co-Manager") (collectively the "Plaintiffs"), by way of Verified Complaint against the Defendants, FOFBakers Holding Company, LLC ("FOFBakers Holding") and James A. Baker a/k/a Al Baker, Individually ("Baker"), (FOFBakers Holding and Baker collectively the "Defendants") state and allege as follows:

## PARTIES

1.     The Plaintiff, Rastelli Partners, is a limited liability company formed in the State of New Jersey with its principal place of business at 300 Heron Drive, Swedesboro, County of Gloucester, New Jersey 08085.

2.     The Plaintiff, Rastelli, Jr. is an individual domiciled in the State of New Jersey and a member of Rastelli Partners.

{HL882979.5}

3.     The Defendant, Baker, is an individual who, upon information and belief, is domiciled in the State of Florida.

4.     The Defendant, FOFBakers Holding, is a limited liability company registered in the State of Ohio with its principal place of business at 820 Center Road, Avon, Ohio 44011.

## FACTUAL BACKGROUND

### A. Nature of the Action

5.     The claims herein arise out of the operation of FOFBakers, LLC, a Delaware limited liability company formed on or about October 27, 2015 (the "Company").

6.     The Company was organized to develop, market, sell and distribute a specific food product line developed by FOFBakers Holding known as Bubba's Q De-Boned Baby Back Rib Steak and Bubba's Q World Famous, and to develop, market, sell and distribute product line extensions that complement Bubba's De-Boned Baby Back Rib Steak, Bubba's Q World Famous and the "Bubba's Q" brand (the "Business").

7.     The Company was formed, and is intended to operate, pursuant to its Limited Liability Company Operating Agreement dated November 11, 2015 (the "Operating Agreement"). A true and correct copy of the Operating Agreement is attached hereto as **Exhibit "A"**.

8.     Since December 30, 2015, the Company has been registered as a foreign limited liability company in the State of New Jersey and has maintained an agent for service of process at 300 Heron Drive, Swedesboro, County of Gloucester, New Jersey 08085.

9.     The Company operates the Business from its principal place of business at 300 Heron Drive, Swedesboro, County of Gloucester, New Jersey 08085 and its books and records are maintained at that location.

10.     The Members of the Company are FOFBakers Holding, Rastelli Partners, and DF Ventures, LLC ("DF Ventures"), a New York limited liability company (together, the "Members").

11.     Leading up to the formation of the Company and since its formation in 2015, the Defendants have had regular contact with the Plaintiffs in New Jersey in connection with the Business.

12.     Rastelli Partners and the Company have their principal place of business in New Jersey, the company's Co-Managing Member, Rastelli, Jr., resides in New Jersey, the Company's food products are developed, marketed, sold and/or distributed from New Jersey and the causes of action herein arose in New Jersey.

**B.  Management of the Company**

13.     The Company is governed by the Operating Agreement.

14.     Pursuant to Section 4.1(a) of the Operating Agreement, the management of the Company is vested in two managers, Rastelli, Jr. and Baker (collectively the "Managers").

15.     Section 4.1(d) of the Operating Agreement provides in relevant part as follows:

> The Managers shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement, to manage, control, administer, and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs.

16.     Section 4.1(e) of the Operating Agreement states in relevant part as follows:

{HL882979.5}

Except with respect to Extraordinary Transactions (as defined in Section 4.3 below) or as otherwise expressly stated elsewhere in this Agreement or as required by the Act, the Managers, without the need for notice to or the consent from all or any of the Members, shall have the full and exclusive power on the Company's behalf, and in its name, to (i) manage, control, administer and operate the business and affairs of the Company and to do or cause to be done anything it deems necessary or appropriate to carry out the purposes of the Company and (ii) execute and deliver such vendor contracts, agreements and other documents as it deems necessary or appropriate to carry out the purposes of the Company.

## C. Arbitration of Disputes Between Managers

17.     In the event the Managers cannot agree on any particular action, the Operating Agreement contains a deadlock provision requiring the deadlock to be resolved through arbitration.

18.     Specifically, Section 4.1 provides in relevant part with respect arbitration as follows:

(g) If the Managers cannot agree on a particular action or resolution (the "**Resolution**") after a vote on a Resolution has been taken during two (2) separate meetings of the Managers or requests for unanimous written consent, which

meetings or requests have been duly called and held pursuant to this Agreement (such disagreement is hereinafter referred to as a "**Deadlock**"), then the Managers shall select an individual who is not an officer, Member, or Manager of the Company (an "**Independent Person**") to serve as a Neutral Arbitrator (as defined below) to resolve the Deadlock, within five (5) business days after the second meeting of the Managers. If the Managers cannot agree on an Independent Person to serve as the Neutral Arbitrator, then each Manager shall select an Independent Person, the identity of which shall be disclosed in writing to all of the Managers and to each such Independent Person, and the two (2) Independent Persons selected shall then promptly appoint one (1) Independent Person to serve as Neutral Arbitrator, to resolve the Deadlock. The Neutral Arbitrator shall vote for or against the Resolution at the next duly called and convened meeting of the Managers.

(h) The "**Neutral Arbitrator**" means, for purposes of this Agreement, a natural person who has no legal, equitable, or economic interest in the Company. The Neutral Arbitrator's sole obligation, duty, and authority shall be approving or disapproving a Resolution in order to resolve a Deadlock, having only the authority to vote with respect to the

{HL882979.5}

>approval or disapproval of the specific Resolution causing the Deadlock. Upon the resolution of the specific Deadlock by the approval or disapproval of the Neutral Arbitrator, said Neutral Arbitrator shall cease to have any obligation, duty or authority whatsoever with respect to the Company.
>
>(Emphasis in original).

19.     The procedure for calling meetings of the Managers is set forth in Section 4.2(a) of the Operating Agreement which provides as follows:

>In General. Any Manager may call a meeting of the Managers by giving written notice to all Managers not less than two (2) nor more than thirty (30) days prior to the date of the meeting, to consider the affairs of the Company and to take any action permitted to be taken by the Act, this Agreement, or the Certificate; provided, however, that any meeting of the Managers may take place without notice in the event that the Managers consent to such meeting and waive notice. All decisions by the Managers at any meeting must be unanimous to have any force or effect. Managers may participate in a meeting of the Managers by means of conference telephone, email or other similar communications equipment by means of which all persons participating in the meeting can immediately communicate with all other persons participating, and participation by

such means shall be deemed to constitute presence in
person at a meeting of the Managers.

**D. Action by Members of the Company**

20.    The Operating Agreement requires that the Members develop and approve an operating budget annually.

21.    Specifically, Section 4.4 of the Operating Agreement provides as follows:

> **Operating Budget**. As soon as practicable, after the
> execution of this Agreement, and annually thereafter, the
> Members shall develop and approve an operating budget
> for the ensuing Fiscal Year (the **"Operating Budget"**) in
> accordance with Section 4.3(b)(i), which shall provide for,
> among other things, the Company's Business Expenses, as
> well as casualty, general liability, director and officer and
> any other insurance coverage deemed appropriate or
> necessary by the Managers in amounts sufficient to
> reasonably protect the interests of the Members, the
> Managers, and/or the officers of the Company. The
> Managers shall utilize the Operating Budget in the
> operation of the Business and in purchases and
> expenditures (including, but not limited to, Business
> Expenses) for the operating requirements of the Business.
> In addition to its use of the Operating Budget, the
> Managers shall have full authority and discretion to utilize

> any and all reserves for Business Expenses in its operation
> of the Business, including, but not limited to, the reserve
> funded and approved by the Members in accordance with
> Section 4.3(b)(ii). (Emphasis in original).

22.     Certain issues in this lawsuit include two (2) Extraordinary Transactions requiring
the written consent of all of the Members.

23.     Section 4.3 of the Operating Agreement regarding Extraordinary Transactions
provides in relevant part as follows:

> (a) Notwithstanding anything to the contrary in this
> Agreement, the Extraordinary Transactions listed in
> Section 4.3(b) below shall require the unanimous
> written consent of all of the Members. Upon receipt of
> the required approval of any Extraordinary
> Transaction, the Managers shall have all power and
> authority necessary or desirable to carry out the
> purposes of such Extraordinary Transaction, including
> without limitation the power and authority to execute,
> acknowledge and deliver all agreements, contracts,
> assignments, deeds, notes, mortgages, bills of sale,
> stock powers, instruments and other documents
> necessary or convenient for the carrying out the
> purposes of such Extraordinary Transaction, all

without requiring the signature of any other Member thereon, and to make all expenditures relating thereto.

(b) As used herein, an **"Extraordinary Transaction"** is defined to mean each of the following actions or decisions, each of which is deemed "not in the ordinary course of the business":

    (i)    Approve an Operating Budget (as defined in Section 4.4) for the Company for each Fiscal Year;

    (ii)    Establish a reserve for Business Expenses of an amount in excess of ten percent (10%) of the total amount of Business Expenses contemplated in the Operating Budget;

(Emphasis in original).

24.    The procedure for calling meetings of the Members is set forth in Section 4.6 of the Operating Agreement which provides in relevant part as follows:

<u>Meetings of Members.</u> No meetings of the Members need be held. However, there shall be, within fifteen (15) days of written demand by any Member, a meeting of the Members to consider the affairs of the Company and to take any action permitted to be taken by the Act, this Agreement, or the Certificate. Such a meeting may be held in person or by telecommunications equipment. For purposes of this

Section 4.6, notice of a written demand for a meeting by
email, facsimile, first-class mail, overnight mail or delivery
service, or hand-delivery shall be sufficient. (Emphasis in
original).

**E. Mediation of Disputes Between Members**

25.     Article 12 of the Operating Agreement requires mediation of disputes and

provides as follows:

In the event of any dispute between the Members or
between the Company and one or more Members, the
parties agree to use commercially reasonable efforts to
resolve the dispute through Mediation in a mutually
acceptable manner. For this purpose, the parties in dispute
shall accept a mutually acceptable mediator. If the parties
in dispute cannot agree upon a mediator, then the mediator
shall be decided upon by a panel of three (3) mediators,
with each party selecting a mediator and the mediators
selecting a third, neutral mediator. The parties in interest
shall share equally all initial costs of mediation. The
mediator shall hold meetings on the question, matter, or
dispute and shall provide opportunity to the parties to be
present and to be fully heard threat by counsel or
otherwise. Discovery by the parties shall be permitted prior
to such meetings. In the event that the mediation is

unsuccessful, the parties shall have the right to pursue legal

action under the laws of the State of Delaware.

### F. Rastelli, Jr.'s Notices for Meetings of the Managers

26.    Rastelli, Jr. and/or Rastelli Partners requested that Baker participate in meetings

of the Managers and meetings of the Members on several dates including December 18, 2018,

December 27, 2018, and January 10, 2019 to, among other things, address providing pricing

information for a potential substantial transaction involving selling certain rib steaks with a

major international franchise system (the "International Franchise System"), and to approve of

the 2019 Operating Budget.

27.    Each of the above referenced meetings was rescheduled due to Baker's refusal to

participate in violation of his fiduciary duties to the other Members and the Company.

28.    As a result, on or about January 15, 2019, Rastelli, Jr. issued a Notice of Call for

Meeting of Managers pursuant to Section 4.2 of the Operating Agreement seeking to hold a

meeting of the Managers on Thursday, January 17, 2019 at 2:00 p.m. via conference call

("January 15 Notice of Meeting of Managers"). A copy of the January 15 Notice for Meeting of

Managers is attached hereto as **Exhibit "B"**.

29.    The purpose of the January 15 Notice for Meeting of Managers was to conduct a

meeting to consider the affairs of the Company and take action permitted to be taken by the Act.

30.    This included two critically urgent affairs of the Company that require the

Managers' immediate attention and were included in the agenda for the meeting as follows:

- First, the Managers were to consider and approve of initial preliminary pricing

    for products in connection with discussions and negotiations with the

    International Franchise System.

- Second, the Managers were to establish the 2019 Operating Budget including the Company's marketing strategy.

31.     By email on January 16, 2019, Rastelli, Jr. emailed to Baker the initial preliminary pricing information for the International Franchise System which contained detailed information regarding costs and pricing to propose to the International Franchise System and an agenda which included, among other things, establishing the 2019 Operating Budget.

32.     No meeting of the Managers took place on January 17, 2019.   However, a meeting between the Managers took place on January 18, 2019 (the "January 18, 2019 Managers' Meeting".

33.     Prior to the January 18, 2019 Managers' Meeting and on many occasions prior thereto, Rastelli, Jr. emphasized that the International Franchise System matter presented a significant potential transaction that could result in millions of dollars of revenue to the Company and that if the initial preliminary pricing information was not immediately forwarded to the International Franchise System, that opportunity could be lost.

34.     During the January 18, 2019 Managers' Meeting and on other occasions prior thereto, Baker refused to approve of the initial preliminary pricing information to present to the International Franchise System.

35.     Also, during the January 18, 2019 Managers' Meeting, Rastelli, Jr. inquired of Baker to approve of the 2019 Operating Budget and, as a courtesy, even offered to meet with Baker in person in Florida where Baker maintains a home to further review and discuss the 2019 Operating Budget. Baker refused to participate in any meeting in Florida and unreasonably conditioned any in person meeting to take place only in Ohio with his lawyer present, which Baker has no right demanding under the Operating Agreement.

36.     On January 25, 2019, Rastelli, Jr. made another attempt to gain the Defendants'
cooperation by sending an email to Baker requesting a meeting of the Managers by telephone on
January 28, 2019 to discuss, among other things, approval of the initial preliminary pricing
information to present to the International Franchise System and the 2019 Operating Budget.

37.     By email on January 27, 2019, Baker responded and refused to participate in any
meeting of the Managers on January 28, 2019 and indicated that nothing should be done with the
International Franchise System "until we have all of our other issues resolved" and stated that
there "is nothing to talk about concerning the 2019 budget, marketing plans, and sales targets
until all the other issues are resolved."  Baker further advised that the Company "should not be
doing any website marketing or new product approvals and launches also until all these issues
are resolved."

## G.  DF Ventures Notice for Meeting of the Members

38.     In an email on January 10, 2019, pursuant to Section 4.6 of the Operating
Agreement, DF Ventures requested a meeting of the Members to take place fifteen (15) days
after the notice (i.e., by January 25, 2019) ("January 10 Notice for Meeting of Members").

39.     The purpose of the January 10 Notice for Meeting of Members was to conduct a
meeting to consider the current state of management regarding the company including, but not
limited to, the International Franchise System opportunity and establishing the 2019 Operating
Budget.

40.     In the January 10 Notice for Meeting of Members, DF Ventures reiterated that the
International Franchise System opportunity is time sensitive and that the Defendants'
unwillingness to discuss that opportunity may result in the loss of that transaction.

41.     On January 25, 2019, Rastelli, Jr. and a representative from DF Ventures called in for the meeting of the Members which was supposed to take place pursuant to the January 10 Notice for Meeting of Members. Baker did not join in the call to participate.

**H. The Defendants' Unlawful Conduct**

42.     The Defendants are refusing to meaningfully participate in necessary actions needed by the Company in order for it to continue operations moving forward.

43.     Baker has engaged in conduct intended to advance his own personal interests over those of the other Members and the Company.

44.     The Defendants have made unsubstantiated monetary demands of the Plaintiffs and unlawfully seek to hold the Plaintiffs hostage by withholding critical decision-making to enable the Company to continue operations by, among other things, timely taking advantage of the International Franchise System matter and carrying out its plan for operations pursuant to the 2019 Operating Budget.

45.     The Defendants seek to avoid meaningfully participating in meetings of the Managers and Members and avoid necessary decision-making in connection with the operations of the Company by fabricating arguments that they have not been provided with financial information and that the Company's sourcing of pork product is deficient.

46.     Contrary to Defendants' fabricated arguments, Rastelli, Jr. and Rastelli Partners have provided financial and other information to the Defendants on a regular basis.

47.     On numerous occasions, Rastelli Partners offered the Defendants direct access into its Aspen System (its inventory and accounting system) to access daily information about the Company but the Defendants refused to take advantage of such training.

48.     Additionally, certain daily, weekly and monthly reports about the Company containing a balance sheet, an income statement and a gross profit report and financial information related to the Company's customer sales, inventory and open orders are automatically emailed to the Defendants.

49.     Furthermore, in another attempt to delay decision-making, the Defendants have repeatedly requested certain information that was previously made accessible to the Defendants and/or previously provided. Nonetheless, Rastelli, Jr. and Rastelli Partners have cooperated with the Defendants and provided requested information despite information being previously made available or provided and have offered to review and discuss any financial or other information regarding the operations of the Company. However, the Defendants continue to refuse to engage in any meaningful dialogue regarding the operations of the Company.

50.     Prior to forming the Company, Baker was not successful in finding domestic suppliers who would be able to provide the necessary pork product at an appropriate price point.

51.     Since 2015, through extensive efforts, including engaging affiliates of Rastelli Partners, Rastelli, Jr. and Rastelli Partners were able to source pork product from international suppliers with the Defendants' knowledge and approval.

52.     From 2015 up to approximately the end of 2018, the Defendants approved of the Company's sourcing of pork product in meetings and in correspondence and did not object to the Company's sourcing of pork product.

53.     Despite the Defendants' prior approval of the Company's sourcing of pork product, the Defendants now assert for the first time that it is an inferior product as a guise to avoid approving the initial preliminary pricing information for the International Franchise System and approving of the 2019 Operating Budget.

{HL882979.5}

54.    The Defendants' allegation that the Company's sourcing of pork product is deficient is without any merit.

55.    Without the necessary approvals required by the Managers and Members as set forth above, the Managers are at a deadlock and the operation of the Company is in serious jeopardy as there is no operating budget in place for 2019 and no plan in place for, among other things, pricing, marketing, social media efforts and product approvals.

56.    Based on the foregoing, it is evident that the Managers cannot agree on particular actions or resolutions including approval of the initial preliminary pricing to the International Franchise System and the Company's sourcing of pork product.

57.    The arbitration provision set forth in Section 4.1(g) of the Operating Agreement was intended to cover such disagreements.

58.    Baker is required to participate in arbitration as set forth in Section 4.1 of the Operating Agreement.

59.    Similarly, the Members cannot agree on approval of the 2019 Operating Budget.

60.    The mediation provision in Article 12 of the Operating Agreement was intended to require the parties to use commercially reasonable efforts to resolve their disputes through mediation as set forth therein.

61.    The Defendants are required to participate in mediation as set forth in Article 12 of the Operating Agreement.

62.    Nevertheless, the Defendants have repeatedly threatened litigation.

63.    Based on the Defendants' conduct and communications, it is evident that the Defendants refuse to participate in arbitration and mediation and that any additional efforts to have them do so would be futile.

64.    The Defendants' conduct constitutes gross negligence or willful misconduct.

## FIRST COUNT – BREACH OF FIDUCIARY DUTIES

65.    The Plaintiffs incorporate all of the above allegations as if fully set forth at length.

66.    As a Co-Manager, Baker owes a fiduciary duty to the Company and the Members.

67.    As a Member, FOFBakers Holding owes a fiduciary duty to the Company and the other Members.

68.    Such duty includes, but is not limited to, the duty of trust, duty of confidence, duty of loyalty and the duty of good faith and fair dealing.

69.    The Defendants' conduct constitutes a clear breach of the Defendants' fiduciary duty owed to the Company and the other Members.

70.    Said conduct has prevented Rastelli, Jr. from effectively performing his functions as Co-Manager and from adequately operating the Company.

71.    Said conduct has reduced the value of the Company and Rastelli Partners' interest in the Company.

72.    Such conduct has, and continues to, irreparably harm the Plaintiffs.

73.    Such conduct also proximately caused damages to the Plaintiffs including, but not limited to, damages to their reputation, profits, business and goodwill.

## SECOND COUNT – BREACH OF OPERATING AGREEMENT

74.    The Plaintiffs incorporate all of the above allegations as if fully set forth at length.

75.    Baker is Co-Manager of the Company.

76.    FOFBakers Holding is a Member of the Company.

77.    Baker and FOFBakers Holding are bound by the Operating Agreement.

78.    The Operating Agreement requires Baker to appear and participate in meetings of the Managers so that necessary management decisions can be made to operate the Company including, but not limited to, consideration and approval of initial preliminary pricing for the International Franchise System.

79.    Baker has refused to appear and participate, or meaningfully participate, in meetings of the Managers thereby precluding the Managers from, among other things, considering and approving of initial preliminary pricing for the International Franchise System and the Company's sourcing of pork product.

80.    Baker refuses to participate in arbitration as required pursuant to Section 4.1(g) of the Operating Agreement to address, among other things, approval of initial preliminary pricing for the International Franchise System and the Company's sourcing of pork product.

81.    The Operating Agreement requires FOF Bakers to appear and participate in meetings of the Members so that necessary Member decisions can be made to operate the Company including, but not limited to, approval of the 2019 Operating Budget.

82.    FOF Bakers has refused to appear and participate in meetings of the Members thereby precluding all the Members from, among other things, approving the 2019 Operating Budget.

83.    FOF Bakers refuses to participate in mediation as required pursuant to Article 12 of the Operating Agreement to address, among other things, approval of the 2019 Operating Budget.

84.    The Defendants are in breach of the Operating Agreement.

85.    As a result of such breach, the Plaintiffs have suffered, and continue to suffer, irreparable harm and damages to their reputation, profits, business and goodwill.

## THIRD COUNT – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

86.    The Plaintiffs incorporate all of the above allegations as if fully set forth at length.

87.    Implied in the Operating Agreement is the covenant of good faith and fair dealing.

88.    The actions of the Defendants constitute a breach of the implied covenant of good faith and fair dealing.

89.    As a result of said breach, the Plaintiffs have suffered, and continue to suffer, irreparable harm and damages to their reputation, profits, business and goodwill.

WHEREFORE, the Plaintiffs request that a Temporary Restraining Order and injunction issue, preliminarily and until final hearing, and permanently thereafter, and judgment be entered which provide for the following:

a. Compels Baker to immediately participate in arbitration in accordance with Section 4.1(g) of the Operating Agreement to address, among other things, approval of initial preliminary pricing for the International Franchise System and the Company's sourcing of pork product.

b. Compels the Defendants to immediately participate in mediation in accordance with Article 12 of the Operating Agreement to address, among other things, approval of the 2019 Operating Budget.

c. Compels Baker to timely participate in good faith in all duly called meetings of the Managers in accordance with the Operating Agreement.

d. Compels the Defendants to timely participate in good faith in all duly called meetings of the Members in accordance with the Operating Agreement.

e. Judgment for all damages including, but not limited to, incidental, compensatory, consequential and punitive damages.

{HL882979.5}

    f.   Judgment for costs of suit.

    g.   Judgment for attorney's fees.

    h.   Judgment for interest.

    i.   Such other relief as the Court deems just, equitable and proper.

**HYLAND LEVIN LLP**

Dated:  January 29, 2019

David R. Dahan, Esq.
*Attorneys for Plaintiffs, Rastelli Partners, LLC
and Raymond M. Rastelli, Jr.*

## CERTIFICATION PURSUANT TO RULE 4:5-1

      Pursuant to Rule 4:5-1, I hereby certify that the matter in controversy is not the subject matter of any other action pending in any Court and is likewise not the subject of any pending arbitration proceeding, except the arbitration proceeding referred to herein.  I further certify that I have no knowledge of any contemplated action or arbitration proceeding regarding the subject matter of this action and that, other than those parties identified in the foregoing pleading, I am not aware of any other parties who should be joined in this action.

**HYLAND LEVIN LLP**

Dated:  January 29, 2019

David R. Dahan, Esq.
*Attorneys for Plaintiffs, Rastelli Partners, LLC
and Raymond M. Rastelli, Jr*

{HL882979.5}

**CERTIFICATION PURSUANT TO RULE 1:38-7(c)**

I certify that confidential personal identifiers have been redacted from documents now submitted to the Court and will be redacted from all documents submitted in the future in accordance with R. 1:38-7(b).

HYLAND LEVIN LLP

_____

David R. Dahan, Esq.

Dated: January 29, 2019       *Attorneys for Plaintiffs, Rastelli Partners, LLC and Raymond M. Rastelli, Jr*

**DESIGNATION OF TRIAL COUNSEL**

David R. Dahan, Esquire, is hereby designated as trial counsel for the Plaintiffs in accordance with R. 4:25-4.

HYLAND LEVIN LLP

_____

David R. Dahan, Esq.

Dated: January 29, 2019       *Attorneys for Plaintiffs, Rastelli Partners, LLC and Raymond M. Rastelli, Jr.*

{HL882979.5}

## VERIFICATION

      1.     I, Raymond M. Rastelli, Jr., hereby state and affirm that I am the President of Rastelli Partners, LLC, Plaintiff in the above-captioned matter.

      2.     I have read the foregoing Verified Complaint and on my own personal knowledge know that the facts set forth therein are true, except those facts which are pled upon information and belief, and with respect to those facts I believe them to be true. True and accurate copies of the exhibits referenced herein are attached hereto.

      3.     I hereby certify that the above statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: January 29, 2019

                               Raymond M. Rastelli, Jr., President
                               Rastelli Partners, LLC

{HL882979.5}

## VERIFICATION

1.     I, Raymond M. Rastelli, Jr., hereby state and affirm that I am the Plaintiff in the above-captioned matter.

2.     I have read the foregoing Verified Complaint and on my own personal knowledge know that the facts set forth therein are true, except those facts which are pled upon information and belief, and with respect to those facts I believe them to be true.  True and accurate copies of the exhibits referenced herein are attached hereto.

3.     I hereby certify that the above statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated:  January 29, 2019

Raymond M. Rastelli, Jr.

{HL882979.5}

## CERTIFICATION OF FACSIMILE SIGNATURE

Pursuant to R.1:4-4(c), I certify that Raymond M. Rastelli, Jr., acknowledged the genuineness of his signatures affixed to the foregoing document. The document bearing his original signature shall be filed with the Court upon request.

_____
David R. Dahan

Dated: January 29, 2019

# EXHIBIT A

LIMITED LIABILITY COMPANY OPERATING AGREEMENT

OF

FOFBAKERS, LLC

(a Delaware limited liability company)


This **LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF FOFBAKERS, LLC** (the "**Company**") is entered into as of the __11th__ day of _November_, 2015 by FOFBakers Holding Company, LLC, an Ohio limited liability company ("**Baker**"), **Rastelli Partners, LLC**, a Delaware limited liability company ("**RP**"), and **DF Ventures, LLC**, a New York limited liability company ("**Daymond**"), as the members of the Company (sometimes individually referred to as a "**Member**" and collectively as the "**Members**").

### RECITALS:

**WHEREAS**, the Company was formed under the Delaware Limited Liability Company Act, as amended from time to time (the "**Act**") pursuant to the filing of its Certificate of Formation ("**Certificate**") with the Secretary of State of the State of Delaware on October 27, 2015; and

**WHEREAS**, the Company was organized to develop, market, sell, and distribute a specific food product line developed by Baker, known as Bubba's Q De-Boned Baby Back Rib Steak and Bubba's Q World Famous, and to develop, market, sell, and distribute product line extensions that compliment Bubba's De-Boned Baby Back Rib Steak, Bubba's Q World Famous and the "Bubba's Q" brand (the "**Business**"); and

**WHEREAS**, the Members now wish to memorialize and to establish the terms and conditions relating to their relationship and to the governance of the Company.

**NOW, THEREFORE**, the undersigned Members, in consideration of the mutual covenants and conditions herein contained and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, agree as follows:

### ARTICLE 1
### FORMATION, PURPOSE AND DEFINITIONS

**1.1.**   **Definitions.**   As used in this Agreement, capitalized terms (other than those specifically defined in this Agreement) shall have the following meanings:

"**Affiliate**" of any Person means (i) any other Person which, directly or indirectly, is in Control of, is Controlled by or is under common Control with, such Person; (ii) any other Person who is a director or officer of (A) such Person, (B) any subsidiary of such Person, or (C)

any Person described in clause (i) above; or (iii) any corporation, limited liability company or partnership which has as a director any Person described in subsection (ii) above.

"**Agreement**" shall mean this Limited Liability Company Operating Agreement, as amended.

"**Business Expenses**" shall mean all cash expenditures of the Company, including, without limitation, (i) taxes (whether federal, state or local) withheld or required to be withheld from sales or salaries including contributions for social security payments, (ii) payment on loans, indebtedness, and other liabilities, (iii) expenses for compensation to employees, accountants, attorneys, consultants, and others, (iv) marketing and advertising expenses, (v) travel, meal, and entertainment expenses, (vi) rents, royalties, and fees, including, but not limited to, those fees payable in accordance with Article 6, (vii) production costs, including, but not limited to, cost of goods sold, product development costs, and inventory management costs, (viii) costs associated with customer service and order processing, and (ix) any and all cash expenditures contemplated in the Operating Budget (as defined in Section 4.4 and approved by the Members in accordance with Section 4.3).

"**Capital**" shall mean the sum of all funds and other property contributed to the Company by the Members as provided herein.

"**Capital Account**" shall mean the book capital account established and maintained for each Member.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Company**" shall mean FOFBAKERS, LLC.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person whether through ownership of voting securities, beneficial interests, by contract or otherwise. The definition is to be construed to apply equally to variations of the word "Control," including "Controlled," "Controlling" or "Controlled by."

"**Disability**" means a mental or physical condition that renders any Manager unable to carry out his or her responsibilities as a Manager of the Company, as applicable, held by such Manager at the time the condition was incurred for a period of nine (9) consecutive months or 270 days in any consecutive 365-day period.

"**Disabled**" means a Manager that is unable to carry out his, her, or its responsibilities as a Manager of the Company, as applicable, as a result of his or her Disability.

"**Distributable Cash**" shall mean, for any Fiscal Year (as defined herein) or any portion thereof, the total annual cash gross receipts of the Company from all sources plus any reduction in cash reserves of the Company for such period minus (a) Business Expenses (as

defined herein), and (b) all reserves of the Company as determined by the Managers and/or Members, as applicable, for such period.

"**Equity Interest**" of a Member shall mean such Member's proportionate Interest in the Capital and Profits and Losses of the Company, expressed as a percentage as shown on Exhibit A.

"**Gross Asset Value**" means, with respect to any asset, its adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of the asset, as determined by the contributing Member and the Company.

(b)     The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Tax Matters Partner (as such term is defined in Section 7.4 below), as of the following times:

(i)     The acquisition of an additional Equity Interest in the Company by any new or existing Member in exchange for more than a de minimis contribution of money or other property;

(ii)     The distribution by the Company to a Member of more than a de minimis amount of money or other property as consideration for an Equity Interest in the Company;

(iii)     The liquidation of the Company for federal income tax purposes within the meaning of Regulation § 1.704-1(b)(2)(ii)(g);

Except that the adjustments pursuant to Paragraphs (i) and (ii) immediately above shall be made only if the Member reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company.

