**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

_____

RASTELLI PARTNERS, LLC, *et al.*,

        Plaintiffs,

        v.

JAMES A. BAKER, *et al.*,

        Defendants.

_____ :

Civ. No. 23-2967 (RBK/AMD)

**OPINION**

**KUGLER**, United States District Judge:

This matter comes before the Court upon Plaintiff Rastelli Partners, LLC's, Plaintiff Rastelli Brothers, Inc.'s, Plaintiff Raymond M. Rastelli, Jr.'s, and Plaintiff Raymond Rastelli, III's (collectively, the "Rastellis") Complaint (ECF No. 1) and application for a preliminary injunction. On May 31, 2023, the Court issued an Order to Show Cause (ECF No. 3), which denied the Rastellis' initial application for a temporary restraining order (TRO) and ordered Defendants James "Al" Baker, Brittani Baker, and Sabrina Baker to show cause as to why this Court should not issue a preliminary injunction against them to take down all their social media posts about the Rastellis and bar them from making similar posts in the future.

The Court held an evidentiary hearing on the matter and its related matter, *DF Ventures LLC, et al. v. FOFBakers Holding Co., LLC, et al.*, Civ No. 23-3126, beginning June 13, 2023 and ending July 5, 2023. The Court heard argument and evidence over six days during that time. At the end of the June 14 hearing date, the Court consolidated the preliminary injunction hearing with the trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2), thus turning the proceeding into an application for a permanent injunction. (Transcript of Hearing on Order to

Show Cause, at 310, *Rastelli Partners, LLC, et al. v. James A. Baker, et al.* (No. 23-2967) (hereinafter, "T.")). On June 16, 2023, the Court granted a joint application with Plaintiffs in the related case for temporary restraints on Defendants after they continued to post on social media and give interviews to local news outlets while the hearing continued. (Civ. No. 23-3126, ECF No. 24). In summary, the Order barred Defendants and their officers, agents, servants, employees, and attorneys from making any kind of public negative comments or encouraging anyone else to make any negative comments that would disparage, defame, or otherwise adversely impact the reputations of Plaintiffs here and Plaintiffs in the related case. (*Id.*). The Court also ordered the parties to submit supplemental briefs with proposed findings of fact and conclusions of law for the Court to consider based on the exhibits and testimony presented during the hearing. (T. at 733–34).

Having heard the evidence and arguments presented by all parties and having further considered the supplemental briefs presented, for the following reasons, the Court **GRANTS** the Rastellis' application for a permanent injunction.

I.      **JURISDICTION**

The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1332. Complete diversity exists between the parties. Raymond M. Rastelli, Jr. is a New Jersey citizen. (Complaint at ¶¶ 1, 3). Raymond Rastelli, III is a New Jersey citizen. (*Id.* at ¶ 4). Rastelli Partners, LLC's members are Raymond M. Rastelli, Jr., Anthony Rastelli, and a trust for the benefit of Raymond M. Rastelli, Jr. and Anthony Rastelli. (*Id.* at ¶ 1). As all three are New Jersey citizens, so is Rastelli Partners, LLC. (*Id.*). Rastelli Brothers, Inc. was incorporated in New Jersey and its principal place of business sits in New Jersey, thus making it a New Jersey citizen. (*Id.* at ¶ 2). Al Baker is a Florida or Ohio citizen. (*Id.* at ¶ 5). Brittani Baker is a citizen of

either California, Florida, or Ohio. (*Id.* at ¶ 7). Sabrina Baker is a Florida or Ohio citizen. (*Id.* at ¶ 6). Given the business venture's size, we find that the amount in controversy exceeds $75,000.

The Court further has personal jurisdiction over Defendants due to a forum-selection clause contained within the 2019 Settlement Agreement into which the parties entered. (ECF No. 1, Complaint, Ex. F, "2019 Settlement Agreement" at 4, ¶ 14). Additionally, Plaintiffs properly served Defendants. After some jurisdictional mishaps under a different docket number, Plaintiffs filed the instant Complaint here on May 31, 2023. On June 8, 2023, June 10, 2023, and June 11, 2023, Defendants filed four different responses and letters with the Court under this docket number, evidencing that they were on notice and aware of allegations against them in this matter. (ECF Nos. 7–10). Defendants also appeared at a June 12, 2023 telephonic status conference after which the Court converted the evidentiary hearing into a virtual, videoconference hearing *at Defendants' request*. The Court then sent Zoom links to Defendants via the same email addresses Plaintiffs sent notice under the original docket numbers, and Defendants appeared at every Zoom hearing. Until now, Defendants never once claimed defective service or lack of notice. As such, we find service adequate and, to the extent it was not, we find that Defendants waived any issues they had with service of process by responding to Plaintiffs' allegations and participating during the entire hearing without once raising a service of process issue until now.

Defendants argue that this Court lacks jurisdiction to hear this case because of the dispute resolution mechanism set up in Paragraphs 11 to 14 of the Amendment to Operating Agreement of FOFBakers, LLC ("Amended OA"). We disagree. First, Defendants did not invoke this provision at any point during these month-plus-long proceedings until now. Although the Court asked the parties to try to work through their issues at the very beginning of this matter, and, in fact, at the Court's urging, the Rastellis sent a letter to Defendants on June 5, 2023 asking them

to use that dispute resolution process, (Exhibit Rastelli-67), Defendants declined to mediate or otherwise negotiate a settlement. Instead, they actively chose to proceed here in this Court. They may not now hide behind the Amended OA's dispute resolution clause for fear that this Court might provide an adverse ruling. Second, the dispute here does not "aris[e] from or relat[e] to" the Amended OA or the original FOFBakers, LLC Operating Agreement. It arises from and relates to the non-disparagement clause contained within the 2019 Settlement Agreement. As such, the Amended OA's dispute resolution mechanism does not apply here.