(c)     The Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution.

(d)     The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of those assets pursuant to Code § 734(b) or Code § 743(b), but only to the extent that the adjustments are taken into account in determining Capital Accounts pursuant to Regulation § 1.704-1(b)(2)(iv)(m), except that Gross Asset Values shall not be adjusted pursuant to this Paragraph (d) to the extent the Tax Matters Partner determines that an adjustment pursuant to Paragraph (b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Paragraph (d).

(e)     If the Gross Asset Value of an asset has been determined pursuant to Paragraph (a), (b), or (d), that Gross Asset Value shall thereafter be adjusted by the depreciation (as defined by the Code) taken into account with respect to that asset for purposes of computing Profits and Losses (as such term is defined below).

"**Gross Receipts**" shall mean and include the aggregate amount received from all sales of products of every kind or nature sold from, at or in connection with the operation of the Business, whether for cash or credit, but excluding: (i) federal, state or municipal taxes or services taxes collected from customers and paid to the appropriate taxing authority, (ii) refunds, (iii) voided customer purchases, and (iv) sales taxes collected in connection with the operation of the Business.

"**Immediate Family Member**" means a Person's spouse, parent, child (including stepchild), grandchild (including step-grandchild) or sibling.

"**Interest in the Company**" shall mean the respective Voting Interest and Equity Interest in the Company owned by each Member, which ownership relationship between Members is expressed as such Member's Equity Interest and corresponding Voting Interest as set forth on Exhibit A attached hereto.

"**Majority**" means the Member or Members whose Voting Interests represent more than eighty five percent (85%) of the Voting Interests held by all of the Members in the Company.

"**Managers**" shall mean the natural person appointed by RP to serve as a Manager of the Company and the natural person appointed by Baker to serve as a Manager of the Company.

"**Members**" shall mean, unless the context indicates otherwise, the current Members as of the date of this Agreement as set forth on Exhibit A and all other Persons subsequently admitted as Members in accordance with the terms of this Agreement.

"**Person**" shall mean any individual, corporation, partnership, limited liability company, trust or other entity incorporated, organized or otherwise properly formed under the laws of the jurisdiction governing such entity.

"**Proceeding**" shall mean, with respect to any Member: (a) any judgment is obtained in any legal or equitable proceeding against the Member, which has become final and non-appealable, and the sale or attachment of any of the Member's Interests in the Company is contemplated or threatened under legal process as a result of such judgment, (b) any execution is issued on a judgment against the Member, (c) any of the Member's Interests in the Company become the subject of legal attachment, (d) there is instituted by or against the Member any other form of legal proceeding or process by which the sale or transfer of any of the Member's Interests in the Company is contemplated within the next sixty (60) days, (e) the Member makes an assignment for the benefit of creditors, (f) the Member admits its inability to pay its debts as they mature, or commences a voluntary case or proceeding under any Bankruptcy Law (defined

as Title 11 of the U.S. Code or any similar federal or state law for the relief of debtors), or consents to the entry of an order for relief against such Member in an involuntary case or proceeding under any Bankruptcy Law, or consents to the appointment of a receiver, trustee, liquidator or similar official for such Member or for all or substantially all of such Member's property, or **(g)** a court of competent jurisdiction enters an order or decree under any Bankruptcy Law for relief against the Member in an involuntary case or proceeding and the order or decree remains unstayed and in effect for sixty (60) days.

"**Profits and Losses.**" For each taxable year or other period, an amount equal to the Company's taxable income or loss for that year or period, determined in accordance with Code § 703(a) (for these purposes, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code § 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to the foregoing shall be added to such taxable income or loss.

(b)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or that are treated as Code § 705(a)(2)(B) expenditures pursuant to Regulation § 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits and Losses pursuant to the foregoing shall be subtracted from such taxable income or loss.

(c)     In the event the Gross Asset Value of any Company asset is adjusted pursuant to Paragraph (b), (c), or (d) of the definition of Gross Asset Value, the amount of the adjustment shall be taken into account as gain or loss from the disposition of the asset for purposes of computing Profits and Losses.

(d)     Gain or loss resulting from any disposition of Company assets with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of the property differs from its Gross Asset Value.

(e)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account depreciation for the taxable year or other period.

Notwithstanding the above, any items that are specially allocated to certain Members shall not be taken into account in computing Profits and Losses.

"**Regulations**" shall mean the regulations promulgated from time to time by the U.S. Treasury Department under the Code.

"**Transfer**" shall mean any and all types of dispositions and transfers of an Interest in the Company including, but not limited to, any sale, conveyance, assignment, disposition, distribution, encumbrance, pledge, mortgage, hypothecation or gift.

"**Voting Interest**" shall mean a Member's interest in the right to vote upon Company matters pursuant to the terms of this Agreement, expressed as a percentage as shown on Exhibit A.

1.2.   **Establishment of Limited Liability Company**.   The Members hereby agree to establish and organize a limited liability company pursuant to the provisions of the Act, upon the terms set forth in this Agreement. The Members are hereby admitted to membership in the Company and, until this Agreement is amended appropriately to contemplate the admission of additional members and their right to participate in the conduct of the Business, the Members shall be the only members of the Company.

1.3.   **Name**.   The name of the Company is "FOFBAKERS, LLC". The Company may conduct its activities under that name and any other permissible name designated by the Members. The Managers (as defined herein) shall be responsible for complying with any registration requirements if an alternate name is used.

1.4.   **Principal Place of Business of the Company**.   The principal place of business of the Company shall be located at 300 Heron Drive, Swedesboro, NJ 08085 or at such other or additional locations as the Members may determine. The registered agent for the service of process and registered office for the service of process of the Company shall be the location set forth in the Company's Certificate of Formation. The Managers may, from time to time, change such registered office, by appropriate filings as required by law.

1.5.   **Purpose**.   The purpose of the Company is (i) to develop, market, sell, and distribute a specific food product line developed by Baker, known as Bubba's Q De-Boned Baby Back Rib Steak, (ii) to develop, market, sell, and distribute product line extensions that compliment Bubba's De-Boned Baby Back Rib Steak and the "Bubba's Q" brand, and (iii) to engage in any lawful act or activity and to exercise any powers permitted to limited liability companies organized under the Act that are related or incidental to and necessary, convenient or advisable for the accomplishment of items (i) and (ii) above.

1.6.   **Duration**.   Unless the Company shall be earlier terminated in accordance with the provisions of this Agreement, it shall have perpetual existence.

1.7.   **Other Activities of Member**.   The Members may engage in or possess an interest in other business ventures of any nature, whether or not similar to or competitive with the activities of the Company.

## ARTICLE 2
## MEMBERS AND THEIR INTERESTS

2.1.    **Members.**   The Members each shall have an Interest in the Company, which shall be expressed as the Member's Equity Interest and corresponding Voting Interest as set forth on Exhibit A hereto.   A schedule of current Members shall be kept at the principal office of the Company.

2.2.    **Capital Contributions.**   Each Member separately has made or has agreed to make a contribution of Capital to the Company in intangibles, cash, and/or property in the amount set forth opposite such Member's name on the attached Exhibit B and which value is proportionate to such Member's Equity Interest in the Company ("**Capital Contribution**").   No Member shall be obligated to make any additional capital contributions to the Company.

2.3.    **Admission of Additional Members.**   Additional Members may be admitted to the Company only upon the written consent of all of the Members.   The Equity Interest(s) in the Company of the most recently admitted Member(s) shall be as specified at the time such new Member(s) shall be admitted, and, correspondingly, the Equity Interest in the Company of each of the then current Members shall be reduced pro rata in proportion to such Member's Equity Interest immediately prior to such admission.   The Voting Interest of the most recently admitted Member(s) shall be specified at the time such new Member(s) shall be admitted, and, correspondingly, the Voting Interests of all of the Members shall be updated accordingly.   The foregoing shall not apply to any substituted Member who is the transferee of an Equity Interest in the Company from another Member hereunder, including, without limitation, a substituted Member who acquires an Interest in the Company in accordance with Article 8.

2.4.    **Limitation of Liability; Other Activities of Members.**   Except as otherwise expressly and specifically provided for in this Agreement, no Member shall have authority, nor shall it undertake, to bind, to act for or to assume any obligation or responsibility on behalf of any of the other Members or the Company.   No Member shall be responsible or liable for any indebtedness or obligation of the other Members incurred or arising either before or after the execution of this Agreement.   It is expressly agreed by the Members that each Member is at all times hereunder acting and performing as an independent individual or entity other than in its capacity as a Member of the Company, and that no act of commission or omission of any Member shall be construed to make or render any other Member its principal, agent, partner or employee liable for such act, except to the extent specifically provided herein.   No Member may in any manner encumber, pledge, transfer, assign or otherwise convey any interest in the Company in contravention of any provision of this Agreement.   The Members and/or their Affiliates may engage in or possess an interest in other business ventures of any nature, whether or not similar to or competitive with the activities of the Company, for their respective accounts and not for the account of the Company or the other Members.   Neither the Company nor any Member shall have any right by virtue of this Agreement nor the relationship created hereby in or to such other ventures or activities, or to the income or proceeds derived therefrom; and the pursuit of such ventures, even if competitive with the Business, shall not be

deemed wrongful or improper. No Member shall have any liability or obligation for any debts, liabilities or obligations of the Company, nor of any agent or employee of the Company, beyond each such Member's respective Capital Contributions.

      **2.5.**   **Loans.** If a Member makes any loans to the Company, or advances money on its behalf, the amount of any such loan or advance shall not be deemed an increase in, or contribution to, the Capital Contribution of the Member and shall not affect such Member's Equity Interest in the Company or its Voting Interest. Interest shall accrue on any such loan at an annual rate agreed to by the Managers and the Member making such loan (but not in excess of the maximum rate allowable under applicable usury laws).

## ARTICLE 3
## CAPITAL ACCOUNTS, DISTRIBUTIONS, AND ALLOCATIONS

      **3.1.**   **Capital Accounts.**

      (a)   **Establishment and Maintenance.** A single Capital Account shall be established and maintained for each Member in accordance with the allocation and Capital Account maintenance provisions of the Regulations under Section 704 of the Code, which are hereby incorporated by reference, including, without limitation, a "qualified income offset" within the meaning of Regulation § 1.704-1(b)(2)(ii)(d), the rules regarding allocation of "partner nonrecourse deductions" under Regulation § 1.704-2(i)(1), "minimum gain chargeback" under Regulation § 1.704-2(f) and "partner nonrecourse debt minimum gain chargeback" under Regulation § 1.704-2(i)(4), and the limitation on allocation of losses to any Member that would cause a deficit capital account in excess of such Member's capital contribution obligations and share of minimum gain and partner nonrecourse debt minimum gain under Regulation § 1.704-1(b)(2)(ii)(d) as modified by Regulation §§ 1.704-2(g)(1) and 1.704-2(i)(5).

      (b)   **Contributed Property.** To the extent contributed property has a fair market value at the time of contribution that differs from the contributing Member's basis in the property, and to the extent the carrying value of property of the Company for Capital Account purposes otherwise differs from the Company's basis in such property, depreciation, gain, and loss for capital account purposes shall be computed by reference to such carrying value rather than such tax basis. In accordance with Section 704(c) of the Code, income, gain, loss, and deduction with respect to such property shall, solely for tax purposes, be shared among the Members so as to take account of the variation between the basis of the property to the Company and its fair market value at the time of contribution, or at the time that the carrying value of such property is adjusted under Regulation § 1.704-1(b)(2)(iv)(f), as the case may be. For these purposes, the Members hereby acknowledge and agree that the carrying value of each of their initial Capital Contributions to the Company in the form of intangibles, cash, and/or property, is set forth opposite each Member's name in the attached Exhibit B.

      **3.2.**   **Return of Capital.** Each Member is entitled to the return of its Capital Contribution only by way of distributions made pursuant to Article 10 hereof. No Member shall have the right to demand or receive any property other than cash in return for that Member's

Capital Contribution or to bring an action of partition against the Company or its property. The Managers shall have no personal liability for the repayment of the Capital contributed by the Members.

      **3.3.**    <u>Allocation of Profits and Losses</u>. After giving effect to any allocations required by <u>Section 3.1,</u> above, the Profits and Losses realized by the Company shall be allocated among the Members in accordance with their Equity Interests as set forth in the attached <u>Exhibit A</u>.

      **3.4.**    <u>Cash Distributions</u>. Except as otherwise provided in Section 3.5 and <u>Article 10</u> below (related to Dissolution and Liquidation), distributions of Distributable Cash and/or other assets or property of the Company, from whatever source, shall be made as to the Members in proportion to their Equity Interests as provided in the attached <u>Exhibit A</u>; provided, however, that such distributions shall not be made more frequently than monthly without the unanimous consent of the Members. In making determinations regarding distributions, the Managers may set aside funds and establish reserves for such items as the Managers shall determine, including, without limitation, working capital, capital expenditures, Business Expenses, acquisition of other assets by the Company, and the satisfaction of liabilities (including, without limitation, tax liabilities and contingent liabilities).

      **3.5.**<u>Payment to Baker.</u> Notwithstanding anything contained herein to the contrary, the Members agree that $52,500 of the cash contributed or to be contributed by Daymond to the Company as part of Daymond's initial Capital Contribution shall be distributed to Baker as reimbursement for certain prior business expenses incurred by Baker in connection with the start-up of the Business, including, without limitation, marketing, travel and development expenses (the "Reimbursement"). The Reimbursement shall be distributed to Baker within seven (7) business days from the date of this Agreement.

      **3.6.**    <u>Restoration of Negative Capital Accounts</u>. If upon the dissolution and liquidation of the Company, or the liquidation of any Member's Equity Interest in the Company, the Member has a negative balance in its Capital Account, that Member shall not be required to make any contribution to the Company on account of such negative Capital Account balance.

## ARTICLE 4
## MANAGEMENT OF THE COMPANY

      **4.1.**    <u>General Provisions</u>.

          (a)    There shall be two (2) Managers of the Company. As long as RP shall be a Member, it shall be entitled to appoint a natural person to serve as a Manager of the Company. As long as Baker shall be a Member, it shall be entitled to appoint a natural person to serve as a Manager of the Company. RP hereby appoints Raymond M. Rastelli, Jr. as an initial Manager and Baker hereby appoints Al Baker as an initial Manager. Upon RP or Baker respectively ceasing to be a Member (a "Transferring Member"), such Transferring Member's right to appoint a natural person to serve as a Manager of the Company shall terminate, and the

Members other than the Transferring Member shall appoint a replacement Manager by the unanimous written consent of the remaining non-Transferring Members.

(b)     RP and Baker, respectively, shall each have the power, by written instrument, to appoint a successor Manager, to serve upon the death, Disability, bankruptcy, resignation or removal (as described in Section 4.1(c)) of the Manager appointed pursuant to Section 4.1(a) above (each, a "**Triggering Event**"); provided, however, that RP and Baker, respectively, shall each have the right to revoke a written appointment of a successor Manager, by written instrument, at any time prior to the occurrence of a Triggering Event.  If a successor Manager fails or ceases to act as Manager, by reason of a Triggering Event, then RP or Baker, as applicable, shall appoint a successor Manager within thirty (30) days of the Triggering Event; provided, however, that if RP or Baker, respectively, fails to appoint a successor Manager within the thirty (30) day period, then a successor Manager shall be appointed by the unanimous written consent of the Members.

(c)     A Manager may be immediately removed from his or her position as a Manager of the Company in the following circumstances:

(i)     The Manager's commission of any act of fraud, gross negligence, or willful misconduct against the Company;

(ii)     The Manager's commission of any felony, embezzlement or misappropriation of money or other property of the Company; or

(iii)     The order or decree of any court of competent jurisdiction.

(d)     The Managers shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement, to manage, control, administer, and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs.  The Managers shall have the authority to delegate any or all of his responsibilities hereunder, and the power to fulfill such duties in accordance with the terms and conditions under this Article 4, to such officers of the Company or other authorized persons, as well as the power and authority to engage one or more of its Affiliates to provide management, operational, and/or administrative services to or for the Company, for such period of time and under such conditions as the Managers may determine, in their absolute discretion.

(e)     Except with respect to Extraordinary Transactions (as defined in Section 4.3 below) or as otherwise expressly stated elsewhere in this Agreement or as required by the Act, the Managers, without the need for notice to or the consent from all or any of the Members, shall have the full and exclusive power on the Company's behalf, and in its name, to (i) manage, control, administer and operate the business and affairs of the Company and to do or cause to be done anything it deems necessary or appropriate to carry out the purposes of the Company and (ii) execute and deliver such vendor contracts, agreements and other documents as it deems necessary or appropriate to carry out the purposes of the Company.

(f)     Notwithstanding anything herein to the contrary, the Managers shall have no authority to create any note, mortgage, pledge, assignment or other obligation, or any guarantee or suretyship thereof, in favor of any Person, without the express written consent of each Member. For this purpose, the execution by a Member of a guarantee, surety or similar agreement relating to indebtedness of the Company shall conclusively be deemed to evidence such Member's express written consent.

(g)     If the Managers cannot agree on a particular action or resolution (the "**Resolution**") after a vote on the Resolution has been taken during two (2) separate meetings of the Managers or requests for unanimous written consent, which meetings or requests have been duly called and held pursuant to this Agreement (such disagreement is hereinafter referred to as a "**Deadlock**"), then the Managers shall select an individual who is not an officer, Member, or Manager of the Company (an "**Independent Person**") to serve as a Neutral Arbitrator (as defined below) to resolve the Deadlock, within five (5) business days after the second meeting of the Managers. If the Managers cannot agree on an Independent Person to serve as the Neutral Arbitrator, then each Manager shall select an Independent Person, the identity of which shall be disclosed in writing to all of the Managers and to each such Independent Person, and the two (2) Independent Persons selected shall then promptly appoint one (1) Independent Person to serve as Neutral Arbitrator, to resolve the Deadlock. The Neutral Arbitrator shall vote for or against the Resolution at the next duly called and convened meeting of the Managers.

(h)     The "**Neutral Arbitrator**" means, for purposes of this Agreement, a natural person who has no legal, equitable, or economic interest in the Company. The Neutral Arbitrator's sole obligation, duty, and authority shall be approving or disapproving a Resolution in order to resolve a Deadlock, having only the authority to vote with respect to the approval or disapproval of the specific Resolution causing the Deadlock. Upon the resolution of the specific Deadlock by the approval or disapproval of the Neutral Arbitrator, said Neutral Arbitrator shall cease to have any obligation, duty or authority whatsoever with respect to the Company.

### 4.2.     Meetings of Managers.

(a)     In General. Any Manager may call a meeting of the Managers by giving written notice to all Managers not less than two (2) nor more than thirty (30) days prior to the date of the meeting, to consider the affairs of the Company and to take any action permitted to be taken by the Act, this Agreement, or the Certificate; provided, however, that any meeting of the Managers may take place without notice in the event that the Managers consent to such meeting and waive notice. All decisions by the Managers at any meeting must be unanimous to have any force or effect. Managers may participate in a meeting of the Managers by means of conference telephone, email or other similar communications equipment by means of which all persons participating in the meeting can immediately communicate with all other persons participating, and participation by such means shall be deemed to constitute presence in person at a meeting of the Managers.

(b) <u>Action by Managers without a Meeting</u>.   Action required or permitted to be taken at a meeting of the Managers may be taken without a meeting if the action is evidenced by a unanimous written consent of the Managers describing the action taken signed by all Managers or confirmed by email and filed by the Managers with the Company records.

(c) <u>Waiver of Notice by a Manager</u>.  When any notice is required to be given to any Manager, a waiver thereof in writing signed by the Manager entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

### 4.3.   <u>Extraordinary Transactions</u>.

(a)    Notwithstanding anything to the contrary in this Agreement, the Extraordinary Transactions listed in <u>Section 4.3(b)</u> below shall require the unanimous written consent of all of the Members.   Upon receipt of the required approval of any Extraordinary Transaction, the Managers shall have all power and authority necessary or desirable to carry out the purposes of such Extraordinary Transaction, including without limitation the power and authority to execute, acknowledge and deliver all agreements, contracts, assignments, deeds, notes, mortgages, bills of sale, stock powers, instruments and other documents necessary or convenient for the carrying out of the purposes of such Extraordinary Transaction, all without requiring the signature of any other Member thereon, and to make all expenditures relating thereto.

(b)    As used herein, an **"Extraordinary Transaction"** is defined to mean each of the following actions or decisions, each of which is deemed "not in the ordinary course of the business":

(i)    Approve an Operating Budget (as defined in <u>Section 4.4</u>) for the Company for each Fiscal Year;

(ii)    Establish a reserve for Business Expenses of an amount in excess of ten percent (10%) of the total amount of Business Expenses contemplated in the Operating Budget;

(iii)    Accept an additional Capital Contribution from any Member(s) of the Company;

(iv)    Obligate the Company to incur any indebtedness or act as guarantor or surety under any loan, promissory note, mortgage, pledge, security agreement, financing statement or other financing arrangement; or

(v)    Authorize the Company to enter into an agreement, contract, arrangement or other transaction with any Affiliate of the Company or any Member's Immediate Family Member in which the material terms and conditions are on terms more favorable than those otherwise contained in an arm's length transaction between third parties.

(vi)     Amend the Certificate or this Agreement, including making any modifications to the Equity Interests or Voting Interests following the date of this Agreement;

(vii)     Approve the Company's purchase or redemption of an Interest in the Company (provided that, for such purposes, the unanimous consent of the disinterested Members shall be sufficient);

(viii)     Approve the sale, merger or consolidation of the Company with any other entities;

(ix)     Approve the sale of all or substantially all of the Company's assets to a third party; or

(x)     File a voluntary petition in bankruptcy; make an assignment for the benefit of creditors; seek, consent to, or acquiesce in the appointment of a trustee, receiver, or liquidator of the Company or all or any substantial part of the Company's assets; or file any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, rule or regulation.

**4.4.     Operating Budget.** As soon as practicable, after the execution of this Agreement, and annually thereafter, the Members shall develop and approve an operating budget for the ensuing Fiscal Year (the "**Operating Budget**") in accordance with Section 4.3(b)(i), which shall provide for, among other things, the Company's Business Expenses, as well as casualty, general liability, director and officer and any other insurance coverage deemed appropriate or necessary by the Managers in amounts sufficient to reasonably protect the interests of the Members, the Managers, and/or the officers of the Company. The Managers shall utilize the Operating Budget in the operation of the Business and in purchases and expenditures (including, but not limited to, Business Expenses) for the operating requirements of the Business. In addition to its use of the Operating Budget, the Managers shall have full authority and discretion to utilize any and all reserves for Business Expenses in its operation of the Business, including, but not limited to, the reserve funded and approved by the Members in accordance with Section 4.3(b)(ii).

**4.5.     Action by Written Consent.** Any action by the Members may be taken in the form of a written consent, unanimous or otherwise, rather than at a meeting of the Members; provided, that such consent contains the requisite approval of the Members as required under the Act or this Agreement for such matter. The Managers shall maintain a permanent record of all actions taken by the Members.

**4.6.     Meetings of Members.** No meetings of the Members need be held. However, there shall be, within fifteen (15) days of a written demand by any Member, a meeting of the Members to consider the affairs of the Company and to take any action permitted to be taken by the Act, this Agreement, or the Certificate. Such a meeting may be held in person or by telecommunications equipment. For purposes of this Section 4.6, notice of a written demand for a meeting by e-mail, facsimile, first class mail, overnight mail or delivery service, or hand-

delivery shall be sufficient. Unless this Agreement provides otherwise, at a meeting of the Members, the presence in person or by proxy of all of the Members shall constitute a quorum for the transaction of business. A Member may vote either in person or by written proxy signed by the Member or by the Member's duly authorized attorney-in-fact. The Members present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the withdrawal of enough Members to leave less than a quorum, if any action taken (other than adjournment) is approved by the requisite percentage of Voting Interests specified by this Agreement; provided, however, that if this Agreement does not specify a requisite percentage of Voting Interests for an action to be taken by the Members, then said action shall require the requisite percentage of Voting Interests specified by the Act. Except as otherwise provided in this Agreement, the vote of holders of a Majority of the Voting Interests held by all of the Members present at a meeting in person or by proxy shall be required to approve any matter to be decided upon by the Members.

4.7.    **Standard of Care of the Managers.** The Managers shall not be liable to the Company or any Member for any matter or item, unless such matter or item is attributable to gross negligence, willful misconduct or fraud on the part of the Managers.

4.8.    **Indemnification.**    The Company shall indemnify, defend and hold harmless the Managers and each duly appointed officer, including Members who are officers of the Company, against any claim or liability incurred in connection with its actions on behalf of the Company to the fullest extent permitted by the Act or other applicable law. No Capital Account of any Member may be drawn upon to support such indemnification and no Member shall have any liability beyond the amount of his or its Capital Account. Neither the Company nor any Member shall have any claim against the Managers by reason of any act or omission, or by reason of any determination by any taxing authority that the treatment of any item on any Company tax return was improper, provided that the Managers acted in good faith in connection with such matters. The Company shall not indemnify the Managers, any officer or other person in connection with (i) a proceeding by or in the right of the Company in which the person was judged liable to the Company or (ii) in connection with any other proceeding charging improper personal benefit to such person, whether or not involving action on behalf of the Company, in which the person was adjudged liable on the basis that personal benefit was improperly received by him.

4.9.    **Reliance by Third Parties.** Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of the Managers. Any corporation, trust, partnership, or other business entity called upon to Transfer any property to or from the name or account of the Company shall be entitled to rely on instructions or assignments signed by the Managers without inquiry as to the authority of the Person signing or purporting to sign such instructions or assignments and without inquiry as to the validity of the Transfer.

## ARTICLE 5
### LIABILITY AND RIGHTS OF MEMBERS

**5.1.** **No Personal Liability.** The Members shall in no event be liable personally for any of the debts or losses of the Company beyond the amount of such Member's Capital Account. No Member shall have any obligation to contribute any sums of money or other property to the Company (other than the agreed upon contributions provided for herein) on account of any deficit or negative balance in his or its Capital Account.

**5.2.** **No Participation in Management.** Except as otherwise provided herein, or in any employment agreement between the Company and a Member, the Members (other than the Managers), shall not participate in the management or control of Company business, nor shall the Members transact any business for the Company, nor shall the Members have the power to act or bind the Company, said powers being vested exclusively in the Managers.

## ARTICLE 6
### MEMBER OBLIGATIONS AND MEMBER AFFILIATE RELATIONSHIPS

**6.1.** **Member Obligations.**

(a) Baker has agreed to provide or engage its Affiliate(s) to provide certain food product inventory developed under the "Bubba's Q" brand to the Company. In addition, Al Baker, individually, has agreed to serve as a brand ambassador and on-air television personality for the Company, to provide or cause to be provided by Baker sales contacts to the Company, and to provide or cause to be provided by Baker certain marketing, promotion, product development, sales, and advertising services and support to the Company.

(b) RP shall provide or engage its Affiliate(s) to provide certain product packaging, labeling, distribution, quality assurance audit, United States Department of Agriculture approval, co-packer management and related services (the "**Co-Packer Services**"). RP shall also perform or engage its Affiliate(s) to perform certain services for the Company, which may include, but not be limited to, e-commerce product order fulfillment, order processing, customer service, point-of-service development, sales support services, and revenue collection services, but expressly excluding any marketing and/or promotional services, which shall be performed by and be the sole responsibility of the Company (the "**RP Services**"). The provision of the Co-Packer Services and the RP Services to the Company by RP and/or its Affiliate(s) shall be subject to the terms and conditions set forth in Section 6.4, below.

(c) Daymond John, individually, has agreed to serve as a brand ambassador and on-air television personality for the Company, to provide or cause to be provided by Daymond sales contacts to the Company, and to provide or cause to be provided by Daymond certain marketing, promotion, product development, sales, and advertising services and support to the Company.

(d)     The Company shall indemnify the Members in connection with each Member's provision of services on behalf of the Company as outlined in this Section 6.1, including Daymond John, individually, with respect to his personal services as set forth in Section 6.1(c) and Al Baker, individually, with respect to his personal services set forth in Section 6.1(a), within the scope of such services as set forth in this Section 6.1, respectively; provided, however, that the Company shall not indemnify any Member (or Al Baker or Daymond John, individually, to the extent applicable) for monetary damages resulting from any act of fraud, gross negligence, or willful misconduct on the part of any Member (or Al Baker or Daymond John, individually, to the extent applicable).

6.2.     Relationship to JABEZBAKER, LLC.    Baker hereby represents and warrants that JABEZBAKER, LLC, an Affiliate of Baker, is the sole owner of certain existing patents, as set forth in Exhibit C hereto ("Patents"), attendant to and in connection with the Business, and that the Patents shall remain the sole and exclusive property of JABEZBAKER, LLC, subject to the terms and conditions set forth herein and in Section 6.3 below.   The Members agree and acknowledge that Baker shall cause JABEZBAKER, LLC to enter an exclusive license agreement between the Company and JABEZBAKER, LLC allowing for the Company's exclusive use of the Patents, upon terms that are mutually acceptable to the Company and JABEZBAKER, LLC (the "License Agreement"), which License Agreement shall include, but not be limited to, the right to use the Patents on an exclusive basis subject to the following royalty fees, which shall be paid monthly to JABEZBAKER, LLC, by the Company:

(a)     Royalty fee of $1.00 per pound for ecommerce sales of Bubba's Q De-Boned Baby Back Rib Steak;

(b)     Royalty fee of one percent (1%) of sales of Bubba's Q De-Boned Baby Back Rib Steak through retail and food service venues; and

(c)     Royalty fee of $0.50 per case for all cases of Bubba's Q De-Boned Baby Back Rib Steak sold through television infomercials, promotions, and offers, including, but not limited to, sales to QVC, Inc. and Home Shopping Network (a/k/a HSN).

6.3.     Assignment of Patents.    The Members acknowledge and agree that immediately upon the determination of the Company's accountant that the Company has generated an aggregate of thirty million dollars ($30,000,000) of Gross Receipts, Baker shall cause JABEZBAKER, LLC to irrevocably and unconditionally grant, convey, transfer, and assign to a newly formed Delaware limited liability company ("NewCo") all of its right, title, and interest in the Patents (the "Patent Assignment"), in consideration for the continuing right of JABEZBAKER, LLC to receive fees equivalent in value to the royalty fees set forth in Sections 6.2(a), 6.2(b), and 6.2(c), above, for such Patent Assignment.  Each Member of the Company or Permitted Transferee thereof, if applicable, shall receive an ownership interest in NewCo that is consistent with such Member's Equity Interest in the Company at the time of the Patent Assignment.