## II.    FINDINGS OF FACT

As a preliminary matter, having heard no objection from Defendants, the Court admits the following exhibits into evidence: Rastelli-1; Rastelli-3; Rastelli-5; Rastelli-6; Rastelli-7 through and including Rastelli-26; Rastelli-29; Rastelli-31; Rastelli-33 through and including Rastelli-39; Rastelli-41 through and including Rastelli-45; Rastelli-47; Rastelli-48; Rastelli-51 through and including Rastelli-68; Rastelli-70; Rastelli-71; and Roop-1 through and including Roop-37.

With that out of the way, pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following findings of fact, which we follow with separate conclusions of law:

1.  On September 5, 2019, Rastelli Partners, LLC; Raymond M. Rastelli, Jr.; DF Ventures, LLC; FOFBakers Holding Company, LLC; and James A. "Al" Baker entered into the 2019 Settlement Agreement. Contemporaneous to the 2019 Settlement Agreement, those same parties executed: (1) the Amended OA; (2) the Addendum to the Amendment to the FOFBakers, LLC Operating Agreement ("Addendum to the OA"); and (3) the Supplement to the Amendment to the FOFBakers, LLC Operating Agreement ("Supplement to the OA"). (Exhibit DJ 2).

2. The 2019 Settlement Agreement is valid and enforceable. We do not credit Al Baker's assertions that he was coerced into signing the 2019 Settlement Agreement under duress. (T. at 174–78). Mr. Baker signed this agreement, and he was represented by multiple (at least three) attorneys during mediation and negotiation of the agreement. (T. at 171). Further, United States Magistrate Judge Joel Schneider led the mediation that resulted in this 2019 Settlement Agreement. (T. at 171).

3. Paragraph 5 of the 2019 Settlement Agreement, titled "Restrictions," states that Rastelli Partners, LLC; Raymond M. Rastelli, Jr.; DF Ventures, LLC; FOFBakers Holding Company, LLC; and Al Baker (referred to collectively in the agreement as "the Parties" or individually as a "Party") as well as Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker, and Sabrina Baker "forever agree not to solicit, disrupt, interfere with, disparage and/or defame any other Party and such other Party's employees, vendors and customers, current and/or prospective, and those of any entity any such other Party operates, has control of or has any interest in. Each Party and Rastelli Brothers, Inc., Jabezbaker, LLC, Brittani Baker and Sabrina Baker forever agree not to make any written or verbal remarks or statements (even in the form of an opinion) about any other Party to anyone including, but not limited to, any such other Party's employees, vendors and customers, current and/or prospective, and those of any entity any such other Party operates, has control of or has any interest in, that are in any way negative, disparaging or false or which could adversely impact the reputation, goodwill, credibility or value of any such other Party or entity or could discourage current and/or prospective customers from buying products from them." (Exhibit DJ 2 at 2–3, ¶ 5).

4.  Brittani Baker controlled four social media accounts: (1) TikTok account @bubbasqfoodtrucks; (2) Instagram account @bubbasqfoodtrucks; (3) Instagram account @bubbasq60; and (4) Instagram account @brittanibobaker. (T. at 192–93).

5.  On a social media post that appears to show a team email, one commenter wrote, "This is FRAUD. Plain and simple. A major corporation exploited and stole from a small minority owned business. This is egregious!" (emphasis in original). The BubbasQfoodtrucks account, the account that created the post, liked that commenter's message and replied to it, "And it's still going!!!!" (Exhibit Rastelli-59 at 7).

6.  On the same social media post, another commenter wrote, "Daymond and Rastelli seem to be making out like fat rats [shaking my head]. [Y]ou'd think Daymond would want to make sure all parties are good. [E]specially after Nate." The BubbasQfoodtrucks account liked the message and responded, "Exactlyyyyy[.] That's exactly what's going on Daymond also made a confidential payment arrangement with the co packer[.]" (Exhibit Rastelli-59 at 8).

7.  In the bio for one of the BubbasQfoodtrucks social media accounts, it reads, "Daymond John & Rastelli Foods ARE trying to steal my families [sic] business[.]" There is also a teary-eyed face emoji. (Exhibit Rastelli-59 at 15).

8.  Via the brittanibobaker TikTok account, under a logo for the NFL Alumni Media, Brittani Baker wrote, "We are sharing #everything about our #SharkTanknightmare working with #DaymondJohn & #RastelliFoods @rastelliraymond #rayrastellijr #NFL #NFLMEDIA #BubbasBonelessRibs #AlBubbaBaker #SharkTank #nflalumnimedia[.]" (Exhibit Rastelli-59 at 26).

9.  In a TikTok post, a commenter wrote, "He[] [referring to Daymond John] going to say your numbers are off… and you'll be like… show me the accounts. Where did the money go[?]" The BubbasQfoodtrucks account liked the message and replied, "They definitely have multiple sets of books[.]" (Exhibit Rastelli-59 at 27).