**6.4.**   **Relationship to RP Affiliate(s).**   The Members acknowledge and agree that RP shall cause Rastelli Brothers, Inc., an Affiliate of RP, to enter into an agreement with the Company upon terms that are mutually acceptable to the Company and Rastelli Brothers, Inc., to provide the Co-Packer Services (the "**Co-Packer Agreement**").   The Members further acknowledge and agree that RP shall also perform or engage its Affiliate(s) to perform the RP Services.  In consideration for the RP Services and for the Co-Packer Agreement, in addition to any profits paid or distributions made to RP elsewhere under this Agreement as a Member, RP shall be entitled to an additional fee in an amount equal to (a) the actual cost of products provided to the Company plus (b) a proportional amount of facility overhead for the facility where the Co-Packer Agreement is being performed, which amount shall be proportional to the volume of products provided to the Company under the Co-Packer Agreement and (c) an amount equal to twelve percent (12%) of the expenses and costs associated with providing the RP Services plus a fee of $.38 per pound of all sales of products provided to the Company.

**6.5.**   **Assignment of Baker Intangibles.**   Baker represents and warrants that Bubba's-Q, Inc., an Affiliate of Baker, is the sole owner of that certain trade mark filing made in the State of Ohio for the name "Bubba's Q World Famous," QueenAnn, Inc., an Affiliate of Baker, is the sole owner of that certain service mark filing made in the State of Ohio for the name "De-Boned Baby Back Rib Steak," copies of which filings are attached hereto as **Exhibit D**, and Baker and/or its Affiliates are the sole owner of certain goodwill, brand names, service marks and intellectual property attendant to and in connection with the Business (collectively, the "**Baker Intangibles**", and together with the Patents to be known as the "**Existing Intangible Rights**").  Notwithstanding anything contained herein to the contrary, the Members acknowledge that the Baker Intangibles are not protected by any federal trademarks as of the date of this Agreement.   The Members hereby agree and acknowledge that contemporaneous with the execution of this Agreement, Baker shall cause QueenAnn, Inc., Bubba's-Q, Inc., and any and all other Affiliates of Baker, including, without limitation, any Baker Intangibles owned by Baker or Baker family members, to irrevocable and unconditionally grant, convey, transfer and assign to the Company or NewCo (as defined above), as the Managers may determine, all of their rights, title and interest in the Baker Intangibles (the "**Intangibles Assignment**").  In consideration for the Intangibles Assignment, the Company and/or NewCo (as applicable) shall file for and attempt to obtain federal trademarks with respect to the Baker Intangibles and the "Bubba's Q" related brand, as soon as reasonably practicable (the "Trademark Filings").   The Trademark Filings, if obtained, shall be made in the name of and be owned by the Company or NewCo (as applicable).   Any filings, registrations, trademarks, services and/or patents for or relating to the Existing Intangible Rights, made hereinafter shall be made in the name of and shall be owned by the Company or NewCo, as applicable.   Notwithstanding the foregoing, the ownership and assignment of the Patents shall be handled in accordance with Sections 6.2 and 6.3 of this Agreement.   Notwithstanding anything contained herein to the contrary, the Members further intend and agree that in addition to the Existing Intangible Rights being contributed to the Company, the website, http://bubbasbonelessribs.com, and any other now existing or future created websites related to the Business, shall be contributed to and owned by the Company or NewCo (as applicable) as of the date of this Agreement.

## ARTICLE 7
### TAX, ACCOUNTING, AND FISCAL MATTERS

**7.1.**   <u>Fiscal Year</u>.  The fiscal year of the Company ("Fiscal Year") shall be the calendar year.

**7.2.**   <u>Method of Accounting</u>.   The Members shall select a method of accounting for the Company as deemed necessary or advisable and shall keep, or cause to be kept, full and accurate records of all transactions of the Company in accordance with sound accounting principles consistently applied.

**7.3.**   <u>Financial Books and Records</u>.  All accounting records shall, at all times, be maintained at such location specified by the Managers, and such records shall be open to inspection by any of the Members upon advance notice during reasonable business hours.

**7.4.**   <u>Tax Matters Member</u>.   The "**Tax Matters Partner**" of the Company pursuant to Section 6231(a)(7) of the Code shall be RP.  Any Member who is designated Tax Matters Partner shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Code.  Any Member who is designated Tax Matters Partner shall inform each other Member of all significant matters that may come to its attention in his capacity as Tax Matters Partner by giving notice thereof on or before the fifth (5th) Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications he may receive in that capacity.  The Company shall reimburse the Tax Matters Partner for any costs incurred representing the interests of the Members in respect of Company tax matters.

**7.5.**   <u>Tax Returns</u>.  The Managers shall cause all tax returns for the Company to be prepared and timely filed with the appropriate taxing authorities and shall provide copies of all such returns to the Members as soon as available.

**7.6.**   <u>Tax Elections.</u>  The Managers may, in their reasonable discretion make, or petition the relevant taxing authority to revoke, any tax election which is available to the Company, including, without limitation, an election under Section 754 of the Code.

## ARTICLE 8
### TRANSFERABILITY OF INTERESTS

**8.1.**   <u>Restriction of Transfer Generally; Exception</u>.   No Member shall Transfer all or any part of its Interest in the Company except in compliance with this <u>Article 8</u>.  Except as provided in <u>Section 8.2</u> and <u>Section 8.3</u> hereof, any Transfer of a Member's Interest in the Company shall require the unanimous written consent of the Members.  Any Transfer not expressly permitted under the terms of this Agreement shall be void and of no effect.

**8.2.**   <u>Permitted Transfers</u>.  Any Member may give, assign, sell, or Transfer all or part of such Member's Interest in the Company to an entity that is under the Control of, or

common Control with the Member or to the trustee of a trust that qualifies as a "Grantor Trust" pursuant to Sections 671-679 of the Code having as its sole beneficiaries the Member and/or one or more of the Member's Immediate Family Members (each such entity or trustee being referred to herein as a "**Permitted Transferee**", and each such Transfer being referred to herein as a "**Permitted Transfer**"); provided, however, that a Member shall provide written notice to the Company and the other Members not less than ten (10) days prior to a Permitted Transfer.

### 8.3.   Right of First Offer / Right of First Refusal.

(a)   With respect to any bona fide arm's length offer received or solicited from a Person other than a Permitted Transferee (a "**Prospective Purchaser**") to acquire all or any portion of a Member's Interest in the Company (the "**Offer**"), upon receipt thereof, such Member (the "**Selling Member**") shall notify the Company and the Members in writing of the terms of such Offer within ten (10) days of the receipt thereof, including the identity of the Prospective Purchaser the amount of the Member's Interest in the Company that is the subject of the Offer (the "**Offered Interests**") and the term and conditions of the Offer, and shall provide such information and documentation relating to the Offer as the Company and the Members may require. An Offer that includes the Prospective Purchaser securing financing to complete the Transfer shall qualify as a bona fide arm's length written offer only if it is accompanied by a binding commitment from a bank, commercial lender or other financial institution to provide the required financing.

(b)   If the remaining Member(s) desire(s) to purchase all, but not less than all, of the Offered Interests, the Member(s) shall, within thirty (30) days of receiving the Offer, send the Selling Member a written notice of its election to purchase the Offered Interests from the Selling Member under the terms and conditions specified in the Offer (the "**Member Purchase Notice**"). If more than one (1) of the remaining Members elects to purchase the Offered Interests, by delivering a Member Purchase Notice, such Members shall each receive a portion of the Offered Interests equal to their proportionate Interest in the Company vis-a-vis each other. If no Member delivers a Member Purchase Notice within its specified thirty (30) day period, the Company shall then have thirty (30) days, beginning on the first day after the expiration of the Members' thirty (30) day period, to provide the Selling Member with a written notice of its intent to purchase the Offered Interests (the "**Company Purchase Notice**").

(c)   The Member Purchase Notice or Company Purchase Notice shall, when taken in conjunction with the Offer, be deemed to constitute a valid, legally binding and enforceable agreement for the Transfer of the Offered Interests as is set forth in the Member Purchase Notice or Company Purchase Notice on the terms of the Offer.

(d)   If the Company or the remaining Members elect to purchase the Offered Interests, the closing of such Transfer shall take place no later than sixty (60) days following the expiration of the period provided in Section 8.3(b) above.

(e)   If neither the Company nor the remaining Member(s) elect to purchase the Offered Interests, then for a period of thirty (30) days commencing upon the

expiration of the period provided in Section 8.3(b) above, the Selling Member may Transfer all of the Offered Interests to the Prospective Purchaser upon the terms specified in the Offer; provided, however, that any material change in the terms of the Offer prior to closing shall constitute a new Offer subject to the right of first offer and/or right of first refusal option of the Members and the Company described in this Section 8.3. Any Offered Interests not sold within the thirty (30) day period commencing upon the expiration of the period provided in Section 8.3(b) above pursuant to the terms specified in the Offer shall continue to be subject to the terms and conditions of this Agreement, including, without limitation, the requirements of this Section 8.3.

(f)     In the event of any completed Transfer to any Prospective Purchaser in accordance with this Section 8.3, the Company may request in writing that the Selling Member provide the Company with copies of the fully executed documents transferring the Offered Interests to the Prospective Purchaser within five (5) days of any such written request.

(g)     If any proposed Transfer under this Section 8.3 involves consideration other than cash, any Person having rights under this Section shall have the right to elect to pay, in lieu of such non-cash consideration, cash in an amount equal to the fair market value of such non-cash consideration.

8.4.    Effect on Transfer.

(a)     In addition to compliance with Section 8.1 above, no assignee or transferee (including, but not limited to, a Permitted Transferee) of all or part of an Interest in the Company shall have the right to become admitted as a Member, unless and until:

(i)     the assignee or transferee has executed an instrument reasonably satisfactory to the Members accepting and adopting the provisions of this Agreement;

(ii)    the assignee or transferee has paid all reasonable expenses incurred by the Company in connection with the admission of such assignee or transferee as a Member;

(iii)   if requested by the Managers, the assignee or transferee has delivered to the Company an opinion of counsel reasonably satisfactory to the Managers that such Transfer is exempt from the registration requirements of all applicable federal and state securities laws;

(iv)    the assignee or transferee has executed and delivered to the Managers such other documents and instruments as are necessary or appropriate, in the Managers' discretion, in connection with the assignee or transferee becoming a Member; and

(v)     such assignment or Transfer shall be reflected in a revised Exhibit A to this Agreement.

       (b)    A Permitted Transferee or a Person who is an assignee of an Interest in the Company may be admitted to the Company as a Member and may receive an Interest in the Company without making a contribution or being obligated to make a contribution to the Company.

       **8.5.**   **Members' Representatives.**  If a Member who is an individual dies or a court of competent jurisdiction adjudges the individual to be incompetent to manage the person or property of the individual, the executor, administrator, guardian, conservator or other legal representative of the Member may exercise all of the rights of the Member for the purpose of settling the estate or administering the property of the Member, including the power under this Agreement of an assignee to become a Member.  If a Member is a corporation, limited liability company, trust or other entity and is dissolved or terminated or is administered under the power of a trustee or receiver, the powers of that Member may be exercised by its legal representative or successor.

## ARTICLE 9
## REDEMPTION OF INTERESTS

       **9.1.**   **Optional Redemption Upon a Proceeding.**  During the term of this Agreement, upon the occurrence of any Proceeding against any Member (a "Redeemed Member"), the Company shall have the option, but not the obligation, to purchase all, but not less than all, of the Redeemed Member's Interest in the Company (the "Redeemed Interest") for a redemption price equal to the Fair Market Value (as defined below) for the Redeemed Interest. Any such option may be exercised by the Company pursuant to written notice to the Redeemed Member within thirty (30) days following the occurrence of a Proceeding against the Redeemed Member.  Upon the Redeemed Member's receipt of a notice by the Company of its intention to exercise such purchase option, the Redeemed Member shall be obligated to sell and deliver to the Company the Redeemed Interest in the Company as of the Proceeding, for Fair Market Value subject to the terms and conditions set forth in Section 9.4.  If all Proceedings with respect to the Redeemed Member terminate and the Redeemed Member retains record and beneficial ownership of some or all of his, her, or its Interest in the Company, the Company shall become obligated to purchase, and the Redeemed Member, or the personal representative of his estate if deceased, as applicable, shall become obligated to sell and deliver to the Company, all of the Redeemed Interests owned by the Redeemed Member upon the termination of the Proceedings against the Redeemed Member.

9.2. **Optional Redemption Upon Termination.** Upon the dissolution or termination of any member that is an entity (each, a "**Termination Event,**" and such Member shall be referred to as a "**Terminated Member**"), the Company shall have the right, but not the obligation, to purchase all, but not less than all, of the Interests in the Company owned by the Terminated Member at the time of the Termination Event (the "**Terminated Interest**") at a redemption price equal to the Fair Market Value (as defined below) for the Terminated Interest. Notwithstanding anything to the contrary in this Agreement, the decision of the Company to exercise this option shall require the approval of all of the disinterested Members. If the Company desires to purchase the Terminated Interest, it shall deliver written notice to the Terminated Member or his or her personal representative, as applicable, within thirty (30) days following the Termination Event.

9.3. **Redemption Price.** The redemption price for any Interest in the Company redeemed under Section 9.1 or Section 9.2 above shall be the total "Fair Market Value" for the Redeemed Interest or Terminated Interest, as the case may be. Except as otherwise provided in this Agreement, "**Fair Market Value**" shall be determined by an appraisal of the Company performed by a firm mutually agreed to by the purchasing party or parties and the Redeemed Member or Terminated Member, or their successors and representatives, in writing. If such parties are unable to agree upon the identity of an appraiser, the purchasing party and the Redeemed Member (or Terminated Member, as the case may be) shall each choose a Qualified Appraiser. For purposes of this Section 9.3, the term "**Qualified Appraiser**" shall mean an independent, certified business appraiser, licensed in the State of Delaware and with at least five (5) years of experience. Each of the two (2) Qualified Appraisers so chosen shall deliver its determination of the Fair Market Value to the purchasing party or parties, the Redeemed Member (or Terminated Member), and the Company, within thirty (30) days of its selection. If the lower of the two (2) appraisals is not equal to at least ninety percent (90%) of the higher appraisal, then the higher appraisal shall determine the Fair Market Value of the Redeemed Interest. If the lower of the two (2) appraisals is at least ninety percent (90%) of the higher appraisal, then the Fair Market Value of the Redeemed Interest or Terminated Interest shall be determined by averaging the two appraisals obtained by the parties.

9.4. **Closing.** Any closing of the Company's purchase of a Redeemed Interest or Terminated Interest under this Article 9 (each a "**Closing**") shall occur within sixty (60) days following the date of exercise of the purchase option or within thirty (30) days of the determination of Fair Market Value of the Redeemed Interest or Terminated Interest pursuant to Section 9.3, whichever is later. The terms of payment for the redemption of Equity Interests in the Company pursuant to the options granted in this Article 9 shall be negotiated and mutually agreed upon by the parties. At Closing, the Company shall enter into such documents and agreements and the Redeemed Member or Terminated Member shall supply such documentation deemed by legal counsel to the Company necessary to evidence the redemption and as may be required by applicable law.

## ARTICLE 10
### DISSOLUTION AND LIQUIDATION

**10.1.** **Dissolution.** The Company shall be dissolved and commence winding up and liquidation upon the occurrence of any of the following:

(a)     Upon the written consent of all of the Members to effect such dissolution; or

(b)     Upon entry of a decree of judicial dissolution pursuant to the Act.

**10.2.** **Liquidation.**

(a)     Upon the dissolution of the Company and at the election of the Managers, all Company assets shall be sold and reduced to cash and/or distributed in-kind to the Members within ninety (90) days following dissolution of the Company. All Company assets shall be distributed in payment of the liabilities of the Company and to the Members in the following order:

(i)     First, to the payment of the debts and liabilities of the Company and the expenses of liquidation, including sales commission to any selling agent;

(ii)     Second, to the funding of any reserves which the Managers deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company. At the expiration of such period as the Managers shall deem advisable, the balance thereof, if any, shall be distributed in the manner provided in this Section, and in the order named. Such reserves shall not be unreasonable and shall be in accordance with acceptable accounting and business standards.

(iii)     Third, to the Members in accordance with their Capital Accounts, to the extent the sums are positive, and any amount in excess of their Capital Accounts shall be distributed in proportion to their Equity Interests.

(b)     A reasonable time, as determined by the Managers, shall be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to creditors in order of legal priority so as to enable the Members to minimize any losses attendant upon liquidation.

## ARTICLE 11
### CONFIDENTIALITY

**11.1.** **Confidentiality Generally.** Each of the Members shall, during the term of this Agreement and at all times thereafter, maintain in confidence all confidential and proprietary information and data of the Company and of the other Members and their Affiliates, (each, a "disclosing party") disclosed to it (the "**Confidential Information**"). Each of the Members further agrees that it shall not use the Confidential Information during the term of this

Agreement or at any time thereafter for any purpose other than the performance of its obligations or the exercise of its rights under this Agreement. The Company and each Member shall take all reasonable measures necessary to prevent any unauthorized disclosure of the Confidential Information by any of their employees, agents or consultants.

11.2. **Permitted Disclosures.** Nothing herein shall prevent the Company, any Member, or any employee, agent or consultant of the Company or of any Member (the "receiving party") from using, disclosing, or authorizing the disclosure of any information such Person receives in the course of the business of the Company which:

(a) becomes publicly available other than through default hereunder by the receiving party;

(b) is lawfully acquired by the receiving party from a source not under any obligation to the disclosing party regarding disclosure of such information;

(c) is properly in the possession of the receiving party in written or other recorded form at the time of its disclosure hereunder;

(d) is non-confidentially disclosed to any third party by or with the permission of the disclosing party; or

(e) is independently developed without the use of any Confidential Information.

11.3. **Remedies; Survival of Covenants.** Each Member acknowledges and agrees that any breach of the provisions of Section 11.1 of this Agreement is likely to result in irreparable injury to the Company, the other Members and their respective members, shareholders, partners, officers, affiliates, employees, and agents, and that the remedy at law alone will be an inadequate remedy for such breach, and that in addition to any other remedy they may have, the Company and the other Members, or their respective members, shareholders, partners, officers, affiliates, employees and agents shall be entitled to specific performance of Section 11.1 of this Agreement by such Member and to seek both temporary and permanent injunctive relief (to the extent permitted by law) without bond and without liability should such relief be denied, modified, or vacated. Neither the right to obtain such relief nor the obtaining of such relief shall be exclusive or preclude the Company, the other Members or their respective members, shareholders, partners, officers, affiliates, employees, and agents from any other remedy. The provisions of this Section 11.3 shall survive the termination of this Agreement to the extent applicable after the termination hereof.

## ARTICLE 12
## MEDIATION OF DISPUTES

In the event of any dispute between the Members or between the Company and one or more Members, the parties agree to use commercially reasonable efforts to resolve the

dispute through Mediation in a mutually acceptable manner. For this purpose, the parties in dispute shall accept a mutually acceptable mediator. If the parties in dispute cannot agree upon a mediator, then the matter shall be decided upon by a panel of three (3) mediators, with each party selecting a mediator and the mediators selecting a third, neutral mediator. The parties in interest shall share equally all initial costs of mediation. The mediators shall hold meetings on the question, matter, or dispute and shall provide opportunity to the parties to be present and to be fully heard thereat by counsel or otherwise. Discovery by the parties shall be permitted prior to such meetings. In the event that the mediation is unsuccessful, the parties shall have the right to pursue legal action under the laws of the State of Delaware.

## ARTICLE 13
## INDEPENDENT LEGAL REPRESENTATIONS

Each Member acknowledges that, prior to entering into this Agreement, such Member has been advised and has had an opportunity to obtain independent counsel to represent such Member in connection with the formation of the Company and entering into this Agreement, including the potential income tax consequences thereof. Each Member acknowledges and understands that Hyland Levin LLP ("Hyland Levin") has represented RP and the Company with regard to the preparation of this Agreement and the formation of the Company. Each Member further acknowledges and understands that Hyland Levin is not representing any Member(s) other than RP with regard to the preparation of this Agreement and the formation of the Company, notwithstanding any prior or current representation of any such Member in other matters.

## ARTICLE 14
## MISCELLANEOUS

**14.1. Binding Effect.** Except as otherwise provided in this Agreement to the contrary, this Agreement shall be binding upon and inure to the benefit of the Members and their successors and assigns.

**14.2. Integration.** This Agreement constitutes the sole agreement among the Members with respect to the subject matter hereof and shall supersede all oral agreements and prior writings with respect to the subject matter hereof.

**14.3. Governing Law.** This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware without reference to conflict of laws principles.

**14.4. Severability.** The invalidity or unenforceability of any particular provision of this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

**14.5. Gender and Number.** As used in this Agreement, the masculine gender shall include the feminine and the neuter, and vice versa and the singular shall include the plural.

14.6.   <u>Headings.</u>   The headings herein have been included for convenience of reference only and shall not be considered in interpreting this Agreement.

14.7.   <u>Dissociation.</u>   Each Member does hereby waive any right to dissociate or the right to take any other action which might otherwise be available to such Member for the purpose of severing its relationship with the Company, or such Member's Equity Interest in the Company from the Equity Interests in the Company of the other Members until the dissolution of the Company as provided in <u>Article 10</u> hereof.

14.8.   <u>Notices.</u>   Unless otherwise specified, all notices required to be given pursuant to this Agreement shall be given personally or be sent by hand delivery, certified mail, return receipt requested or overnight express delivery service to the addresses specified on <u>Exhibit A</u> or, for a Member who shall become a Member after the execution hereof, on the joinder or other agreement executed by such Member (or any superseding addresses specified by proper notice) with all postage or other charges of conveyance prepaid and shall be effective upon the earlier of the actual receipt thereof or the second day (excluding weekends and Federal holidays) after the proper sending thereof.

14.9.   <u>Execution of Documents.</u>   The Members agree that they shall execute any amendments or other documents relating to the Certificate as required by the Act and any other instrument necessary to carry out the terms of this Agreement and the actions contemplated hereby.

14.10.   <u>Counterparts.</u>   This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same Agreement.

14.11.   <u>Amendment.</u>   The Certificate and this Agreement may only be amended by the written approval of all of the Members.

*[Remainder of this page intentionally left blank.  Signatures appear on the following page.]*

**IN WITNESS WHEREOF,** and intending to be legally bound, the Members have executed this Agreement as of the date first written above.

FOFBAKERS HOLDING COMPANY, LLC,
an Ohio limited liability company

By: _James A. Baker_
Name: James A. Baker
Title: CEO / President

RASTELLI PARTNERS, LLC,
a New Jersey limited liability company

By: _____
     Name:    Raymond M. Rastelli, Jr.
     Title:    President

DF VENTURES, LLC,
a New York limited liability company

By: _____
     Name:  Daymond John
     Title:

**IN WITNESS WHEREOF**, and intending to be legally bound, the Members have executed this Agreement as of the date first written above.

FOFBAKERS HOLDING COMPANY, LLC,
an Ohio limited liability company

By:_____
Name:
Title:

RASTELLI PARTNERS, LLC,
a New Jersey limited liability company

By: _____
Name:    Raymond M. Rastelli, Jr.
Title:    President

DF VENTURES, LLC,
a New York limited liability company

By: _____
Name:  Daymond John
Title:

{HL479703.19}

FOFBAKERS, LLC
LIMITED LIABILITY COMPANY OPERATING AGREEMENT
Page 27 of 27

**IN WITNESS WHEREOF**, and intending to be legally bound, the Members have executed this Agreement as of the date first written above.

FOFBAKERS HOLDING COMPANY, LLC,
an Ohio limited liability company

By:_____
Name:
Title:


RASTELLI PARTNERS, LLC,
a New Jersey limited liability company


By: _____
    Name:    Raymond M. Rastelli, Jr.
    Title:     President

DF VENTURES, LLC,
a New York limited liability company

By:_____
    Name:  Daymond John
    Title:

## EXHIBIT A

### Members

| Member Name & Address | Voting Interest | Equity Interest |
|---|---|---|
| FOFBakers Holding Company, LLC | 51% | 45% |
| Rastelli Partners, LLC | 32% | 35% |
| DF Ventures, LLC | <u>17%</u> | <u>20%</u> |
| TOTAL: | 100% | 100% |

**EXHIBIT B**

**Initial Capital Contributions**

Baker will contribute the Existing Intangible Rights and intellectual property, including the website (as defined in Article 6 of the Agreement), as well as certain goodwill and know-how to the Company.

RP will contribute certain goodwill and know-how to the Company.

Daymond will contribute $52,500 in cash to the Company to be distributed to Baker pursuant to Section 3.5 of the Agreement and the intellectual property in connection with the website, and has contributed $47,500 expended on research and development ($22,500), trade show ($15,000) and start-up expenses ($10,000) that have directly benefitted the Company.

Based on the mutually agreed upon relative value of the aforesaid contributions and the respective undertakings between the Members as set forth in this Agreement, the parties agree and acknowledge that the Members' initial Equity Interests in the Company shall be as follows:

| Member | Initial Capital Contribution |
|---|---|
| FOFBakers Holding Company, LLC | Intangibles valued at $225,000 |
| Rastelli Partners, LLC | Intangibles valued at $175,000 |
| DF Ventures, LLC | Intangibles and Cash valued at $100,000 |
| TOTAL: | $500,000 |

# EXHIBIT C

Patents Attached



US007666075B1

(12) **United States Patent**
Baker et al.

(10) Patent No.: **US 7,666,075 B1**
(45) Date of Patent: **Feb. 23, 2010**

(54) RIB MEAT PRODUCT AND PROCESS FOR
PREPARING SAME

(76) Inventors: James Albert London Baker, 2784
Trinity Ct., Avon, OH (US) 44011;
Brittani Bo Baker, 27559 Remington
Cir., Westlake, OH (US) 44145

(*) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 532 days.

(21) Appl. No.: 11/595,268

(22) Filed: Nov. 9, 2006

(51) Int. Cl.
A22C 17/04 (2006.01)
(52) U.S. Cl. ...................................................... 452/135
(58) Field of Classification Search ......... 452/135–140,
452/174, 198
See application file for complete search history.

(56) References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,137,605 A * | 2/1979 | van Rij et al. | 452/138 |
| 4,186,216 A * | 1/1980 | Roth | 452/140 |
| 4,217,679 A * | 8/1980 | Gordon | 452/140 |
| 5,104,351 A | 4/1992 | van den Nieuwelaar et al. | |
| 5,197,918 A | 3/1993 | Klaassen | |
| 5,273,483 A * | 12/1993 | Gagliardi, Jr. | 452/135 |
| 5,464,368 A | 11/1995 | White et al. | |
| 5,525,103 A | 6/1996 | White et al. | |
| 5,667,435 A | 9/1997 | Baughman et al. | |
| 5,775,986 A | 7/1998 | Law et al. | |
| 5,823,867 A * | 10/1998 | Roth et al. | 452/138 |
| 5,868,613 A | 2/1999 | Heidke et al. | |
| 5,976,004 A * | 11/1999 | Hazenbroek | 452/136 |
| 6,527,636 B2 * | 3/2003 | Mickelsen | 452/149 |
| 6,648,744 B2 | 11/2003 | Bell et al. | |
| 6,716,097 B2 | 4/2004 | Freund et al. | |
| 7,008,313 B2 * | 3/2006 | Gagliardi, Jr. | 452/135 |
| 7,022,007 B2 | 4/2006 | Naehring | |
| 7,198,564 B2 * | 4/2007 | Hine et al. | 452/135 |
| 2006/0035005 A1 | 2/2006 | McMindes et al. | |

FOREIGN PATENT DOCUMENTS

EP          1053684          11/2002

* cited by examiner

Primary Examiner—Thomas Price
(74) Attorney, Agent, or Firm—Curatolo Sidoti Co., LPA;
Salvatore A. Sidoti; Joseph G. Curatolo

(57) **ABSTRACT**

A cooked and de-boned substantially intact slab of rib meat is
provided. A process for preparing a de-boned rib meat prod-
uct from a pork or beef rib cut is also provided. The process
for preparing the rib meat product involves cooking a length
of rib meat having rib bones embedded therein at a tempera-
ture and for a time sufficient to enable the removal of the rib
bones from the length of rib meat, while maintaining a sub-
stantially intact length of rib meat.

10 Claims, 5 Drawing Sheets



**U.S. Patent**       Feb. 23, 2010       Sheet 1 of 5       US 7,666,075 B1



FIG 1

**U.S. Patent**      Feb. 23, 2010      Sheet 2 of 5      US 7,666,075 B1



FIG 2

U.S. Patent      Feb. 23, 2010      Sheet 3 of 5      US 7,666,075 B1



FIG 3

**U.S. Patent**          Feb. 23, 2010          Sheet 4 of 5          US 7,666,075 B1



FIG 4A

**U.S. Patent**     Feb. 23, 2010     Sheet 5 of 5        US 7,666,075 B1



FIG 4B

US 7,666,075 B1

1

# RIB MEAT PRODUCT AND PROCESS FOR PREPARING SAME

## TECHNICAL FIELD

Generally provided is a cooked and de-boned meat product and a process for preparing the meat product. More particularly, provided is a cooked and de-boned rib meat product and a process for preparing the rib meat product. The process of preparation results in a ready-to-eat substantially intact beef or pork rib meat steak, which does not include any rib bones.

## BACKGROUND

Pork and beef carcasses are typically butchered into several cuts or portions, which may be used to prepare spare ribs and back ribs. Spare ribs may be further divided into the traditional breast bone spare ribs or St. Louis style spare ribs. St. Louis style spare ribs generally comprise the upper part of a rib separated from the breast bone or brisket bone. St. Louis style spare ribs are generally very meaty and include minimal fat.

Back rib cuts are generally prepared by cutting the loin sections between the back ribs and the semispinalis muscle adjacent to the back ribs to form a loin cut and a back rib cut. The back rib meat cut, also known as a baby back rib cut, includes rib bones and related intercostal meat. Each back rib cut is intact and includes portions of at least eight ribs. See *Institutional Meat Purchaser Specification Item No. 422* (June, 1997). Back rib cuts are generally sold as a single intact rib section, which may be prepared and consumed with various sauces. The demand for the baby back rib cuts has increased dramatically in recent years due to the increase in the number of barbeque-themed restaurants. However, because back rib cuts typically contain only intercostal meat between the rib bones, conventional back rib cuts do not include a substantial amount of meat.