10. In a social media post, above a picture of Daymond John, Brittani Baker wrote, "The margins are not 1-4%, as that would not have justified our decision to collaborate with #RastelliFoods. My family and I would have continued making our own product if the margins were 1-4%. In emails, Raymond Rastelli clearly states that our margins were initially 6-8% and were increasing to 15-16%. It is undeniable that significant revenue has been generated over the years. However, what remains unanswered is the precise amount of profit earned by both The Rastellis and Daymond John. Also what your new arrangement is you worked out with our copacker "confidentially[.]" We have been denied access to real-time accounting information over & over again hindering our ability to gain insight into the financial details of our business. Communications intended for us via the BubbasBonelessRibs website are redirected to #RastelliFoods per Ray 3, preventing us from accessing valuable contact information. Also, our family has been excluded from ALL discussions with one of the top pork producers who has shown interest in purchasing our PATENT, despite our expressed interest in being involved in all calls & emails. We have REPEATEDLY requested inclusion in all past and future communications, but our PLEAS have been ignored. REMEMBER I called and asked for your help to be included in the calls?? Ray 3 keeps saying we are left off of emails because we didn't go to Mexico neither did you, Larry, Ray 3 or Ray Rastelli. You say speak your truth while You constantly reference non-disclosure agreements &

confidentiality arrangements to silence small businesses like ours and other[s] that have been taken advantage of. I will speak all of our truth and working with YOU and #RastelliFoods has been and continues to be a #NIGHTMARE #SharkTank #Sharktanknightmare #daymondjohn #rastellifoods[.]" (Exhibit Rastelli-59 at 31).

11. On a TikTok post referring to meat from Poland, a commenter wrote, "So [Daymond] had never met Rastelli but then when he did, they joined forces and played [you]? Am I getting this right?" The BubbasQfoodtrucks account liked the comment and replied, "Exactly!!!!!!" (Exhibit Rastelli-59 at 33).

12. On the same TikTok post, a commenter wrote, "So is anyone from your family on the payroll? Profits [are] what's left over. Are y'all being paid a salary?" The BubbasQfoodtrucks account liked the comment and replied, "My family isn't but Rastellis and Daymond John probably are. The only payments we received were 1% of total sales for licensing and then it was[.]" (Exhibit Rastelli-59 at 34).

13. On the same TikTok post, a commenter wrote, "The profits were increasing[,] which is why they arbitrated[.] [T]hey are snake oil salesmen…" The BubbasQfoodtrucks account liked the comment. (Exhibit Rastelli-59 at 36).

14. On the same TikTok post, a commenter wrote, "You should [s]ue Rastelli too." The BubbasQfoodtrucks account liked the comment. (Exhibit Rastelli-59 at 37).

15. A user commented on a social media post: "Google Philip Rastelli[.]" The BubbasQfoodtrucks account liked the message and replied, "No surprise there friend they are definitely running an organized crime scheme." (Exhibit Rastelli-62).

16. A user commented on a social media post: "Rastelli is mafia!" The BubbasQfoodtrucks account liked the message and replied, "Yep with their organized crime schemes preying on small businesses[.]" (Exhibit Rastelli-63).

17. In a TikTok post, Brittani Baker said, "And where did the money go with Rastelli and Daymond John at the forefront of it? It probably went to the same places or people that the majority of this $18 million in sales went. I'm telling you guys that Daymond has aligned with our co-packer to try to push us out of our business just like they aligned together and pushed the co-inventors of the jerky company right on out of their business." (Exhibit DJ 4).

18. In a TikTok post, while showing an image that reads, "5. Daymond and [Rastelli Partners, LLC] shall separately determine a mutually acceptable arrangement concerning payments to Daymond as a Member of Company ("Daymond Payment")[,]" Brittani Baker said, "Where did the money go?" (Exhibit DJ 7).

19. In a TikTok post, in front of a background that shows the cover of the Los Angeles Times article titled "Ex-NFL player thought 'Shark Tank' would launch his barbecue empire. It became a nightmare, he says[,]" Brittani Baker said, "So today I'm gonna give you guys more evidence on how the Rastellis and Daymond John were manipulating the numbers for their benefit." (Exhibit DJ 8).

20. In a TikTok post, Brittani Baker said, "My family and I are so confident that fraud and illegal activities are taking place." She did this in front of the same image of the Los Angeles Times article. (Exhibit DJ 10).

21. Brittani Baker diverted the Bubbas Barbecue Boneless Ribs product website to bbqconsulting.com, which says, "Looking for our Boneless Ribs? Sorry they are not

available right now. Unfortunately working with Daymond John, Rastelli Foods, Larry

Fox, Ray Jr. & Ray Rastelli 3 is a nightmare and I have to bring awareness to our story

and fight for our product[.]" The site also reads, "WORKING WITH DAYMOND JOHN

AND RASTELLI FOODS SINCE APPEARING ON SHARK TANK IS A

NIGHTMARE[.]" Further, the site says, "DAYMOND JOHN LARRY FOX, Ray

Rastelli Jr. Ray Rastelli 3 & RASTELLI FOODS ARE TRYING TO STEAL MY

FAMILIES [sic] BUSINESS[.]" (Exhibit DJ 22) (emphasis in original).