In recent years, corporations owning barbeque-themed restaurants have become increasingly interested in barbeque style food products that can retain the interest of repeat business. Consuming barbeque style ribs in a social situation, however, has always been a delicate undertaking. Traditionally, barbeque style ribs have carried the distinction of being an untidy food item, and as a result, are left off of many fine dining menus. Enjoying barbeque style ribs is often difficult, as eating them can be time consuming, embarrassing, and messy. As is often the custom, barbeque ribs are eaten without utensils, utilizing one's own hands to assist in separating the meat from the rib bones and introducing the meat into one's mouth.

As a result of this direct contact of the meat with the hands, the thick consistency of barbeque sauce has the potential to coat one's hands and is difficult to remove without the assistance of a moist towelette or inserting by one's own fingers into their mouth to assist in removing the excess barbeque sauce.

Embarrassment can also occur due to the shape of the rib bones themselves. A single barbeque style rib possesses the shape of an elongated cylinder, encased in meat and covered with barbeque sauce. When taken to one's mouth to eat, if not eaten with care, the rib can displace sauce onto the consumer's face, which can cause great embarrassment.

There are also health risks associated with the consumption of ribs. Because of the irregular shapes and hardness of the rib bones, the risk of injury to the inside of one's mouth is also a concern. Furthermore, the potential for choking on a portion of a rib bone causes people to avoid consuming ribs.

2

Additionally, a meat cut that includes both rib bones and associated meat makes it more difficult for a person to consume all available meat, because the person must work around and between the bones. Therefore, consuming barbeque style ribs has the tendency to be tedious and laborious, due to the requirement of tearing the meat from the bones and eating meat from around the rib bones themselves.

There have been attempts to produce boneless pork and beef back rib products. One such method of producing boneless rib meat includes first separating the rib meat from the bones, creating a paste-like meat intermediate product, and restructuring the paste-like intermediate product into a form that attempts to resemble the appearance of a natural slab of ribs. These types of processed or restructured rib products are commonly offered by fast food restaurant chains and in the frozen foods sections of retail grocery stores. Obviously, these boneless pork or beef products that lack the natural appearance and consistency of an unprocessed slab of rib meat.

Heretofore, there has been no process for providing a ready-to-eat de-boned rib product that does not involve processing the native rib meat into piece or parts, and reforming or restructuring meat pieces into a slab-shaped product. Accordingly, there is still a need in the art for a barbeque style rib meat product that can be readily consumed and that overcomes the disadvantages associated with consuming traditional barbeque ribs having bones embedded therein. Such a de-boned rib meat product would avoid the stigma traditionally attached to dining on barbeque style ribs and is therefore more likely to result in repeat business for barbeque-themed restaurants, retail grocery outlets, and the like.

## SUMMARY

Provided is a de-boned substantially intact length of rib meat.

Also provided is a cooked and de-boned substantially intact length of rib meat.

Additionally provided is a process for preparing a length of de-boned rib meat comprising cooking a length of rib meat having at least one rib bone at least partially embedded therein at a temperature and for a time sufficient to enable the removal of at least one of said rib bones from said length of rib meat, while maintaining a substantially intact length of rib meat; and removing at least one of said rib bones from said length of rib meat.

Further provided is a packaged ready-to-heat and serve rib meat product comprising a package, at least one de-boned substantially intact length of rib meat contained within said package, and optionally a flavoring agent associated with said package.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a side sectional view of a side of pork or beef with cut lines added to illustrate main portions including St. Louis style rib and back rib portions.

FIG. 2 is a perspective view of slab of rib meat including a plurality of rib bones embedded within the rib meat.

FIG. 3 is a perspective view of a cooked and de-boned continuous slab of rib meat.

FIG. 4A is a flowchart of one illustrative embodiment of a process for preparing the cooked and de-boned rib meat product.

FIG. 4B is a flowchart of another illustrative embodiment of a process for preparing the cooked and de-boned rib meat product.

US 7,666,075 B1

| 3 | 4 |

### DETAILED DESCRIPTION

Disclosed is a process for the preparation of a de-boned beef or pork rib meat cut. Broadly, the rib meat cut is prepared by cooking a desired length of rib meat having at least one bone embedded within the rib meat and removing the at least one of the embedded rib bones from the rib meat. According to the process, the rib bones can be easily separated from the rib meat, while the maintaining a substantially intact length of rib meat. Thus, the process provides a cooked and de-boned substantially intact continuous length of rib meat. The rib meat product can be consumed using conventional utensils (fork and knife), without having to first separate the meat from the bones, or to navigate around the bones to remove all of the rib meat. By removing the bones from a barbeque style slab of rib meat, the tediousness, embarrassing, and messy nature of the act of consuming the ribs is avoided.

According to illustrative embodiments, the process for preparing the rib meat product involves cooking a length of rib meat having at least one rib bone embedded therein at a temperature and for a time sufficient to enable the removal of at least one of the rib bones from the length of rib meat, while maintaining the continuous length of natural rib meat. At least one of the embedded rib bones is removed from the rib meat, thereby forming a substantially intact continuous length of rib meat.

As used throughout this specification, the term "cooking" shall refer to partially cooking, substantially cooking, or fully cooking a desired length of rib meat. A partially cooked length of rib meat retains certain qualities of raw pork or beef meat, but a higher internal temperature than that of raw meat is reached within the meat. A substantially cooked length of rib meat refers to meat that has been more than partially cooked and has reached an internal temperature where the rib meat begins to lose its reddish color. A fully cooked length of rib meat refers to a length of rib meat that has been cooked such that it can be readily consumed without a health risk. The term "cooked" refers to a length of rib meat that has been partially cooked, substantially cooked or fully cooked. It should be noted that partially cooking, substantially cooking, or fully cooking may produce sufficient cooking to produce rib meat retaining minimal attachment to the rib bones, thereby enabling the removal of the rib bones from the meat while maintaining a substantially intact continuous length of rib meat.

As used throughout this specification, the term "de-boned" shall refer to a desired length of rib meat, wherein at least one of the rib bones embedded in the rib meat has been removed. Thus, a de-boned length of rib meat refers to desired lengths of rib meat wherein one or more of the rib bones have been removed from the meat. According to certain illustrative embodiments, all of the rib bones in a desired length of rib meat have been removed to provide a boneless length of rib meat. It should be noted, however, that it may be desirable to leave one or more of the rib bones embedded within the length of rib meat at strategic positions. Therefore, the term "de-boned" may also refer to those lengths of rib meat in which at least one rib bone has been removed, but at least one rib bone remains embedded in the rib meat.

As used throughout this specification, the term "substantially intact" refers to a desired length or section of rib meat, wherein after removal of at least one of the rib bones embedded therein, the rib meat substantially retains its natural consistency, texture, and shape it held prior to the bones being removed. It should be noted that in removing the bones from the length or section of rib meat, the bones may retain some slight level of attachment to the meat wherein the bones

emerge from the length of rib meat with an amount of meat remaining attached to the bones. This situation is encompassed by the term "substantially intact."

The term "length of rib meat" refers to any desired section or portion of rib meat. It can be appreciated that a length of rib meat is not limited to a length of rib meat that spans a plurality of rib bones, but the length of rib meat may also comprise an individual (a single rib section) rib section wherein the one rib bone location in this rib meat section has been removed. A single rib meat section simply comprises the rib meat adjacent both sides of the removed rib bone and connecting meat.

FIG. 1 is a diagrammatical side sectional view of the side of pork or beef 10 with cut lines 12 added to illustrate the major cuts or portions of side 10 after butchering. Typically, side 10 is butchered about cut lines 12 into main cuts or portions including shoulder 14, loin 16, ham 18, and belly 20. Back ribs 22, also known as "baby back" ribs, originate from the blade and center section of the loin 16. Back ribs 18 contain meat between the ribs called finger meat and include at least 8 ribs.

Spare ribs 24 comprise the intact rib section removed from the belly 20 of the pork side. Spare ribs 24 may be further butchered or cut into St. Louis-style spare ribs and brisket or breast bone spare ribs. Spare ribs 24 are separated into St. Louis-style ribs and breast bone spare ribs by cutting about cut line 23 along costal cartilage connecting the breast bone spare ribs and the St. Louis-style ribs. Breast bone spare ribs are generally taken from the belly of the hog or cow.

FIG. 2 illustrates the traditional slab of rib meat 30 with rib bones 32 lodged among the intercostal meat 34. Despite St Louis-style ribs being illustrated in FIG. 2, this process is not limited to the preparation of a de-boned and substantially intact length of rib meat from a St. Louis-style rib cut, but may also include any rib cut including, without limitation, the traditional spare rib cut and baby back rib cut.

FIG. 3 is a perspective view of an illustrative embodiment of a cooked and substantially intact length of rib meat prepared in accordance with the process. As shown in FIG. 3, side 42 of the rib meat product 40 comprises a completely de-boned and substantially intact length of rib meat that is ready for consumption. Reference numeral 44 refers to the channel or slits in the rib meat where the rib bones had resided prior to being removed. The rib meat 40 retains its natural consistency, texture, form and shape it held prior to the bones being removed. The cooked and de-boned length of rib meat resembles a high-end boneless steak or filet of rib meat. Accordingly, the rib meat is more palatable and can be consumed in an easier and tidier fashion, which is contrary to most previous barbeque dining experiences.

The process for preparing a length of de-boned rib meat includes cooking a length of rib meat having at least one rib bone embedded therein at both a temperature and for a time sufficient to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat. At least one of the rib bones is removed from the length of rib meat. According to certain embodiments, all of the bones from the length of rib meat are removed to produce a boneless slab of rib meat.

The rib meat is cooked under certain time-temperature regimens to enable the removal of the rib bones from the rib meat without damaging the continuous length of rib meat. According to certain illustrative embodiments, the rib meat is cooked pursuant to at least two time-temperature regimens. By way of illustration, but not in limitation, the process includes cooking the length of rib meat at a first temperature for a first period of time, followed by cooking the length of rib

US 7,666,075 B1

5

meat at a second temperature for a second period of time. Cooking the rib meat in accordance with these time-temperature regimens permits the easy removal of at least one of the rib bones from the length of rib meat.

According to certain embodiments, desired lengths of rib meat are cooked at a temperature of greater than 0 to about 400 degrees Fahrenheit for a sufficient amount of time to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat.

According to certain embodiments, desired lengths of rib meat are cooked at a temperature of greater than 0 to about 400 degrees Fahrenheit for a period of time ranging from about 1 hour to about 6 hours to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat.

According to certain embodiments, desired lengths of rib meat are cooked at a temperature of greater than 0 to about 400 Fahrenheit for a period of time ranging from about 1 hour to about 5 hours to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat.

According to certain embodiments, the time-temperature regimens for cooking the rib meat include cooking a length of rib meat for a first temperature from about 100 to about 300 degrees Fahrenheit for a period of time from about 1 to about 6 hours, followed by cooking the length of rib meat at a second temperature for a second period of time and removing at least one of the rib bones from the length of cooked rib meat.

According to other embodiments, the time-temperature regimens for cooking the rib meat include cooking said length of rib meat at a first temperature for a first period of time, followed by cooking the length of rib meat at a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 about 120 minutes, and removing at least one of the rib bones from the length of rib meat.

According to further embodiments, the time-temperature regimens for cooking the rib meat cooking said length of rib meat at a first temperature from about 100 to about 300 degrees Fahrenheit for a time period from about 1 to about 6 hours, followed by cooking said length of rib meat for a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 to about 120 minutes and removing at least one of the rib bones from the length of rib meat.

According to further embodiments, the time-temperature regimens for cooking the rib meat comprises cooking the length of rib meat at a first temperature of about 400 degrees Fahrenheit for a time period from about 1 to about 4 hours, followed by cooking the length of rib meat for a second temperature of about 300 degrees Fahrenheit for a time period from about 30 to about 90 minutes and removing at least one of the rib bones from the length of rib meat.

To facilitate the retention of moisture within the length of rib meat during the one or more of the above cooking regimens, the length of rib meat may be located within a moisture loss preventive environment. The moisture loss preventive environment is any suitable environment that acts to minimize, reduce, lessen or prevent loss of moisture of from the length of rib meat. For example, without limitation, to facilitate the retention of moisture in the rib meat, at least a portion of the length of rib meat may be enclosed or wrapped in a suitable moisture loss preventive material. Such materials

6

include plastic wrap, metal foil, such as aluminum foils, cooking bags, and other suitable containers. The step of enclosing or wrapping the length of rib meat in a moisture loss preventive material may also comprise hermetically sealing the length of rib meat in a suitable hermetic enclosure. The length of rib meat may be enclosed or wrapped in such moisture loss preventive material at any stage prior or during the cooking process. To be hermetically sealed, the slab of rib meat will cook within its own environment that is different from the oven enclosure. Sealing the slab of rib meat protects the slab from a cooking environment and maintains the moisture level within the slab of rib meat. A plastic sheet or plastic bag or any other suitable packaging (such as vacuum packaging) may be used to wrap the slab of rib meat as long as it provides a hermetic enclosure. It should be noted that the step of locating the length of rib meat within a moisture loss preventive environment is not limited to enclosing or wrapping the meat within a moisture loss preventive material. The length of rib meat may be positioned within the inner chamber or volume of suitable piece of equipment and further cooked, so long as the chamber or volume acts to minimize, reduce or even prevent moisture loss from the length of rib meat.

By way of illustration, the desired length of rib meat may be to enclosed within a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat, prior to the commencement of any cooking. Thus, according to certain embodiments, the process for preparing a de-boned length of rib meat includes enclosing the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat at a temperature and for a time sufficient to enable the removal of at least one of said rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat cooking at a first temperature for a first period of time and cooking the length of rib meat at a second temperature for a second period of time enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat at a first temperature from about 100 to about 300 degrees Fahrenheit for a period of time from about 1 to about 6 hours, and cooking the length of rib meat at a second temperature for a second period of time enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat at a first temperature for a first period of time, and cooking said length of rib meat at a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 to about 120 minutes to enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact

US 7,666,075 B1

7

continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat at a first temperature from about 100 to about 300 degrees Fahrenheit for a time period from about 1 to about 6 hours, and cooking the length of rib meat for a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 to about 120 minutes; and to enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib rib bones is separated from the length of rib meat.

The various cooking regimens of the process may be carried out by cooking the length of rib meat in any suitable cooking apparatus. For example, and without limitation, cooking the length of rib meat may be carried out by cooking in a conventional oven, cooking in a convection oven, smoking, steaming, roasting, boiling, broiling, cooking in a slow cooker, halogen lamp cooking, or any combination thereof. According a suitable embodiment, the cooking stages are carried out by smoking the length of rib meat. In other embodiments, a combination of smoking the length of rib meat and cooking by halogen lamps may be used to facilitate removal of the rib bones, yet maintaining the tenderness and juiciness of the rib meat to enable the separation of the rib bones from the rib meat.

The process for the preparation of the de-boned rib product also includes imparting a flavor to the length of rib meat. The step of imparting flavor to the length of rib meat may comprise at least one of seasoning the meat, marinating the meat, injection marinating the meat, dry rubbing the meat, basting the meat, smoking the meat, or combinations thereof.

Once the length of rib meat has been cooked to enable removal of the rib bones, the bones are removed. The rib bones may be removed from the rib meat by any suitable process known in the culinary art, so long as the desired length of rib meat remains substantially intact. For example, and not in limitation, the removal of at least one rib bones may be accomplished by manually removing the rib bones, using a non-automated hand-tool to remove the bones, by mechanically removing the rib bones with suitable power equipment, or by combinations thereof. It should be also noted that the rib bones may be removed prior to cooking the length of rib meat, so long as the process of removing the rib bones from the meat maintains a substantially intact length of rib meat.

If the cooked and de-boned length of rib meat is prepared in the retail restaurant setting, the product may be presented to the diner for consumption. If the cooked and de-boned length of rib meat is prepared and destined for resale at a retail grocery store, or other sales outlet, then the product can be suitably packaged. By way of illustration, suitable packaging includes vacuum packaging the length of cooked and de-boned rib meat. It is contemplated that the cooked and de-boned rib meat may also by suitable for sale as a frozen, heat and serve product that would be commercially available at a grocery outlet. In this case, the cooked and de-boned rib meat is frozen and packaged in a suitable package for resale.

Also disclosed is a packaged ready-to-heat and serve de-boned rib meat product. The packaged rib product comprises a package and at least one de-boned substantially intact length of rib meat that is contained within the package. According to certain embodiments, a separate flavoring agent may be associated with the packaged rib product. It should be

8

noted that the separate flavoring agent may be contained with the cooked and de-boned rib meat inside of the package, or simply provided with the packaged rib meat product.

According to certain embodiments, also provided is a packaged ready-to-heat and serve rib meat product comprising a package, at least one cooked and de-boned substantially intact continuous length of rib meat contained within the package, and optionally a flavoring agent associated with the package. It should be noted that the separate flavoring agent may be contained with the cooked and de-boned rib meat inside of the package, or simply provided with the packaged rib meat product.

For the embodiments of the packaged rib meat product that includes a flavoring agent, the flavoring agent may include an agent in the form of dry rubs, sauces, bastes, marinades, injection flavorings, or combinations thereof.

FIG. 4A depicts a flow chart for an illustrative embodiment of the process for preparing a cooked and de-boned length of rib meat. This process results in the preparation of the de-boned length of rib meat that retains the natural consistency, texture and shape of a slab of rib meat and the bones not been removed from the rib meat.

At step 50, a slab of ribs is presented for processing. As described herein, the slab of ribs may comprise a slab of traditional spare ribs, a slab of St. Louis style ribs, baby back ribs, or any other rib cut. According to step 60, the process includes the optional step of imparting a flavoring to the rib meat with any combination of spices and seasonings. The exact form and blend of flavorings is unlimited and is up to the preparer of the slab of rib meat.

At step 70, the flavored or unflavored slab of rib meat is then located within a moisture loss preventive environment. Locating the slab of ribs in such an environment maintains a suitable moisture level within the slab of rib meat.

Following the optional flavoring 60 and locating 70 steps, if these steps are carried out, the length of rib meat is cooked 80 at a temperature and for a time sufficient to enable the removal of the rib bones from the length of rib meat, while maintaining a substantially intact length of rib meat. Following cooking step 80, the rib bones are separated from the slab of rib meat, leaving a substantially intact continuous length of rib meat.

After the bones have been removed from the rib meat in step 90, the boneless steak or filet of rib meat may be immediately consumed 100 or packaged for future sale 110. Alternatively, the boneless slab of rib meat can be further packaged as desired (e.g., frozen, seasoned, cooked, smoked etc.) to create a final servable food product. The further packaged boneless slab of rib meat can be sold as a pre-cooked ready to eat meal, and only requires that the slab of rib meat be warmed to a desirable temperature.

FIG. 4B depicts a flow chart for another illustrative embodiment of the process for preparing a cooked and de-boned length of rib meat. This process results in the preparation of de-boned length of rib meat that retains the natural consistency, texture and shape of a slab of rib meat and the bones not been removed from the rib meat.

At step 120, a slab of ribs is presented for processing. As described in connection with the flowchart of the illustrative embodiment shown in FIG. 4A, the slab of ribs may comprise a slab of traditional spare ribs, a slab of St. Louis style ribs, baby back ribs, or other rib cut. According to step 130, the process includes the optional step of imparting a flavoring to the rib meat with any combination of spices and seasonings. The exact blend of flavoring is unlimited and is up to the preparer of the slab of rib meat.

US 7,666,075 B1

9

Following the seasoning stage, at step 140, the length of rib meat is exposed to a first cooking regimen which comprises exposing the length of rib meat to a flavored smoke at a temperature of at least 100 degrees Fahrenheit for a period of time between two hours and six hours. To "smoke" a slab of rib meat comprises burning flavored wood (for example, but not limited to Apple, Cherry, Hickory, Peach or Mesquite woods) within a confined area so that the slab of rib meat absorbs the aroma of the smoke and therefore imparts additional flavor to the slab of rib meat.

Following the "smoking" step 140, the slab of rib meat is then removed from the smoker 150 and optionally seasoned with various barbeque sauce flavors. The meat can be either basted with a semi-viscous fluid or "dry-rubbed" with a powder seasoning mix. In one embodiment, basting the rib meat is performed by covering the slab of rib meat with a fluid of high viscosity on the theory that the slab of rib meat will absorb additional flavor and the highly viscous fluid to penetrate the outer layer of the meat and permeate the lower layers of meat, providing additional flavor throughout the meat, and not only within the outermost layers of meat.

In another embodiment, the meat can also be seasoned with a "dry-rub". Dry rubs differ from basting sauces in that the rubs are powdery mixes lacking any form of moisture. Dry rub mixes can be made up of a multitude of seasonings into infinite number of mixes and only limited by the creativity of the preparer. The theory behind seasoning the slab of meat is the same behind the basting process. The powder seasoning mix will mix with the meats own juices secreted during cooking, allowing the mix to be absorbed into the lower layers of meat. However, in the seasoning process, both the basting step and dry rub step is purely optional and can be skipped at the desire of the preparer.

At step 160, the slab of rib meat is then enclosed within a moisture loss preventive environment. According to the embodiment of the process depicted in the flowchart of FIG. 4B, the length of rib meat is enclosed in a cooking bag which is then sealed.

As shown at step 170, once the slab of rib meat is located within the moisture loss preventive environment, it is desirable that the slab of rib meat be cooked by convection oven cooking 170 for at least 60 minutes at a temperature of at least 200 degrees, depending on the individual oven and how many slabs are on a tray, cooking time may be lengthened and/or the temperature be raised. Additionally, a single slab of rib meat may require less cooking time, and the temperature may need to be constant.

In another further embodiment, it is possible to wrap the slab of rib meat or seal in a hermetic enclosure prior to the smoking of the slab of rib meat or prior to the first period of time in the suitable cooking device. Therefore, it is optional that the slab of rib meat need not be wrapped or sealed in between the first and second cooking stages. Accordingly, if wrapped prior to the smoking stage, the slab of rib meat can be inserted directly into the second cooking stage for its desired length of time.

Following the second period of cooking at step 170, the slab of rib meat can be removed from the cooking enclosure. At this time, according to step 180, the slab of rib meat can be removed from the moisture loss preventive environment and the rib bones are separated from the length of rib meat to produce a substantially intact de-boned continuous length of rib meat.

Each rib bone within the slab of rib meat is exposed to very small forces in during the removal process, so that its fiber

10

structure of the slab of rib meat is retained as much as possible, and the risk of damage to the meat is very low. What is left is a boneless slab of rib meat that is substantially intact.

The exact reason for the meat separating from the bone during the wrapped/cooking stage is not precisely known. Without being bound to any particular theory, locating the slab of rib meat within a moisture loss preventive environment protects the slab of rib meat within a cooking environment that maintains a high level of moisture level within the meat itself. This high level of moisture serves two purposes: first, retaining the moisture maintains the slab of rib meat's juiciness and tenderness, which prevents it from becoming dry and difficult to consume; second, the high level of moisture also acts as a solution to break down the natural attachments between the muscle (meat) and the bone. It is this breaking down of the bonds between the meat and bone that allows the bone to be removed from the slab of rib meat with little to no resistance and therefore leaves the slab of rib meat substantially intact.

After the bones have been removed in step 180, the boneless length of rib meat can then be immediately consumed 190 or packed either dry or with a marinade 200 for future sale. Alternatively, the boneless slab of rib meat can be further packaged as desired (e.g., frozen, seasoned, cooked, smoked etc.) to create a final servable food product. The further packaged boneless slab of rib meat can be sold as a pre-cooked ready to eat meal, and only requires that the slab of rib meat be warmed to a desirable temperature.

The disclosed process prepares a pork or beef meat cut to become a more attractive and economically beneficial product to achieve an end product that is more in demand. The boneless slab of rib meat can be consumed with utensils, in the manner similar to how one would consume other boneless or bone-in pork or beef meat products like steaks or pork chops.

Thus, provided is a process for producing a boneless slab of rib meat that which results in a meaty and easy to consume boneless steak or filet of rib meat. This process involves a minimally invasive way to remove the rib bones from a slab of rib meat to provide a length of boneless rib meat. Accordingly, the process creates an edible boneless slab of rib meat, which can be consumed without having to maneuver around the rib bones themselves.

It will be understood that the embodiments described herein are merely illustrative and that a person skilled in the art may make many variations and modifications without departing from the spirit and scope of the invention. All such modifications and variations are intended to be included within the scope of the appended claims. It should be understood that the embodiments described herein are not only in the alternative, but can be combined.

We claim:

1. A cooked and de-boned substantially intact length of rib meat.

2. The rib meat of claim 1, comprising beef rib meat.

3. The rib meat of claim 1, comprising pork rib meat.

4. The rib meat of claim 3, comprising cooked and de-boned substantially intact continuous length rib meat from a traditional spare rib cut.

5. The rib meat of claim 3, comprising cooked and de-boned substantially intact continuous length rib meat from a St. Louis style spare rib cut.

6. The rib meat of claim 3, comprising cooked and de-boned substantially intact continuous length from a back rib cut.

7. The rib meat of claim 3, wherein said substantially intact length of rib meat is boneless

US 7,666,075 B1

**11**

8. A packaged rib meat product comprising:

a package;

at least one de-boned substantially intact length of rib meat contained within said package; and

a separate flavoring agent associated with said product.

9. The packaged rib meat product of claim 8, wherein said product is a ready-to-heat and serve product and comprises at

**12**

least one cooked and de-boned substantially intact length of rib meat contained within said package.

10. The packaged rib meat product of claim 8, wherein said flavoring agent is selected from the group consisting of dry ribs, sauces, bastes, marinades, injection flavorings, and combinations thereof.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO.         : 7,666,075 B1                                    Page 1 of 1
APPLICATION NO. : 11/595268
DATED                  : February 23, 2010
INVENTOR(S)      : Baker et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page:

The first or sole Notice should read --

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 638 days.

Signed and Sealed this

Seventh Day of December, 2010

David J. Kappos
Director of the United States Patent and Trademark Office



US007959500B1

(12) **United States Patent**
Baker et al.

(10) Patent No.: **US 7,959,500 B1**
(45) Date of Patent: **Jun. 14, 2011**

(54) **PROCESS FOR PREPARING RIB MEAT PRODUCT**

(76) Inventors: **James A. Baker**, Avon, OH (US); **Brittani Baker**, Westlake, OH (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/691,450**

(22) Filed: **Jan. 21, 2010**

**Related U.S. Application Data**

(62) Division of application No. 11/595,268, filed on Nov. 9, 2006, now Pat. No. 7,666,075.

(51) Int. Cl.
*A22C 17/00*        (2006.01)

(52) U.S. Cl. ....................................................... 452/135

(58) Field of Classification Search ................ 452/2–6, 452/102–105, 125, 137, 198
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 4,127,605 | A | 2/1979 | van Rij et al. |
| 4,186,216 | A | 1/1980 | Roth |
| 4,217,679 | A | 8/1980 | Gordon |
| 5,104,351 | A | 4/1992 | van den Nieuwelaar et al. |

| 5,197,918 | A | 3/1993 | Klaassen |
| 5,273,483 | A | 12/1993 | Gagliardi, Jr. |
| 5,464,368 | A | 11/1995 | White et al. |
| 5,525,103 | A | 6/1996 | White et al. |
| 5,667,435 | A | 9/1997 | Baughman et al. |
| 5,775,986 | A | 7/1998 | Law et al. |
| 5,823,867 | A | 10/1998 | Roth et al. |
| 5,868,613 | A | 2/1999 | Heidtke et al. |
| 5,976,004 | A | 11/1999 | Hazenbroek |
| 6,527,636 | B2 | 3/2003 | Mickelsen |
| 6,648,744 | B2 | 11/2003 | Bell et al. |
| 6,716,097 | B2 | 4/2004 | Freund et al. |
| 7,088,313 | B2 | 3/2006 | Gagliardi, Jr. |
| 7,022,007 | B2 | 4/2006 | Naehring |
| 7,198,564 | B2 | 4/2007 | Hino et al. |
| 2006/0035005 | A1 | 2/2006 | McMindes et al. |

FOREIGN PATENT DOCUMENTS

| EP | 1053684 | 11/2002 |

*Primary Examiner* — Thomas Price

(74) *Attorney, Agent, or Firm* — Curatolo Sidoti Co., LPA; Salvatore A. Sidoti

(57)        **ABSTRACT**

A cooked and de-boned substantially intact slab of rib meat is provided. A process for preparing a de-boned rib meat product from a pork or beef rib cut is also provided. The process for preparing the rib meat product involves cooking a length of rib meat having rib bones embedded therein at a temperature and for a time sufficient to enable the removal of the rib bones from the length of rib meat, while maintaining a substantially intact length of rib meat.

23 Claims, 5 Drawing Sheets



U.S. Patent        Jun. 14, 2011        Sheet 1 of 5        US 7,959,500 B1



FIG 1

U.S. Patent          Jun. 14, 2011          Sheet 2 of 5          US 7,959,500 B1



FIG 2

**U.S. Patent**      Jun. 14, 2011      Sheet 3 of 5      US 7,959,500 B1



FIG 3

**U.S. Patent**          Jun. 14, 2011          Sheet 4 of 5          US 7,959,500 B1



FIG 4A

**U.S. Patent**          Jun. 14, 2011          Sheet 5 of 5          US 7,959,500 B1



FIG 4B

US 7,959,500 B1

**1**

PROCESS FOR PREPARING RIB MEAT
PRODUCT

CROSS REFERENCE TO RELATED
APPLICATIONS

This application is a divisional application of copending
application U.S. Ser. No. 11/595,268 filed on Nov. 9, 2006,
which is incorporated by reference in its entirety.

TECHNICAL FIELD

Generally provided is a cooked and de-boned meat product
and a process for preparing the meat product. More particu-
larly, provided is a cooked and de-boned rib meat product and
a process for preparing the rib meat product. The process of
preparation results in a ready-to-eat substantially intact beef
or pork rib meat steak, which does not include any rib bones.

BACKGROUND

Pork and beef carcasses are typically butchered into several
cuts or portions, which may be used to prepare spare ribs and
back ribs. Spare ribs may be further divided into the tradi-
tional breast bone spare ribs or St. Louis style spare ribs. St.
Louis style spare ribs generally comprise the upper part of a
rib separated from the breast bone or brisket bone. St. Louis
style spare ribs are generally very meaty and include minimal
fat.

Back rib cuts are generally prepared by cutting the loin
sections between the back ribs and the semispinalis muscle
adjacent to the back ribs to form a loin cut and a back rib cut.
The back rib meat cut, also known as a baby back rib cut,
includes rib bones and related intercostal meat. Each back rib
cut is intact and includes portions of at least eight ribs. See
*Institutional Meat Purchaser Specification Item No. 422*
(June, 1997). Back rib cuts are generally sold as a single intact
rib section, which may be prepared and consumed with vari-
ous sauces. The demand for the baby back rib cuts has
increased dramatically in recent years due to the increase in
the number of barbeque-themed restaurants. However,
because back rib cuts typically contain only intercostal meat
between the rib bones, conventional back rib cuts do not
include a substantial amount of meat.