22. The website also contains text that reads, "I am Brittani Bo Baker my dad is former

NFLer AL Bubba Baker. Our story has been told by an award winning investigative

journalist with the Los Angeles Times[.] Unfortunately we are not the only small

business that has been affected by Daymond John and Rastelli Food[.] Welcome to our

website[,] where we share the untold story behind our challenging journey with Daymond

John and Rastelli Foods. What began as an exciting opportunity on Shark Tank quickly

turned into a nightmare as we discovered their relentless efforts to take over our patent

and exclude us from our own business. Daymond John and Rastelli Foods have joined

forces[,] intentionally shutting us out of important conversations and decisions

concerning our patent. It has become apparent that Daymond John has a confidential

payment arrangement with Rastelli Foods[,] raising serious questions about their motives.

This is not the first time Daymond John has engaged in deals with Rastelli Foods[,]

creating a concerning pattern. . . . Working with Daymond John and Rastelli Foods has

been a true nightmare[,] with our dreams turning into a constant battle for justice. Our

website is dedicated to shedding light on these injustices and rallying support from

individuals who believe in fairness and integrity in business. We refuse to let corporate

greed prevail and are determined to protect our patent and our rightful place in the industry. By sharing our story and seeking your support[,] we aim to bring attention to the need for transparency and accountability in business dealings. If you can support our cause by donating to our Go Fund Me campaign, aimed at covering legal fees and ensuring a fair fight against the forces that seek to silence us. Every contribution brings us closer to reclaiming our business and preserving our legacy." (Exhibit DJ 22).

23. In a TikTok post, Brittani Baker said, "And we've been asking questions about where that $18 million went. We have no access to real-time accounting, no transparency, and no explanations for where the money went even though we know where it went: to Daymond John, Larry Fox, Ray Rastelli, Jr., and Ray Rastelli III." (Exhibit DJ 25).

24. Although it is not entirely clear when it was created or when it first appeared, there exists a pop-up window on the bbqconsulting.com website that prompts viewers to subscribe to receive email updates about Defendants perceived "nightmare" situation involving the Rastellis, John, and DFV. (Exhibit DJ 28).

25. Brittani Baker created a GoFundMe page that reads, in part, "We are the Bakers, a family-owned business that experienced the American dream turned into a nightmare. Our success on Shark Tank caught the attention of viewers everywhere, but little did we know the deception that awaited us from Daymond John and Rastelli foods[,]" and "We are seeking your support to fund our legal battle against these unethical practices." (Exhibit Rastelli-61; T. at 221–22).

26. Section 5 of the Supplement to the OA reads, "[Rastelli Brothers, Inc.] represents it will expend a minimum of $1.5 million for purchase commitment of raw materials, marketing

and promotions, social media, web support, allocated personnel, trade shows and payment of the minimum to Jabezbaker." (Exhibit DJ 2 at 15, ¶ 5; T. at 555–56).

27. Raymond M. Rastelli, Jr. testified, undisputed, that the amount of gross receipts of sales from the 2019 Settlement Agreement (executed in September 2019) to present day was approximately $3.5 million. (T. at 364–65).

28. The Rastellis paid for all FOFBakers Holding Company, LLC's expenses since the 2019 Settlement Agreement. (T. at 301).

29. Since the 2019 Settlement Agreement, the Rastellis' expenses on behalf of the company and their efforts to create, sell, and promote the product exceeded all revenue and resulted in a loss to the Rastellis. (T. at 396–97).

30. Thus, we find the Rastellis did expend at least $1.5 million in the various capacities listed in Section 5 of the Supplement to the OA and did not breach that obligation.

31. The Amended OA states at Paragraph 10: "[Rastelli Brothers, Inc.] shall keep true and accurate records of all Products sold under this Amendment in sufficient detail and consistent with its customary business record keeping practices, to enable the accuracy of the Report Form to be verified and to confirm the amounts of the Royalty Payments and the Daymond Payments due and owing. RBI agrees to permit the inspection or audit of the relevant records no more than once each calendar year by Jabezbaker or [FOFBakers Holding Company, LLC] and no more than once each calendar year by Daymond, or independent Certified Public Accountants or other duly authorized representatives of Jabezbaker, or Daymond, as the case may be, who shall agree to maintain in strict confidence all reviewed or audited information. Any such inspection or audit shall be performed on no less than fourteen (14) days written notice, during normal business

hours at [Rastelli Brothers, Inc.]'s place of business or through electronic transmissions of records, upon reasonable request." (Exhibit DJ 2 at 10–11, ¶ 10).

32. No member of Jabezbaker, LLC or FOFBakers Holding Company, LLC (i.e., Al, Brittani, or Sabrina Baker) invoked or exercised their audit rights as set forth in Paragraph 10 of the Amended OA. (T. at 303, 402, 592). Mr. Baker admitted on cross that the "Baker family never sent an email or a letter to Rastelli requesting an inspection or an audit in connection with Section 10" of the Amended OA. (T. at 592).

33. Brittani Baker claims that she did not have "back office website access," i.e., access to real-time data related to website sales and online accounting information. (T. at 662–63). The Rastellis, however, counter that she did have access to this information. They provide an email from July 6, 2022, (Exhibit Rastelli-52), from Ray Rastelli, III, which says "As for access to Bubbas Q site[,] Brittani has access already[,] and we couldn't figure out what else was stopping her from seeing what she needs but I believe [it's] due to her not being the ADMIN access, which we are granting today and has already been resolved. Please have her check this and let me know." Defendants provide no evidence to the contrary other than Brittani Baker's blanket statements that she did not have such access. Having heard the testimony from all witnesses and considered the evidence presented, we do not credit Brittani Baker's testimony on this subject and find that the Rastellis did provide her with back-end website data access.