In recent years, corporations owning barbeque-themed res-
taurants have become increasingly interested in barbeque
style food products that can retain the interest of repeat busi-
ness. Consuming barbeque style ribs in a social situation,
however, has always been a delicate undertaking. Tradition-
ally, barbeque style ribs have carried the distinction of being
an untidy food item, and as a result, are left off of many fine
dining menus. Enjoying barbeque style ribs is often difficult,
as eating them can be time consuming, embarrassing, and
messy. As is often the custom, barbeque ribs are eaten without
utensils, utilizing one's own hands to assist in separating the
meat from the rib bones and introducing the meat into one's
mouth.

As a result of this direct contact of the meat with the hands,
the thick consistency of barbeque sauce has the potential to
coat one's hands and is difficult to remove without the assis-
tance of a moist towelette or inserting by one's own fingers
into their mouth to assist in removing the excess barbeque
sauce.

Embarrassment can also occur due to the shape of the rib
bones themselves. A single barbeque style rib possesses the
shape of an elongated cylinder, encased in meat and covered
with barbeque sauce. When taken to one's mouth to eat, if not

**2**

eaten with care, the rib can displace sauce onto the consum-
er's face, which can cause great embarrassment.

There are also health risks associated with the consumption
of ribs. Because of the irregular shapes and hardness of the rib
bones, the risk of injury to the inside of one's mouth is also a
concern. Furthermore, the potential for choking on a portion
of a rib bone causes people to avoid consuming ribs.

Additionally, a meat cut that includes both rib bones and
associated meat makes it more difficult for a person to con-
sume all available meat, because the person must work
around and between the bones. Therefore, consuming bar-
beque style ribs has the tendency to be tedious and laborious,
due to the requirement of tearing the meat from the bones and
eating meat from around the rib bones themselves.

There have been attempts to produce boneless pork and
beef back rib products. One such method of producing bone-
less rib meat includes first separating the meat from the
bones, creating a paste-like meat intermediate product, and
restructuring the paste-like intermediate product into a form
that attempts to resemble the appearance of a natural slab of
ribs. These types of processed or restructured rib products are
commonly offered by fast food restaurant chains and in the
frozen foods sections of retail grocery stores. Obviously,
these boneless pork or beef products that lack the natural
appearance and consistency of an unprocessed slab of rib
meat.

Heretofore, there has been no process for providing a
ready-to-eat de-boned rib product that does not involve pro-
cessing the native rib meat into piece or parts, and reforming
or restructuring meat pieces into a slab-shaped product.
Accordingly, there is still a need in the art for a barbeque style
rib meat product that can be readily consumed and that over-
comes the disadvantages associated with consuming tradi-
tional barbeque ribs having bones embedded therein. Such a
de-boned rib meat product would avoid the stigma tradition-
ally attached to dining on barbeque style ribs and is therefore
more likely to result in repeat business for barbeque-themed
restaurants, retail grocery outlets, and the like.

SUMMARY

Provided is a de-boned substantially intact length of rib
meat.

Also provided is a cooked and de-boned substantially
intact length of rib meat.

Additionally provided is a process for preparing a length of
de-boned rib meat comprising cooking a length of rib meat
having at least one rib bone of least partially embedded
therein at a temperature and for a time sufficient to enable the
removal of at least one of said rib bones from said length of rib
meat, while maintaining a substantially intact length of rib
meat; and removing at least one of said rib bones from said
length of rib meat.

Further provided is a packaged ready-to-heat and serve rib
meat product comprising a package, at least one de-boned
substantially intact length of rib meat contained within said
package, and optionally a flavoring agent associated with said
package.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a side sectional view of a side of pork or beef with
cut lines added to illustrate main portions including St. Louis
style rib and back rib portions.

FIG. 2 is a perspective view of slab of rib meat including a
plurality of rib bones embedded within the rib meat.

US 7,959,500 B1

3

FIG. 3 is a perspective view of a cooked and de-boned continuous slab of rib meat.

FIG. 4A is a flowchart of one illustrative embodiment of a process for preparing the cooked and de-boned rib meat product.

FIG. 4B is a flowchart of another illustrative embodiment of a process for preparing the cooked and de-boned rib meat product.

DETAILED DESCRIPTION

Disclosed is a process for the preparation of a de-boned beef or pork rib meat cut. Broadly, the rib meat cut is prepared by cooking a desired length of rib meat having at least one bone embedded within the rib meat and removing the at least one of the embedded rib bones from the rib meat. According to the process, the rib bones can be easily separated from the rib meat, while the maintaining a substantially intact length of rib meat. Thus, the process provides a cooked and de-boned substantially intact continuous length of rib meat. The rib meat product can be consumed using conventional utensils (fork and knife), without having to first separate the meat from the bones, or to navigate around the bones to remove all of the rib meat. By removing the bones from a barbeque style slab of rib meat, the tediousness, embarrassing, and messy nature of the act of consuming the ribs is avoided.

According to illustrative embodiments, the process for preparing the rib meat product involves cooking a length of rib meat having at least one rib bone embedded therein at a temperature and for a time sufficient to enable the removal of at least one the rib bones from the length of rib meat, while maintaining the continuous length of natural rib meat. At least one of the embedded rib bones is removed from the rib meat, thereby forming a substantially intact continuous length of rib meat.

As used throughout this specification, the term "cooking" shall refer to partially cooking, substantially cooking, or fully cooking, a desired length of rib meat. A partially cooked length of rib meat retains certain qualities of raw pork or beef meat, but a higher internal temperature than that of raw meat is reached within the meat. A substantially cooked length of rib meat refers to meat that has been more than partially cooked and has reached an internal temperature where the rib meat begins to lose its reddish color. A fully cooked length of rib meat refers to a length of rib meat that has been cooked such that it can be readily consumed without a health risk. The term "cooked" refers to a length of rib meat that has been partially cooked, substantially cooked or fully cooked. It should be noted that partially cooking, substantially cooking, or fully cooking may provide sufficient cooking to produce rib meat retaining minimal attachment to the rib bones, thereby enabling the removal of the rib bones from the meat while maintaining a substantially intact continuous length of rib meat.

As used throughout this specification, the term "de-boned" shall refer to a desired length or section of rib meat, wherein at least one of the rib bones embedded in the rib meat has been removed. Thus, a de-boned length of rib meat refers to desired lengths of rib meat wherein one or more of the rib bones have been removed from the meat. According to certain illustrative embodiments, all of the rib bones in a desired length of rib meat have been removed to provide a boneless length of rib meat. It should be noted, however, that it may be desirable to leave one or more of the rib bones embedded within the length of rib meat at strategic positions. Therefore, the term "de-boned" may also refer to those lengths of rib meat in which at

4

least one rib bone has been removed, but at least one rib bone remains embedded in the rib meat.

As used throughout this specification, the term "substantially intact" refers to a desired length or section of rib meat, wherein after removal of at least one of the rib bones embedded therein, the rib meat substantially retains its natural consistency, texture, and shape it held prior to the bones being removed. It should be noted that in removing the bones from the length or section of rib meat, the bones may retain some slight level of attachment to the meat wherein the bones emerge from the length of rib meat with an amount of meat remaining attached on the bones. This situation is encompassed by the term "substantially intact."

The term "length of rib meat" refers to any desired section or portion of rib meat. It can be appreciated that a length of rib meat is not limited to a length of rib meat that spans a plurality of rib bones, but the length of rib meat may also comprise an individual (a single rib section) rib section wherein the one rib bone location in this rib meat section has been removed. A single rib meat section simply comprises the rib meat adjacent both sides of the removed rib bone and connecting meat.

FIG. 1 is a diagrammatical side sectional view of the side of pork or beef 10 with cut lines 12 added to illustrate the major cuts or portions of side 10 after butchering. Typically, side 10 is butchered about cut lines 12 into main cuts or portions including shoulder 14, loin 16, ham 18, and belly 20. Back ribs 22, also known as "baby back" ribs, originate from the blade and center section of the loin 16. Back ribs 18 contain meat between the ribs called finger meat and include at least 8 ribs.

Spare ribs 24 comprise the intact rib section removed from the belly 20 of the pork side. Spare ribs 24 may be further butchered or cut into St. Louis-style spare ribs and brisket or breast bone spare ribs. Spare ribs 24 are separated into St. Louis-style ribs and breast bone spare ribs by cutting about cut line 13 along costal cartilage connecting the breast bone spare ribs and the St. Louis-style ribs. Breast bone spare ribs are generally taken from the belly of the hog or cow.

FIG. 2 illustrates the traditional slab of rib meat 30 with rib bones 32 lodged among the intercostal meat 34. Despite St Louis-style ribs being illustrated in FIG. 2, this process is not limited to the preparation of a de-boned and substantially intact length of rib meat from a St. Louis-style rib cut, but may also include any rib cut including, without limitation, the traditional spare rib cut and baby back rib cut.

FIG. 3 is a perspective view of an illustrative embodiment of a cooked and substantially intact length of rib meat prepared in accordance with the process. As shown in FIG. 3, side 42 of the rib meat product 40 comprises a completely de-boned and substantially intact length of rib meat that is ready for consumption. Reference numeral 44 refers to the channel or slits in the rib meat where the rib bones had resided prior to being removed. The rib meat 40 retains its natural consistency, texture, form and shape it held prior to the bones being removed. The cooked and de-boned length of rib meat resembles a high-end boneless steak or filet of rib meat. Accordingly, the rib meat is more palatable and can be consumed in an easier and tidier fashion, which is contrary to most previous barbeque dining experiences.

The process for preparing a length of de-boned rib meat includes cooking a length of rib meat having at least one rib bone embedded therein at both a temperature and for a time sufficient to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat. At least one of the rib bones is removed from the length of rib meat. According to certain embodi-

US 7,959,500 B1

| 5 | 6 |

ments, all of the bones from the length of rib meat are removed to produce a boneless slab of rib meat.

The rib meat is cooked under certain time-temperature regimens to enable the removal of the rib bones from the rib meat without damaging the continuous length of rib meat. According, to certain illustrative embodiments, the rib meat is cooked pursuant to at least two time-temperature regimens. By way of illustration, but not in limitation, the process includes cooking the length of rib meat at a first temperature for a first period of time, followed by cooking the length of rib meat at a second temperature for a second period of time. Cooking the rib meat in accordance with these time-temperature regimens permits the easy removal of at least one of the rib bones from the length of rib meat.

According to certain embodiments, desired lengths of rib meat are cooked at a temperature of greater than 0 to about 400 degrees Fahrenheit for a sufficient amount of time to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat.

According to certain embodiments, desired lengths of rib meat are cooked at a temperature of greater than 0 to about 400 degrees Fahrenheit for a period of time ranging from about 1 hour to about 6 hours to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat.

According to certain embodiments, desired lengths of rib meat are cooked at a temperature of greater than 0 to about 400 Fahrenheit for a period of time ranging from about 1 hour to about 5 hours to enable the removal of at least one of said rib bones from the length of rib meat, without causing significant damage to the meat and maintaining a substantially intact length of rib meat.

According to certain embodiments, the time-temperature regimens for cooking the rib meat include cooking a length of rib meat for a first temperature from about 100 to about 300 degrees Fahrenheit for a period of time from about 1 to about 6 hours, followed by cooking the length of rib meat at a second temperature for a second period of time and removing at least one of the rib bones from the length of cooked rib meat.

According to other embodiments, the time-temperature regimens for cooking the rib meat includes cooking said length of rib meat at a first temperature for a first period of time, followed by cooking the length of rib meat at a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 about 120 minutes, and removing at least one of the rib bones from the length of rib meat.

According to further embodiments, the time-temperature regimens for cooking the rib meat cooking said length of rib meat at a first temperature from about 100 to about 300 degrees Fahrenheit for a time period from about 1 to about 6 hours, followed by cooking said length of rib meat for a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 to about 120 minutes and removing at least one of the rib bones from the length of rib meat.

According to further embodiments, the time-temperature regimens for cooking the rib meat comprises cooking the length of rib meat at a first temperature of about 400 degrees Fahrenheit for a time period from about 1 to about 4 hours, followed by cooking the length of rib meat for a second temperature of about 300 degrees Fahrenheit for a time period from about 30 to about 90 minutes and removing at least one of the rib bones from the length of rib meat.

To facilitate the retention of moisture within the length of rib meat during the one or more of the various cooking regimens, the length of rib meat may be located within a moisture loss preventive environment. The moisture loss preventive environment is any suitable environment that acts to minimize, reduce, lessen or prevent loss of moisture of from the length of rib meat. For example, without limitation, to facilitate the retention of moisture in the rib meat, at least a portion of the length of rib meat may be enclosed or wrapped in a suitable moisture loss preventive material. Such materials include plastic wrap, metal foil, such as aluminum foils, cooking bags, and other suitable containers. The step of enclosing or wrapping the length of rib meat in a moisture loss preventive material may also comprise hermetically sealing the length of rib meat in a suitable hermetic enclosure. The length of rib meat may be enclosed or wrapped in such moisture loss preventive material at any stage prior or during the cooking process. To be hermetically sealed, the slab of rib meat will cook within its own environment that is different from the oven enclosure. Sealing the slab of rib meat protects the slab from a cooking environment and maintains the moisture level within the slab of rib meat. A plastic sheet or plastic bag or any other suitable packaging (such as vacuum packaging) may be used to wrap the slab of rib meat as long as it provides a hermetic enclosure. It should be noted that the step of locating the length of rib meat within a moisture loss preventive environment is not limited to enclosing or wrapping the rib meat within a moisture loss preventive material. The length of rib meat may be positioned within the inner chamber or volume of suitable piece of equipment and further cooked, so long as the chamber or volume acts to minimize, reduce or even prevent moisture loss from the length of rib meat.

By way of illustration, the desired length of rib meat may be to enclosed within a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat, prior to the commencement of any cooking. Thus, according to certain embodiments, the process for preparing a de-boned length of rib meat includes enclosing the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat at a temperature for a time sufficient to enable the removal of at least one of said rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat cooking at a first temperature for a first period of time and cooking the length of rib meat at a second temperature for a second period of time enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat for a first temperature from about 100 to about 300 degrees Fahrenheit for a period of time from about 1 to about 6 hours, and cooking the length of rib meat at a second period of time enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cook-

US 7,959,500 B1

7

ing stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat at a first temperature for a first period of time, and cooking said length of rib meat at a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 about 120 minutes to enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

According to certain embodiments, the process for preparing a de-boned length of rib meat includes locating the length of rib meat in the moisture loss preventive environment and then cooking the length of rib meat at a first temperature from about 100 to about 300 degrees Fahrenheit for a time period from about 1 to about 6 hours, and cooking the length of rib meat for a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 to about 120 minutes; and to enable the removal of at least one of the rib bones from the length of rib meat, while maintaining a substantially intact continuous length of rib meat. Upon completion of the cooking stage of the process, at least one of the rib bones is separated from the length of rib meat.

The various cooking regimens of the process may be carried out by cooking the length of rib meat in any suitable cooking apparatus. For example, and without limitation, cooking the length of rib meat may be carried out by cooking in a conventional oven, cooking in a convection oven, smoking, steaming, roasting, boiling, broiling, cooking in a slow cooker, halogen lamp cooking, or any combinations thereof. According a suitable embodiment, the cooking stages are carried out by smoking the length of rib meat. In other embodiments, a combination of smoking the length of rib meat and cooking by halogen lamps may be used to facilitate removal of the rib bones, yet maintaining the tenderness and juiciness of the rib meat to enable the separation of the rib bones from the rib meat.

The process for the preparation of the de-boned rib product also includes imparting a flavor to the length of rib meat. The step of imparting flavor to the length of rib meat may comprise at least one of seasoning the meat, marinating the meat, injection marinating the meat, dry rubbing the meat, basting the meat, smoking the meat, or combinations thereof.

Once the length of rib meat has been cooked to enable removal of the rib bones, the bones are removed. The rib bones may be removed from the rib meat by any suitable process known in the culinary art, so long as the desired length of rib meat remains substantially intact. For example, and not in limitation, the removal of at least one rib bones may be accomplished by manually removing the rib bones, using a non-automated hand-tool to remove the bones, by mechanically removing the rib bones with suitable power equipment, or by combinations thereof. It should be also noted that the rib bones may be removed prior to cooking the length of rib meat, so long as the process of removing the rib bones from the meat maintains a substantially intact length of rib meat.

If the cooked and de-boned length of rib meat is prepared in the retail restaurant setting, the product may be presented to the diner for consumption. If the cooked and de-boned length of rib meat is prepared and destined for resale at a retail grocery store, or other sales outlet, then the product can be suitably packaged. By way of illustration, suitable packaging includes vacuum packaging the length of cooked and de-

8

boned rib meat. It is contemplated that the cooked and de-boned rib meat may also by suitable for sale as a frozen, heat and serve product that would be commercially available at a grocery outlet. In this case, the cooked and de-boned rib meat is frozen and packaged in a suitable package for resale.

Also disclosed is a packaged ready-to-heat and serve de-boned rib meat product. The packaged rib product comprises a package and at least one de-boned substantially intact length of rib meat that is contained within the package. According to certain embodiments, a separate flavoring agent may be associated with the packaged rib product. It should be noted that the separate flavoring agent may be contained with the cooked and de-boned rib meat inside of the package, or simply provided with the packaged rib meat product.

According to certain embodiments, also provided is a packaged ready-to-heat and serve rib meat product comprising a package, at least one cooked and de-boned substantially intact continuous length of rib meat contained within the package, and optionally a flavoring agent associated with the package. It should be noted that the separate flavoring agent may be contained with the cooked and de-boned rib meat inside of the package, or simply provided with the packaged rib meat product.

For the embodiments of the packaged rib meat product that includes a flavoring agent, the flavoring agent may include an agent in the form of dry rubs, sauces, bastes, marinades, injection flavorings, or combinations thereof.

FIG. 4A depicts a flow chart for an illustrative embodiment of the process for preparing a cooked and de-boned length of rib meat. This process results in the preparation of de-boned length of rib meat that retains the natural consistency, texture and shape of a slab of rib meat had the bones not been removed from the rib meat.

At step 50, a slab of ribs is presented for processing. As described herein, the slab of ribs may comprise a slab of traditional spare ribs, a slab of St. Louis style ribs, baby back ribs, or any other rib meat. According to step 60, the process includes the optional step of imparting a flavoring to the rib meat with any combination of spices and seasonings. The exact form and blend of flavorings is unlimited and is up to the preparer of the slab of rib meat.

At step 70, the flavored or unflavored slab of rib meat is then located within a moisture loss preventive environment. Locating the slab of ribs in such an environment maintains a suitable moisture level within the slab of rib meat.

Following the optional flavoring 60 and cooking 70 steps, if these steps are carried out, the length of rib meat is cooked 80 at a temperature and for a time sufficient to enable the removal of the rib bones from the length of rib meat, while maintaining a substantially intact length of rib meat. Following cooking step 80, the rib bones are separated from the slab of rib meat, leaving a substantially intact continuous length of rib meat.

After the bones have been removed from the rib meat in step 90, the boneless steak or fillet of rib meat may be immediately consumed 100 or packaged for future sale 110. Alternatively, the boneless slab of rib meat can be further packaged as desired (e.g., frozen, seasoned, cooked, smoked etc.) to create a final servable food product. The further packaged boneless slab of rib meat can be sold as a pre-cooked ready to eat meal, and only requires that the slab of rib meat be warmed to a desirable temperature.

FIG. 4B depicts a flow chart for another illustrative embodiment of the process for preparing a cooked and de-boned length of rib meat. This process results in the preparation of de-boned length of rib meat that retains the natural

US 7,959,500 B1

9

consistency, texture and shape of a slab of rib meat had the bones not been removed from the rib meat.

At step 120, a slab of ribs is presented for processing. As described in connection with the flowchart of the illustrative embodiment shown in FIG. 4A, the slab of ribs may comprise a slab of traditional spare ribs, a slab of St. Louis style ribs, baby back ribs, or other rib cut. According to step 130, the process includes the optional step of imparting a flavoring to the rib meat with any combination of spices and seasonings. The exact blend of flavoring is unlimited and is up to the preparer of the slab of rib meat.

Following the seasoning stage, at step 140, the length of rib meat is exposed to a first cooking regimen which comprises exposing the length of rib meat to a flavored smoke at a temperature of at least 100 degrees Fahrenheit for a period of time between two hours and six hours. To "smoke" a slab of rib meat comprises burning flavored wood (for example, but not limited to Apple, Cherry, Hickory, Peach or Mesquite woods) within a confined area so that the slab of rib meat absorbs the aroma of the smoke and therefore imparts additional flavor to the slab of rib meat.

Following the "smoking" step 140, the slab of rib meat is then removed from the smoker 150 and optionally seasoned with various barbeque sauce flavors. The meat can be either basted with a semi-viscous fluid or "dry-rubbed" with a powder seasoning mix. In one embodiment, basting the rib meat is performed by covering the slab of rib meat with a fluid of high viscosity on the theory that the slab of rib meat will absorb additional flavor from the basting. Basting the meat allows the highly viscous fluid to penetrate the outer layer of the meat and permeate the lower layers of meat, providing additional flavor throughout the meat, and not only within the outermost layers of meat.

In another embodiment, the meat can also be seasoned with a "dry-rub". Dry rubs differ from basting sauces in that the rubs are powdery mixes lacking any form of moisture. Dry rub mixes can be made up of a multitude of seasonings into infinite number of mixes and only limited by the creativity of the preparer. The theory behind seasoning the slab of meat is the same behind the basting process. The powder seasoning mix will mix with the meats own juices secreted during cooking, allowing the mix to be absorbed into the lower layers of meat. However, in the seasoning process, both the basting step and dry rub step is purely optional and can be skipped at the desire of the preparer.

At step 160, the slab of rib meat is then enclosed within a moisture loss preventive environment. According to the embodiment of the process depicted in the flowchart of FIG. 4B, the length of rib meat is enclosed in a cooking bag, which is then sealed.

As shown at step 170, once the slab of rib meat is located within the moisture loss preventive environment, it is desirable that the slab of rib meat be cooked by convection oven cooking 170 for at least 60 minutes at a temperature of at least 200 degrees, depending on the individual oven and how many slabs are on each sheet tray. Thus, depending on the number of slabs on a tray, cooking time may be lengthened and/or the temperature be raised. Additionally, a single slab of rib meat may require less cooking time, and the temperature may need to be decreased.

In another further embodiment, it is possible to wrap the slab of rib meat or seal in a hermetic enclosure prior to the smoking of the slab of rib meat or prior to the first period of time in the suitable cooking device. Therefore, it is optional that the slab of rib meat need not be wrapped or sealed in between the first and second cooking stages. Accordingly, if

10

wrapped prior to the smoking stage, the slab of rib meat can be inserted directly into the second cooking stage for its desired length of time.

Following the second period of cooking at step 170, the slab of rib meat can be removed from the cooking enclosure. At this time, according to step 180, the slab of rib meat can be removed from the moisture loss preventive environment and the rib bones are separated from the length of rib meat to produce a substantially intact de-boned continuous length of rib meat.

Each rib bone within the slab of rib meat is exposed to very small forces in during the removal process, so that its fiber structure of the slab of rib meat is retained as much as possible, and the risk of damage to the meat is very low. What is left is a boneless slab of rib meat that is substantially intact.

The exact reason for the meat separating from the bone during the wrapped/cooking stage is not precisely known. Without being bound to any particular theory, locating the slab of rib meat within a moisture loss preventive environment protects the slab of rib meat within a cooking environment that maintains a high level of moisture level within the meat itself. This high level of moisture serves two purposes: first, retaining the moisture maintains the slab of rib meat's juiciness and tenderness, which prevents it from becoming dry and difficult to consume; second, the high level of moisture also acts as a solution to break down the natural attachments between the muscle (meat) and the bone. It is this breaking down of the bonds between the meat and bone that allows the bone to be removed from the slab of rib meat with little to no resistance and therefore leaves the slab of rib meat substantially intact.

After the bones have been removed in step 180, the boneless length of rib meat can then be immediately consumed 190 or packed either dry or with a marinade 200 for future sale. Alternatively, the boneless slab of rib meat can be further packaged as desired (e.g., frozen, seasoned, cooked, smoked etc.) to create a final servable food product. The further packaged boneless slab of rib meat can be sold as a pre-cooked ready to eat meal, and only requires that the slab of rib meat be warmed to a desirable temperature.

The disclosed process prepares a pork or beef meat cut to become a more attractive and economically beneficial product to achieve an end product that is more in demand. The boneless slab of rib meat can be consumed with utensils, in the manner similar to how one would consume other boneless or bone-in pork or beef meat products like steaks or pork chops.

Thus, provided is a process for producing, a boneless slab of rib meat that which results in a meaty and easy to consume boneless steak or filet of rib meat. This process involves a minimally invasive way to remove the rib bones from a slab of rib meat to provide a length of boneless rib meat. Accordingly, the process creates an edible boneless slab of rib meat, which can be consumed without having to maneuver around the rib bones themselves.

It will be understood that the embodiments described herein are merely illustrative and that a person skilled in the art may make many variations and modifications without departing from the spirit and scope of the invention All such modifications and variations are intended to be included within the scope of the appended claims. It should be understood that the embodiments described herein are not only in the alternative, but can be combined.

US 7,959,500 B1

11

We claim:

1. A process for preparing a length of de-boned rib meat comprising:

cooking a length of rib meat having at least one rib bone at least partially embedded therein at a temperature and for a time sufficient to enable the removal of at least one of said rib bones from said length of rib meat, while maintaining a substantially intact length of rib meat; and

removing at least one of said rib bones from said length of rib meat.

2. The process of claim 1, comprising:

cooking said length of rib meat at a first temperature for a first period of time;

locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

cooking said length of rib meat at a second temperature for a second period of time; and

removing at least one of said rib bones from said length of rib meat.

3. The process of claim 2, comprising:

cooking said length of rib meat for a first temperature from about 100 to about 300 degrees Fahrenheit for a period of time from about 1 to about 6 hours;

locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

cooking said length of rib meat at a second temperature for a second period of time; and

removing at least one of said rib bones from said length of rib meat.

4. The process of claim 2, comprising:

cooking said length of rib meat at a first temperature for a first period of time;

locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

cooking said length of rib meat at a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 about 120 minutes; and

removing at least one of said rib bones from said length of rib meat.

5. The process of claim 2, wherein:

cooking said length of rib meat at a first temperature from about 100 to about 300 degrees Fahrenheit for a time period from about 1 to about 6 hours;

locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

cooking said length of rib meat for a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 to about 120 minutes;

removing at least one of said rib bones from said length of rib meat.

6. The process of claim 2, wherein said locating said length of rib meat comprises hermetically sealing said length of rib meat.

7. The process of claim 6, wherein said locating comprises wrapping said length of rib meat with plastic wrap, metal foil, or enclosing within a cooking bag.

8. The process of claim 1, comprising:

locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

cooking said length of rib meat at a temperature and for a time sufficient to enable the removal of at least one of

12

said rib bones from said length of rib meat, while maintaining a substantially intact length of rib meat; and

removing at least one of said rib bones from said length of rib meat.

9. The process of claim 8, wherein said locating said length of rib meat comprises hermetically sealing said length of rib meat.

10. The process of claim 9, wherein said locating comprises wrapping said length of rib meat with plastic wrap, metal foil, or enclosing within a cooking bag.

11. The process of claim 1, comprising:

locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

cooking said length of rib meat at a first temperature for a first period of time;

cooking said length of rib meat at a second temperature for a second period of time; and

removing at least one of said rib bones from said length of rib meat.

12. The process of claim 11, comprising:

locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

cooking said length of rib meat for a first temperature from about 100 to about 300 degrees Fahrenheit for a period of time from about 1 to about 6 hours;

cooking said length of rib meat at a second temperature for a second period of time; and

removing at least one of said rib bones from said length of rib meat.

13. The process of claim 11, comprising:

locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

cooking said length of rib meat at a first temperature for a first period of time;

cooking said length of rib meat at a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 about 120 minutes; and

removing at least one of said rib bones from said length of rib meat.

14. The process of claim 11, wherein:

locating said length of rib meat in a moisture loss preventive environment to facilitate retention of moisture within the length of rib meat;

cooking said length of rib meat at a first temperature from about 100 to about 300 degrees Fahrenheit for a time period from about 1 to about 6 hours;

cooking said length of rib meat for a second temperature from about 200 to about 400 degrees Fahrenheit for a time period from about 30 to about 120 minutes; and

removing at least one of said rib bones from said length of rib meat.

15. The process of claim 1, further comprising imparting a flavor to said length of rib meat.

16. The process of claim 15, wherein said imparting a flavor comprises said at least one of seasoning, marinating, injection marinating, dry rubbing, basting, or smoking.

17. The process of claim 1, wherein said cooking said length of rib meat comprises cooking in a conventional oven, cooking in a convection oven, smoking, steaming, roasting, boiling, broiling, cooking in a slow cooker, halogen lamp cooking, and combinations thereof.

18. The process of claim 17, comprising

smoking said length of rib meat at a first temperature for a first period of time; and

US 7,959,500 B1

13

cooking said length of rib meat at a second temperature for a second period of time.

19. The process of claim 17, comprising

cooking said length of rib meat at a first temperature for a first period of time; and

halogen lamp cooking said length of rib meat at a second temperature and for a second period of time.

20. The process of claim 17, comprising

smoking said length of rib meat at a first temperature and for a first period of time; and

14

halogen lamp cooking said length of rib meat at a second temperature and for second period of time.

21. The process of claim 1, comprising removing said at least one rib bone manually, with a hand-tool, mechanically, or combinations thereof.

22. The process of claim 1, comprising packaging said cooked and de-boned length of rib meat.

23. The process of claim 1, comprising freezing and packaging said length of cooked and de-boned rib meat.

* * * * *

## EXHIBIT D

### Ohio Service Mark Filings Attached

| DATE:<br>09/17/2010 | DOCUMENT ID<br>201025900735 | DESCRIPTION<br>TRADE MARK/ORIGINAL FILING (TMO) | FILING<br>125.00 | EXPED<br>100.00 | PENALTY<br>.00 | CERT<br>.00 | COPY<br>.00 |

**Receipt**
This is not a bill. Please do not remit payment.

WILLIAM DAVID MOORE
815 SUPERIOR AVENUE, EAST
SUITE 1717 SUPERIOR BLDG.
CLEVELAND, OH 44114

# STATE OF OHIO
## CERTIFICATE
### Ohio Secretary of State, Jennifer Brunner

1963461

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

**BUBBA'S-Q WORLD FAMOUS**

and, that said business records show the filing and recording of:

Document(s)                                                    Document No(s):

**TRADE MARK/ORIGINAL FILING**                                 201025900735
   Class:  MEATS AND PROCESSED FOODS
   Registrant's State of Inc.:  OH                BUBBA'S-Q, INC.
   Date of First Use:        11/12/1993            820 CENTER ROAD
   Date of First Use in Ohio:  11/12/1993          AVON, OH 44011
   Expiration Date:          09/16/2020



United States of America
State of Ohio
Office of the Secretary of State

Witness my hand and the seal of
the Secretary of State at Columbus,
Ohio this 16th day of September,
A.D. 2010.