34. The Rastellis sent monthly financial reports to the Bakers. These reports provided a list of all customers who had purchased any product that month, the gross sales made that month, and also provided the 4% or other applicable calculation for the royalty payment due to Defendants per the 2019 Settlement Agreement. The Exhibits entered into

evidence as Roop-1 through and including Roop-35 are the monthly reports sent to the Bakers from September 2019 (the month the Parties executed the 2019 Settlement Agreement) to May 2023 (the month when Plaintiffs initiated this suit). (T. at 357, 637; Exhibits Roop-1 through and including Roop-35).

35. The Bakers have provided no evidence or testimony that any of these monthly reports are in any way inaccurate.

36. From the day the Parties executed the 2019 Settlement Agreement on September 5, 2019 to September 2022, Plaintiffs kept in regular communication with Defendants and provided periodic updates on the business.

37. There was a dead period in that communication from September 2022 to May 2023. During that time, neither Plaintiffs nor Defendants contacted the other. The Rastellis did not reach out to the Bakers, but neither, too, did Al Baker, a co-manager of the company, reach out to the Rastellis. (T. at 442–43).

38. At one point, the Rastellis had a pork supplier in Poland to provide raw materials for the product. (T. at 390). But, during the COVID-19 pandemic, in 2021, the Polish pork supplier cut the Rastellis off, dropped the account, and said they would no longer manufacture the product. (T. at 299, 390). Defendants do not rebut this.

39. Because of this, the Rastellis only had one small, local meat packer who could satisfy the online customers, but they were not able to manufacture enough product for large volume retail customers. (T. at 391). Defendants do not rebut this.

40. In response, the Rastellis began looking for an alternative supplier and found one in Mexico. (T. at 320–21).

41. As it relates to that approximately eight-month dead period in communication, the last communication sent by the Rastellis to the Bakers on September 26, 2022 notes that they are awaiting USDA approval of the product's manufacture at the Mexican plant. (Exhibit Rastelli-55). Ray Rastelli, Jr. testified, unrebutted, that this process can take in total between eight to twenty months. (T. at 332–33). Given that fact, along with the fact that the company, at that point, had no boneless rib product to speak of (which was why they were soliciting this Mexican plant to manufacture it), we find the length of time without an update reasonable. As Ray Rastelli, Jr. also testified, unrebutted, there simply was no update to give during that time. (T. at 337). And, as recounted, Al Baker admits that he, too, did not try to contact the Rastellis during this period.

42. The combination of the Polish pork supplier pulling the plug on the Rastellis in 2021 and the length of time it takes to get full administrative approval for the Mexican plant explains why the overall pork supply to manufacture the product was so limited for an extended period. The Rastellis used what product they did have to satisfy online orders but did not have enough to put product in stores. (T. at 391).

43. Paragraph 4 of the Amended OA reads that Rastelli "shall pay Jabezbaker four percent (4%) of the Gross Receipts of Product sales on the first $5,000,000 of Gross Receipts of Products sold, and three percent (3%) of Gross Receipts (as defined below) on Product sales over $5,000,000, on a per annum basis . . . . Jabezbaker shall receive no less than a monthly payment of $8,333.33 (the "Minimum") only for a period of twelve months following the execution of this Amendment. Following this twelve-month period, the Minimum shall expire, and Jabezbaker shall receive the Royalty Payments based solely on Gross Receipts, as provided herein." (Exhibit DJ 2 at 8).

15

44. Paragraph 4 of the Supplement to the OA reads, "Section 8 of the Amendment is hereby amended as follows: a. Al shall receive a monthly expense and benefits stipend of $1,500 per month for a period of 24 months from [Rastelli Brothers, Inc. ("RBI");] b. Al shall receive $1,500 for each personal appearance to promote the products requested by RBI, plus reasonable expenses, as agreed to in advance by RBI and Al. Personal appearances include trade shows, QVC, or such other promotional events. Personal appearances do not include sales calls to sell specific products to customers or potential customers. There shall be a minimum of six per year; appearances over fifteen per year will require Al's consent[;] c. Section 4 of the Amendment is hereby amended to add a payment to Jabezbaker of $34,000 [which] shall be paid within 10 days following execution of the Settlement Agreement and Supplement . . . ." (Exhibit DJ 2 at 14–15).

45. The Bakers received all the upfront payments they were due to receive per the Amended OA and the Supplement to the OA, i.e., approximately $133,000 along with the $1,500 payments for twenty-four months and $1,500 per personal appearance for Al Baker. (T. at 364). The Bakers also received the Royalty Payments as they were meant to be calculated and continued to after the upfront and supplemental payments expired.

46. Brittani Baker attempted to change the owner of the company's Shopify account from the Rastellis to herself. (T. at 353–54).

47. In an email dated June 1, 2022, Ray Rastelli, III told the Bakers, "As for QVC we are currently pushing them to get Bubbas back on air right now with the other products we sell on Bubbas boneless ribs.com like the bone in baby back rub as well as cooked pulled pork and chicken. I will keep you posted as that progresses." (Exhibit Rastelli-74). This

shows that the Rastellis were trying to push what products they could while they were also trying to find a new co-packer for the boneless rib product.

48. Defendants presented no evidence that Rastelli Partners, LLC, Rastelli Brothers, Inc., Raymond M. Rastelli, Jr., and Raymond Rastelli, III breached the 2019 Settlement Agreement.