Ohio Secretary of State



| DATE:<br>10/08/2010 | DOCUMENT ID<br>201028100165 | DESCRIPTION<br>SERVICE MARK/ORIGINAL FILING<br>(SMO) | FILING<br>125.00 | EXPED<br>100.00 | PENALTY<br>.00 | CERT<br>.00 | COPY<br>.00 |

### Receipt
This is not a bill. Please do not remit payment.

WILLIAM D MOORE
815 SUPERIOR AVENUE EAST
SUITE 1717
CLEVELAND, OH 44114

# STATE OF OHIO
## CERTIFICATE
### Ohio Secretary of State, Jennifer Brunner

1968129

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

"DE-BONED BABY BACK RIB STEAK"

and, that said business records show the filing and recording of:

Document(s)                                          Document No(s):

**SERVICE MARK/ORIGINAL FILING**                       201028100165
   Class:  PROVIDING FOOD AND DRINK
   Registrant's State of Inc.:  OH              QUEENANN, INC.
   Date of First Use:          09/08/2010        820 CENTER ROAD
   Date of First Use in Ohio: 09/08/2010         AVON, OH 44011
   Expiration Date:            10/07/2020

Witness my hand and the seal of
the Secretary of State at Columbus,
Ohio this 7th day of October, A.D.
2010.

United States of America
State of Ohio
Office of the Secretary of State                      Ohio Secretary of State

# EXHIBIT B



January 15, 2019

**VIA EMAIL AND FEDERAL EXPRESS**

Mr. Al Baker                    FOFBakers Holding Company, LLC
2784 Trinity Court              Attn:  Al Baker
Avon, OH 44011                  820 Center Road
                                Avon, OH 44011

Mr. Al Baker
17408 Gulf Blvd #903
Redington Shores, Fl 33708

Re:    FOFBAKERS, LLC – NOTICE OF CALL FOR MEETING OF MANAGERS
PURSUANT TO SECTION 4.2 OF OPERATING AGREEMENT

Dear Al:

The purpose of this letter is to provide formal notice of a call for a meeting of the Managers
pursuant to the requirements of Section 4.2 of the Operating Agreement of Fofbakers, LLC dated
November 11, 2015 (the "Operating Agreement").  Section 4.2 provides "any Manager may call
a meeting of the Managers by giving written notice to all Managers not less than two (2) nor
more than thirty (30) days prior to the date of the meeting."  Meetings shall be called to consider
the affairs of the Company and take action permitted to be taken by the Act.  The Operating
Agreement expressly provides for participation in a meeting of the Managers by conference call,
email or similar communications equipment by means of which all persons participating in the
meeting can immediately communicate with all others person participating.

As Co-Manager of the Company, I am calling a meeting of the Managers to take place on
**Thursday, January 17, 2019** at 2:00 pm via conference call in full compliance with the terms of
the Operating Agreement.  Please call 719-387-0599 at the time of the meeting and enter the
participant code 229426 (the "Meeting").

There are two critically urgent affairs of the Company that require the Managers' immediate
attention and which are included in the agenda for the Meeting.

Rastelli Foods Group
300 Heron Drive
Swedesboro, NJ 08085
856-803-1100

The first shall be approving initial preliminary pricing for products in connection with discussions and negotiations with ███████ The ██████ deal is extremely time sensitive and in order to not lose this business opportunity for the Company, preliminary pricing (which shall serve as the starting point for negotiations with ██████) must be submitted to ██████ no later than this **Friday, January 18, 2019**.

The second matter requiring immediate attention is establishing the 2019 fiscal year Operating Budget, including FofBakers, LLC's marketing strategy.  Action on these matters cannot wait, and any delay in taking action now will result in FofBakers, LLC losing its most significant business opportunity and jeopardize the brand and market recognition the Company is developing. Accordingly, these matters require immediate action of the Managers as part of performing their duties as managers charged with decision making responsibility for the Company.

Sincerely,

Raymond M. Rastelli, Jr.

cc:     Edward J. Heben, Jr., Esq.
        Benjamin A. Levin, Esq.

2

# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

RASTELLI PARTNERS, LLC, *et al*

        Plaintiffs,

        v.

FOFBAKERS HOLDING COMPANY,
LLC, *et al*
        Defendants.

:    Civ. A. No. 1:19-cv-05124-NLH-JS

## CONSENT ORDER TO PROCEED WITH MEDIATION AND ARBITRATION

**THIS MATTER** has been opened to the Court by David R. Dahan, Esquire, counsel for the

Plaintiffs, Rastelli Partners, LLC and Raymond M. Rastelli, Jr. ("Plaintiffs"), seeking interim

relief/temporary restraints and injunctive relief for the reasons set forth in the Verified Complaint

and Briefs and Certifications filed therewith; with a hearing date of February 15, 2019 as set by

the Court with respect to the Plaintiffs' application for interim relief/temporary restraints, and all

parties having agreed to the following:

    IT IS on this ___15th___ day of ___February___, 2019, **ORDERED** with the

consent of all parties as follows:

    A.    The Defendant, James A. Baker a/k/a Al Baker shall timely participate in good

faith in all duly called meetings of the Managers in accordance with the Operating Agreement for

FOFBakers, LLC (the "Company").

    B.    The Defendants shall timely participate in good faith in all duly called meetings of

the Members in accordance with the Operating Agreement for the Company

1

C.    The Managers of the Company shall immediately submit to arbitration the deadlock issues described below in accordance with Section 4.1(g) and (h) of the Operating Agreement for the Company. The deadlock issues include (1) approval of pricing information for the Company to submit to the major international franchise chain referred to in the Verified Complaint, (2) entering into an agreement with the major international franchise for the testing and sale of products and (3) the continued use of the Company's sourcing of pork.   The time place and manner of the arbitration shall take place in New Jersey (unless otherwise agreed to by the parties) with all parties and their counsel participating either in person or by videoconferencing, Skype or telephone.  Expenses for attendance by each party shall be at each party's sole cost and expense. The arbitrator shall be selected in accordance with Section 4.1(g) of the Operating Agreement for the Company by Monday, February 18, 2019 and the arbitration shall take place by no later than Thursday, February 21, 2019. Nothing herein shall limit or restrict any other deadlock issues that the arbitrator may determine as being subject to arbitration under Section 4.1 (g) and (h) of the Operating Agreement for the Company.  The scheduling of the arbitration as to any such other deadlock issues other than items (1) – (3) above shall be determined by the arbitrator.

D.    Pursuant to L.Civ.R. 301.1, the parties shall participate in expedited mediation with respect to developing and approving a 2019 operating budget and any other issues identified by the parties in accordance with Section 4.4 of the Operating Agreement. The mediation shall be conducted in accordance with Article 12 of the Operating Agreement for the Company. The mediation shall take place in New Jersey within 30 days from the date hereof unless otherwise mutually agreed to by the parties or directed by the Court, and with all parties and their counsel participating either in person or by videoconferencing, Skype or telephone. The parties consent to using United States Magistrate Schneider, if available, to mediate any dispute submitted to

2

mediation under Section 12 of the Operating Agreement.  In the event that Judge Schneider is unavailable, the mediation shall be conducted through the use of a single mediator (as opposed to a panel of three (3) mediators) to be agreed upon by the parties within three (3) days from the date of this Consent Order provided that if the parties cannot agree, the Court shall appoint a mediator within three (3) days after such request. Expenses for attendance by each party shall be at each party's sole cost and expense. The selected mediator shall oversee discovery and schedule mediation sessions.  However, the parties may submit any discovery dispute to the Court.

        E.    This action shall remain active pending the results of mediation and the Court retains jurisdiction.

SO ORDERED this 15th day of Feb. 2019

_____

                ,U.S.D.J.

_____

3

# EXHIBIT E



**CONNELL FOLEY**
A TRADITION OF LEGAL EXCELLENCE SINCE 1938

Connell Foley LLP
Liberty View Building
457 Haddonfield Road
Suite 230
Cherry Hill, NJ 08002
P 856.317.7100  F 856.317.7117

**Francis J. Orlando, Jr.**
Of Counsel
FOrlando@connellfoley.com

**RECEIVED**

February 26, 2019

FEB 2 7 2019

Hyland Levin LLP

David R. Dahan, Esquire
HYLAND LEVIN LLP
6000 Sagemore Drive - Suite 6301
Marlton, NJ 08053

> **Re:** <u>Rastelli Partners, LLC, et al vs. FOFBakers Holding Company, LLC, et al.</u>
> **Our Matter No: 126315**

Dear Mr. Dahan:

I have enclosed an executed original Ruling Regarding Results of Arbitration Held on February 22, 2019.

Thank you.

Regards,

**CONNELL FOLEY LLP**

Francis J. Orlando, Jr.

FJO/ps
Enclosure

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---

RASTELLI PARTNERS, LLC, *et al*

       Plaintiffs,

       v.

FOFBAKERS HOLDING
COMPANY, LLC, *et al*
       Defendants.

       :
       :
       :
       :
       :   Civ. A. No. 1:19-cv-05124-NLH-JS
       :
       :
       :
       :

---

## RULING REGARDING RESULTS OF ARBITRATION HELD ON FEBRUARY 22, 2019

**THIS MATTER** has been opened to the Court by David R. Dahan, Esquire, counsel for the Plaintiffs, Rastelli Partners, LLC and Raymond M. Rastelli, Jr. ("Plaintiffs"), seeking interim relief/temporary restraints and injunctive relief for the reasons set forth in the Verified Complaint and Briefs and Certifications filed therewith; and the parties having agreed to enter into the Consent Order to Proceed with Mediation and Arbitration dated February 15, 2019 (the "Consent Order"), and the parties having agreed to use Retired Judge Francis J. Orlando, Jr. as the arbitrator (the "Arbitrator"), and the arbitration having taken place on February 22, 2019 (the "Arbitration") on the three (3) deadlock issues identified in Section C of the Consent Order with Greg Lomax, Esquire appearing in person as local counsel for the

{H1.890147.2}

Defendants, Edward J. Heben, Jr., Esquire appearing via videoconference as outside counsel for the Defendants, the Defendant, James A. Baker a/k/a Al Baker appearing via videoconference, David R. Dahan, Esquire appearing in person for the Plaintiffs, the Plaintiff, Raymond M. Rastelli appearing in person, Raymond Rastelli, III appearing in person, and Larry Fox appearing in person on behalf of Intervenor, DF Ventures, LLC, the Arbitrator hereby rules as follows:

1.  The Arbitrator rules in favor of the Plaintiffs submitting to ████████ preliminary pricing information of ██████████████ for the sale of product.  This ruling does not include any approval or disapproval of the Plaintiffs being entitled to charge any ███████████ or ███████████ for any product supplied to ████████ it being understood that any approval/disapproval of same is to be decided in the future in litigation, arbitration or mediation, as the case may be.

2.  The Arbitrator rules in favor of the Plaintiffs entering into an agreement, on behalf of FOFBakers, LLC (the "Company"), with ████████ in the redlined form presented to the Arbitrator at the Arbitration as Exhibit P-9 (which agreement was attached to an email from Mr. Dahan to Mr. Lomax on February 20, 2019 with edits in tracked changes format and contained a revised title of "Product

{HL890147.2}

Development Agreement") with any other further edits to finalize the

agreement with ███████

3.   The Arbitrator rules in favor of the Plaintiffs with regard to the

Company's continued use of its sourcing of pork from Poland.

4.   The Arbitrator hereby confirms that all submissions, exhibits,

testimony and statements related to the Arbitration are and shall remain

confidential.  To the extent any party wishes to enforce the terms of this

Ruling, and such party wishes to file this Ruling in Court, such party

shall redact the following and keep the same confidential:



SO RULED this 26 day of February 2019.

Retired Judge Francis J. Orlando, Jr., Arbitrator

# EXHIBIT F

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release ("Agreement") is entered into between the Plaintiffs, Rastelli Partners, LLC ("RP") and Raymond M. Rastelli, Jr. ("Ray, Jr.") (collectively, the "Plaintiffs"), the Intervenor, DF Ventures, LLC ("Daymond") and the Defendants, FOFBakers Holding Company, LLC ("FOFBakers Holding) and James A. Baker a/k/a Al Baker ("Baker") (collectively, the "Defendants") and is effective as of the date it is ~~fully~~ executed. RP, Ray, Jr., Daymond, FOFBakers Holding and Baker are sometimes individually referred to as a "Party" and collectively as the "Parties".

## BACKGROUND

A.      On or about October 27, 2015, FOFBakers, LLC (the "Company") was formed.

B.      The members of the Company are RP, Daymond and FOFBakers Holding.

C.      The Company was intended to operate pursuant to its Limited Liability Company Operating Agreement dated November 11, 2015 (the "Operating Agreement").

D.      Pursuant to the Operating Agreement, Ray, Jr. and Baker were identified as the managers of the Company.

E.      Baker is also a member of FOFBakers Holding.

F.      Disputes arose between the Parties as to the operations of the Company.

G.      On January 29, 2019, the Plaintiffs initiated legal action against the Defendants by filing a Verified Complaint in State Court in the matter captioned <u>Rastelli Partners, LLC and Raymond Rastelli, Jr. v. FOFBakers Holding Company, LLC and James A. Baker a/k/a Al Baker, Individually,</u> Superior Court of New Jersey, Chancery Division, Gloucester County, Docket No. C-5-19 (the "State Court Action"). On February 8, 2019, the Defendants removed the State Court Action to the United States District Court for the District of New Jersey, Camden Vicinage, which bears Docket No. 1:19-cv-05124-NLH-JS (the "Federal Court Action"). The State Court Action and the Federal Court Action shall collectively be referred to herein as the "Litigation".

H.      On February 15, 2019, in response to an application for injunctive relief, the Parties entered into a Consent Order to Proceed with Mediation and Arbitration (the "Consent Order") to engage in arbitration on three (3) deadlock issues and to participate in mediation on other issues.

I.      The Parties agreed to use Retired Judge Francis J. Orlando, Jr. as the arbitrator (the "Arbitrator") and an arbitration took place on February 22, 2019 on the three (3) deadlock issues identified in Section C of the Consent Order.

J.      The Arbitrator issued, in connection with all three (3) deadlock issues, a Ruling Regarding Results of Arbitration Held on February 22, 2019 (the "Ruling").

K.      On March 14, 2019, the Parties and counsel participated in mediation with Joel Schneider, U.S.M.J.



L.    Due to the expense, time and uncertainty of litigation, the Parties now desire to resolve the Litigation between them in accordance with the terms of this Agreement.

## AGREEMENT

In consideration of the mutual promises and covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, and intending to be legally bound, the Parties agree as follows:

1.    **Recitals**.  The Recitals set forth above are incorporated in the body of this Agreement as if fully set forth at length.

2.    **Arbitrator's Ruling**.  The Ruling shall remain in full force and effect.

3.    **Amendment to Operating Agreement**.  Contemporaneous with the execution of this Agreement, the Company, RP, Rastelli Brothers, Inc., Daymond, FOFBakers Holding, Jabezbaker, LLC, Brittani Baker, Sabrina Baker and Baker shall execute the Amendment to Operating Agreement of FOFBakers, LLC and/or (as applicable) the Addendum to the Amendment to Operating Agreement of FOFBakers, LLC attached hereto as Exhibit "A" and incorporated herein as if fully set forth at length.

4.    **Mutual Release**.  In consideration of the promises in this Agreement, each Party and Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker and· Sabrina Baker on behalf of themselves and all persons or entities claiming by, through or under them (together, the "Releasors"), do hereby release, remise, acquit and forever discharge each other, and all related persons and entities including, but not limited to, each of its/his/her respective officers, directors, shareholders, members, employees, directors, trustees, contractors, managers, partners, servants, representatives, attorneys, accountants, agents, consultants, parent companies, subsidiaries, affiliates, successors, heirs and assigns (together, the "Releasees"), from any and all actions, causes of action, claims, suits, demands, covenants, debts, obligations, accounts, contracts, agreements, promises, controversies, liabilities, judgments, damages, losses, costs, charges, expenses, fees, attorneys' fees and executions, of every kind and nature whatsoever either at law or in equity, contingent or fixed, known or unknown, that the Releasors had, have or claim to have against the Releasees from the beginning of the world to this date including, but not limited to, all claims arising from, connected with, or relating to, the matters which are the subject of the Litigation; provided, however, that the foregoing release shall not apply to any claims (a) arising from, connected with, or relating to the alleged breach of this Agreement or (b) arising from, connected with, or relating to any claims, complaints, filings or statements either of the Defendants, Jabezbaker, LLC, Brittani Baker and/or Sabrina Baker made to any governmental or law enforcement agency but excluding the New Jersey Attorney General) about the Plaintiffs or Daymond or their businesses.  The Defendants, Jabezbaker, LLC, Brittani Baker and Sabrina Baker represent that the only claim, complaint, filing or statement made about the Plaintiffs and Daymond to any governmental or law enforcement agency was one undated letter to the New Jersey Attorney General which the Defendants, Jabezbaker, LLC, Brittani Baker and Sabrina Baker represent was subsequently withdrawn via a letter to the New Jersey Attorney General dated March 5, 2019.

5.    **Restrictions**.  Each Party and Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker and Sabrina Baker forever agree not to solicit, disrupt, interfere with, disparage and/or defame any other Party and such other Party's employees, vendors and customers, current and/or prospective, and those of any entity any such other Party operates, has control of or has any

Case 1:23-cv-02967-RBK-AMD   Document 1   Filed 05/31/23   Page 211 of 265 PageID: 211
Case 1:23-cv-02864   Document 1-1   Filed 05/25/23   Page 168 of 222 PageID: 212

Case 1:19-cv-05124-NLH-JS   Document 42-3   Filed 06/12/19   Page 5 of 15 PageID: 661

interest in. Each Party and Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker and Sabrina Baker forever agree not to make any written or verbal remarks or statements (even in the form of an opinion) about any other Party to anyone including, but not limited to, any such other Party's employees, vendors and customers, current and/or prospective, and those of any entity any such other Party operates, has control of or has any interest in, that are in any way negative, disparaging or false or which could adversely impact the reputation, goodwill, credibility or value of any such other Party or entity or could discourage current and/or prospective customers from buying products from them. Except as may be necessary to comply with the rights and obligations under this Agreement, the Operating Agreement, the Amendment to Operating Agreement of FOFBakers, LLC and the Addendum to the Amendment to Operating Agreement of FOFBakers, LLC, each Party and Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker and Sabrina Baker forever agree not to contact any other Party's employees, current and/or prospective, and those of any entity any such other Party operates, has control of or has any interest in. Each Party and Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker and Sabrina Baker forever agree not to contact any other Party's vendors and customers, current and/or prospective, and those of any entity any such other Party operates, has control of or has any interest in. Each Party and Rastelli Brothers, Inc, Jabezbaker, LLC, Brittani Baker and Sabrina Baker forever agree not to interfere with any other Party's business relationships, current and/or prospective, and those of any entity any such other Party operates, has control of or has any interest in.

6.   **Dismissal**.  Within ten (10) days after this Agreement is fully executed, the Parties shall dismiss all asserted claims without costs.  For the avoidance of doubt, the Parties acknowledge that such dismissal does not pertain to or limit claims for alleged failure to comply with the terms of this Agreement.

7.   **No Admission of Liability**.  This Agreement is a compromise of the Litigation as set forth herein and shall never be treated as an admission of liability for any purpose whatsoever.

8.   **Binding Effect**.  This Agreement shall be for the benefit of and binding upon the Parties and their respective successors, heirs and assigns.

9.   **Governing Law**.  This Agreement shall be interpreted, governed and construed in accordance with the laws of the State of New Jersey.

10.   **Complete Agreement**.  This Agreement and any exhibits referenced herein reflect the entire understanding and agreement of the Parties and Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker and Sabrina Baker in connection with the matters set forth herein.

11.   **Modification**.  The terms of this Agreement may be amended, modified or waived only by an instrument in writing signed by all Parties and, to the extent applicable, Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker and Sabrina Baker.

12.   **Execution of Agreement**.  The Parties and Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker and Sabrina Baker have each consulted with their respective attorneys regarding the terms and conditions of this Agreement, have carefully read this Agreement and know and understand the contents hereof.  The Parties and Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker and Sabrina Baker each execute this Agreement of their own free will.





13.    **Counterparts**.  This Agreement may be executed in multiple telecopied or original counterparts and the failure to have the signatures of all Parties and Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker and Sabrina Baker on a single Agreement shall not affect the validity or enforceability of any part of this Agreement.

14.    **Enforcement**.  The Parties and Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker and Sabrina Baker agree that the United States District Court for the District of New Jersey, Camden Vicinage, shall retain jurisdiction to enforce the terms of this Agreement.

15.    **Third-Party Beneficiary**.  The Parties and Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker and Sabrina Baker acknowledge that the Releasees are intended third-party beneficiaries of this Agreement with the express right to enforce the terms hereof.

*[Signature Page Follows]*

**I HAVE READ THE ABOVE AGREEMENT AND UNDERSTAND ITS TERMS.**

Intending to be legally bound under the terms and conditions set forth in this Agreement, we execute this Agreement on the day and year noted below.

**RASTELLI PARTNERS, LLC**

By: _____
Name:  Raymond M. Rastelli, Jr.
Title:  President
Date: _____9 - 5 - 19_____

_____
RAYMOND M. RASTELLI, JR., Individually
Date: _____9 - 5 - 19_____

**DF VENTURES, LLC**

By: _____
Name: ~~Raymond John~~ Lawrence Fox
Title: Member / Attorney-in-fact
Date: _____9-5-19_____

**FOFBAKERS HOLDING COMPANY, LLC**

By: _____
Name: James A. Baker
Title:  CEO/President
Date: _____9.5.19_____

_____
AL BAKER, Individually
Date: _____

ACKNOWLEDGED AND AGREED
AS TO SECTIONS 3, 4, 5, 9, 10, 11, 12, 13,
14 and 15 OF THIS AGREEMENT

**RASTELLI BROTHERS, INC.**

By: _____
Name:  Raymond M. Rastelli, Jr.
Title:  President
Date: _____9 - 5 - 19_____

James D. Bal on behalf of Brittani Bal
BRITTANI BAKER
Date: 9.5.19

**JABEZBAKER, LLC**

By: _____
Name: _____
Title: 9.5.19

James D. Bal on behalf of Sabrina Bal
SABRINA BAKER
Date: 9.5.19

# EXHIBIT A

Case 1:23-cv-02967-RBK-AMD   Document 1   Filed 05/31/23   Page 215 of 265 PageID: 215
Case 1:23-cv-02864   Document 1-1   Filed 05/25/23   Page 172 of 222 PageID: 216

Case 1:19-cv-05124-NLH-JS   Document 42-3   Filed 06/12/19   Page 9 of 15 PageID: 665

## AMENDMENT TO OPERATING AGREEMENT
## OF
## FOFBAKERS, LLC

This Amendment ("**Amendment**"), dated as of the 5ᵗʰ day of ~~April~~ September, 2019, is hereby intended to amend certain sections of the Operating Agreement of **FOFBAKERS LLC** (the "**Company**") dated November 11, 2015 ("**Agreement**"), among **FOFBAKERS HOLDING COMPANY, LLC** ("**Holding**"), **RASTELLI PARTNERS, LLC** ("**RP**") and **DF VENTURES, LLC** ("**Daymond**"). All signatories to this Amendment are sometimes individually referred to as a "**Party**" and collectively as "**Parties**". Capitalized terms used but not defined herein shall have the meanings given them in the Agreement.

### BACKGROUND

A dispute has arisen among the Members of the Company. The purpose of this Amendment is to resolve the dispute by amending the Agreement as provided herein.

**NOW, THEREFORE**, the undersigned Parties, in consideration of the mutual covenants and conditions herein contained, and for other good and valuable consideration, the sufficiency of which is hereby acknowledged agree as follows:

1.    The Parties hereby confirm that pursuant to Section 6.2 of the Agreement, **Jabezbaker, LLC** ("**Jabezbaker**") has granted the Company an exclusive license "allowing for the Company's exclusive use of the Patents" for the manufacture and sale of "Products" made in accordance with the methods and processes set forth in the US Patents and all improvements thereto identified in Exhibit C of the Agreement (the "**Patents**")

2.    For purposes of this Amendment, the term "**Products**" means (i) any and all boneless rib products whether made in accordance with the methods and claims of the Patents or otherwise and any other products that are processed to look like boneless ribs; (ii) all products currently made under the Bubba's Q brand and any future product line extensions; and, (iii) any other products agreed to by the Parties.

3.    Terms of License Grant to RBI.

(a)    The Members of the Company hereby grant RP's affiliate, **Rastelli Brothers, Inc.** ("**RBI**"), the exclusive world-wide right to manufacture and sell the Products, subject to the terms set forth herein. RBI shall use its commercially reasonable best efforts to source, manufacture, produce, make or have made, market, promote, distribute, and sell and deliver the Products in the ordinary course of business (the "**RBI Grant**"). RBI shall be responsible for all costs and expenses in connection with this RBI Grant and shall perform its duties in accordance with industry standards, governmental approvals, and compliance with all applicable laws and regulations. RBI is solely responsible for all costs and expenses in connection with the RBI Grant including, but not limited to, sourcing, manufacture, production, marketing, promotion, distribution, storage, customer services, sale, delivery and collections. The RBI Grant includes the right to sub-contract or sub-license this RBI Grant in the reasonable

and ordinary course of its business to fulfill its obligations herein. RBI shall fulfill its obligations under the RBI Grant in good faith and consistent with the business interests of the Company and the terms and conditions of this Amendment.

(b)     RP, RBI, and Daymond hereby agree that during the term of the RBI Grant and continuing for two (2) years after the termination of the RBI Grant, neither they nor their affiliates, agents, members or owners, shall compete with Company in the manufacturing, marketing, selling or distributing of the Products.

(c)     At the option of the Company, the RBI Grant shall terminate contemporaneous with any transaction (or series of related transactions) pursuant to which the Company is acquired resulting in a change in control or upon the sale of substantially all of the Company's assets (which shall be deemed to include the sale or transfer of any material portion of the Products or Patents). RBI may continue to perform services following any such transaction for or on behalf of the acquirer provided that the terms thereof are consistent with the fair market value for the services to be performed and, as a result thereof, would not result in a reduction of the consideration received by the Company or its members from the sale. In addition, the RBI Grant may be terminated by the Company upon the institution of insolvency, receivership or bankruptcy proceedings by or against RBI or if RBI makes an assignment for the benefit of creditors of all or substantially all of its assets.

4.     RBI shall pay Jabezbaker four percent (4%) of the Gross Receipts of Product sales on the first $5,000,000 of Gross Receipts of Products sold, and three percent (3%) of Gross Receipts (as defined below) on Product sales over $5,000,000, on a per annum basis (the "**Royalty Payments**"), commencing upon the execution of this Amendment. The Royalty Payments shall be paid by RBI monthly by the fifteenth (15th) of the month following the just-ended month, together with a report form substantially in the form attached hereto (the "**Report Form**"). Jabezbaker shall receive no less than a monthly payment of $8,333.33 (the "**Minimum**") only for a period of twelve months following the execution of this Amendment. Following this twelve-month period, the Minimum shall expire, and Jabezbaker shall receive the Royalty Payments based solely on Gross Receipts, as provided herein. RP and RBI shall be jointly and severally liable for RBI's obligations hereunder.

"**Gross Receipts**" means all amounts paid by a Customer (as defined below) to RBI and RBI's sublicensees from all sales of Products of every kind and nature sold, whether for cash or credit, but excluding (i) federal, state or municipal taxes or services taxes collected from Customers and paid to the appropriate taxing authority, (ii) refunds, (iii) voided customer purchases, and (iv) sales taxes collected in connection with the sales of Products.

"**Customer**" means any retail or wholesale business, supermarket (e.g., Acme), hypermarket (e.g., Walmart), fast-food chain (e.g., Subway) or other similar first receiver that purchases the Products from RBI or an RBI sublicensee, as the case may be.

By way of example, if RBI or its sublicensee Smithfield enters into an agreement with Subway and/or Walmart who pays a total of $8.00 per pound for the Product and from which RBI is paid $1.00 per pound for its portion of the process and its sublicensee, Smithfield, is paid $7.00 per pound for its portion of the process, then the amount of Gross Receipts is $8.00 per

pound even if Subway and/or Walmart pays some or all of such purchase price directly to Smithfield .

5.      Daymond and RP shall separately determine a mutually acceptable arrangement concerning payments to Daymond as a Member of Company ("**Daymond Payments**").

6.      Because no operating revenues are coming into the Company, the RBI Grant, the Royalty Payments ~~and the Daymond Payments~~ set forth in this Amendment are in lieu of, and replace in their entirety, any ongoing profits, royalties, license fees, compensation or any other payments or distributions of the Company to its Members, or to any Party to the Addendum signed of even date herewith and attached hereto. Nothing herein is intended to impact the Members respective equity interests in the Company, including rights upon sale or any other liquidating event.

7.      Because no operating revenues are coming into the Company, RBI shall be responsible for the payment of all current and accrued expenses of the Company. The costs of an accountant to make appropriate tax and related filings on behalf of the Company and any other prospective expenses of the Company, which the Members agree to pay on behalf of the Company, shall be paid by the Members, with contributions of funds being pro rata in accordance with each Member's Equity Interests in the Company, or as otherwise agreed by the Members.

8.      **Al Baker's ("Al")** continuing obligations to the Company are to serve as a brand ambassador and on-air television personality, and to collaborate with the Members to market and promote the Products. Al shall further collaborate with RBI on product development concerning the Products and shall participate in product development meetings with RBI personnel. If Al contributes services, RBI shall reimburse Al for his reasonable expenses, as agreed to in advance by RBI and Al. Al shall retain the right to operate and expand his retail restaurant business with the Products. This paragraph is intended to replace Section 6.1(a) of the Operating Agreement.