49. Defendants presented no evidence that Rastelli Partners, LLC, Rastelli Brothers, Inc., Raymond M. Rastelli, Jr., and Raymond Rastelli, III breached the Amended OA.

50. Defendants presented no evidence that Rastelli Partners, LLC, Rastelli Brothers, Inc., Raymond M. Rastelli, Jr., and Raymond Rastelli, III breached the Addendum to the OA.

51. Defendants presented no evidence that Rastelli Partners, LLC, Rastelli Brothers, Inc., Raymond M. Rastelli, Jr., and Raymond Rastelli, III breached the Supplement to the OA.

52. Until this lawsuit, Al Baker, as co-manager of the company, never asserted in writing that Rastelli Partners, LLC, Rastelli Brothers, Inc., Raymond M. Rastelli, Jr., or Raymond Rastelli, III breached or was in violation of any agreement with Defendants. (T. at 587–588).

## III.   CONCLUSIONS OF LAW

Pursuant to Rule 52(a), the Court states the following conclusions of law. For a Court to grant a permanent injunction, the "plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010). To succeed on a breach of contract claim, a plaintiff must show that (1) the

parties entered into a valid contract; (2) the defendant(s) failed to perform under the contract's

terms; and (3) the defendant's failure to perform injured the plaintiff. *Murphy v. Implicito*, 920

A.2d 678, 689 (N.J. Super. App. Div. 2007).

The Rastellis have shown that the Bakers breached the 2019 Settlement Agreement.

Contrary to some of Al Baker's assertions while questioned, the 2019 Settlement Agreement is a

valid and enforceable contract which binds him, Brittani Baker, and Sabrina Baker. Mr. Baker

was represented by multiple attorneys during its negotiation and a United States Magistrate

Judge was involved in the mediation and the agreement's negotiation. Defendants have presented

no evidence (other than unsupported assertions) that anyone coerced Mr. Baker to sign the 2019

Settlement Agreement for himself and on behalf of his wife and daughter, nor have they shown

that any of their own attorneys or the federal judge leading the mediation and the agreement's

negotiation coerced him or failed to adhere to their respective duties.

Mr. Baker claims, specifically, that the coercion occurred when he "was forced to call

[Sabrina and Brittani Baker] on the phone and sign on their behalf, otherwise, they were going to

sue my daughter." (T. at 175). Although we can understand that might be frustrating for Mr.

Baker, that is not coercion. That is—generally speaking—the point of a settlement agreement.

Opposing parties come together and agree that each side will receive some consideration in

exchange for a promise not to sue or to drop a lawsuit based on the claims subsumed by that

agreement. Saying something along the lines of "you have to sign this settlement agreement, or

we will sue you" is not coercion, especially when legal counsel represents both sides during the

settlement process. That is simply how settlement agreements work.

Defendants clearly breached the 2019 Settlement Agreement. Paragraph 5 plainly states

that Al, Brittani, and Sabrina Baker "forever agree not to . . . disparage and/or defame any other

Party and such other Party's employees, vendors and customers, current and/or prospective, and those of any entity any such other Party operates, has control of or has any interest in." (Exhibit DJ 2 at 2–3, ¶ 5). Further, per the agreement, they "forever agree not to make any written or verbal remarks or statements (even in the form of an opinion) about any other Party to anyone including, but not limited to, any such other Party's employees, vendors and customers, current and/or prospective, and those of any entity any such other Party operates, has control of or has any interest in, that *are in any way negative, disparaging or false or which could adversely impact the reputation, goodwill, credibility or value of any such other Party or entity or could discourage current and/or prospective customers from buying products from them*." (Exhibit DJ 2 at 3, ¶ 5) (emphasis added).

All the Bakers' posts are negative, disparaging, or both and certainly could impact the Rastellis' reputation, goodwill, and credibility. We have listed many posts and comments made by Defendants online in our Findings of Fact section above, but we will recount some highlights here. In social media posts and comments, Brittani Baker wrote or said the following: (1) "And it's still going!!!!" in response to a commenter writing, "This is FRAUD. . . . A major corporation exploited and stole from a small minority owned business. This is egregious!"; (2) "Daymond John & Rastelli Foods ARE trying to steal my families [sic] business"; (3) "Exactly!!!!!!" in response to a commenter writing, "So [Daymond] had never met Rastelli but then when he did, they joined forces and played [you]? Am I getting this right?"; (4) she liked a comment that referred to Daymond John and the Rastellis as "snake oil salesmen"; (5) "And where did the money go with Rastelli and Daymond John at the forefront of it? It probably went to the same places or people that the majority of this $18 million in sales went. I'm telling you guys that Daymond has aligned with our co-packer to try to push us out of our business just like

they aligned together and pushed the co-inventors of the jerky company right on out of their business."; (6) "So today I'm gonna give you guys more evidence on how the Rastellis and Daymond John were manipulating the numbers for their benefit."; (7) "My family and I are so confident that fraud and illegal activities are taking place."; and (8) perhaps most egregiously, on more than one occasion she alleged the Rastellis were running an organized crime scheme and were involved with the mafia. It is beyond obvious to the Court that, even if you believe the statement to be true, alleging that someone is involved with organized crime and the mafia is a negative and disparaging comment.