9.      The Parties hereto acknowledge and agree that Product Gross Receipts to the date hereof total 14,480,291 as reflected in the Schedule A Report Form, attached hereto. RBI agrees to provide all documents reasonably requested by Jabezbaker accountants concerning Schedule A. When Product Gross Receipts reach $30,000,000, and provided that the applicable Royalty Payments have been made, Jabezbaker shall irrevocably and unconditionally grant, convey, transfer and assign to the Company the Patents, and all rights attendant thereto (the "**Patent Assignment**") as provided in the Operating Agreement. Notwithstanding the foregoing, or anything else to the contrary, all Members' respective Equity Interests in the Company, and all other rights hereunder, including the RBI Grant, the Royalty Payments and the Daymond Payments shall continue following the Patent Assignment.

10.     RBI shall keep true and accurate records of all Products sold under this Amendment in sufficient detail and consistent with its customary business record keeping practices, to enable the accuracy of the Report Form to be verified and to confirm the amounts of the Royalty Payments and the Daymond Payments due and owing. RBI agrees to permit the inspection or audit of the relevant records no more than once each calendar year by Jabezbaker or Holding and no more than once each calendar year by Daymond, or independent Certified

Public Accountants or other duly authorized representatives of Jabezbaker, or Daymond, as the case may be, who shall agree to maintain in strict confidence all reviewed or audited information. Any such inspection or audit shall be performed on no less than fourteen (14) days written notice, during normal business hours at RBI's place of business or through electronic transmissions of records, upon reasonable request.

In the event that an inspection or audit discloses an underpayment, within thirty (30) days after notice thereof, RBI shall pay to Jabezbaker or Daymond, as the case may be, the difference between the royalties actually paid and the royalties which should have been paid, plus interest calculated at an annual rate of five percent (5%) simple interest from the date of any such underpayment to the date of payment. If the inspection or audit discloses an overpayment, the amount of the overpayment shall be repaid to RBI within thirty (30) days after notice thereof provided to Jabezbaker or Daymond, as the case may be. The cost of any inspection or audit performed shall be paid by Jabezbaker or Daymond, as the case may be, except in the event that the inspection or audit reveals an underpayment of more than three percent (3%) of the amount that should have been paid, RBI agrees to reimburse Jabezbaker or Daymond, as the case may be, for the reasonable cost of any such inspection or audit.

11.     The Parties, and each of them, will attempt in good faith to promptly resolve any dispute or controversy arising from or relating to this Amendment or the Agreement (collectively, the "**Dispute**"), by negotiations between applicable representatives, who have authority to settle the controversy. The initial meeting shall take place, in person, or be conducted telephonically within fifteen (15) business days after demand is made by any Party (the "**Initiating Party**"). Disputes shall also include any "deadlock" between Managers and any failure by the Members to achieve unanimity on any actions contemplated in the Agreement.

12.     If good faith negotiations as to the Dispute are unsuccessful, the Parties shall engage in non-binding third-party mediation; provided, however, that no Party is required to mediate any Dispute in case of irreparable loss or damage, as set forth in Section 14 below. The Initiating Party shall compile a list of three (3) mediators and send it to the other applicable Parties ("**Responding Parties**"). Within ten (10) business days, the Responding Parties shall select one of these three (3) mediators or send a new list of three (3) mediators to the Initiating Party. If the Parties cannot agree on a mediator, then each side shall select one person from their respective lists, and those two selected persons shall determine an acceptable mediator. Any Dispute not resolved by good faith negotiation or mediation may then be submitted to binding arbitration.

13.     Any Dispute must be arbitrated in the greater Philadelphia/South Jersey metro area, before a single arbitrator who is selected and mutually approved by the Parties. The Parties agree that the arbitration may be held elsewhere upon mutual written agreement. If the Parties are unable to or fail to agree on the selection of the arbitrator within fifteen (15) business days of the demand for arbitration being served, the arbitrator will be appointed in the same manner as set forth above in the selection of a mediator. The selected arbitrator shall apply the following American Arbitration Association's Commercial Arbitration Rules dated effective October 1, 2013 as applicable after deleting all references to the "AAA" or substituting the word "Arbitrator" for AAA as applicable and deleting any reference to fees or costs: R-4 excluding Section (f); R-5 excluding section (c); R-6; R-7; R-8; R-10; ; R-17; R-18; R-19; R-21; R-22; R-



23; R-24; R-25; R-26; R-27; R-28; R-30; R-31; R-32; R-33; R-34; R-35; R-36; R-37; R-39; R40; R-41; R-42; R-43; R-45; R-46; R-47; R-48; R-49; R-50; R-51; R-58; and P-1 and P-2 excluding (a)(i). The arbitrator shall serve as a neutral, independent and impartial arbitrator. Any arbitration decision rendered will be final and binding and judgment thereon may be entered in any court of competent jurisdiction.

14.     Each Party shall first attempt to resolve any Dispute in accordance with Section 11 above. Thereafter, nothing herein contained shall bar a Party's right to seek and obtain injunctive relief in accordance with applicable law against actual and/or threatened conduct that will cause such Party irreparable loss or damage with respect to only the following: (i) substantive rights with respect to the Patents; (ii) the transfer of the Patents in accordance with Section 9 above; (iii) the sale of or transfer of substantially all of the assets of the Company; or (iv) the termination of the RBI Grant. Requests for injunctive relief, shall be heard and determined in the United States District Court for the District of New Jersey, Camden Vicinage. The Parties to this Amendment expressly consent to, and agree not to contest such exclusive jurisdiction.

15.     Each Party hereto represents and warrants to the other Parties to this Amendment that it has the full power and authority to execute, deliver and perform its respective obligations under this Amendment.

16.     To the extent there is a conflict between the terms of this Amendment and the Agreement, the terms of the Amendment shall control.

17.     The Parties agree that each shall execute any and all documents and instruments necessary to carry out the terms of this Amendment and the actions contemplated hereby.

18.     This Amendment may be executed in multiple counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same Amendment.

*[Remainder of Page Intentionally Left Blank, Signature Page Follows]*



IN WITNESS WHEREOF, the Parties have caused their duly authorized representatives to execute this Amendment as of the date first written above.

**FOFBAKERS HOLDING COMPANY, LLC**

By: _____  9.5.19

Name: James A. Baker

Title:  CEO/President

**RASTELLI PARTNERS, LLC**

By: _____  9 5-19

Name:  Raymond M. Rastelli, Jr.

Title:  President

**DF VENTURES, LLC**

By: _____  9-5-19

Name: Daymond John *Lawrence Fox, Member*

Title: *Member / Attorney-in-fact*

{HL898811.16}                          **6**

# EXHIBIT G

Case 1:23-cv-02967-RBK-AMD   Document 1   Filed 05/31/23   Page 222 of 265 PageID: 222
Case 1:23-cv-02864   Document 1-1   Filed 05/25/23   Page 179 of 222 PageID: 223

Case 1:19-cv-05124-NLH-JS   Document 42-3   Filed 06/12/19   Page 9 of 15 PageID: 665

## AMENDMENT TO OPERATING AGREEMENT

### OF

### FOFBAKERS, LLC

This Amendment ("**Amendment**"), dated as of the 5ᵗʰ day of ~~April,~~ *September* 2019, is hereby intended to amend certain sections of the Operating Agreement of **FOFBAKERS LLC** (the "**Company**") dated November 11, 2015 ("**Agreement**"), among **FOFBAKERS HOLDING COMPANY, LLC** ("**Holding**"), **RASTELLI PARTNERS, LLC** ("**RP**") and **DF VENTURES, LLC** ("**Daymond**"). All signatories to this Amendment are sometimes individually referred to as a "**Party**" and collectively as "**Parties**". Capitalized terms used but not defined herein shall have the meanings given them in the Agreement.

### BACKGROUND

A dispute has arisen among the Members of the Company. The purpose of this Amendment is to resolve the dispute by amending the Agreement as provided herein.

**NOW, THEREFORE**, the undersigned Parties, in consideration of the mutual covenants and conditions herein contained, and for other good and valuable consideration, the sufficiency of which is hereby acknowledged agree as follows:

1.      The Parties hereby confirm that pursuant to Section 6.2 of the Agreement, **Jabezbaker, LLC** ("**Jabezbaker**") has granted the Company an exclusive license "allowing for the Company's exclusive use of the Patents" for the manufacture and sale of "Products" made in accordance with the methods and processes set forth in the US Patents and all improvements thereto identified in Exhibit C of the Agreement (the "**Patents**")

2.      For purposes of this Amendment, the term "**Products**" means (i) any and all boneless rib products whether made in accordance with the methods and claims of the Patents or otherwise and any other products that are processed to look like boneless ribs; (ii) all products currently made under the Bubba's Q brand and any future product line extensions; and, (iii) any other products agreed to by the Parties.

3.      Terms of License Grant to RBI.

(a)      The Members of the Company hereby grant RP's affiliate, **Rastelli Brothers, Inc.** ("**RBI**"), the exclusive world-wide right to manufacture and sell the Products, subject to the terms set forth herein. RBI shall use its commercially reasonable best efforts to source, manufacture, produce, make or have made, market, promote, distribute, and sell and deliver the Products in the ordinary course of business (the "**RBI Grant**"). RBI shall be responsible for all costs and expenses in connection with this RBI Grant and shall perform its duties in accordance with industry standards, governmental approvals, and compliance with all applicable laws and regulations. RBI is solely responsible for all costs and expenses in connection with the RBI Grant including, but not limited to, sourcing, manufacture, production, marketing, promotion, distribution, storage, customer services, sale, delivery and collections. The RBI Grant includes the right to sub-contract or sub-license this RBI Grant in the reasonable

and ordinary course of its business to fulfill its obligations herein. RBI shall fulfill its obligations under the RBI Grant in good faith and consistent with the business interests of the Company and the terms and conditions of this Amendment.

(b)     RP, RBI, and Daymond hereby agree that during the term of the RBI Grant and continuing for two (2) years after the termination of the RBI Grant, neither they nor their affiliates, agents, members or owners, shall compete with Company in the manufacturing, marketing, selling or distributing of the Products.

(c)     At the option of the Company, the RBI Grant shall terminate contemporaneous with any transaction (or series of related transactions) pursuant to which the Company is acquired resulting in a change in control or upon the sale of substantially all of the Company's assets (which shall be deemed to include the sale or transfer of any material portion of the Products or Patents). RBI may continue to perform services following any such transaction for or on behalf of the acquirer provided that the terms thereof are consistent with the fair market value for the services to be performed and, as a result thereof, would not result in a reduction of the consideration received by the Company or its members from the sale. In addition, the RBI Grant may be terminated by the Company upon the institution of insolvency, receivership or bankruptcy proceedings by or against RBI or if RBI makes an assignment for the benefit of creditors of all or substantially all of its assets.

4.     RBI shall pay Jabezbaker four percent (4%) of the Gross Receipts of Product sales on the first $5,000,000 of Gross Receipts of Products sold, and three percent (3%) of Gross Receipts (as defined below) on Product sales over $5,000,000, on a per annum basis (the "**Royalty Payments**"), commencing upon the execution of this Amendment. The Royalty Payments shall be paid by RBI monthly by the fifteenth (15th) of the month following the just-ended month, together with a report form substantially in the form attached hereto (the "**Report Form**"). Jabezbaker shall receive no less than a monthly payment of $8,333.33 (the "**Minimum**") only for a period of twelve months following the execution of this Amendment. Following this twelve-month period, the Minimum shall expire, and Jabezbaker shall receive the Royalty Payments based solely on Gross Receipts, as provided herein. RP and RBI shall be jointly and severally liable for RBI's obligations hereunder.

"**Gross Receipts**" means all amounts paid by a Customer (as defined below) to RBI and RBI's sublicensees from all sales of Products of every kind and nature sold, whether for cash or credit, but excluding (i) federal, state or municipal taxes or services taxes collected from Customers and paid to the appropriate taxing authority, (ii) refunds, (iii) voided customer purchases, and (iv) sales taxes collected in connection with the sales of Products.

"**Customer**" means any retail or wholesale business, supermarket (e.g., Acme), hypermarket (e.g., Walmart), fast-food chain (e.g., Subway) or other similar first receiver that purchases the Products from RBI or an RBI sublicensee, as the case may be.

By way of example, if RBI or its sublicensee Smithfield enters into an agreement with Subway and/or Walmart who pays a total of $8.00 per pound for the Product and from which RBI is paid $1.00 per pound for its portion of the process and its sublicensee, Smithfield, is paid $7.00 per pound for its portion of the process, then the amount of Gross Receipts is $8.00 per

Case 1:23-cv-02967-RBK-AMD   Document 1   Filed 05/31/23   Page 224 of 265 PageID: 224
Case 1:23-cv-02864   Document 1-1   Filed 05/25/23   Page 181 of 222 PageID: 225

Case 1:19-cv-05124-NLH-JS   Document 42-3   Filed 06/12/19   Page 11 of 15 PageID: 667

pound even if Subway and/or Walmart pays some or all of such purchase price directly to Smithfield .

5.      Daymond and RP shall separately determine a mutually acceptable arrangement concerning payments to Daymond as a Member of Company ("**Daymond Payments**").

6.      Because no operating revenues are coming into the Company, the RBI Grant, the Royalty Payments ~~and the Daymond Payments~~ set forth in this Amendment are in lieu of, and replace in their entirety, any ongoing profits, royalties, license fees, compensation or any other payments or distributions of the Company to its Members, or to any Party to the Addendum signed of even date herewith and attached hereto. Nothing herein is intended to impact the Members respective equity interests in the Company, including rights upon sale or any other liquidating event.

7.      Because no operating revenues are coming into the Company, RBI shall be responsible for the payment of all current and accrued expenses of the Company. The costs of an accountant to make appropriate tax and related filings on behalf of the Company and any other prospective expenses of the Company, which the Members agree to pay on behalf of the Company, shall be paid by the Members, with contributions of funds being pro rata in accordance with each Member's Equity Interests in the Company, or as otherwise agreed by the Members.

8.      **Al Baker's ("Al")** continuing obligations to the Company are to serve as a brand ambassador and on-air television personality, and to collaborate with the Members to market and promote the Products. Al shall further collaborate with RBI on product development concerning the Products and shall participate in product development meetings with RBI personnel. If Al contributes services, RBI shall reimburse Al for his reasonable expenses, as agreed to in advance by RBI and Al. Al shall retain the right to operate and expand his retail restaurant business with the Products. This paragraph is intended to replace Section 6.1(a) of the Operating Agreement.

9.      The Parties hereto acknowledge and agree that Product Gross Receipts to the date hereof total 14,480,291 as reflected in the Schedule A Report Form, attached hereto. RBI agrees to provide all documents reasonably requested by Jabezbaker accountants concerning Schedule A. When Product Gross Receipts reach $30,000,000, and provided that the applicable Royalty Payments have been made, Jabezbaker shall irrevocably and unconditionally grant, convey, transfer and assign to the Company the Patents, and all rights attendant thereto (the "**Patent Assignment**") as provided in the Operating Agreement. Notwithstanding the foregoing, or anything else to the contrary, all Members' respective Equity Interests in the Company, and all other rights hereunder, including the RBI Grant, the Royalty Payments and the Daymond Payments shall continue following the Patent Assignment.

10.     RBI shall keep true and accurate records of all Products sold under this Amendment in sufficient detail and consistent with its customary business record keeping practices, to enable the accuracy of the Report Form to be verified and to confirm the amounts of the Royalty Payments and the Daymond Payments due and owing. RBI agrees to permit the inspection or audit of the relevant records no more than once each calendar year by Jabezbaker or Holding and no more than once each calendar year by Daymond, or independent Certified

Public Accountants or other duly authorized representatives of Jabezbaker, or Daymond, as the case may be, who shall agree to maintain in strict confidence all reviewed or audited information. Any such inspection or audit shall be performed on no less than fourteen (14) days written notice, during normal business hours at RBI's place of business or through electronic transmissions of records, upon reasonable request.

In the event that an inspection or audit discloses an underpayment, within thirty (30) days after notice thereof, RBI shall pay to Jabezbaker or Daymond, as the case may be, the difference between the royalties actually paid and the royalties which should have been paid, plus interest calculated at an annual rate of five percent (5%) simple interest from the date of any such underpayment to the date of payment. If the inspection or audit discloses an overpayment, the amount of the overpayment shall be repaid to RBI within thirty (30) days after notice thereof provided to Jabezbaker or Daymond, as the case may be. The cost of any inspection or audit performed shall be paid by Jabezbaker or Daymond, as the case may be, except in the event that the inspection or audit reveals an underpayment of more than three percent (3%) of the amount that should have been paid, RBI agrees to reimburse Jabezbaker or Daymond, as the case may be, for the reasonable cost of any such inspection or audit.

11.     The Parties, and each of them, will attempt in good faith to promptly resolve any dispute or controversy arising from or relating to this Amendment or the Agreement (collectively, the **"Dispute"**), by negotiations between applicable representatives, who have authority to settle the controversy. The initial meeting shall take place, in person, or be conducted telephonically within fifteen (15) business days after demand is made by any Party (the **"Initiating Party"**). Disputes shall also include any "deadlock" between Managers and any failure by the Members to achieve unanimity on any actions contemplated in the Agreement.

12.     If good faith negotiations as to the Dispute are unsuccessful, the Parties shall engage in non-binding third-party mediation; provided, however, that no Party is required to mediate any Dispute in case of irreparable loss or damage, as set forth in Section 14 below. The Initiating Party shall compile a list of three (3) mediators and send it to the other applicable Parties (**"Responding Parties"**). Within ten (10) business days, the Responding Parties shall select one of these three (3) mediators or send a new list of three (3) mediators to the Initiating Party. If the Parties cannot agree on a mediator, then each side shall select one person from their respective lists, and those two selected persons shall determine an acceptable mediator. Any Dispute not resolved by good faith negotiation or mediation may then be submitted to binding arbitration.

13.     Any Dispute must be arbitrated in the greater Philadelphia/South Jersey metro area, before a single arbitrator who is selected and mutually approved by the Parties. The Parties agree that the arbitration may be held elsewhere upon mutual written agreement. If the Parties are unable to or fail to agree on the selection of the arbitrator within fifteen (15) business days of the demand for arbitration being served, the arbitrator will be appointed in the same manner as set forth above in the selection of a mediator. The selected arbitrator shall apply the following American Arbitration Association's Commercial Arbitration Rules dated effective October 1, 2013 as applicable after deleting all references to the "AAA" or substituting the word "Arbitrator" for AAA as applicable and deleting any reference to fees or costs: R-4 excluding Section (f); R-5 excluding section (c); R-6; R-7; R-8; R-10; ; R-17; R-18; R-19; R-21; R-22; R-



23; R-24; R-25; R-26; R-27; R-28; R-30; R-31; R-32; R-33; R-34; R-35; R-36; R-37; R-39; R40; R-41; R-42; R-43; R-45; R-46; R-47; R-48; R-49; R-50; R-51; R-58; and P-1 and P-2 excluding (a)(i). The arbitrator shall serve as a neutral, independent and impartial arbitrator. Any arbitration decision rendered will be final and binding and judgment thereon may be entered in any court of competent jurisdiction.

14.    Each Party shall first attempt to resolve any Dispute in accordance with Section 11 above.  Thereafter, nothing herein contained shall bar a Party's right to seek and obtain injunctive relief in accordance with applicable law against actual and/or threatened conduct that will cause such Party irreparable loss or damage with respect to only the following: (i) substantive rights with respect to the Patents; (ii) the transfer of the Patents in accordance with Section 9 above; (iii) the sale of or transfer of substantially all of the assets of the Company; or (iv) the termination of the RBI Grant.  Requests for injunctive relief, shall be heard and determined in the United States District Court for the District of New Jersey, Camden Vicinage. The Parties to this Amendment expressly consent to, and agree not to contest such exclusive jurisdiction.

15.    Each Party hereto represents and warrants to the other Parties to this Amendment that it has the full power and authority to execute, deliver and perform its respective obligations under this Amendment.

16.    To the extent there is a conflict between the terms of this Amendment and the Agreement, the terms of the Amendment shall control.

17.    The Parties agree that each shall execute any and all documents and instruments necessary to carry out the terms of this Amendment and the actions contemplated hereby.

18.    This Amendment may be executed in multiple counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same Amendment.

*[Remainder of Page Intentionally Left Blank, Signature Page Follows]*



IN WITNESS WHEREOF, the Parties have caused their duly authorized representatives to execute this Amendment as of the date first written above.

**FOFBAKERS HOLDING COMPANY, LLC**

By: _____  9.5.19
Name: James A. Baker
Title:  CEO/President

**RASTELLI PARTNERS, LLC**

By: _____  9-5-19
Name:  Raymond M. Rastelli, Jr.
Title:  President

**DF VENTURES, LLC**

By: _____  9-5-19
Name: ~~Daymond John~~ Lawrence Fox, Member
Title: Member / Attorney-in-fact

# EXHIBIT H

### ADDENDUM
### ("Addendum")
### TO THE AMENDMENT TO OPERATING AGREEMENT
### OF FOFBAKERS, LLC
### ("Amendment")

RASTELLI BROTHERS, INC., a New Jersey corporation ("RBI"), JABEZBAKER, LLC, an Ohio limited liability company (**Jabezbaker**"), AL BAKER, an individual ("**Al**") and BRITTANI BAKER, an individual ("**Brittani**"), for good and valuable consideration, including the covenants and conditions set forth in the attached Amendment, the sufficiency of which is hereby acknowledged, agree as follows:

1.      Jabezbaker confirms the grant of the exclusive license to FOFBakers, LLC, set forth in Section 1 of the Amendment and agrees to the terms and conditions set forth in Sections 4, 6, 9, 10, 11, 12, 13 and 14 of the Amendment.

2.      RBI agrees to the terms and conditions set forth in Sections 2, 3, 4, 6, 7, 8, 9, 10, 11, 12, 13 and 14 of the Amendment.

3.      Al agrees to the terms and conditions set forth in Sections 1, 4, 6, 8, 9, 11, 12, 13 and 14 of the Amendment.

4.      Brittani agrees to the terms and conditions set forth in Sections 1, 4, 6, 9, 11, 12, 13 and 14 of the Amendment.

5.      Each party hereto represents and warrants to the other parties to this Addendum that it, he or she has the full power and authority to execute, deliver and perform its, his or her respective obligations under this Addendum and shall execute any and all documents and instruments necessary to carry out the terms of this Addendum and the actions contemplated thereby.

6.      This Addendum may be executed in multiple counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same Addendum.

**JABEZBAKER, LLC**                          **RASTELLI BROTHERS, INC.**

By: _____           By: _____  9-5-19

Name: _____           Name: _Raymond M. Rastelli Jr._

Title: _9-5-19_                          Title: _Pres._

_James D. Bal on behalf Brittani Bal_

BRITTANI BAKER

_____

AL BAKER

# EXHIBIT I

RR
JAP

## Supplement

This Supplement to the Settlement Agreement and Mutual Release attached hereto and incorporated herein by reference (the Settlement) including the Amendment to Operating Agreement of FOFBAKERS LLC is intended to fully and finally settle the Federal Court Action and all Litigation between the Parties.

The terms of the Supplement are as follows:

1. The "carve out" in Section 4(b) of the Settlement Agreement is hereby deleted.

2. Section 8 of the Amendment hereby is amended to permit franchising of Al's restaurant business.

3. Section 3(a) of the Amendment hereby is amended to require Holding's consent to RBI's sublicensing of the intellectual property set forth in the Patents, which shall not be unreasonably withheld.

4. Section 8 of the Amendment is hereby amended as follows:

a. Al shall receive a monthly expense stipend and benefits of $1500 per month for a period of 24 months from RBI

b. Al shall receive $1500

JAB

for each personal appearance to promote the Products requested by RBI, plus reasonable expenses, as agreed to in advance by RBI and AL. Personal Appearance include are such as trade shows, QVC, or such other promotional events. Personal appearances do not include sales calls to sell specific Products to customers or potential customers. There shall be a minimum of six per year; appearances over fifteen per year will require AL's consent. Section 4 of the Amendment is hereby amended to add a payment to Jabezbaker shall be paid within 10 days following execution $34,000 upon filing the Settlement Agreement and Supplement with the federal Court. In addition to the Minimum Commencing following the Filing execution and payment of the $34,000 after a 12 month period

5. RBI represents it will expend a minimum of $1.5 million for purchase commitments of raw materials, marketing and promotion, social media web support, allocated personnel, trade shows and payment of the Minimum to Jabezbaker.

6. The Federal Court shall retain jurisdiction of the Settlement and enforcement thereof for a period of two years. The prevailing party shall be paid its reasonable attorney fees and costs from the non-prevailing party.

Addition to the Agreement as to Supplement

DF VENTURES, LLC

By: _____
Lawrence Fox, Member

7. Sections 5-7 the Settlement Agreement is hereby amended to include affiliates.

8. Section 4 of the Settlement shall include affiliates as both Releasors and Releasees.

9. Section 8 of the Amendment with respect to AL's participation and collaboration are hereby directed to make such adjustment at AL's discretion.

10. The members of FUBAKER.S, LLC (the "Company") agree to retain a mutually acceptable investment banker no later than 3 years from the execution of the settlement and supplemental for purposes of valuing the Company and determining strategies and plans, including a potential liquidity event, at the Company's expense, or as otherwise agreed by the members.

11. All of AI's expenses shall be submitted to RBI for reimbursement. If AI needs expenses advanced by RBI the advance will be based on average monthly expenses. RBI will furnish AI with a credit card for approved expenses.

FUBAKER'S, HOLDING COMPANY, LLC

By: _James A. Bal_
Title: CEO / President

Rastelli Partners, LLC

By: _Ray M. Ratell_
Raymond M. Rastelli, Jr.
Title: President / Managing Partner

Rastelli Brothers, Inc.

By: _Ray M. Ratell_
Raymond M. Rastelli, Jr.
Title: President

JABE BAKER, LLC
By: _James A. Bal_
James A. Baker
Title: Member with full authority to sign on behalf of all Members.

_James A. Bal_
James A. Baker
individually and with authority to sign on behalf of Brittani Baker and Sabrina Baker

# EXHIBIT J

# facebook

Log In



# Brittani Bo Baker

1.3K followers • 0 following

Posts    About    Photos    Videos    •••

## Intro

Profile · Digital creator

Co-inventor at **Bubbas Boneless Ribs**

owner at **BBQconsulting.com**

## Connect with Brittani Bo Baker on Facebook

Log In

or

Create new account

**facebook**

Log in

## Photos

See all photos



Privacy · Terms · Advertising · Ad Choices ▪ · Cookies · More · Meta © 2023

 **Brittani Bo Baker**
17h · 🌐

We are going to be working with the #NFL Alumni media to share our story 🙏💙

# Connect with Brittani Bo Baker on Facebook

Log In

or

Create new account

# facebook

Log in





**Brittani Bo Baker**
22h · 🌐

Thanks to the award winning investigative journalist & New York Times Best Selling author #Stacyperman & the Los Angeles Times My family and I have been shedding light on not only our #SharkTanknightmare working with Daymond John and Rastelli Foods Group #RayRastelliJr #RayRastelli3 but also other hardworking small businesses that have been affected.Please read and share link to article in comments 🙏💙

## Connect with Brittani Bo Baker on Facebook

Log In

or

Create new account

# facebook

Log In



**Takisha Purnell**
Sorry to hear this. You and your family will be in my thoughts and prayers.
BLESSINGS 🖤🙌🙏

6h   Edited

**Brittani Bo Baker**
1d · 🌐

My Tik Toks are under review for sharing the TRUTH 😈 Can y'all please share this as much as you can EVERYWHERE ⁉️💕 pt1 of 2

#SharkTank #DaymondJohn #DaymondJohnnightmare #rastellifoods #albubbabaker #bubbasbonelessribs #Sharktanknightmare

# Connect with Brittani Bo Baker on Facebook

Log In

or

Create new account

# facebook

Log In



♡👍😯 18                                    3 ▪ 13 ▪

Like                    Comment

**Our SHARK TANK NIGHTMARE**

View 1 more comment



**Angela Dawn**
Dude. This stuff is wild. Never give up.

23h

Baker replied · Reply

**Brittani Bo Baker**
2d · 🌐

Let's talk about #DaymondJohn social media response to our TRUE experience working with him part 1 of 2 #SharkTank #SharkTankNightmare #BubbasBonelessRibs #AlBubbaBaker #RastelliFoods #RaymondRastelli3 #RaymondRastelliJR #LarryFox



## Connect with Brittani Bo Baker on Facebook

Log In

or

Create new account

# facebook

Log In

Like                                    Comment

View 3 previous comments

 **Renee Michelle**
I saw that Rastelli Family and Friends is on QVC.

1d

 **Brittani Bo Baker** shared a memory.
2d · 🌐

How fitting is it that this post popped up today.... I cant wait to get into the #QVC details of our #SharkTankNightmare  working with #RastelliFoods & #DaymondJohn
This man said profit margins are between 1-4% I have the evidence. I would normally say receipts but we don't have access to real time accounting or the details of Daymond John's confidential payment arrangement he has with #RastelliFoods



**8 Years Ago**
See your memories

**Brittani Bo Baker**
May 22, 2015 · 🌐

# Connect with Brittani Bo Baker on Facebook

Log In

or

**Create new account**

# facebook

Log In

 **Lynn Ischay**
Hopefully **#LATimes** will continue to look into the ugly dark corners of **#sharktank**, Daymond John et al.
Who knows how many have been lead astray at best, or robbed, at worst.
You and your dad are far stronger and smarter than they realize. They, sadly,... **See more**

2d

 Marsh Jones replied · 3 Replies

# Connect with Brittani Bo Baker on Facebook

Log In

or

Create new account

# EXHIBIT K

Customer Service - Bubba's Boneless Ribs





SHOP    JOIN CLUB Q    ABOUT US    PREPARATION    BLOG    RESTAURANT

## CUSTOMER SERVICE



stomer satisfaction is of the number one priority at Bubba's Q and we welcome your feedback! We value your suggestions and ideas as well, so feel ...e to send us your comments to help us improve our website and programs.

**OFFICE HOURS:**
9:00 a.m. to 5:00 p.m. (EST) Monday - Friday

**CUSTOMER SUPPORT:**
Toll-Free: 877-686-2276

Fax : 856-241-1916

Please email us comments or suggestions.

Your Name:

Email:

Phone Number:

Order #:

Message:

How much is:

8 + 4

Answer*

SUBMIT

---

**QUICK LINKS**

HOME

SHOP

RIB STEAK?