Defendants argue that the Rastellis violated some agreement obligations first, thus excusing any potential breach on their part. One such argument is that the Rastellis did not use commercially reasonable efforts to produce and sell the product (or any product), which resulted in a material breach of the Amended OA and thus excuses Defendants own obvious breach of the 2019 Settlement Agreement. We do not agree. It is undisputed that the Rastellis had a pork supplier in Poland who agreed to manufacture the product to make the boneless ribs. In 2021, though, possibly because of supply limitations caused by the COVID-19 pandemic, that Polish supplier pulled the plug on their relationship with the Rastellis and no longer agreed to produce pork or any product for the Rastellis. This left the Rastellis in a difficult position, but they worked to find an alternate supplier and co-packer. They ended up finding one in Mexico. Once they found a plant willing to work with them in Mexico, the Rastellis needed to secure USDA approval. As Ray Rastelli, Jr. testified, in his experience, that process could take anywhere from eight to twenty months. The Rastellis invited the Bakers to come to the Mexican plant to see the operation, but the Bakers declined at the last minute. Defendants dispute none of this.

20

The Rastellis provided periodic updates to the Bakers on the Mexican plant's status. There was a period from September 2022 to May 2023 where the two parties did not communicate with one another, but two things are true. First, this silence is explainable. The last email sent by the Rastellis in September 2022 was to inform the Bakers that the process of getting USDA approval was starting. As we have said, that process can take quite a long time. Thus, we find it reasonable that no updates were provided because, as the testimony suggested, there were no updates to give during that period.

Second, Al Baker, as co-manager of the company, did not reach out to the Rastellis during that period either. It is not reasonable to hold the Rastellis fully responsible for a mutual lack of communication during a period when there appears to have been nothing to communicate about the Mexican plant's (and therefore the boneless rib product's) status. In the meantime, the Rastellis did use what little pork they had to satisfy online sales, and they did push the other Bubbas Q products, including bone-in ribs and pulled chicken. Additionally, the Supplement to the OA required the Rastellis to expend at least $1.5 million to purchase raw materials, market and promote the company, and provide for other company and product-related expenses. There was undisputed testimony that, since the settlement, gross sales is at about $3.5 million and in the same period expenses have exceeded gross sales. Therefore, not only have the Rastellis complied with that portion of the agreement, they also took a loss along the way. Thus, we find that the Rastellis did use commercially reasonable means to try and get the boneless rib product to market and similarly used commercially reasonable means to make what money they could for the company in the meantime through other products and online ordering.

Defendants have not shown any other material breach by the Rastellis in any capacity. The 2019 Settlement Agreement and the Amended OA obligated the Rastellis to make several

payments to the Bakers: $8,333.33 per month for twelve months; 4% of gross receipts as a royalty payment on the first $5,000,000 of sales and 3% on all gross sales thereafter; $1,500 directly to Al Baker for twenty-four months; $1,500 directly to Al Baker per personal appearance for promoting the product; and $34,000 to Jabezbaker within ten days of the 2019 Settlement Agreement's execution. Defendants do not dispute that the Rastellis held up their end of the bargain and made every single one of these payments. Bilateral contracts are mutual. The Bakers may not receive the benefit of their bargain, no matter how small the royalties may currently be, without holding up their own end of the deal by refraining from making negative, disparaging, hostile public comments.

Further, the Rastellis provided the Bakers with monthly financial reports detailing every customer who purchased FOFBakers product for that month, the gross amount of the sales, and the calculated royalty payment the Rastellis owed the Bakers based on those numbers per the 2019 Settlement Agreement and Amended OA. Exhibits Roop-1 through and including Roop-35 show monthly reports sent for every month from the 2019 Settlement Agreement's execution in September 2019 up to May 2023 when this lawsuit began. Defendants never introduced any evidence (1) that any of these monthly reports were inaccurate at all, or (2) that the Rastellis owed them anything more than what they gave them. The Rastellis arguably went beyond the duties they owed. They provided Brittani Baker with back-end admin website access to view online customer data if she wished. And, despite a specific audit provision contained within the Amended OA, the Bakers admit they never once initiated or invoked their audit rights under the agreement. As such, the Court has no choice but to conclude the Rastellis are in full compliance with the 2019 Settlement Agreement and the Amended OA and did not commit any material breaches.

The Rastellis also established injury stemming from Defendants' breach of the 2019 Settlement Agreement. The largest harm Defendants caused to the Rastellis is reputational harm. Ray Rastelli, Jr. testified numerous times about how important trust and reputation is to his business. The amount of reputational harm that Defendants' posts, which have received millions of views and include at least two interviews with major news outlets, have caused is incalculable. Defendants' comments and posts allege that the Rastellis are related to or are the mafia, are an organized crime operation, manipulate the books, say that working with them is a nightmare, and that they are trying to steal the Bakers' business. These posts clearly caused reputational harm that the Rastellis will now have to deal with and counter.

That reputational harm is irreparable. *Great Caesars Ghost, LLC v. Unachukwu*, No. 19-5408, 2020 WL 2394052, at *4 (D.N.J. May 12, 2020) ("Irreparable injury includes loss of control of reputation . . . and loss of good will.") (citing *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990)); *see also Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998) (citing *Opticians*, 920 F.2d at 195)). Defendants unmitigated, calculated, and virulent attack on the Rastellis and their reputation is, as we said in our original order granting temporary injunctive relief, unusual in its vehemence and persistence. And as Brittani Baker testified, she has no intention of stopping these posts about the Rastellis, presumably absent a court order. (T. at 206). The amount of harm that these posts caused, which, again, alleged without any evidence whatsoever that the Rastellis were involved with the mafia, is incalculable, and that loss of control of their reputation and goodwill—an essential component of the Rastellis' business and lives—constitutes irreparable harm.