SHIPPING

**FOLLOW US!**

**JOIN THE EMAIL LIST**

Enter your email addi    SIGN ME UP

**RECENT INSTAGRAM POS**

Club Q

ABOUT US

STORE LOCATIONS

BLOG

RESTAURANT/CATERING

REFER A FRIEND



Bubba's Q
131 likes

Like Page                    Learn more



Copyright © 2023 Bubba's Boneless Ribs

Terms of Use Privacy Policy Customer Service Shipping

# EXHIBIT L

# NEW YEAR, NEW GOALS: EXCLUSIVE INTERVIEW WITH AL 'BUBBA' BAKER

JANUARY 12 2021



BROWSE BY CATEGORY

Bubba Talks

Bubba's Best Moments

Bubba's Boozy Pairings

Contests

Desserts

Entrées

Great for the Grill

Shark Tank

Side Dishes

With every new year comes new goals, ideas, and of course... resolutions. We decided to sit down and talk to Al 'Bubba' Baker about some of his, as well as discuss his business and its direction during these trying times. Read on to learn more!

RECENT ARTICLES

The 2021 Super Bowl, COVID-19 and More with Al 'Bubba' Baker
Posted on February 02, 2021

New Year, New Goals: Exclusive Interview with Al 'Bubba' Baker
Posted on January 12, 2021

The Bubba & Bo Cooking Show: Episode 2
Posted on December 20, 2020

The Bubba & Bo Cooking Show: Episode 1
Posted on December 20, 2020

The Ultimate Holiday Recipe Guide
Posted on November 28, 2020

Al 'Bubba' Baker Talks COVID-19, Football and More.
Posted on September 18, 2020

Rib Bone-less Rib Wrap
Posted on September 18, 2020

Boneless Rib Tacos
Posted on September 18, 2020

Boneless Rib Wontons
Posted on September 18, 2016

Al's Nacho Grande
Posted on September 16, 2016

## QUESTION #1: WHAT INSPIRED YOU TO START BUBBA'S Q?

Al Baker: I grew up in the barbecue business, and my family had a venture called Jenkins Quality BBQ. My family was deeply committed to it — in fact, after I was born, mom came back to work just two days later. When I was five, my uncle (the founder of the business), who I called Daddy Jr., when including me in the business. I expressed interested in unloading the firewood from the truck that delivered to us, and so I started chopping rich hickory to do it. I ended up working with him until I was nine, and then my family moved to New Jersey. Every summer, though, I went back to Arkadelphia to help him stack the wood.

When it comes to barbecue — I've never known anything else. I always knew I'd end up in the barbecue business. And then I made it into the NFL, which became my job, but still, barbecue remained my true passion. If I cut myself, I don't bleed blood... I bleed BBQ.

## QUESTION #2: WHEN STARTING BUBBA'S Q, WHAT CHALLENGES DID YOU FACE? HOW DID YOU OVERCOME THEM?

A. Baker: I decided to start this business because I'd been around it for my entire life. I'd started multiple BBQ places while I was playing in the NFL, but I was mostly passionate about ribs, wings and a couple of side dishes.

The one way is the BBQ business a glamorous one — if you look at it, you've got to be there 24/7 to fire up the grill. There's a lot that goes into it. My biggest mistake in opening Bubba's Q in Ohio was being TOO involved. Before I knew it, customers started coming to the restaurant just to hang out with me. When I wasn't there, customers complained that the food wasn't as good, and we weren't as busy. I always had to be there and be the last one to leave, too. And then when we launched the boneless ribs in 2007, we couldn't even get into the place. It became difficult to make time to be a father, husband, and even a friend... I was sleeping for maybe 2 hours/night.

Ultimately, I decided to close the restaurant and pursue catering. That segment of our business had grown a lot, and it was a lot more cost-effective for us. We literally had no waste.

## QUESTION #3: WHAT ADVICE DO YOU HAVE FOR SOMEONE LOOKING TO START A BUSINESS, OR CREATE A NEW PRODUCT?

A. Baker: You have to look around and let the market dictate what it is you want to get into. Today, in the midst of the pandemic, thousands of people are selling masks out of their homes, or starting online businesses.



I love selling, none of the savvy marketing stuff plays in. Serve a really important reason, passion, etc. But they also remain and it's unclear or needed, stand to fill a true need.

You can't be afraid to fail. The richest real estate in the world is the graveyard — People let their ideas die. I've failed so many times. How will you leave the world? Did you make it better for other people? Were you kind? It's what you do and how you treat people. In the end, no one will care how much money you have. You want to leave a legacy behind so people to remember YOU, not for what you didn't do.

## QUESTION #4: WHAT WAS THE SHARK TANK EXPERIENCE LIKE? HOW DID YOU PREPARE?

Al Baker: It was the most nerve-wracking experience I've ever had. They took me because I had a story — I was in the NFL, and also had a business with my daughter. They do their best to show how uncomfortable you are to being out the best or worst in you. They wanted me to feel like I was on a boat with my friends, fell off the boat, and all of a sudden was surrounded by sharks. And that's exactly how you felt.

I learn differently than others — I'm very easily distracted, and I'm always last to finish a test. I knew I really needed to practice my pitch to be successful on the show. My granddaughter was in gymnastics at the time, and while she would tumble, the TV would be on. I would practice my pitch with all of that going on to learn not to get distracted. I even practiced in my car with the music blasting. Preparing that way worked for me, and I knew it would. It made me comfortable. I was never the kid that read a book once and got an A. I always had to work hard.

Daymond John is a great partner. He reached out to me on the show, and he's been true to form ever since. He's never too busy and always willing to help.

## QUESTION #5: HOW DID YOU KNOW YOUR PRODUCT WAS SOMETHING SPECIAL?

Al Baker: When we had the restaurant, I was running the inventory report to decide how much to order for the following week. I saw that we'd sold 3x the amount of boneless ribs as compared to bone-in ones, and I was in shock. The boneless ribs involved a lot of labor and were much more expensive, but no one seemed to care. Everyone would come to our restaurant to try the boneless ribs — That's when I knew I needed to apply for the patent. I knew it was special.

## QUESTION #6: WHAT ARE YOU UP TO TODAY?

Al Baker: The biggest thing I've been working on is my peace of mind. I know that I can't live in fear, and the way that I overcome that is through my faith. I have also been fortunate to have airings on QVC and participate in an entrepreneurship class, given by the NFL. I've never been as busy as I am right now. I didn't even know what Zoom was prior to COVID-19, now I'm using it daily.

Other than that — My family has grown and my son got married. I was so happy to be apart of that.

More than anything, I've learned that we can't control 90% of what happens to us. But once things happen, we have full control of our response and how we react. Your attitude is what is going to get you through it — Attitude is everything. I am doing everything I can to stay safe and make sense of what's happening in our world, one day at a time.



QUICK LINKS

HOME
SHOP
RIB STEAK
SHIPPING
ABOUT US
STORE LOCATIONS
BLOG
RESTAURANT/CATERING
REFER A FRIEND

FOLLOW US!

Bubba's Q
131 likes

Like Page                    Learn more

JOIN THE EMAIL LIST

Enter your email addr   SIGN ME UP

RECENT INSTAGRAM POSTS

Copyright © 2020 Bubba's Boneless Ribs |
Terms of Use Privacy Policy Customer Service Shipping

# EXHIBIT M

FACTS

# Where Is Bubba's Q From Shark Tank Today?



By Stacie Adams  |  Updated: Feb. 15, 2023 9:55 am EST

It's no secret that professional football players work up quite an appetite on the field. Take Al "Bubba" Baker, for instance, a former NFL player who enjoyed an illustrious football career up to his final season in 1990 (per his website's about us page). Post-retirement, Baker took inspiration from his uncle (affectionately nicknamed Daddy Jr.), owner of Jenkins Quality Barbeque. This establishment is renowned all over the country for its amazing barbecue preparations and served as the basis for Baker's own restaurant Bubba's Q.





Using recipes meticulously developed by Daddy Jr. and the rest of Baker's family over the years, Bubba's Q was quite a success in its home base of Cleveland. Additionally, Baker also exhibited an entrepreneurial spirit with his creation of dry rubs and sauces to imbue home-cooked barbecue dishes with the unbelievable flavors found in his establishment. Baker recognized that he indeed had something very special, which led to his appearance on ABC's "Shark Tank" to see if he could advance his new career to the next level.

## The patented process impressed the Shark Tank crew



Al "Bubba" Baker appeared before the Sharks to pitch his product on "Shark Tank" Season 5, Episode 11 (via YouTube). Baker and his daughter Brittani were touting boneless baby back ribs, which the former football star developed out of his wife's aversion toward "messy ribs." Baker's goal during the appearance was to secure a $300,000 investment for 15% equity in his enterprise.

While the hosts obviously enjoyed Baker's tasty boneless ribs, his proprietary process proved to be the real selling point. Baker explained to the Sharks that he holds not one, but two patents for his ribs. The first is for the process used to remove the bones, and the second is for the boneless ribs themselves. Upon hearing this, Kevin "Mr. Wonderful" O'Leary proclaimed that it was the first time a person on the show had a patented food product.

Accordingly, O'Leary offered Baker $300,000 for a 49% share of the company, a deal that would be contingent on Baker also licensing his patent to O'Leary. Shark Daymond John countered this w dubbing O'Leary a "greedy savage." Ultimately, Baker accepted John's offe

## A rocky road with a happy ending



In the years after his appearance on "Shark Tank," Al "Bubba" Baker experienced a roller coaster of wins and losses. His partnership with Daymond John turned out to be a remarkable success, per CNBC. Just three years after the deal was struck, Bubba's Q earned a whopping $16 million in profits. Much of the success was attributed to a deal with CKE Restaurants, which ordered 1 million pounds of Baker's patented boneless ribs for use in fast-casual chains Carl's Jr. and Hardee's.

Unfortunately, Baker has also experienced setbacks in his business. According to WKYC, his Cleveland restaurant was forced to shutter in 2019. Although the reason for the closure was not made public, it seemed to be a clear and obvious hit to his previously unrivaled success. Of course, part of what makes a great businessperson is how that individual responds to adversity and defeat. Only three years later, the business reemerged as a food truck that features delectable dishes like pulled pork and brisket.

The football star and entrepreneur stated that his lifelong success was "proof that if you live your life with integrity, you work hard — good things happen to you."



# EXHIBIT N



6000 Sagemore Drive, Suite 6301
Marlton, NJ 08053-3900

main 856.355.2900
fax 856.355.2901

www.hylandlevin.com

**David R. Dahan**
*Direct* 856.355.2991
dahan@hylandlevin.com

May 22, 2023

# NOTICE TO IMMEDIATELY CEASE AND DESIST

<u>VIA FEDERAL EXPRESS AND EMAIL</u>

James A. Baker
675 S. Gulfview Blvd #1004
Clearwater, FL 33767
(bubbasq@icloud.com)

Jabezbaker, LLC
c/o James A, Baker
675 S. Gulfview Blvd #1004
Clearwater, FL 33767
(bubbasq@icloud.com)

Brittani Baker
c/o BBQ Consulting LLC
3033 West Olympic Boulevard
Suite 205, Unit #1110
Los Angeles, CA 90006
(brittanibo03@yahoo.com)

Sabrina Baker
675 S. Gulfview Blvd #1004
Clearwater, FL 33767
(sabrinasq@icloud.com)

FOFBakers Holding Company, LLC
c/o James A. Baker, CEO/President
675 S. Gulfview Blvd #1004
Clearwater, FL 33767
(bubbasq@icloud.com)

BBQ Consulting LLC
3033 West Olympic Boulevard
Suite 205, Unit #1110
Los Angeles, CA 90006
(brittanibo03@yahoo.com)

  RE: Rastelli Partners, LLC, Raymond M. Rastelli, Jr. and Raymond Rastelli, III

To Whom It May Concern:

  As you are aware, this firm serves as counsel for Rastelli Partners, LLC ("RP"), Raymond M. Rastelli, Jr. and Raymond Rastelli, III (collectively, "Rastelli").

  The purpose of this letter is to demand that you immediately cease and desist your conduct which is blatantly intended to disparage Rastelli and destroy FOFBakers, LLC (the

May 22, 2023
Page 2

"Company"). It is clear that you directly, and on behalf of the above-identified entities, have orchestrated a deliberate disparagement campaign against Rastelli and the Company and which is no doubt in violation of your contractual and common law obligations. You falsely allege that RP has not complied with its contractual obligations while at the same time completely ignoring your legal obligations. Please be reminded of your legal obligations. The relationship between the parties is governed by various written agreements, some of which arose after the settlement of litigation in the matter captioned <u>Rastelli Partners, LLC and Raymond Rastelli, Jr. v.</u> <u>FOFBakers Holding Company, LLC and James A. Baker a/k/a Al Baker, Individually,</u> Superior Court of New Jersey, Chancery Division, Gloucester County, Docket No. C-5-19 and which, on February 8, 2019, was removed by the Defendants to the United States District Court for the District of New Jersey, Camden Vicinage, which bears Docket No. 1:19-cv-05124-NLH-JS (the "Federal Court Action"). Those documents include the following:

1. Limited Liability Company Operating Agreement of FOFBakers, LLC dated November 11, 2015 ("Original Operating Agreement");
2. Settlement Agreement and Mutual Release ("Settlement Agreement") with Exhibit "A", Amendment to Operating Agreement of FOFBakers, LLC ("Amendment"), both dated September 5, 2019;
3. Addendum to the Amendment to Operating Agreement of FOFBakers, LLC dated September 5, 2019.

Section 11.1 of the Original Operating Agreement states as follows:

> <u>**Confidentiality Generally**</u>. ***Each of the Members shall, during the term of this*** ***Agreement and at all times thereafter, maintain in confidence all confidential*** ***and proprietary information and data of the Company and of the other*** ***Members and their Affiliates,*** (each, a "disclosing party") ***disclosed to it*** (the "**Confidential Information**"). Each of the Members further agrees that it shall not use the Confidential Information during the term of this Agreement or at any time thereafter for any purpose other than the performance of its obligations or the exercise of its rights under this Agreement. The Company and each Member shall take all reasonable measures necessary to prevent any unauthorized disclosure of the Confidential Information by any of their employees, agents or consultants.

(Emphasis added).

Section 11.3 of the Original Operating Agreement, relating to Section 11.1 provides as follows:

> <u>**Remedies; Survival of Covenants**</u>. ***Each Member acknowledges and agrees*** ***that any breach of the provisions of Section 11.1 of this Agreement is likely to*** ***result in irreparable injury to the Company, the other Members and their*** ***respective members, shareholders, partners, officers, affiliates, employees, and*** ***agents, and that the remedy at law alone will be an inadequate remedy for such***

{H0348378.6}

May 22, 2023
Page 3

> *breach, and that in addition to any other remedy they may have*, the Company
> the other Members, or their respective members, shareholders, partners, officers,
> affiliates, employees and agents *shall be entitled to specific performance of
> Section 11.1 of this Agreement* by such Member and to seek both temporary and
> permanent injunctive relief (to the extent permitted by law) without bond and
> without liability should such relief be denied, modified, or vacated. Neither the
> right to obtain such relief nor the obtaining of such relief shall be exclusive or
> preclude the Company, the other Members or their respective members,
> shareholders, partners, officers, employees, and agents from any other remedy.
> The provisions of this Section 11.3 shall survive the termination of this
> Agreement to the extent applicable after the termination hereof.

(Emphasis added).

Section 4 of the Settlement Agreement provides in relevant part as follows:

> **Mutual Release**. In consideration of the promises in this Agreement, *each Party
> and* Rastelli Brothers, Inc., *Jabezbaker, LLC, Brittani Baker and Sabrina Baker*
> on behalf of themselves and all persons or entities claiming by, through or under
> them (together, the "Releasors"), *do hereby release, remise, acquit and forever
> discharge each other, and all related persons and entities* including, but not
> limited to, each of its/his/her respective officers, directors, shareholders,
> members, employees, directors, trustees, contractors, managers, partners,
> servants, representatives, attorneys, accountants, agents, consultants, parent
> companies, subsidiaries, affiliates, successors, heirs and assigns (together, the
> "Releasees"), *from any and all actions, causes of action, claims, suits, demands,
> covenants, debts, obligations, accounts, contracts, agreements, promises,
> controversies, liabilities, judgments, damages, losses, costs, charges, expenses,
> fees, attorneys' fees and executions, of every kind and nature whatsoever* either
> at law or in equity, contingent or fixed, known or unknown, that the Releasors
> had, have or claim to have against the Releasees from the beginning of the world
> to this date including, but not limited to, all claims arising from, connected with,
> or relating to, the matters which are the subject of the Litigation; …

(Emphasis added).

Section 5 of the Settlement Agreement reads as follows:

> **Restrictions**. *Each Party and* Rastelli Brothers, Inc., *Jabezbaker, LLC, Brittani
> Baker and Sabrina Baker forever agree not to solicit, disrupt, interfere with,
> disparage and/or defame any other Party and such other Party's employees,
> vendors and customers*, current and/or prospective, and those of any entity any
> such other Party operates, has control of or has any interest in. *Each Party and*
> Rastelli Brothers, Inc., *Jabezbaker, LLC, Brittani Baker and Sabrina Baker
> forever agree not to make any written or verbal remarks or statements (even in*

{H0348378.6}

May 22, 2023
Page 4

> *the form of an opinion) about any other Party to anyone including, but not limited to, any such other Party's employees, vendors and customers*, current and/or prospective, and those of any entity any such other Party operates, has control of or has any interest in, *that are in any way negative, disparaging or false or which could adversely impact the reputation, goodwill, credibility or value of any such other Party or entity or could discourage current and/or prospective customers from buying products from them*.   Except as may be necessary to comply with the rights and obligations under this Agreement, the Operating Agreement, the Amendment to Operating Agreement of FOFBakers, LLC and the Addendum to the Amendment to Operating Agreement of FOFBakers, LLC, each Party and Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker and Sabrina Baker forever agree not to contact any other Party's employees, current and/or prospective, and those of any entity any such other Party operates, has control of or has any interest in.  *Each Party and* Rastelli Brothers, Inc., *Jabezbaker, LLC, Brittani Baker and Sabrina Baker forever agree not to contact any other Party's vendors and customers, current and/or prospective*, and those of any entity any such other Party operates, has control of or has any interest in.  *Each Party and* Rastelli Brothers, Inc, *Jabezbaker, LLC, Brittani Baker forever agree not to interfere with any other Party's business relationships, current and/or prospective*, and those of any entity any such other Party operates, has control of or has any interest in.

Emphasis added).

Section 14 of the Settlement Agreement includes the following:

> **Enforcement**.  The Parties and Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker and Sabrina Baker *agree that the United States District Court for the District of New Jersey, Camden Vicinage, shall retain jurisdiction to enforce the terms of this Agreement*.

(Emphasis added).

The settlement, via the Amendment, also includes how Jabezbaker, LLC ("Jabezbaker") was to be compensated.  In brief, Rastelli Brothers, Inc. ("RBI") agreed to pay Jabezbaker four percent (4%) of the Gross Receipts of Product sales on the first $5,000,000 of Gross Receipts of Products sold, and three percent (3%) of Gross Receipts on Product sales over $5,000,000, on a per annum basis (the "**Royalty Payments**").  The terms Gross Receipts and Products are defined in the Amendment.  RBI made any Royalty Payments each month when due and submitted along with each payment a report form substantially in the form attached to the Amendment (the "**Report Form**").

While RP and RBI have complied with their obligations, you clearly have not.   Your willful conduct includes, but is not limited to, the following:

May 22, 2023
Page 5

1. Disclosing confidential information to journalists and social media outlets including, but not limited to, the L.A. Times. Such disclosure includes alleged sales figures, spreadsheets and reports with financial information, ownership interests in the Company and internal communications about the Company.

2. Making and/or posting written remarks or statements that are negative, disparaging or false on social media including, but not limited to Facebook, Twitter, Instagram and Tik Tok. Some examples of such negative, disparaging or false remarks include the following:

   (i) "Where is the $$" and "where did the money go". These remarks are intended to give the impression that RP and RBI did not pay money that was allegedly due. That is false. You fail to mention that you, with the assistance of counsel during the Federal Court Action, negotiated an initial payment of $33,333.33 plus additional minimum payments from RBI of $8,333.33 per month for a period of twelve (12) months totaling at least $133,000.00 for that period of time. Likewise, you fail to mention that Mr. Baker negotiated, again with the assistance of counsel, having RBI pay Mr. Baker for personal appearances plus reasonable expenses. RBI complied with its obligations in this regard.

   (ii) Alleging that you are not provided information about the Company or requests for information are ignored. You are provided with reports that support any money that may be due and other documents and information about the operation of the Company and its efforts to source and sell the product.

   (iii) "Daymond John & Rastelli Foods ARE trying to steal my families business". That is false. The parties' relationship is governed by certain written agreements including those identified above. To the extent you are referring to the Company's right to have the patents transferred to it after certain Product sales are reached and the Royalty Payments have been made, that is something that you knowingly agreed to while you were represented by counsel. Your attempt to rewrite the agreements is bad faith. Rastelli is not attempting to steal any business.

   (iv) "Over $700,000 of underreported income" which was part of the Federal Court Action. There was no underreporting. In addition, any alleged claims you believed you had on this issue were released as part of the settlement that was reached.

May 22, 2023
Page 6

        (v)     That Rastelli is attempting to push you out of this business.  That is false.

3. Contacting RP and RBI's customers and vendors and interfering with their business relationships including, but not limited to, QVC.

Your conduct is absolutely intended to publish negative, disparaging or false remarks and statements which could, and do, adversely impact the reputation, goodwill, credibility and value of Rastelli and is designed to discourage current and/or prospective customers and vendors from doing business with Rastelli and to sabotage the Company.  Rastelli has worked very hard for decades to build an honest reputation and is well-respected in the industry and will not allow you to tarnish that.  No matter what you may believe, that gives you no right to engage in your unlawful conduct.  Such conduct gives rise to various claims including, but not limited to, breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference, breach of fiduciary duty and defamation.

Demand is made that you immediately cease and desist from the following:

      i.    Publishing any negative, disparaging or false remarks and statements about Rastelli or any of their affiliates.

     ii.    Any and all communications of confidential information.

This demand includes that you:

- Cease and desist from all future (and planned posts) related to Rastelli and their affiliates.

- Take down all social media entries, including posts, videos, and comments, related to Rastelli and any of their affiliates.

- Cease and desist from interviews with media outlets related to Rastelli and any of their affiliates.

- Cease and desist all reposting and retweeting related to the LA Times story, and Rastelli and any of their affiliates; delete any and all reposts and retweets you generated from the LA Times story.

Additionally, we hereby demand that you, your family, your representatives and any other agent acting on your behalf retain and preserve all evidence related to the foregoing matter including, but not limited to, all documents and communications (e.g. notes, memoranda, text messages, telephone records, facsimiles, and email correspondence) kept in any form (hard copy, electronic, etc.).  Should you have any questions regarding this matter, please contact me.

{H0348378.6}

May 22, 2023
Page 7


       If you do not immediately comply with the demands in this letter, Rastelli will take any and all legal action necessary against the entities named above and you personally to compel compliance and seek all damages.

       The contents of this letter and all future communications with you are made without prejudice to Rastelli.  Rastelli reserves all rights, claims and remedies.

       Please be guided accordingly.

                      Sincerely,

                      David R. Dahan

DRD

{H0348378.6}

# EXHIBIT O

5/25/23, 10:41 AM

Replying to @JackOfAllTrades Rastellis had relationships with polish plants...

Search   🔍   + Upload   Log in   ⋮

We're updating our Privacy Policy. Please click here to review.      OK

🔲 For You

👥 Following

🧭 Explore   New

📹 LIVE

Log in to follow creators, like
videos, and view comments.

Log in



Replying to @JackOfAllTrades
Rastellis had relationships with polish plants and said having the
product made in Poland would increase our profit margins
#greenscreenvideo #greenscreen #sharktank #bubbasbonelessribs
#albubbabaker #qvc #daymondjohn #rastellifoods
#sharktanknightmare

🎵 Spooky, quiet, scary atmosphere piano songs - Skittlegirl Sound

 **bubbasqfoodtrucks**
BubbasQfoodtrucks · 18h ago      Follow

**116 comments**

   Log in to comment

 **Swangerjarrod**
@Inside Edition this is what people want to see
17h ago   ♡ 29   Reply

 **BubbasQfoodtrucks · Creator**
Thank you 🙏 🍖
17h ago   ♡ 7   Reply

View more replies (4) ⌄

 **PhoenixWolf_Auron**

### You may like



looking for a grant
writer to help you to
submit standout gran..
bubbasqfoodtrucks
5·10   ♡ 191



#CapCut Need help
starting or scaling your
dream#FoodTruck...
bubbasqfoodtrucks
5-10   ♡ 115



Looking for a
#grantwriter or need
help with a...
bubbasqfoodtrucks
5-16   ♡ 314



#greenscreen I have
so much more to say
about our #SharkTan...
bubbasqfoodtrucks

About  Newsroom  Contact  Careers
ByteDance

TikTok for Good  Advertise  Developers
Transparency  TikTok Rewards
TikTok Embeds

Help  Safety  Terms  Privacy
Creator Portal  Community Guidelines

2023 TikTok

https://www.tiktok.com/@bubbasqfoodtrucks/video/7236850895747665195      1/4

5/25/23, 10:41 AM    Case 1:23-cv-02864    Document 1-1    Filed 05/25/23    Page 220 of 222 PageID: 264

Replying to @JackOfAllTrades Rastelli had relationship with... | TikTok

+ Upload

⋮

We're updating our Privacy Policy. Please click here to review.    OK    ator

For You

Following

Explore  New

LIVE

Log in to follow creators, like videos, and view comments.

17h ago  ♡ 9  Reply

View more replies (6) ⌄

 **Adjani222**
Following your story, keep fighting!
17h ago  ♡ 17  Reply

 **BubbasQfoodtrucks · Creator**
Thank you for your support 🙏 🖤
17h ago  ♡ 2  Reply

 **K.G.2**
@👀Nosy👀 you should def do a segment on this!!
3h ago  ♡ 1  Reply

 **BubbasQfoodtrucks · Creator**
She did Thank you so much 🙏 🖤
2h ago  ♡ 0  Reply

View more replies (2) ⌄

 **Mr. W**
keep up the good fight ! this is so sad, people will think twice about doing business with Damen John
3h ago  ♡ 1  Reply

 **BubbasQfoodtrucks · Creator**
Thank You 🙏 🖤
2h ago  ♡ 0  Reply

 **danasomfinofficial**
So Damon had never met Rastelli but then when he did, they joined forces and played u? Am I getting this right?
4h ago  ♡ 2  Reply

 **BubbasQfoodtrucks · Creator**
Exactly !!!!!!
2h ago  ♡ 1  Reply

View more replies (1) ⌄

 **Babbling_beauty**
@Inside Edition @New York Post @Maury Show someone has too share this more!!🗣
4h ago  ♡ 1  Reply

 **BubbasQfoodtrucks · Creator**
Thank You 🙏 🖤
2h ago  ♡ 0  Reply

 **Silva Mane**
Has there been an audit of all of the financial records as of yet ?🔍🔍🔍🔍
5h ago  ♡ 1  Reply

View more replies (1) ⌄

About  Newsroom  Contact  Careers
ByteDance

TikTok for Good  Advertise  Developers
Transparency  TikTok Rewards
TikTok Embeds

Help  Safety  Terms  Privacy
Creator Portal  Community Guidelines

© 2023 TikTok


Thank you all for your support.... 🖤🖤🖤
Let's disect...
bubbasqfoodtrucks
2d ago  ♡ 2974


#mybestamazonfinds #lifetipsshare #tiktokmademebuyit...
sunrise1223456
1d ago  ♡ 9


Our Partnership with Daymond John is a nightmare
#greenscreen Whats the common denominator in all thi...
bubbasqfoodtrucks
2d ago  ♡ 984


#fashionhack ##underwear #underwearsexy...
underwearsexy
1d ago  ♡ 7

5/25/23, 10:41 AM                    Replying to @JackOfAllTrades Rastellis had relationships with pebol... | TikTok

+ Upload

We're updating our Privacy Policy. Please click here to review.                    OK

For You

Following

Explore   New

LIVE

Log in to follow creators, like
videos, and view comments.

no a salary?

**...ator**
My family isn't but Rastellis and Daymond John
probably are. The only payments we received
were 1% of total sales for licensing and then it was
2h ago      ♡ 0      Reply

View more replies (1) ⌄

**robaldeenyo**
simple fact they are abusing the Financials since you
have the licensing fee
10h ago      ♡ 1      Reply

**BubbasQfoodtrucks · Creator**
Bingo !!
2h ago      ♡ 0      Reply

**Twest**
Does that mean Lori is part of it since she owns QVC?
10h ago      ♡ 1      Reply

**BubbasQfoodtrucks · Creator**
No she doesn't own QVC she just sells a lot of
products on there 🤝
2h ago      ♡ 1      Reply

View more replies (1) ⌄

**d ferguson290**
BOYCOTT
13h ago      ♡ 1      Reply

**TheDeLaurian**
👏👏👏👏👏 I hope this keeps spreading to the
right places and people!
14h ago      ♡ 1      Reply

**tavi8671**
the underline for me is that the meat came from
poland. so so deep. I definitely forgot about those
imports
14h ago      ♡ 1      Reply

**SMOKEHOUSE SYNDICATE**
you are being took.
15h ago      ♡ 4      Reply

**user8619032086265**
I hope you sue his A!! He dId you and your pops dirty
this whole thing is awful 😡 where is the money? He's
stealing it plan and simple
15h ago      ♡ 3      Reply

**BubbasQfoodtrucks · Creator**
Where Is the money is the question
13h ago      ♡ 0      Reply

**Michael Matthews**

About  Newsroom  Contact  Careers
ByteDance

TikTok for Good  Advertise  Developers
Transparency  TikTok Rewards
TikTok Embeds

Help  Safety  Terms  Privacy
Creator Portal  Community Guidelines

`. 2023 TikTok

5/25/23, 10:41 AM                      Replying to @JackOfAllTrades Bestella had relationships with roluon... | TikTok

♪ **TikTok**                                                              + Upload          ⋮

We're updating our Privacy Policy. Please click here to review.                    OK

⌂ For You                            Oh my gosh !!😲
                                                         15h ago    ♡ 1    Reply
⚇ Following
                                     **user4493953311041**
⊘ Explore   New                                          How come you did not get a better topline
                                                         commission?
▣ LIVE                                                   Also, how is profit calculated?
                                                         15h ago    ♡ 1    Reply

Log in to follow creators, like               **BubbasQfoodtrucks · Creator**
videos, and view comments                                          We had 1% of total sales and 45% of Net profits
                                                                   13h ago    ♡ 0    Reply

                                            **DJ D-Rex**
                                            When is the movie dropping?
                                            16h ago    ♡ 1    Reply

About  Newsroom  Contact  Careers
ByteDance

TikTok for Good  Advertise  Developers
Transparency  TikTok Rewards
TikTok Embeds

Help  Safety  Terms  Privacy
Creator Portal  Community Guidelines

© 2023 TikTok