For the same reasons, any remedy at law, i.e., monetary damages, would not sufficiently remedy these reputational harms. As we have said, the amount of harm Defendants' actions have

caused to the Rastelli's reputation and good will with the public and particularly with other businesses is incalculable. Additionally, as we have said, Brittani Baker testified that she does not intend to stop making these posts. *See Hermès Int'l v. Rothschild*, No. 22-cv-384, 2023 WL 4145518, at *9 (S.D.N.Y. June 23, 2023) (stating that a plaintiff has no adequate remedy at law if he can show that "absent an injunction, the defendant is likely to continue" with his course of harmful conduct).

On top of that, the Rastellis argue (and the Bakers appear to admit) that Defendants do not have the assets to satisfy any kind of monetary judgment the Court might levy against them. We note that we do not have enough evidence to decide whether this is accurate. Although both parties argue it is true, it is also undisputed that the Bakers own the patents currently held by Jabezbaker, LLC. It is not entirely clear how much those patents might be worth or whether they could be worth enough to satisfy any possible monetary award granted to Plaintiffs. As such, we will decline to find the Bakers are essentially "judgment proof," but we will still find any remedy at law is inadequate for the reasons provided above.

The balance of hardships also militates toward granting injunctive relief. Here, the Court weighs the harm caused to the movant by denying the injunction against any harm caused to the non-moving party by granting the injunction. *Great Caesars Ghost*, 2020 WL 2394052, at *4 (citing *TD Bank N.A. v. Hill*, 928 F.3d 259, 283–84 (3d Cir. 2019)). The harm to the Rastellis if we do not grant the injunction is obvious. Their reputation will continue to greatly suffer if Defendants continue their nonstop buzzsaw campaign against them.

As it relates to Defendants, one question has loomed in the Court's mind throughout the proceedings: why would the Bakers do this? Surely, the Bakers want to make money off their patents, their products, and this business? But still, the Bakers engaged in this social media and

news media war against the Rastellis, DF Ventures, and Daymond John. At least as it relates to their financial interests, doing so shoots themselves in the foot. Their barrage of interviews and social media posts does nothing but work to kill the business's brand. What's more, the takeover of the company website, first, does the same, but second, makes it impossible for customers to place online orders. (T. at 88). The Court therefore can only draw one logical conclusion: the Bakers are not doing this to try to improve the business or to further some other legitimate purpose. Instead, the Bakers' enmity, antipathy, and animosity toward the Rastellis and John overcame their financial self-interest and their ability to reasonably work through their issues with the Rastellis and John. That vitriol then compelled them to breach the 2019 Settlement Agreement and make these repeated, targeted, hostile, negative, and disparaging public comments and posts.

There are also no First Amendment issues presented here. Defendants voluntarily and validly waived their free speech rights when they executed the 2019 Settlement Agreement and agreed to receive significant cash payments and a promise of continuing royalty payments in the future in exchange for limited restraints on their speech, namely, that they would not speak negatively of or disparage Plaintiffs. *See USA Techs., Inc. v. Tirpak*, No. 12-2399, 2012 WL 1889157, *9–10 (E.D. Pa. May 24, 2012) (finding that a party waived its First Amendment rights by agreement where agreement was "not a one-way street" and was negotiated by counsel). Of course, those future royalty payments assume there would be gross sales from which to calculate the royalties, but that is the agreement Defendants made, and the Court will hold them to it.

As such, forcing Defendants to stop making these posts and take down all the posts and comments that currently exist does not present a real hardship to Defendants. To the extent one could argue it does, it certainly does not outweigh the hardships allowing those posts to continue

25

would cause the Rastellis. Defendants knew the terms to which they agreed. The only harms suffered by Defendants here are self-inflicted. *See Trico Equipment, Inc. v. Manor*, No. 08-5561, 2009 WL 1687391, at *9 (D.N.J. June 15, 2009); *see also Great Caesars Ghost*, 2020 WL 2394052, at *4 (finding that, in granting injunctive relief against a defendant barring that defendant from continuing to violate a non-disparagement clause, the only harm suffered by the defendant would be that the defendant must now actually abide by the agreement's terms and that harm did not outweigh the harm the defendant was actively causing to the plaintiff's business reputation).

Finally, we believe that granting the permanent injunction furthers the public interest. The public is best served if the Court enjoins Defendants and obligates them to uphold their end of the bargain—a bargain to which they agreed. *See id.* ("Although this matter involves a dispute between private parties, the public has an interest in the protection of private contractual rights.").

Consequently, the Rastellis have satisfied all the requisite elements to show that Defendants breached the 2019 Settlement Agreement and that Defendants actions warrant a permanent injunction. The Court will list the specific terms of that injunction in the accompanying Order but, in summary, the Court will forever bar Defendants from violating the 2019 Settlement Agreement's non-disparagement clause and will order Defendants to take down all existing social media and other online posts that violate the agreement.

## IV.    CONCLUSION

For these reasons, the Court **GRANTS** Plaintiffs' application for a permanent injunction. An appropriate Order follows.

Dated: July 21, 2023                                /s/ Robert B. Kugler
                                                    ROBERT B. KUGLER
                                                    United States District Judge